**No. 22–1619**

In the

# United States Court of Appeals
## For the Fourth Circuit

RENTGROW, INC.,

*Defendant-Appellant*,

v.

MARCO A. FERNANDEZ,

*Plaintiff-Appellee*.

On Appeal from United States District Court for the District of Maryland, No. 19–01190–JKB

**JOINT APPENDIX: VOLUME I OF II**

Maura K. Monaghan
Kristin D. Kiehn
Emilia N. Brunello
**DEBEVOISE & PLIMPTON LLP**
919 Third Ave.
New York, NY 10022
Tel: (212) 909–6000
Fax: (212) 909–6836
mkmonaghan@debevoise.com
kdkiehn@debevoise.com
enbrunello@debevoise.com

Bonnie Keane DelGobbo
**BAKER & HOSTETLER LLP**
One North Wacker Drive, Suite 4500
Chicago, Illinois 60606
Tel: (312) 416–6200
bdelgobbo@bakerlaw.com

Joel Griswold
**BAKER & HOSTETLER LLP**
SunTrust Center
200 South Orange Ave., Suite 2300
Orlando, Florida 32801–3432
Tel: (407) 649–4088
jcgriswold@bakerlaw.com

*Counsel for Defendant-Appellant*

E. Michelle Drake
John G. Albanese
Ariana B. Kiener
Joshua P. Davis
**Berger Montague PC**
1229 Tyler Street NE, Suite 205
Minneapolis, MN 55413
(612) 594-5999

Matthew W.H. Wessler
Neil K. Sawhney
**Gupta Wessler PLLC**
2001 K Street, NW, Suite 850 North
Washington, DC 20006
(202) 888-1741

*Counsel for Plaintiff-Appellee*

**TABLE OF CONTENTS**
**VOLUME I OF II**

Appendix Page

Docket Entries ........................................................................ 1

Fernandez's Complaint,
filed April 23, 2019 ........................................................ 20

RentGrow's Answer and Affirmative Defenses,
filed July 12, 2019 .......................................................... 36

Exhibits to Fernandez's Motion for Class Certification,
filed August 6, 2021:

1. John G. Albanese Declaration,
dated August 6, 2021 .................................................. 50

2. Redacted Deposition Excerpts, Marco Fernandez,
dated October 27, 2020 ............................................... 55

3. Plaintiff's Third Objections & Supplemental Answers to
Defendant's Interrogatories, Set I,
dated December 8, 2020 ............................................... 78

4. Plaintiff's Letter to RentGrow,
dated December 3, 2018 ............................................... 87

5. RentGrow's Supplemental Answer to Interrogatory No. 3,
dated July 22, 2021 .................................................... 105

6. RentGrow's Supplemental Objections and Responses to
Plaintiff's Interrogatory No. 4,
dated October 8, 2020 ................................................ 110

7. RentGrow's Supplemental Objections and Responses to Plaintiff's Interrogatories to Defendant, Set IV, dated April 7, 2020 .......... 118

8. RESIDENTIALResource Magazine, September/October 2008 Issue .......... 123

9. RentGrow's Objections and Responses to Plaintiff's Interrogatories to Defendant, Set II, dated January 13, 2020 .......... 151

Exhibits to RentGrow's Response in Opposition to Fernandez's Motion for Class Certification, filed September 8, 2021:

1. Deposition Excerpts, Patrick Hennessey, dated October 23, 2020 .......... 158

2. Plaintiff's Redacted Prospective Tenant Screening Report, dated November 16, 2018 .......... 183

3. Deposition Excerpts, Porsche Kemp, dated December 10, 2020 .......... 193

4. Deposition Excerpts, Ira Blieden, dated December 10, 2020 .......... 223

5. RentGrow's Objections and Responses to Plaintiff's First Set of Interrogatories, dated September 27, 2019 .......... 230

6. Deposition Excerpts, Marco Fernandez, dated October 27, 2020 .......... 237

Exhibits to Fernandez's Response in Opposition to RentGrow's Motion for Summary Judgment, filed September 8, 2021:

1. John G. Albanese Declaration, dated September 8, 2021 .......... 287

2. Redacted Deposition Excerpts, Marco Fernandez, dated October 27, 2020 .......................................................290

3. California State Criminal Complaint, dated January 11, 2012 .......................................................311

4. Investigative Report, Donald Sazma, dated December 7, 2020 .......................................................314

5. Deposition Excerpts, Porsche Kemp, dated December 10, 2020 .......................................................322

6. Department of Treasury Letter to TransUnion, dated October 27, 2010 .......................................................331

Exhibits to Fernandez's Reply in Support of the
Motion for Class Certification,
        filed October 6, 2021:

1. John G. Albanese Declaration, dated October 6, 2021 .......................................................332

2. Deposition Excerpts, Porsche Kemp, dated December 10, 2020 .......................................................333

Memorandum Opinion of the Honorable James K. Bredar,
Chief Judge of the District of Maryland,
Granting Fernandez's Motion for Class Certification and
Denying RentGrow's Motion for Summary Judgment,
        filed March 10, 2022 .......................................................348

Order of the Honorable James K. Bredar,
Chief Judge of the District of Maryland,
Granting Fernandez's Motion for Class Certification and
Denying RentGrow's Motion for Summary Judgment,
        filed March 10, 2022 .......................................................410

CASREF,STAYED

# U.S. District Court
# District of Maryland (Baltimore)
# CIVIL DOCKET FOR CASE #: 1:19-cv-01190-JKB

Fernandez v. RentGrow, Inc.
Assigned to: Chief Judge James K. Bredar
Referred to: Magistrate Judge A. David Copperthite
Demand: $9,999,000
Cause: 15:1681 Fair Credit Reporting Act

Date Filed: 04/23/2019
Jury Demand: Plaintiff
Nature of Suit: 480 Consumer Credit
Jurisdiction: Federal Question

**Plaintiff**

**Marco A Fernandez** represented by

**Martin Eugene Wolf**
Gordon, Wolf & Carney, Chtd
100 W Pennsylvania Ave Ste 100
Towson, MD 21204
14108252300
Fax: 14108250066
Email: mwolf@GWCfirm.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Ariana B Kiener**
Berger Montague PC
1229 Tyler Street NE Ste 205
Minneapolis, MN 55413
6126077793
Fax: 6125844470
Email: akiener@bm.net
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**E Michelle Drake**
Berger Montague PC
1229 Tyler Street NE
Suite 505
Minneapolis, MN 55413
6125945933
Fax: 6125844470
Email: emdrake@bm.net
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**John G Albanese**
Berger Montague PC
1229 Tyler Street NE
Suite 205
Minneapolis, MN 55413

6125945997
Fax: 6125844470
Email: jalbanese@bm.net
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joseph C Hashmall**
Berger Montague PC
1229 Tyler Street NE
Suite 205
Minneapolis, MN 55413
6125945996
Fax: 6125844470
Email: jhashmall@bm.net
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**RentGrow, Inc.**                          represented by  **Brian Patrick Donnelly**
Nixon Peabody LLP
799 9th St NW
Ste 500
Washington, DC 20001
20258581000
Fax: 2025858080
Email: bdonnelly@nixonpeabody.com
*TERMINATED: 12/02/2019*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Louis J. Cannon , Jr**
Baker & Hostetler LLP
1050 Connecticut Avenue NW
Suite 1100
Washington, DC 20036-5304
12028611563
Fax: 12028611783
Email: louis.cannon@jacksonlewis.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Bonnie Keane DelGobbo**
Baker and Hostetler LLP
1 North Upper Wacker Dr. Ste. 4500
Chicago, IL 60606
3124168185
Fax: 3124166201
Email: bdelgobbo@bakerlaw.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Elizabeth Nagle**
Nixon Peabody LLP
53 State St.
Boston, MA 02109
6173451201
Fax: 8444308763
Email: enagle@nixonpeabody.com
*TERMINATED: 09/06/2019*
*PRO HAC VICE*

**Elizabeth Anne Scully**
Baker and Hostetler LLP
1050 Connecticut Ave NW Ste 1100
Washington, DC 20036
12028611698
Fax: 12028611783
Email: escully@bakerlaw.com
*ATTORNEY TO BE NOTICED*

**Emilia N. Brunello**
Debevoise and Plimpton LLP
919 Third Avenue
New York, NY 10022
212-909-6000
Email: enbrunello@debevoise.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joel C Griswold**
Baker and Hostetler LLP
200 South Orange Ave. Ste. 2300
Orlando, FL 32801
4076494000
Fax: 4078410168
Email: jcgriswold@bakerlaw.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Joseph Francis Yenouskas**
Goodwin Procter LLP
1900 N Street, N.W.
Washington, DC 20036
12023464000
Fax: 12023464444
Email: jyenouskas@goodwinlaw.com
*TERMINATED: 08/26/2020*
*ATTORNEY TO BE NOTICED*

**Keith Eric Levenberg**
Goodwin Procter LLP
1900 N Street NW
Washington, DC 20036
202-346-4248
Fax: 202-346-4444

Email: klevenberg@goodwinlaw.com
*TERMINATED: 08/26/2020*
*ATTORNEY TO BE NOTICED*

**Kristin D Kiehn**
Debevoise and Plimpton LLP
919 Third Avenue
New York, NY 10022
212-909-6000
Email: kdkiehn@debevoise.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Matthew J Frankel**
Nixon Peabody LLP
53 State St.
Boston, MA 02109
6173451038
Fax: 6173451300
Email: mfrankel@nixonpeabody.com
*TERMINATED: 09/30/2019*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Maura Kathleen Monaghan**
Debevoise and Plimpton LLP
919 Third Ave
New York, NY 10022
12129096470
Fax: 12129096483
Email: mkmonagh@debevoise.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Tierney Smith**
Goodwin Procter LLP
901 New York Ave NW
Apt. 318
Washington, D.C., DC 20001
2023464019
Email: TierneySmith@goodwinlaw.com
*TERMINATED: 08/26/2020*
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 04/23/2019 | 1 | COMPLAINT against All Defendants ( Filing fee $ 400 receipt number 0416-7969557.), filed by Marco A Fernandez. (Attachments: # 1 Civil Cover Sheet, # 2 Summons)(Wolf, Martin) (Entered: 04/23/2019) |
| 04/23/2019 |  | Jury Trial Demand by Marco A Fernandez(bas, Deputy Clerk) (Entered: 04/24/2019) |
| 04/24/2019 | 2 | Supplemental to 1 Complaint filed by Marco A Fernandez *Corrected Summons* (Wolf, Martin) (Entered: 04/24/2019) |

| | | |
|---|---|---|
| 04/24/2019 | 3 | NOTICE of Case Assignment. This case has been assigned to Magistrate Judge J. Mark Coulson. Marco A Fernandez or counsel for Marco A Fernandez are required to review and comply with the Magistrate Judge Pilot Project Procedures which can be downloaded here. Pursuant to Standing Order 2018-04, which can be downloaded here, counsel has 14 days from the date of this notice to file their consent, or decline to consent to proceed before a U.S. Magistrate Judge which can be downloaded here. To file your consent, go to *Civil > Other Filings > Other Documents > 25 Pct Mag - Consent to Proceed Before a Magistrate Judge*. To file your declination, go to *Civil > Other Filings > Other Documents > 25 Pct Mag - Decline to Proceed Before a Magistrate Judge*. Failure to file a consent or declination will result in issuance of an Order to Show Cause. Please review the case management order that has been issued in this case. Magistrate Election Form due by 5/8/2019. (bas, Deputy Clerk) (Entered: 04/24/2019) |
| 04/24/2019 | 4 | Case Management Order. Signed by Magistrate Judge J. Mark Coulson on 4/24/2019. (bas, Deputy Clerk) (Entered: 04/24/2019) |
| 04/24/2019 | 5 | Summons Issued 21 days as to Marco A Fernandez.(bas, Deputy Clerk) (Entered: 04/24/2019) |
| 04/29/2019 | 6 | SUMMONS Returned Executed by Marco A Fernandez. RentGrow, Inc. served on 4/25/2019, answer due 5/16/2019.(Wolf, Martin) (Entered: 04/29/2019) |
| 04/29/2019 | 7 | MOTION to Appear Pro Hac Vice for John G. Albanese (Filing fee $100, receipt number 0416-7981356.) by Marco A Fernandez (Attachments: # 1 Attachment Federal Court Admissions)(Wolf, Martin) (Entered: 04/29/2019) |
| 04/29/2019 | 8 | MOTION to Appear Pro Hac Vice for E. Michelle Drake (Filing fee $100, receipt number 0416-7981381.) by Marco A Fernandez (Attachments: # 1 Attachment Federal Court Admissions)(Wolf, Martin) (Entered: 04/29/2019) |
| 05/01/2019 | 9 | PAPERLESS ORDER granting 7 Motion to Appear Pro Hac Vice on behalf of John G Albanese. Directing attorney John G Albanese to use the attorney's existing CM/ECF login and password previously issued in this Court. The account password can be reset at http://www.mdd.uscourts.gov/electronic-case-filing-password-reset. Signed by Clerk on 5/1/2019. (srd, Deputy Clerk) (Entered: 05/01/2019) |
| 05/01/2019 | 10 | PAPERLESS ORDER granting 8 Motion to Appear Pro Hac Vice on behalf of E Michelle Drake. Directing attorney E Michelle Drake to use the attorney's existing CM/ECF login and password previously issued in this Court. The account password can be reset at http://www.mdd.uscourts.gov/electronic-case-filing-password-reset. Signed by Clerk on 5/1/2019. (srd, Deputy Clerk) (Entered: 05/01/2019) |
| 05/09/2019 | | Case reassigned to Chief Judge James K. Bredar. Magistrate Judge J. Mark Coulson no longer assigned to the case. (cags, Deputy Clerk) (Entered: 05/09/2019) |
| 05/10/2019 | 14 | Consent MOTION for Extension of Time to File Answer re 1 Complaint by RentGrow, Inc.(Donnelly, Brian) (Entered: 05/10/2019) |
| 05/10/2019 | 15 | PAPERLESS ORDER granting 14 Motion for Extension of Time to Answer. RentGrow, Inc. answer due 6/14/2019. Signed by Chief Judge James K. Bredar on 5/10/2019. (vdcs, Chambers) (Entered: 05/10/2019) |
| 06/13/2019 | 16 | Consent MOTION for Extension of Time to File Answer re 1 Complaint *(Second Motion)* by RentGrow, Inc.(Donnelly, Brian) (Entered: 06/13/2019) |
| 06/13/2019 | 17 | PAPERLESS ORDER granting 16 Consent MOTION for Extension of Time to File Answer re 1 Complaint *(Second Motion)* RentGrow, Inc. Answer due 7/12/2019. Signed by Chief Judge James K. Bredar on 6/13/2019. (vdcs, Chambers) (Entered: 06/13/2019) |

| | | |
|---|---|---|
| 07/12/2019 | 18 | Local Rule 103.3 Disclosure Statement by RentGrow, Inc. identifying Corporate Parent Yardi Systems, Inc. for RentGrow, Inc..(Donnelly, Brian) (Entered: 07/12/2019) |
| 07/12/2019 | 19 | ANSWER to 1 Complaint *and Affirmative Defenses* by RentGrow, Inc..(Donnelly, Brian) (Entered: 07/12/2019) |
| 07/15/2019 | 20 | Correspondence re: Proposed Scheduling Order (Attachments: # 1 Proposed Scheduling Order)(vdcs, Chambers) (Entered: 07/15/2019) |
| 07/29/2019 | 21 | MOTION to Appear Pro Hac Vice for Matthew J. Frankel (Filing fee $100, receipt number 0416-8148816.) by RentGrow, Inc.(Donnelly, Brian) (Entered: 07/29/2019) |
| 07/29/2019 | 22 | MOTION to Appear Pro Hac Vice for Elizabeth Nagle (Filing fee $100, receipt number 0416-8148866.) by RentGrow, Inc.(Donnelly, Brian) (Entered: 07/29/2019) |
| 07/30/2019 | 23 | Consent Correspondence re: Scheduling (Albanese, John) (Entered: 07/30/2019) |
| 07/31/2019 | 24 | PAPERLESS ORDER. The SCHEDULING TELEPHONE CONFERENCE that was previously set in for 8/1/19 is CANCELLED. Signed by Chief Judge James K. Bredar on 7/31/2019. (vdcs, Chambers) (Entered: 07/31/2019) |
| 07/31/2019 | 25 | ORDER STAYING CASE until 11/1/2019; Status Report due 11/1/2019. Signed by Chief Judge James K. Bredar on 7/31/2019. (hmls, Deputy Clerk) (Entered: 07/31/2019) |
| 08/01/2019 | 26 | PAPERLESS ORDER granting 21 Motion to Appear Pro Hac Vice on behalf of Matthew J Frankel. Directing attorney Matthew J Frankel to register online for CM/ECF at http://www.mdd.uscourts.gov/electronic-case-filing-registration. Signed by Clerk on 8/1/2019. (srd, Deputy Clerk) (Entered: 08/01/2019) |
| 08/01/2019 | 27 | PAPERLESS ORDER granting 22 Motion to Appear Pro Hac Vice on behalf of Elizabeth Nagle. Directing attorney Elizabeth Nagle to register online for CM/ECF at http://www.mdd.uscourts.gov/electronic-case-filing-registration. Signed by Clerk on 8/1/2019. (srd, Deputy Clerk) (Entered: 08/01/2019) |
| 09/06/2019 | 28 | MOTION to Withdraw as Attorney by RentGrow, Inc.(Nagle, Elizabeth) (Entered: 09/06/2019) |
| 09/06/2019 | 29 | MARGINAL ORDER granting 28 Motion to Withdraw as Attorney. Attorney Elizabeth Nagle terminated. Signed by Chief Judge James K. Bredar on 9/6/2019. (kw2s, Deputy Clerk) (Entered: 09/06/2019) |
| 09/27/2019 | 30 | MOTION to Withdraw as Attorney by RentGrow, Inc.(Frankel, Matthew) (Entered: 09/27/2019) |
| 09/27/2019 | 31 | Consent MOTION for Protective Order by RentGrow, Inc. (Attachments: # 1 Text of Proposed Order Stipulated Protective Order)(Donnelly, Brian) (Entered: 09/27/2019) |
| 09/30/2019 | 32 | ORDER Granting 30 Motion to Withdraw as Attorney. Attorney Matthew J Frankel terminated. Signed by Chief Judge James K. Bredar on 9/27/2019. (bas, Deputy Clerk) (Entered: 09/30/2019) |
| 09/30/2019 | 33 | PROTECTIVE/CONFIDENTIALITY ORDER OF DISCOVERY MATERIAL. Signed by Chief Judge James K. Bredar on 9/30/2019. (kw2s, Deputy Clerk) (Entered: 10/01/2019) |
| 10/22/2019 | 34 | NOTICE of Appearance by Joseph Francis Yenouskas on behalf of RentGrow, Inc. (Yenouskas, Joseph) (Entered: 10/22/2019) |
| 10/25/2019 | 35 | Consent REQUEST for Extension of Time to File *Status Report* (Albanese, John) (Entered: 10/25/2019) |

| | | |
|---|---|---|
| 11/01/2019 | 36 | ORDER Granting 35 Request for Extension of Time to File Status Report filed by Marco A Fernandez. Signed by Chief Judge James K. Bredar on 10/28/2019. (bas, Deputy Clerk) (Entered: 11/01/2019) |
| 11/20/2019 | 37 | STATUS REPORT *Joint* by RentGrow, Inc.(Yenouskas, Joseph) (Entered: 11/20/2019) |
| 11/22/2019 | 38 | ORDER Lifting Stay; Setting date for telephone scheduling conference. Signed by Chief Judge James K. Bredar on 11/22/2019. (cags, Deputy Clerk) (Entered: 11/22/2019) |
| 12/02/2019 | 39 | MOTION to Withdraw as Attorney by RentGrow, Inc.(Donnelly, Brian) (Entered: 12/02/2019) |
| 12/02/2019 | 40 | MARGINAL ORDER Granting 39 Motion to Withdraw as Attorney. Attorney Brian Patrick Donnelly terminated. Signed by Chief Judge James K. Bredar on 12/2/2019. (bas, Deputy Clerk) (Entered: 12/03/2019) |
| 12/11/2019 | 41 | STATUS REPORT *re Case Management Schedule* by RentGrow, Inc.(Yenouskas, Joseph) (Entered: 12/11/2019) |
| 12/12/2019 | | Scheduling Tele-Conference held on 12/12/2019 before Chief Judge James K. Bredar. (Court Reporter: None) (mds, Deputy Clerk) (Entered: 12/12/2019) |
| 12/13/2019 | 42 | SCHEDULING ORDER. Signed by Chief Judge James K. Bredar on 12/12/2019. (kw2s, Deputy Clerk) (Entered: 12/13/2019) |
| 03/09/2020 | 43 | NOTICE of Appearance by Tierney Smith on behalf of RentGrow, Inc. (Smith, Tierney) (Entered: 03/09/2020) |
| 03/30/2020 | 44 | Joint MOTION for Extension of Time *re: December 13, 2019 Scheduling Order (ECF 42) Deadlines* by RentGrow, Inc.(Yenouskas, Joseph) (Entered: 03/30/2020) |
| 03/30/2020 | 45 | PAPERLESS ORDER granting 44 Motion for Extension of Time. Signed by Chief Judge James K. Bredar on 3/30/2020. (vdcs, Chambers) (Entered: 03/30/2020) |
| 04/01/2020 | 46 | NOTICE of Appearance by Keith Eric Levenberg on behalf of RentGrow, Inc. (Levenberg, Keith) (Entered: 04/01/2020) |
| 07/17/2020 | 47 | Joint MOTION for Extension of Time *re: Scheduling Order Deadlines* by RentGrow, Inc. (Yenouskas, Joseph) (Entered: 07/17/2020) |
| 07/17/2020 | 48 | PAPERLESS ORDER granting 47 Motion for Extension of Time. Signed by Chief Judge James K. Bredar on 7/17/2020. (vdcs, Chambers) (Entered: 07/17/2020) |
| 08/14/2020 | 49 | NOTICE of Appearance by Louis Joseph Cannon, Jr on behalf of RentGrow, Inc. (Cannon, Louis) (Entered: 08/14/2020) |
| 08/14/2020 | 50 | MOTION to Appear Pro Hac Vice for Joel Griswold (Filing fee $100, receipt number 0416-8809834.) by RentGrow, Inc.(Cannon, Louis) (Entered: 08/14/2020) |
| 08/19/2020 | 51 | MOTION to Appear Pro Hac Vice for Bonnie Keane DelGobbo (Filing fee $100, receipt number 0416-8815316.) by RentGrow, Inc.(Cannon, Louis) (Entered: 08/19/2020) |
| 08/20/2020 | 52 | PAPERLESS ORDER granting 50 Motion to Appear Pro Hac Vice on behalf of Joel C Griswold. Directing attorney Joel C Griswold to use the attorney's existing CM/ECF login and password previously issued in this Court. The account password can be reset at http://www.mdd.uscourts.gov/electronic-case-filing-password-reset. Signed by Clerk on 8/20/2020. (srds, Deputy Clerk) (Entered: 08/20/2020) |
| 08/21/2020 | 53 | PAPERLESS ORDER granting 51 Motion to Appear Pro Hac Vice on behalf of Bonnie Keane DelGobbo. Directing attorney Bonnie Keane DelGobbo to use the attorney's existing CM/ECF login and password previously issued in this Court. The account |

| | | |
|---|---|---|
| | | password can be reset at http://www.mdd.uscourts.gov/electronic-case-filing-password-reset. Signed by Clerk on 8/21/2020. (srds, Deputy Clerk) (Entered: 08/21/2020) |
| 08/25/2020 | 54 | MOTION to Withdraw as Attorney by RentGrow, Inc.(Levenberg, Keith) (Entered: 08/25/2020) |
| 08/25/2020 | 55 | MOTION to Withdraw as Attorney by RentGrow, Inc.(Yenouskas, Joseph) (Entered: 08/25/2020) |
| 08/25/2020 | 56 | MOTION to Withdraw as Attorney by RentGrow, Inc.(Smith, Tierney) (Entered: 08/25/2020) |
| 08/26/2020 | 57 | ORDER Granting 56 Motion to Withdraw as Attorney. Attorney Tierney Smith terminated. Signed by Chief Judge James K. Bredar on 8/25/2020. (bas, Deputy Clerk) (Entered: 08/26/2020) |
| 08/26/2020 | 58 | ORDER Granting 54 Motion to Withdraw as Attorney. Attorney Keith Eric Levenberg and Joseph Francis Yenouskas terminated; granting 55 Motion to Withdraw as Attorney. Attorney Keith Eric Levenberg and Joseph Francis Yenouskas terminated. Signed by Chief Judge James K. Bredar on 8/25/2020. (bas, Deputy Clerk) (Entered: 08/26/2020) |
| 09/24/2020 | 59 | Local Rule 104.7 (Attachments: # 1 Exhibit 1 - Meet & Confer Corresp. (Redacted), # 2 Exhibit 2 - Plaintiff's Motion to Compel Briefing (Redacted))(Albanese, John) (Entered: 09/24/2020) |
| 09/24/2020 | 60 | Sealed Document(Albanese, John) (Entered: 09/24/2020) |
| 09/24/2020 | 61 | Sealed Document(Albanese, John) (Entered: 09/24/2020) |
| 09/24/2020 | 62 | MOTION to Seal by Marco A Fernandez (Attachments: # 1 Certificate of Service for Documents Submitted Under Seal)(Albanese, John) (Entered: 09/24/2020) |
| 09/25/2020 | 63 | MARGINAL ORDER Granting 62 Motion to Seal. Signed by Chief Judge James K. Bredar on 9/24/2020. (bas, Deputy Clerk) (Entered: 09/25/2020) |
| 09/29/2020 | 64 | -[STRICKEN, per 78 Order]- RESPONSE re 59 Local Rule filed by RentGrow, Inc.. (Attachments: # 1 Exhibit)(Cannon, Louis) Modified on 10/29/2020 (bas, Deputy Clerk). (Entered: 09/29/2020) |
| 10/06/2020 | 65 | MOTION to Strike 64 Response by Marco A Fernandez (Attachments: # 1 Memorandum in Support - Redacted, # 2 Declaration of John G. Albanese, # 3 Placeholder for Exhibits 1 - 3)(Albanese, John) (Entered: 10/06/2020) |
| 10/06/2020 | 66 | Sealed Document(Albanese, John) (Entered: 10/06/2020) |
| 10/06/2020 | 67 | Sealed Document (Attachments: # 1 Exhibit 2 to Albanese Decl., # 2 Exhibit 3 to Albanese Decl.)(Albanese, John) (Entered: 10/06/2020) |
| 10/06/2020 | 68 | MOTION to Seal by Marco A Fernandez (Attachments: # 1 Certificate of Service) (Albanese, John) (Entered: 10/06/2020) |
| 10/07/2020 | 69 | MARGINAL ORDER Granting 68 Motion to Seal. Signed by Chief Judge James K. Bredar on 10/7/2020. (bas, Deputy Clerk) (Entered: 10/08/2020) |
| 10/13/2020 | 70 | MOTION for Extension of Time by RentGrow, Inc.(Cannon, Louis) (Entered: 10/13/2020) |
| 10/13/2020 | 71 | -SEALED-RESPONSE in Opposition re 65 MOTION to Strike 64 Response filed by RentGrow, Inc..(Cannon, Louis) (Entered: 10/13/2020) |
| 10/14/2020 | 72 | RESPONSE in Opposition re 65 MOTION to Strike 64 Response filed by RentGrow, |

| | | |
|---|---|---|
| | | Inc..(Cannon, Louis) (Entered: 10/14/2020) |
| 10/16/2020 | 73 | ORDER Granting in Part 70 Motion for Extension of Time. Signed by Chief Judge James K. Bredar on 10/15/2020. (bas, Deputy Clerk) (Entered: 10/16/2020) |
| 10/16/2020 | 74 | ORDER REFERRING CASE to Magistrate Judge A. David Copperthite for all Discovery and Related Scheduling. Signed by Chief Judge James K. Bredar on 10/16/2020. (cags, Deputy Clerk) (Entered: 10/16/2020) |
| 10/16/2020 | 75 | REPLY to Response to Motion re 65 MOTION to Strike 64 Response filed by Marco A Fernandez.(Drake, E) (Entered: 10/16/2020) |
| 10/20/2020 | 76 | PAPERLESS ORDER: This case was referred to me for all discovery and related scheduling. I have reviewed ECF 59,65 and documents under seal ECF 66,67. It is unclear from the submissions which discovery responses remain in dispute. The Court ORDERS the parties to submit an updated joint status report identifying the items that remain in dispute. The joint status report is to be submitted by ECF no later than COB October 22, 2020. Signed by Magistrate Judge A. David Copperthite on 10/20/2020. (Chambers) (Entered: 10/20/2020) |
| 10/22/2020 | 77 | STATUS REPORT by Marco A Fernandez(Albanese, John) (Entered: 10/22/2020) |
| 10/29/2020 | 78 | PAPERLESS ORDER: The motion to strike (ECF 65) is GRANTED. The Response (ECF 64) was filed in violation of Local Rule 104.8. The motion to compel (ECF 59) as to the remaining issue is GRANTED. Defendant shall respond to Plaintiffs narrowed request for responses regarding disputes of reports containing criminal records from California. Signed by Magistrate Judge A. David Copperthite on 10/29/2020. (Chambers) (Entered: 10/29/2020) |
| 11/11/2020 | 79 | -SEALED- MOTION for Discovery by RentGrow, Inc. (Attachments: # 1 Exhibit) (Cannon, Louis) (Entered: 11/11/2020) |
| 11/11/2020 | 80 | Local Rule 104.7 (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit) (Cannon, Louis) (Entered: 11/11/2020) |
| 11/11/2020 | 81 | MOTION to Seal by RentGrow, Inc.(Cannon, Louis) (Entered: 11/11/2020) |
| 11/17/2020 | 82 | MARGINAL ORDER Granting 81 Interim Motion to Seal. Signed by Chief Judge James K. Bredar on 11/17/2020. (bas, Deputy Clerk) (Entered: 11/17/2020) |
| 11/24/2020 | 83 | ORDER Denying 80 Motion to Compel filed by RentGrow, Inc.. Signed by Magistrate Judge A. David Copperthite on 11/24/2020. (bas, Deputy Clerk) (Entered: 11/24/2020) |
| 11/25/2020 | 84 | RESPONSE in Opposition re 79 MOTION for Discovery *[Redacted]* filed by Marco A Fernandez. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G)(Albanese, John) (Entered: 11/25/2020) |
| 11/25/2020 | 85 | Sealed Document (Attachments: # 1 Exhibit A [Unredacted], # 2 Exhibit C [Unredacted], # 3 Exhibit E [Unredacted], # 4 Exhibit G [Unredacted])(Albanese, John) (Entered: 11/25/2020) |
| 11/25/2020 | 86 | MOTION to Seal *ECF No. 85 [Unredacted Opposition and Exhibits A, C, E, G]* by Marco A Fernandez (Attachments: # 1 Certificate of Service of Sealed Documents) (Albanese, John) (Entered: 11/25/2020) |
| 11/30/2020 | 87 | PAPERLESS ORDER granting 86 Motion to Seal ECF 85. Signed by Magistrate Judge A. David Copperthite on 11/30/2020. (Chambers) (Entered: 11/30/2020) |
| 11/30/2020 | 88 | PAPERLESS ORDER: The Court has reviewed ECF 79 and ECF 84. Defendants motion is DENIED, for failure to comply with Fed. R. Civ. P. 45 service of process, failure to |

| | | |
|---|---|---|
| | | comply with Fed. R. Civ. P. 37 and Local Rule 104.8, and failure to comply with proper service upon a government agency. United States ex rel. Touhy v. Ragen, 340 U.S. 462 (1951). Signed by Magistrate Judge A. David Copperthite on 11/30/2020. (Chambers) (Entered: 11/30/2020) |
| 12/08/2020 | 89 | MOTION to Appear Pro Hac Vice for Joseph C. Hashmall (Filing fee $100, receipt number 0416-9001006.) by Marco A Fernandez(Wolf, Martin) (Entered: 12/08/2020) |
| 12/08/2020 | 90 | -SEALED- MOTION to Compel by RentGrow, Inc. (Attachments: # 1 Exhibit)(Cannon, Louis) (Entered: 12/08/2020) |
| 12/08/2020 | 91 | MOTION to Seal by RentGrow, Inc.(Cannon, Louis) (Entered: 12/08/2020) |
| 12/08/2020 | 92 | -[FILED IN ERROR, per Atty's Request]- MOTION to Compel by RentGrow, Inc. (Attachments: # 1 Exhibit)(Cannon, Louis) Modified on 12/9/2020 (bas, Deputy Clerk). (Entered: 12/08/2020) |
| 12/09/2020 | 93 | PAPERLESS ORDER granting 89 Motion to Appear Pro Hac Vice on behalf of Joseph C Hashmall. Directing attorney Joseph C Hashmall to use the attorney's existing CM/ECF login and password previously issued in this Court. The account password can be reset at http://www.mdd.uscourts.gov/electronic-case-filing-password-reset. Signed by Clerk on 12/9/2020. (srd, Deputy Clerk) (Entered: 12/09/2020) |
| 12/09/2020 | 94 | ORDER Granting 91 Motion to Seal. Signed by Chief Judge James K. Bredar on 12/9/2020. (bas, Deputy Clerk) (Entered: 12/09/2020) |
| 12/09/2020 | 95 | MOTION to Compel by RentGrow, Inc. (Attachments: # 1 Exhibit)(Cannon, Louis) (Entered: 12/09/2020) |
| 12/11/2020 | 96 | MOTION for Extension of Time by RentGrow, Inc.(Cannon, Louis) (Entered: 12/11/2020) |
| 12/14/2020 | 97 | -SEALED- MOTION for Other Relief by RentGrow, Inc.(Cannon, Louis) (Entered: 12/14/2020) |
| 12/14/2020 | 98 | MOTION to Seal by RentGrow, Inc.(Cannon, Louis) Modified on 2/11/2021 (bas, Deputy Clerk). (Entered: 12/14/2020) |
| 12/14/2020 | 99 | MOTION for Other Relief by RentGrow, Inc.(Cannon, Louis) Modified on 2/11/2021 (bas, Deputy Clerk). (Entered: 12/14/2020) |
| 12/14/2020 | 100 | MOTION for Extension of Time by RentGrow, Inc.(Cannon, Louis) (Entered: 12/14/2020) |
| 12/15/2020 | 101 | MARGINAL ORDER Approving 96 Motion for Extension of Time. Signed by Magistrate Judge A. David Copperthite on 12/15/2020. (kw2s, Deputy Clerk) (Entered: 12/15/2020) |
| 12/15/2020 | 102 | PAPERLESS ORDER re 101 Order on Motion for Extension of Time. The Motion (ECF No. 100) is REFERRED TO U.S. Magistrate Judge A. David Copperthite, who will rule thereon and who will also address all scheduling issues raised therein. Signed by Chief Judge James K. Bredar on 12/15/2020. (vdcs, Chambers) (Entered: 12/15/2020) |
| 12/16/2020 | 103 | RESPONSE in Opposition re 100 MOTION for Extension of Time filed by Marco A Fernandez.(Albanese, John) (Entered: 12/16/2020) |
| 12/17/2020 | 104 | REPLY to Response to Motion re 100 MOTION for Extension of Time filed by RentGrow, Inc..(Cannon, Louis) (Entered: 12/17/2020) |
| 12/17/2020 | 105 | NOTICE by Marco A Fernandez re 103 Response in Opposition to Motion *of Errata* (Attachments: # 1 Exhibit A - Corrected Response)(Albanese, John) (Entered: |

| | | |
|---|---|---|
| | | 12/17/2020) |
| 12/22/2020 | 106 | MOTION to Seal by RentGrow, Inc.(Cannon, Louis) (Entered: 12/22/2020) |
| 12/22/2020 | 107 | MOTION to Stay by RentGrow, Inc.(Cannon, Louis) (Entered: 12/22/2020) |
| 12/22/2020 | 108 | Sealed Document (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit)(Cannon, Louis) (Entered: 12/22/2020) |
| 12/22/2020 | 109 | REDACTED DOCUMENT by RentGrow, Inc. (Attachments: # 1 Exhibit, # 2 Exhibit, # 3 Exhibit, # 4 Exhibit, # 5 Exhibit)(Cannon, Louis) (Entered: 12/22/2020) |
| 12/22/2020 | 110 | RESPONSE in Opposition re 95 MOTION to Compel *(Redacted)* filed by Marco A Fernandez. (Attachments: # 1 Exhibit 1 (Redacted), # 2 Exhibit 2 (Redacted), # 3 Exhibit 3 (Redacted), # 4 Exhibit 4 (Redacted), # 5 Exhibit 5)(Albanese, John) (Entered: 12/22/2020) |
| 12/22/2020 | 111 | Sealed Document (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4)(Albanese, John) (Entered: 12/22/2020) |
| 12/22/2020 | 112 | MOTION to Seal *ECF No. 111* by Marco A Fernandez (Attachments: # 1 Certificate of Service)(Albanese, John) (Entered: 12/22/2020) |
| 12/28/2020 | 113 | RESPONSE re 97 MOTION for Other Relief *(Redacted)* filed by Marco A Fernandez. (Attachments: # 1 Excerpts from Plaintiff Deposition Transcript (Redacted))(Albanese, John) (Entered: 12/28/2020) |
| 12/28/2020 | 114 | Sealed Document (Attachments: # 1 Excerpts from Plaintiff Deposition Transcript (Unredacted))(Albanese, John) (Entered: 12/28/2020) |
| 12/28/2020 | 115 | MOTION to Seal *ECF No. 114* by Marco A Fernandez (Attachments: # 1 Certificate of Service)(Albanese, John) (Entered: 12/28/2020) |
| 12/28/2020 | 116 | NOTICE by Marco A Fernandez re 115 MOTION to Seal *ECF No. 114 [Proposed Order]* (Albanese, John) (Entered: 12/28/2020) |
| 12/30/2020 | 117 | ORDER Granting 115 Motion to Seal. Signed by Chief Judge James K. Bredar on 12/30/2020. (bas, Deputy Clerk) (Entered: 12/30/2020) |
| 01/05/2021 | 118 | RESPONSE in Opposition re 107 MOTION to Stay *[Redacted]* filed by Marco A Fernandez. (Attachments: # 1 Placeholder for Exhibits 1 & 2, Filed Under Seal)(Albanese, John) (Entered: 01/05/2021) |
| 01/05/2021 | 119 | Sealed Document (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Albanese, John) (Entered: 01/05/2021) |
| 01/05/2021 | 120 | MOTION to Seal *ECF No. 119* by Marco A Fernandez (Attachments: # 1 Certificate of Service for Sealed Dockets, # 2 Text of Proposed Order)(Albanese, John) (Entered: 01/05/2021) |
| 01/05/2021 | 121 | MOTION to Seal by RentGrow, Inc.(Cannon, Louis) (Entered: 01/05/2021) |
| 01/05/2021 | 122 | -[FILED IN ERROR]- MOTION to Compel by RentGrow, Inc.(Cannon, Louis) Modified on 1/11/2021 (bas, Deputy Clerk). (Entered: 01/05/2021) |
| 01/06/2021 | 123 | MARGINAL ORDER Granting 112 Motion to Seal. Signed by Chief Judge James K. Bredar on 1/5/2021. (bas, Deputy Clerk) (Entered: 01/06/2021) |
| 01/06/2021 | 124 | MARGINAL ORDER Granting 106 Motion to Seal. Signed by Chief Judge James K. Bredar on 1/5/2021. (bas, Deputy Clerk) (Entered: 01/06/2021) |
| 01/06/2021 | 125 | ORDER Granting 120 Motion to Seal. Signed by Chief Judge James K. Bredar on |

| | | |
|---|---|---|
| | | 1/5/2021. (bas, Deputy Clerk) (Entered: 01/06/2021) |
| 01/06/2021 | 126 | -[FILED IN ERROR]- -SEALED- MOTION to Compel by RentGrow, Inc.(Cannon, Louis) Modified on 1/11/2021 (bas, Deputy Clerk). (Entered: 01/06/2021) |
| 01/07/2021 | 127 | PAPERLESS ORDER. After reviewing ECF 100, the Motion for Extension of Time, ECF 103 Response and ECF 104 Reply. The Motion (ECF 100) is GRANTED in Part and DENIED in Part. The Summary Judgment and Class Certification briefing deadlines for Defendant are extended for 30 days after the Court enters a ruling on all outstanding discovery that is at issue at the time of this Order or if further discovery is Ordered by this Court, 30 days after Defendant receives any outstanding discovery Ordered by this Court. Signed by Magistrate Judge A. David Copperthite on 1/7/2021. (Chambers) (Entered: 01/07/2021) |
| 01/07/2021 | 128 | REPLY to Response to Motion re 107 MOTION to Stay filed by RentGrow, Inc.. (Cannon, Louis) (Entered: 01/07/2021) |
| 01/08/2021 | 129 | Consent MOTION for Extension of Time *[Modify Motion and Briefing Schedules]* by Marco A Fernandez (Attachments: # 1 Memorandum in Support, # 2 Text of Proposed Order)(Albanese, John) (Entered: 01/08/2021) |
| 01/11/2021 | 130 | ORDER Granting 129 Consent Motion to Modify Motion and Briefing Schedule. Signed by Magistrate Judge A. David Copperthite on 1/11/2021. (bas, Deputy Clerk) (Entered: 01/11/2021) |
| 01/11/2021 | 131 | QC NOTICE: 126 Motion to Compel filed by RentGrow, Inc., 122 Motion to Compel filed by RentGrow, Inc. was filed incorrectly.<br>***Please refile using the event under Responses and Replies - Reply to Response to Motion.. It has been noted as FILED IN ERROR, and the document link has been disabled.* (bas, Deputy Clerk) (Entered: 01/11/2021) |
| 01/12/2021 | 132 | RESPONSE in Support re 95 MOTION to Compel filed by RentGrow, Inc..(Cannon, Louis) (Entered: 01/12/2021) |
| 01/12/2021 | 133 | -SEALED-RESPONSE in Support re 95 MOTION to Compel filed by RentGrow, Inc.. (Cannon, Louis) (Entered: 01/12/2021) |
| 01/13/2021 | 134 | -SEALED- MEMORANDUM OPINION. Signed by Magistrate Judge A. David Copperthite on 1/13/2021. (c/m 1/14/2021 bas, Deputy Clerk) (Entered: 01/14/2021) |
| 01/13/2021 | 135 | ORDER Granting in Part and Denying in Part 90 Motion to Compel; Granting in Part and Denying in Part 95 Motion to Compel. Signed by Magistrate Judge A. David Copperthite on 1/13/2021. (bas, Deputy Clerk) (Entered: 01/14/2021) |
| 02/04/2021 | 136 | MARGINAL ORDER granting 121 Motion to Seal. Signed by Chief Judge James K. Bredar on 2/4/2021. (bas, Deputy Clerk). (Entered: 02/05/2021) |
| 02/04/2021 | 137 | MARGINAL ORDER granting 98 Motion to Seal. Signed by Chief Judge James K. Bredar on 2/4/2021. (bas, Deputy Clerk) (Entered: 02/05/2021) |
| 02/10/2021 | 138 | MOTION to Compel by RentGrow, Inc.(Cannon, Louis) (Entered: 02/10/2021) |
| 02/10/2021 | 139 | MOTION to Seal by RentGrow, Inc.(Cannon, Louis) (Entered: 02/10/2021) |
| 02/10/2021 | 140 | -SEALED- MOTION to Compel by RentGrow, Inc.(Cannon, Louis) (Entered: 02/10/2021) |
| 02/10/2021 | 141 | MARGINAL ORDER Granting 139 Motion to Seal. Signed by Chief Judge James K. Bredar on 2/10/2021. (bas, Deputy Clerk) (Entered: 02/11/2021) |
| 02/11/2021 | 142 | -SEALED- ORDER Denying 138 Motion to Compel; Denying 140 Motion to Compel. |

| | | |
|---|---|---|
| | | Signed by Magistrate Judge A. David Copperthite on 2/11/2021. (c/m 2/11/2021 bas, Deputy Clerk) (Entered: 02/11/2021) |
| 02/25/2021 | 143 | MOTION to Seal by RentGrow, Inc.(Cannon, Louis) (Entered: 02/25/2021) |
| 02/25/2021 | 144 | -[FILED IN ERROR]- -SEALED- MOTION for Discovery by RentGrow, Inc.(Cannon, Louis) Modified on 2/26/2021 (bas, Deputy Clerk). (Entered: 02/25/2021) |
| 02/25/2021 | 145 | -[FILED IN ERROR]- MOTION for Discovery by RentGrow, Inc.(Cannon, Louis) Modified on 2/26/2021 (bas, Deputy Clerk). (Entered: 02/25/2021) |
| 02/26/2021 | 146 | QC NOTICE: 144 Motion for Discovery filed by RentGrow, Inc., 145 Motion for Discovery filed by RentGrow, Inc. was filed incorrectly. ***The incorrect civil event was used. The correct event is " Response". It has been noted as FILED IN ERROR, and the document link has been disabled.* (bas, Deputy Clerk) (Entered: 02/26/2021) |
| 02/26/2021 | 147 | MARGINAL ORDER Granting 143 Motion to Seal. Signed by Chief Judge James K. Bredar on 2/26/2021. (bas, Deputy Clerk) (Entered: 02/26/2021) |
| 02/26/2021 | 148 | RESPONSE re 142 Order on Motion to Compel, filed by RentGrow, Inc..(Cannon, Louis) (Entered: 02/26/2021) |
| 02/26/2021 | 149 | -SEALED-RESPONSE re 142 Order on Motion to Compel, filed by RentGrow, Inc..(Cannon, Louis) (Entered: 02/26/2021) |
| 03/11/2021 | 150 | RESPONSE re 148 Response, 149 Response *[Plaintiff's Response in Opposition to Defendant's Objections - Redacted]* filed by Marco A Fernandez.(Albanese, John) (Entered: 03/11/2021) |
| 03/11/2021 | 151 | Sealed Document(Albanese, John) (Entered: 03/11/2021) |
| 03/11/2021 | 152 | MOTION to Seal *ECF No. 151* by Marco A Fernandez (Attachments: # 1 Certificate of Service of Sealed Document, # 2 Text of Proposed Order)(Albanese, John) (Entered: 03/11/2021) |
| 03/12/2021 | 153 | ORDER Granting 152 Motion to Seal. Signed by Chief Judge James K. Bredar on 3/12/2021. (bas, Deputy Clerk) (Entered: 03/15/2021) |
| 04/12/2021 | 154 | Supplemental to 107 MOTION to Stay filed by RentGrow, Inc. (Cannon, Louis) (Entered: 04/12/2021) |
| 05/07/2021 | 155 | Sealed Document (c/m 5/7/2021 bas, Deputy Clerk) . (Entered: 05/07/2021) |
| 05/07/2021 | 156 | -SEALED- ORDER Denying 97 Objections ; Denying 149 Motion to Compel; Granting 107 Motion to Stay. Signed by Chief Judge James K. Bredar on 5/6/2021. (c/m 5/7/2021 bas, Deputy Clerk) . (Entered: 05/07/2021) |
| 06/02/2021 | 157 | NOTICE by Marco A Fernandez *of Change of Office Address for E. Michelle Drake, Joseph C. Hashmall & John G. Albanese* (Albanese, John) (Entered: 06/02/2021) |
| 07/06/2021 | 158 | ORDER LIFTING STAY. Signed by Chief Judge James K. Bredar on 7/6/2021. (bas, Deputy Clerk) (Entered: 07/06/2021) |
| 07/06/2021 | 159 | PAPERLESS ORDER vacating the scheduling telephone conference set for July 6, 2021. (See ECF No. 156.) Although Counsel for Defendant was present on the call, Counsel for Plaintiff did not appear within the first 12 minutes of the scheduled conference, despite it being Counsel for Plaintiff's responsibility to arrange for and distribute the conference call information. Signed by Chief Judge James K. Bredar on 7/6/2021. (vdcs, Chambers) (Entered: 07/06/2021) |

| | | |
|---|---|---|
| 07/06/2021 | 160 | Correspondence re: July 6 Conference (Drake, E) (Entered: 07/06/2021) |
| 07/06/2021 | 161 | MARGINAL ORDER Accepting 160 Correspondence re: July 6 Conference. Signed by Chief Judge James K. Bredar on 7/6/2021. (bas, Deputy Clerk) (Entered: 07/07/2021) |
| 07/06/2021 | | Scheduled Telephone Conference held on 7/6/2021 before Chief Judge James K. Bredar. (Court Reporter: None) (mds, Deputy Clerk) (Entered: 07/07/2021) |
| 08/05/2021 | 162 | STIPULATION *Dismissing Plaintiff's Individual Claim under 15 USC 1681i(a)(7) Only* by Marco A Fernandez(Albanese, John) (Entered: 08/05/2021) |
| 08/06/2021 | 163 | MOTION for Summary Judgment by RentGrow, Inc.(Cannon, Louis) (Entered: 08/06/2021) |
| 08/06/2021 | 164 | Memorandum re 163 MOTION for Summary Judgment filed by RentGrow, Inc.. (Attachments: # 1 Attachment EXHIBIT LIST, # 2 Exhibit EXHIBIT 1, # 3 Exhibit EXHIBIT 2, # 4 Exhibit EXHIBIT 3, # 5 Exhibit EXHIBIT 4, # 6 Exhibit EXHIBIT 5, # 7 Exhibit EXHIBIT 6, # 8 Exhibit EXHIBIT 7, # 9 Exhibit EXHIBIT 8, # 10 Exhibit EXHIBIT 9, # 11 Exhibit EXHIBIT 10, # 12 Exhibit EXHIBIT 11, # 13 Exhibit EXHIBIT 12, # 14 Exhibit EXHIBIT 13, # 15 Exhibit EXHIBIT 14, # 16 Exhibit EXHIBIT 15, # 17 Exhibit EXHIBIT 16, # 18 Exhibit EXHIBIT 17, # 19 Exhibit EXHIBIT 18, # 20 Exhibit EXHIBIT 19, # 21 Exhibit EXHIBIT 20, # 22 Exhibit EXHIBIT 21)(Cannon, Louis) (Entered: 08/06/2021) |
| 08/06/2021 | 165 | -SEALED-Memorandum re 163 MOTION for Summary Judgment filed by RentGrow, Inc.. (Attachments: # 1 Attachment EXHIBIT LIST, # 2 Exhibit EXHIBIT 1, # 3 Exhibit EXHIBIT 2, # 4 Exhibit EXHIBIT 3, # 5 Exhibit EXHIBIT 4, # 6 Exhibit EXHIBIT 5, # 7 Exhibit EXHIBIT 6, # 8 Exhibit EXHIBIT 7, # 9 Exhibit EXHIBIT 8, # 10 Exhibit EXHIBIT 9, # 11 Exhibit EXHIBIT 10, # 12 Exhibit EXHIBIT 11, # 13 Exhibit EXHIBIT 12, # 14 Exhibit EXHIBIT 13, # 15 Exhibit EXHIBIT 14, # 16 Exhibit EXHIBIT 15, # 17 Exhibit EXHIBIT 16, # 18 Exhibit EXHIBIT 17, # 19 Exhibit EXHIBIT 18, # 20 Exhibit EXHIBIT 19, # 21 Exhibit EXHIBIT 20, # 22 Exhibit EXHIBIT 21)(Cannon, Louis) (Entered: 08/06/2021) |
| 08/06/2021 | 166 | MOTION to Seal by RentGrow, Inc.(Cannon, Louis) (Entered: 08/06/2021) |
| 08/06/2021 | 167 | MOTION to Certify Class by Marco A Fernandez (Attachments: # 1 Memorandum in Support [Redacted], # 2 Declaration of John G. Albanese in Support, # 3 Placeholder for Exhibits 1-3, 7, 10, 12 to Albanese Decl., # 4 Exhibit 3 to Albanese Decl. [Redacted], # 5 Exhibit 4 to Albanese Decl., # 6 Exhibit 5 to Albanese Decl., # 7 Exhibit 6 to Albanese Decl., # 8 Exhibit 8 to Albanese Decl., # 9 Exhibit 9 to Albanese Decl., # 10 Exhibit 11 to Albanese Decl., # 11 Exhibit 13 to Albanese Decl., # 12 Exhibit 14 to Albanese Decl., # 13 Text of Proposed Order)(Albanese, John) (Entered: 08/06/2021) |
| 08/06/2021 | 168 | Sealed Document (Attachments: # 1 Exhibit 1 to Albanese Decl., # 2 Exhibit 2 to Albanese Decl., # 3 Exhibit 3 to Albanese Decl., # 4 Exhibit 7 to Albanese Decl., # 5 Exhibit 10 to Albanese Decl., # 6 Exhibit 12 to Albanese Decl.)(Albanese, John) (Entered: 08/06/2021) |
| 08/06/2021 | 169 | MOTION to Seal *ECF No. 168* by Marco A Fernandez (Attachments: # 1 Certificate of Service of Sealed Documents, # 2 Text of Proposed Order)(Albanese, John) Modified on 8/12/2021 (hmls, Deputy Clerk). (Entered: 08/06/2021) |
| 08/10/2021 | 170 | Marginal ORDER GRANTING 166 Motion to Seal. Signed by Chief Judge James K. Bredar on 8/10/2021. (hmls, Deputy Clerk) Modified on 8/12/2021 (hmls, Deputy Clerk). (Entered: 08/10/2021) |
| 08/10/2021 | 171 | ORDER re 162 Stipulation filed by Marco A Fernandez; Dismissing Count II Plaintiff's Individual Claim under 15 USC 1681i(a)(7). Signed by Chief Judge James K. Bredar on |

| | | |
|---|---|---|
| | | 8/10/2021. (hmls, Deputy Clerk) (Entered: 08/10/2021) |
| 08/12/2021 | 172 | Joint MOTION to Amend/Correct 171 Order by Marco A Fernandez (Attachments: # 1 Text of Proposed Order)(Albanese, John) (Entered: 08/12/2021) |
| 08/12/2021 | 173 | ORDER GRANTING 169 Motion to Seal ECF No. 168. Signed by Chief Judge James K. Bredar on 8/12/2021. (hmls, Deputy Clerk) (Entered: 08/12/2021) |
| 08/12/2021 | 174 | ORDER GRANTING 172 Motion to Amend/Correct 171 Order. Signed by Chief Judge James K. Bredar on 8/11/2021. (hmls, Deputy Clerk) (Entered: 08/12/2021) |
| 08/16/2021 | 175 | Joint MOTION for Extension of Time *for Oppositions, Defendant's Expert Report(s)* by Marco A Fernandez (Attachments: # 1 Text of Proposed Order)(Albanese, John) (Entered: 08/16/2021) |
| 08/18/2021 | 176 | ORDER Granting 175 Joint Motion for Extension of Time. Signed by Chief Judge James K. Bredar on 8/17/2021. (bas, Deputy Clerk) (Entered: 08/18/2021) |
| 08/27/2021 | 177 | MOTION to Appear Pro Hac Vice for Ariana B. Kiener (Filing fee $100, receipt number 0416-9460546.) by Marco A Fernandez(Wolf, Martin) (Entered: 08/27/2021) |
| 08/27/2021 | 178 | PAPERLESS ORDER granting 177 Motion to Appear Pro Hac Vice on behalf of Ariana B Kiener. Directing attorney Ariana B Kiener to register online for CM/ECF at http://www.mdd.uscourts.gov/electronic-case-filing-registration. Signed by Clerk on 8/27/2021. (dm4, Deputy Clerk) (Entered: 08/27/2021) |
| 09/03/2021 | 179 | MOTION for Leave to File Excess Pages by RentGrow, Inc.(Cannon, Louis) (Entered: 09/03/2021) |
| 09/03/2021 | 180 | PAPERLESS ORDER granting 179 Motion for Leave to File Excess Pages. Signed by Chief Judge James K. Bredar on 9/3/2021. (vdcs, Chambers) (Entered: 09/03/2021) |
| 09/08/2021 | 181 | Memorandum re 167 MOTION to Certify Class filed by RentGrow, Inc.. (Attachments: # 1 Exhibit EXHIBIT LIST, # 2 Exhibit EXHIBIT 1, # 3 Exhibit EXHIBIT 2, # 4 Exhibit EXHIBIT 3, # 5 Exhibit EXHIBIT 4, # 6 Exhibit EXHIBIT 5, # 7 Exhibit EXHIBIT 6, # 8 Exhibit EXHIBIT 7, # 9 Exhibit EXHIBIT 8, # 10 Exhibit EXHIBIT 9, # 11 Exhibit EXHIBIT 10, # 12 Exhibit EXHIBIT 11, # 13 Exhibit EXHIBIT 12, # 14 Exhibit EXHIBIT 13, # 15 Exhibit EXHIBIT 14, # 16 Exhibit EXHIBIT 15, # 17 Exhibit EXHIBIT 16, # 18 Exhibit EXHIBIT 17, # 19 Exhibit EXHIBIT 18)(Cannon, Louis) (Entered: 09/08/2021) |
| 09/08/2021 | 182 | MOTION in Limine *TO EXCLUDE TESTIMONY AND OPINIONS OF ERICH FERRARI* by RentGrow, Inc. (Attachments: # 1 Text of Proposed Order PROPOSED ORDER)(Cannon, Louis) (Entered: 09/08/2021) |
| 09/08/2021 | 183 | Memorandum re 182 MOTION in Limine *TO EXCLUDE TESTIMONY AND OPINIONS OF ERICH FERRARI* filed by RentGrow, Inc.. (Attachments: # 1 Exhibit EXHIBIT LIST, # 2 Exhibit EXHIBIT A, # 3 Exhibit EXHIBIT B, # 4 Exhibit EXHIBIT C, # 5 Exhibit EXHIBIT D, # 6 Exhibit EXHIBIT E, # 7 Exhibit EXHIBIT F, # 8 Exhibit EXHIBIT G, # 9 Exhibit EXHIBIT H)(Cannon, Louis) (Entered: 09/08/2021) |
| 09/08/2021 | 184 | RESPONSE in Opposition re 163 MOTION for Summary Judgment *[Redacted]* filed by Marco A Fernandez. (Attachments: # 1 Declaration of John G. Albanese, # 2 Exhibit 1 to Albanese Declaration, # 3 Exhibit 2 to Albanese Declaration, # 4 Exhibit 5 to Albanese Declaration, # 5 Exhibit 8 to Albanese Declaration, # 6 Exhibit 9 to Albanese Declaration, # 7 Exhibit 10 to Albanese Declaration, # 8 Exhibit 12 to Albanese Declaration, # 9 Exhibit 13 to Albanese Declaration, # 10 Exhibit 16 to Albanese Declaration, # 11 Exhibit 17 to Albanese Declaration, # 12 Exhibit 18 to Albanese |

| | | |
|---|---|---|
| | | Declaration, # 13 Notice of Filing Exhibits 3, 4, 6, 7, 11, 14, 15 Under Seal)(Albanese, John) (Entered: 09/08/2021) |
| 09/08/2021 | 185 | Sealed Document (Attachments: # 1 Exhibit 1 to Albanese Declaration [Unredacted], # 2 Exhibit 3 to Albanese Declaration, # 3 Exhibit 4 to Albanese Declaration, # 4 Exhibit 6 to Albanese Declaration, # 5 Exhibit 7 to Albanese Declaration, # 6 Exhibit 11 to Albanese Declaration, # 7 Exhibit 14 to Albanese Declaration, # 8 Exhibit 15 to Albanese Declaration, # 9 Exhibit 16 to Albanese Declaration [Unredacted])(Albanese, John) (Entered: 09/08/2021) |
| 09/08/2021 | 186 | MOTION to Seal *ECF No. 185* by Marco A Fernandez (Attachments: # 1 Certificate of Service of Sealed Documents, # 2 Text of Proposed Order)(Albanese, John) (Entered: 09/08/2021) |
| 09/09/2021 | 187 | QC NOTICE: 182 Motion in Limine filed by RentGrow, Inc., 183 Memorandum, filed by RentGrow, Inc. was filed incorrectly.<br>***A motion and supporting memorandum must be filed separately. The motion should be filed as the main document and the supporting memorandum as a separate attachment to the main document. Your document has been accepted as filed. No corrective action is required in regard to this filing.* (bas, Deputy Clerk) (Entered: 09/09/2021) |
| 09/10/2021 | 188 | ORDER Granting 186 Motion to Seal. Signed by Chief Judge James K. Bredar on 9/9/2021. (bas, Deputy Clerk) (Entered: 09/10/2021) |
| 09/10/2021 | 189 | Joint MOTION for Extension of Time to File Response/Reply as to 182 MOTION in Limine *TO EXCLUDE TESTIMONY AND OPINIONS OF ERICH FERRARI* by Marco A Fernandez (Attachments: # 1 Text of Proposed Order)(Albanese, John) (Entered: 09/10/2021) |
| 09/14/2021 | 190 | ORDER Granting 189 Motion for Extension of Time to File Response/Reply. Signed by Chief Judge James K. Bredar on 9/13/2021. (bas, Deputy Clerk) (Entered: 09/14/2021) |
| 09/28/2021 | 191 | MOTION for Leave to File Excess Pages *[Unopposed]* by Marco A Fernandez (Attachments: # 1 Text of Proposed Order)(Albanese, John) (Entered: 09/28/2021) |
| 09/29/2021 | 192 | ORDER Granting 191 Motion for Leave to File Excess Pages. Signed by Chief Judge James K. Bredar on 9/28/2021. (bas, Deputy Clerk) (Entered: 09/29/2021) |
| 10/06/2021 | 193 | MOTION in Limine *to Exclude Evidence and Testimony of Damages Related to Plaintiff's Employment* by RentGrow, Inc. (Attachments: # 1 Exhibit Exhibit A)(Cannon, Louis) (Entered: 10/06/2021) |
| 10/06/2021 | 194 | RESPONSE in Support re 163 MOTION for Summary Judgment filed by RentGrow, Inc.. (Attachments: # 1 Exhibit Index of Exhibits, # 2 Exhibit Exhibit 1, # 3 Exhibit Exhibit 2, # 4 Exhibit Exhibit 3, # 5 Exhibit Exhibit 4)(Cannon, Louis) (Entered: 10/06/2021) |
| 10/06/2021 | 195 | REPLY to Response to Motion re 167 MOTION to Certify Class filed by Marco A Fernandez. (Attachments: # 1 Declaration of John G. Albanese, # 2 Exhibit 15 to Albanese Declaration, # 3 Placeholder for Exhibit 16 to Albanese Declaration)(Albanese, John) (Entered: 10/06/2021) |
| 10/06/2021 | 196 | Sealed Document (Attachments: # 1 Exhibit 16 to Albanese Declaration)(Albanese, John) (Entered: 10/06/2021) |
| 10/06/2021 | 197 | MOTION to Seal *ECF 196* by Marco A Fernandez (Attachments: # 1 Certificate of Service for Sealed Documents, # 2 Text of Proposed Order)(Albanese, John) (Entered: 10/06/2021) |

| | | |
|---|---|---|
| 10/06/2021 | 198 | RESPONSE in Opposition re 182 MOTION in Limine *TO EXCLUDE TESTIMONY AND OPINIONS OF ERICH FERRARI* filed by Marco A Fernandez. (Attachments: # 1 Declaration of Ariana Kiener, # 2 Placeholder for Ex 1 to Kiener Declaration, # 3 Exhibit 2 to Kiener Declaration)(Kiener, Ariana) (Entered: 10/06/2021) |
| 10/06/2021 | 199 | Sealed Document(Kiener, Ariana) (Entered: 10/06/2021) |
| 10/06/2021 | 200 | MOTION to Seal *ECF 199* by Marco A Fernandez (Attachments: # 1 Certificate of Service for Sealed Document, # 2 Text of Proposed Order)(Kiener, Ariana) (Entered: 10/06/2021) |
| 10/07/2021 | 201 | ORDER granting 200 Motion to Seal. Signed by Chief Judge James K. Bredar on 10/7/2021. (bas, Deputy Clerk) (Entered: 10/07/2021) |
| 10/20/2021 | 202 | RESPONSE in Opposition re 193 MOTION in Limine *to Exclude Evidence and Testimony of Damages Related to Plaintiff's Employment* filed by Marco A Fernandez. (Kiener, Ariana) (Entered: 10/20/2021) |
| 11/03/2021 | 203 | RESPONSE in Support re 193 MOTION in Limine *to Exclude Evidence and Testimony of Damages Related to Plaintiff's Employment* filed by RentGrow, Inc..(Cannon, Louis) (Entered: 11/03/2021) |
| 11/05/2021 | 204 | -[FILED IN ERROR]- RESPONSE in Support re 182 MOTION in Limine *TO EXCLUDE TESTIMONY AND OPINIONS OF ERICH FERRARI* filed by RentGrow, Inc..(Cannon, Louis) Modified on 11/8/2021 (bas, Deputy Clerk). (Entered: 11/05/2021) |
| 11/05/2021 | 205 | QC NOTICE: 204 Response in Support of Motion filed by RentGrow, Inc. was filed incorrectly.<br>***Please refile using the event under Responses and Replies - Reply to Response to Motion. It has been noted as FILED IN ERROR, and the document link has been disabled.* (bas, Deputy Clerk) (Entered: 11/08/2021) |
| 11/08/2021 | 206 | REPLY to Response to Motion re 182 MOTION in Limine *TO EXCLUDE TESTIMONY AND OPINIONS OF ERICH FERRARI* filed by RentGrow, Inc..(Cannon, Louis) (Entered: 11/08/2021) |
| 11/23/2021 | 207 | NOTICE by RentGrow, Inc. re 163 MOTION for Summary Judgment (Cannon, Louis) (Entered: 11/23/2021) |
| 11/24/2021 | 208 | RESPONSE re 207 Notice (Other) filed by Marco A Fernandez.(Albanese, John) (Entered: 11/24/2021) |
| 03/08/2022 | 209 | NOTICE by Marco A Fernandez re 167 MOTION to Certify Class *[of Supplemental Authority]* (Attachments: # 1 Exhibit A - Kang v. Credit Bureau Connection)(Albanese, John) (Entered: 03/08/2022) |
| 03/10/2022 | 210 | MEMORANDUM OPINION (c/m 3/10/2022 bas, Deputy Clerk). Modified on 3/22/2022 (bas, Deputy Clerk). (Entered: 03/10/2022) |
| 03/10/2022 | 211 | ORDER Denying 163 Motion for Summary Judgment; Granting 167 Motion to Certify Class; Granting 197 Motion to Seal. Signed by Chief Judge James K. Bredar on 3/9/2022. (bas, Deputy Clerk) (Entered: 03/10/2022) |
| 03/10/2022 | 212 | -SEALED- ORDER Denying without prejudice 182 Motion in Limine; Denying without prejudice 193 Motion in Limine. Signed by Chief Judge James K. Bredar on 3/9/2022. (c/m 3/10/2022 bas, Deputy Clerk) . (Entered: 03/10/2022) |
| 03/10/2022 | 213 | RESPONSE re 209 Notice (Other) *OF SUPPLEMENTAL AUTHORITY* filed by RentGrow, Inc..(Cannon, Louis) (Entered: 03/10/2022) |

| | | |
|---|---|---|
| 03/18/2022 | 214 | Correspondence re: Sealed Memorandums (Albanese, John) (Entered: 03/18/2022) |
| 03/22/2022 | 215 | ORDER Directing Clerk to Unseal 210 Sealed Document. Signed by Chief Judge James K. Bredar on 3/22/2022. (bas, Deputy Clerk) (Entered: 03/22/2022) |
| 03/30/2022 | 216 | NOTICE by Marco A Fernandez *of Motion to Approve Notice Plan* (Attachments: # 1 Exhibit A - Mail Notice, # 2 Exhibit B - Email Notice, # 3 Exhibit C - Long Form Notice, # 4 Exhibit D - Class Action Administration CV, # 5 Text of Proposed Order)(Albanese, John) (Entered: 03/30/2022) |
| 04/14/2022 | 217 | NOTICE of Appearance by Elizabeth Anne Scully on behalf of RentGrow, Inc. (Scully, Elizabeth) (Entered: 04/14/2022) |
| 04/19/2022 | 218 | ORDER Directing RentGrow, Inc. to file a response on or before 5/2/2022 re: 216 Motion to Approve Notice Plan, filed by Marco A Fernandez. Signed by Chief Judge James K. Bredar on 4/18/2022. (bas, Deputy Clerk) (Entered: 04/19/2022) |
| 04/20/2022 | 219 | MOTION to Stay *Pending Rule 23(f) Appeal* by RentGrow, Inc. (Attachments: # 1 Exhibit 1)(Scully, Elizabeth) (Entered: 04/20/2022) |
| 04/25/2022 | 220 | MOTION to Appear Pro Hac Vice for Kristin D. Kiehn (Filing fee $100, receipt number AMDDC-9894948.) by RentGrow, Inc.(Scully, Elizabeth) (Entered: 04/25/2022) |
| 04/25/2022 | 221 | MOTION to Appear Pro Hac Vice for Maura Kathleen Monaghan (Filing fee $100, receipt number AMDDC-9894957.) by RentGrow, Inc.(Scully, Elizabeth) (Entered: 04/25/2022) |
| 04/25/2022 | 222 | MOTION to Appear Pro Hac Vice for Emilia Brunello (Filing fee $100, receipt number AMDDC-9894963.) by RentGrow, Inc.(Scully, Elizabeth) (Entered: 04/25/2022) |
| 04/25/2022 | 223 | CORRECTED MOTION to Appear Pro Hac Vice for Emilia Brunello by RentGrow, Inc.. The fee has already been paid.(Scully, Elizabeth) (Entered: 04/25/2022) |
| 04/29/2022 | 224 | QC NOTICE: 220 Motion to Appear Pro Hac Vice filed by RentGrow, Inc., 223 Corrected Motion to Appear Pro Hac Vice filed by RentGrow, Inc., 221 Motion to Appear Pro Hac Vice filed by RentGrow, Inc., 222 Motion to Appear Pro Hac Vice filed by RentGrow, Inc. needs to be modified. See attachment for details and corrective actions needed regarding the signature(s) on the motion. (dm4s, Deputy Clerk) (Entered: 04/29/2022) |
| 04/29/2022 | 225 | CORRECTED MOTION to Appear Pro Hac Vice for Maura Kathleen Monaghan by RentGrow, Inc.. The fee has already been paid.(Scully, Elizabeth) (Entered: 04/29/2022) |
| 04/29/2022 | 226 | CORRECTED MOTION to Appear Pro Hac Vice for Emilia Brunello by RentGrow, Inc.. The fee has already been paid.(Scully, Elizabeth) (Entered: 04/29/2022) |
| 04/29/2022 | 227 | CORRECTED MOTION to Appear Pro Hac Vice for Kristin D. Kiehn by RentGrow, Inc.. The fee has already been paid.(Scully, Elizabeth) (Entered: 04/29/2022) |
| 05/02/2022 | 228 | MOTION for Protective Order *CONSENT MOTION FOR ENTRY OF STIPULATED PROTECTIVE ORDER GOVERNING PUTATIVE CLASS MEMBER DATA* by RentGrow, Inc. (Attachments: # 1 Stipulated Protective Order Governing Putative Class Member Data)(Scully, Elizabeth) (Entered: 05/02/2022) |
| 05/02/2022 | 229 | RESPONSE re 216 Notice (Other), *RENTGROW, INC.'S RESPONSE TO PLAINTIFF'S MOTION TO APPROVE THE NOTICE PLAN* filed by RentGrow, Inc..(Scully, Elizabeth) (Entered: 05/02/2022) |
| 05/03/2022 | 230 | RESPONSE in Opposition re 219 MOTION to Stay *Pending Rule 23(f) Appeal* filed by Marco A Fernandez.(Kiener, Ariana) (Entered: 05/03/2022) |

| | | |
|---|---|---|
| 05/03/2022 | 231 | STIPULATED PROTECTIVE/CONFIDENTIALITY ORDER, Motions terminated: 228 MOTION for Protective Order *CONSENT MOTION FOR ENTRY OF STIPULATED PROTECTIVE ORDER GOVERNING PUTATIVE CLASS MEMBER DATA* filed by RentGrow, Inc... Signed by Chief Judge James K. Bredar on 5/3/2022. (bas, Deputy Clerk) (Entered: 05/03/2022) |
| 05/05/2022 | 232 | PAPERLESS ORDER granting 225 Corrected Motion to Appear Pro Hac Vice on behalf of Emilia Brunello, Maura Kathleen Monaghan, Kristin D Kiehn. Directing attorney Emilia Brunello, Maura Kathleen Monaghan, Kristin D Kiehn to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. The *Pro Hac Vice* option must be selected when registering; granting 226 Corrected Motion to Appear Pro Hac Vice on behalf of Emilia Brunello, Maura Kathleen Monaghan, Kristin D Kiehn. Directing attorney Emilia Brunello, Maura Kathleen Monaghan, Kristin D Kiehn to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. The *Pro Hac Vice* option must be selected when registering; granting 227 Corrected Motion to Appear Pro Hac Vice on behalf of Emilia Brunello, Maura Kathleen Monaghan, Kristin D Kiehn. Directing attorney Emilia Brunello, Maura Kathleen Monaghan, Kristin D Kiehn to register for pro hac vice filing in the District of Maryland through PACER at https://pacer.uscourts.gov/ if attorney has not already done so. The *Pro Hac Vice* option must be selected when registering. Signed by Clerk on 5/5/2022. (dm4s, Deputy Clerk) (Entered: 05/05/2022) |
| 05/17/2022 | 233 | -[FILED IN ERROR]- RESPONSE in Support re 219 MOTION to Stay *Pending Rule 23(f) Appeal* filed by RentGrow, Inc..(Scully, Elizabeth) Modified on 5/18/2022 (bas, Deputy Clerk). (Entered: 05/17/2022) |
| 05/18/2022 | 234 | QC NOTICE: 233 Response in Support of Motion filed by RentGrow, Inc. was filed incorrectly.<br>***Please refile using the event under Responses and Replies - Reply to Response to Motion. It has been noted as FILED IN ERROR, and the document link has been disabled.* (bas, Deputy Clerk) (Entered: 05/18/2022) |
| 05/18/2022 | 235 | REPLY to Response to Motion re 219 MOTION to Stay *Pending Rule 23(f) Appeal* filed by RentGrow, Inc..(Scully, Elizabeth) (Entered: 05/18/2022) |
| 06/01/2022 | 236 | MEMORANDUM AND ORDER Granting in Part and Denying in Part 219 Motion to Stay Pending Rule 23(f) Appeal. Signed by Chief Judge James K. Bredar on 5/31/2022. (bas, Deputy Clerk) . (Entered: 06/01/2022) |
| 06/15/2022 | 237 | Joint MOTION to Stay by RentGrow, Inc.(Scully, Elizabeth) (Entered: 06/15/2022) |
| 06/17/2022 | 238 | ORDER granting 237 Motion to Stay. Signed by Chief Judge James K. Bredar on 6/16/2022. (bas, Deputy Clerk) (Entered: 06/17/2022) |
| 06/17/2022 | | Case Stayed (bas, Deputy Clerk) (Entered: 06/17/2022) |

---

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 07/27/2022 15:33:17 | | | |
| **PACER Login:** | dldl0349 | **Client Code:** | 26749-1001 |
| **Description:** | Docket Report | **Search Criteria:** | 1:19-cv-01190-JKB |
| **Billable Pages:** | 16 | **Cost:** | 1.60 |

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| Marco A. Fernandez,<br>7501 Trafalgar Cir., Apt. 31<br>Hanover, MD 21076-5010<br>(Anne Arundel County)<br><br>Individually and as a representative of the class,<br><br>Plaintiffs,<br><br>v.<br><br>RentGrow, Inc.,<br>307 Waverly Oaks Road,<br>Suite 301<br>Waltham, Massachusetts 02452-8449<br><br>Defendant. | : | Civil Case No. ________________________ |

**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

COMES NOW, the Plaintiff Marco A. Fernandez ("Plaintiff"), on behalf of himself and the class set forth below and states as follows:

**INTRODUCTION**

1. This is a class action for damages, costs, and attorneys' fees brought against the Defendant RentGrow, Inc. ("Defendant" or "RentGrow") pursuant to the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq*. ("FCRA").

2. Defendant is a consumer reporting agency that compiles and maintains files on consumers on a nationwide basis. It sells consumer reports generated from its database and furnishes these consumer reports to management companies and landlords who use the reports to make decisions regarding prospective tenants.

3. In November 2018, Plaintiff applied to rent an apartment in Hanover, Maryland. In connection with his application for the apartment, Serenity Place at Dorsey Ridge ("Dorsey Ridge") requested a consumer report from Defendant. The consumer report provided by Defendant to Dorsey Ridge was grossly inaccurate and contained numerous criminal convictions that did not belong to Plaintiff.

4. Defendant falsely reported that, in 2012, Plaintiff had been convicted of felony possession of a controlled substance for sale, and three misdemeanors for petty theft in California. These reported convictions, however, belonged to an entirely different individual than Plaintiff.

5. Plaintiff has no criminal record in California or elsewhere.

6. Defendant's report indicates that there is no full date of birth associated with the felony and misdemeanor convictions. Yet Defendant reported Plaintiff as being convicted of a felony and numerous misdemeanor charges merely because Plaintiff and the convicted felon share the same name, which is a very common name in the Hispanic community, and the same birth year.

7. Defendant also inaccurately reported that Plaintiff was a person on the United States Department of the Treasury, Office of Foreign Assets Control's list of Specially Designated Nationals and Blocked Persons ("OFAC-SDN & Blocked Persons List"). Defendant's report included a record that belongs to "Mario Alberto Fernandez Santana," a resident of Mexico, whose date of birth is in May 1977.

8. Contrary to the report, Plaintiff is not this individual. Even a rudimentary review of the record would reveal that Mario Alberto Fernandez Santana has a completely different name than Plaintiff. The date of birth and address associated with Mario Alberto Fernandez Santana

also differs vastly from Plaintiff's date of birth and address.

9.     When Plaintiff took steps to determine the source of this inaccurate information, he learned that in 2014, Defendant had sent a report about him to another potential landlord in California.  That report included the same false information associating him with the OFAC-SDN & Blocked Persons List, but did not include the inaccurate 2012 convictions.

10.     By issuing inaccurate reports about Plaintiff, Defendant violated § 1681e(b) of the FCRA which requires consumer reporting agencies to "follow reasonable procedure to assure maximum possible accuracy of the information concerning the individual about whom the report relates."  15 U.S.C. § 1681e(b).  Defendant does not employ reasonable procedures to ensure the maximum possible accuracy of its records, and its failure to employ reasonable procedures resulted in Plaintiff's reports being inaccurate.

11.     As a result of Defendant's inaccurate reporting, Plaintiff was initially denied the opportunity to rent an apartment.  Defendant's inaccurate reporting caused Plaintiff serious distress and embarrassment, and will cause Plaintiff future distress, reputational harm, and embarrassment.

12.     On behalf of himself, and a class of similarly situated individuals, Plaintiff brings claims pursuant to 15 U.S.C. § 1681e(b).

13.     Plaintiff also brings an individual claim for Defendant's violation of 15 U.S.C. § 1681i.

## JURISDICTION

14.     The Court has jurisdiction under the FCRA, 15 U.S.C. § 1681p, and 28 U.S.C. § 1331.

15. The Court has personal jurisdiction over Defendant. Defendant conducts business in this District, including issuing consumer reports on residents in this District, and delivers them to prospective landlords and management companies in this District.

16. Venue is proper in this Court under 28 U.S.C. § 1391(b) because Plaintiff resides in this District and because a substantial part of the events giving rise to the claim occurred in this District.

**PARTIES**

17. Individual and representative Plaintiff Marco A. Fernandez is a resident of Hanover, Maryland.

18. Plaintiff is a natural person and a "consumer" as defined by § 1681a(c) of the FCRA.

19. Defendant RentGrow, Inc. is a Delaware corporation with its principal office located at 307 Waverly Oaks Road, Suite 301, Waltham, Massachusetts.

20. Defendant is a "consumer reporting agency," as defined in 15 U.S.C. § 1681(f). RentGrow regularly engages in the business of assembling, evaluating, and disseminating information concerning consumers for the purpose of furnishing consumer reports to third parties, as defined in 15 U.S.C. §1681a(d).

**FACTUAL ALLEGATIONS RELATING TO PLAINTIFF**

21. Plaintiff serves in the United States Navy.

22. He works for Cyber Strike Activity 63 Command in Fort Meade, Maryland. As a condition of his employment, Plaintiff received a Top Secret security clearance and underwent a polygraph examination.

23. In November 2018, Plaintiff arrived in Maryland after a one-year deployment in South Korea. He applied to rent an apartment in Hanover, Maryland.

24. As part of this process, a representative of Dorsey Ridge requested a consumer report from Defendant.

25. On or around November 16, 2018, Defendant prepared a consumer report regarding Plaintiff and furnished the report to Dorsey Ridge for a fee.

26. The consumer report sold by Defendant contained inaccurate information relating to Plaintiff, including that, in 2012, Plaintiff was convicted of felony possession of a controlled substance for sale and three misdemeanors for petty theft.

27. These convictions did not belong to Plaintiff. As a Top Secret security clearance holder, Plaintiff has never been convicted of a crime.

28. Defendant's report states that the "DOB" associated with the criminal records is "00/00/1984." Despite the lack of a birth month and day, Defendant reported a match solely on the fact Plaintiff's very common Hispanic name and birth year matched the name and birth year of an individual with a felony and misdemeanor criminal record.

29. The report included a search section for "OFAC/SDN." That section falsely reported that Plaintiff was a match to a suspected terrorist and/or narcotic trafficker included on the OFAC–SDN & Blocked Persons List.

30. Individuals and businesses in the United States are generally prohibited from conducting business with anyone on the OFAC–SDN & Blocked Persons List. *See*, *e.g.*, 31 C.F.R. § 536.201.

31. The OFAC–SDN & Blocked Persons List is publicly available through the United

States Department of the Treasury, Office of Foreign Assets Control website, https://www.treasury.gov/resource-center/sanctions/SDN-List/Pages/default.aspx.

32. The OFAC–SDN & Blocked Persons List is searchable online and is also downloadable in both PDF and TEXT format.

33. Plaintiff is not, and never has been, on the OFAC–SDN & Blocked Persons List.

34. Defendant reported "Mario Alberto Fernandez Santana" as the name on the OFAC–SDN & Blocked Persons List and associated a "DOB" of "May 1977"[1] and an address in "Zapopan, Jalisco, Mexico" associated with the name.

35. Plaintiff's full name is Marco Antonio Fernandez. The reported name on OFAC–SDN & Blocked Persons List has an entirely different first name (Mario) and middle name (Alberto), and has two surnames (Fernandez Santana). The reported date of birth of May 1977 also differs as Plaintiff's date of birth in that it is a different month, day, and year.

36. Plaintiff has never lived in Mexico. Defendant was aware that Plaintiff never resided in Mexico. Defendant's report lists no addresses in Mexico for Plaintiff under the "Other Addresses" section.

37. Defendant should have known that the name on the OFAC–SDN & Blocked Persons List is not the same name as Plaintiff, which is clearly stated on the first page of the report under "Applicant Information" as "MARCO A FERNANDEZ." In addition to the name-match error, a simple review would have revealed that the date of birth and address is not a match to

[1] The report contained a full date of birth here, but as this is a publicly-filed pleading, Plaintiff has removed the specific day of birth information. Plaintiff is able to provide the full date of birth reported to the Court upon request.

Plaintiff.

38.     After receiving Defendant's grossly inaccurate report, Dorsey Ridge denied Plaintiff the opportunity to rent an apartment.  Plaintiff was alarmed that his potential landlord thought he had a felony and misdemeanor criminal record and was listed on the OFAC–SDN & Blocked Persons List.

39.     Plaintiff was able to explain to Dorsey Ridge that he was neither a felon or any other type of criminal nor a suspected terrorist and/or narcotic trafficker on the OFAC–SDN & Blocked Persons List.  Fortunately, Dorsey Ridge was willing to disregard Defendant's inaccurate reporting and rent Plaintiff an apartment.

40.     In the course of challenging Defendant's reporting, Plaintiff requested his file from Defendant.  When he received that file, Plaintiff learned for the first time that, in December 2014, Defendant had issued another report on him to a different potential landlord, located in California. The December 2014 report also falsely matched Plaintiff with someone on the OFAC-SDN & Blocked Persons List.  However, it did not include any information about the crimes of which Defendant later reported Plaintiff had been convicted.

41.     Plaintiff disputed the contents of his Dorsey Ridge-related report with Defendant in December 2018 and Defendant subsequently corrected his report.

42.     In January of 2019, consistent with 15 U.S.C §§ 1681i(a)(6)(B)(iii) and 1681i(a)(7), Plaintiff asked Defendant for a description of the procedures used to investigate his dispute. Defendant never responded to Plaintiff's request.

43.     Due to the sensitive nature of his employment in cybersecurity, Plaintiff is very concerned that Defendant's inaccurate reporting will cause him future harm because in order to

maintain his Top Secret security clearance, he will have to disclose that he had been initially denied an opportunity to rent an apartment. Questions that relate to an individual's suitability to rent an apartment are extremely common in a United States government security investigation and one must talk openly about anything that may be in their rental history record. Defendant's inaccurate reporting will follow Plaintiff for the rest of his career as he is reinvestigated every five years to maintain his Top Secret security clearance.

44. Plaintiff also fears that Defendant's inaccurate reporting could recur.

## FACTS DEMONSTRATING THAT DEFENDANT WILLFULLY FAILED TO USE REASONABLE PROCEDURES TO ASSURE MAXIMUM POSSIBLE ACCURACY

45. If Defendant had reasonable procedures to assure maximum possible accuracy, it would have determined that the information in Plaintiff's consumer report belonged to other people with the same or similar names.

46. Defendant did not consult with readily available online court records before reporting Plaintiff of being convicted of numerous criminal charges, including a felony drug offense and misdemeanor theft. If it had, these serious errors could have been avoided.

47. Instead, Defendant chose to rely on "Merced County – Superior Court – Historical Data," which did not include a full date of birth, instead listing "00/00/1984" for the "DOB."

48. If Defendant had obtained the available online court records from the Merced County Superior Court website, Defendant could have obtained further information, including the full date birth, allowing Defendant to determine that the Marco Antonio Fernandez who was the subject of the criminal records was a different person than Plaintiff.

49. Other tenant screening agencies have faced governmental scrutiny for substantially similar activities. *See, e.g.*, *FTC v. Realpage, Inc.*, No 3:18-cv-2737 (FTC settlement with tenant screening agency which failed to comply with 15 U.S.C. § 1681e(b) because it used loose matching criteria to link potential tenants with criminal records).

50. Had Defendant consulted its own report, issued in 2014, it would have also seen that the 2014 report did not include any information indicating Plaintiff had a criminal record, despite the fact that Plaintiff had supposedly been convicted in 2012. This fact should have also alerted Defendant to problems with the 2018 report.

51. Defendant also erroneously matched Plaintiff with a suspected terrorist with a different name, date of birth, and address.

52. Defendant could have and should have checked the OFAC–SDN & Blocked Persons List, which is readily available online, prior to issuing its report. If it had done so, it would have discovered that a search for Plaintiff's actual name, Marco Antonio Fernandez, returns no results.

53. The dangers of erroneous matching of persons with suspected terrorists on the OFAC–SDN & Blocked Persons List is well recognized in the tenant screening industry. In 2017, a jury awarded $60 million to a class of persons who had been mismatched to the OFAC list by Trans Union. *Ramirez v. Trans Union, LLC*, 3:12-cv-632 (N.D. Cal.). And nearly a decade ago, the Third Circuit Court of Appeals upheld a jury verdict for mismatching an individual to the OFAC list. *Cortez v. Trans Union, LLC*, 617 F.3d 688 (3d Cir. 2010).

54. It is well-recognized that failing to require actual name matches is inconsistent with reasonable procedures to ensure maximum possible accuracy. *In re Gen. Info. Servs., Inc.*, No.

2015-CFPB-0028, Consent Order ¶¶ 10-12 (C.F.P.B. Oct. 29, 2015), available at http://files.consumerfinance.gov/f/201510_cfpb_consent-order_general-information-service-inc.pdf.

55. In addition to the conduct set forth above, Defendant's willful conduct is further reflected by, *inter alia*, the following:

a. Defendant is a corporation with access to legal advice through its own general counsel's office and outside litigation counsel. Yet, there is no contemporaneous evidence that it determined that its conduct was lawful;

b. Defendant knew or had reason to know that its conduct was inconsistent with FTC guidance, caselaw, and the plain language of the FCRA;

c. Defendant voluntarily ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless;

d. Defendant knew that matching individuals using name only or a common name match would result in false positives. However, it persisted in doing so;

e. If Defendant had consulted the publicly available online court records, it would have easily discovered that Plaintiff was not the subject of the court records in question. However, Defendant failed to do so;

f. If Defendant had compared its 2018 report to its 2014 report, it would have seen the reports contained inconsistent information with respect to Plaintiff's criminal background;

g. If Defendant had reviewed its own report or consulted with the publicly available database, it would have been obvious that Plaintiff was not a match to

the individual on the OFAC–SDN & Blocked Persons List; and

h. Defendant's violations of the FCRA were repeated and systematic.

56. At all times relevant hereto, Defendant's conduct was willful and carried out in knowing or reckless disregard for consumers' rights under the FCRA. Defendant's conduct was intentionally accomplished through its intended procedures; these procedures have continued despite the fact that other consumer reporting agencies have been subject to court decisions and consumer complaints critical of similar conduct; and Defendant will continue to engage in this conduct because it believes there is greater economic value in selling over-inclusive consumer reports than in producing accurate reports.

**CLASS ACTION ALLEGATIONS**

57. Plaintiff brings Count I on behalf of himself individually, and, pursuant to Fed. R. Civ. P. 23, on behalf of a Class, defined as:

> All individuals who were the subjects of consumer reports furnished by Defendant which contained public record information in the "OFAC/SDN" section of the reports where the name or date of birth or address of the subject of the report do not match the name or date of birth or address in the government database in the five years predating the filing of this Complaint and continuing through the date the class list is prepared.

58. The Class satisfies the requirements of Fed. R. Civ. P. 23(b)(3).

59. Numerosity: The Class is so numerous that joinder of all class members is impracticable. Given the volume of Defendant's business, there are hundreds or thousands of class members.

60. Commonality: This case presents common questions of law and fact, including but not limited to:

a) Whether Defendant violated the FCRA by failing to follow reasonable procedures to ensure maximum possible accuracy of the information contained in consumers' reports with respect to the OFAC–SDN & Blocked Persons information;

b) Whether Defendant's violations of the FCRA were willful; and

c) The proper measure of damages.

61. Typicality: Plaintiff's claims are typical of the members of the Class. It is typical for Defendant to match consumers to public records using only a name or common name. The FCRA violations suffered by Plaintiff are typical of those suffered by other class members, and Defendant treated Plaintiff consistently with other class members in accordance with its standard policies and practices.

62. Adequacy: Plaintiff will fairly and adequately protect the interests of the Class because he and his experienced counsel are free of any conflicts of interest and are prepared to vigorously litigate this action on behalf of the Class.

63. Class certification is appropriate under Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to the Class predominate over any questions affecting only individual members of the Class, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation. Defendant's conduct described in this Complaint stems from common and uniform policies and practices, resulting in common violations of the FCRA. Members of the Class do not have an interest in pursuing separate actions against Defendant, as the amount of each class member's individual claim is small compared to the expense and burden of individual prosecution. Class certification also will obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendant's practices. Moreover,

management of this action as a class action will not present any likely difficulties. In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all class members' claims in a single forum.

64. In view of the complexities of the issues and the expenses of litigation, the separate claims of individual class members are insufficient in amount to support separate actions.

65. Yet, the amount which may be recovered by individual class members will be large enough in relation to the expense and effort of administering the action to justify a class action. The administration of this action can be handled by class counsel or a third-party administrator, and the costs of administration will represent only a small fraction of the ultimate recovery to be achieved.

66. Plaintiff intends to send notice to all members of the Class to the extent required by Rule 23(c)(2). The names and addresses of the class members are available from Defendant's records.

**COUNT I**
**15 U.S.C. § 1681e(b)**
**On behalf of Plaintiff individually and on behalf of the Class**

67. Plaintiff reiterates each of the allegations in the preceding paragraphs as if set forth at length herein.

68. Defendant violated 15 U.S.C. § 1681e(b) by failing to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the consumer reports it furnished regarding Plaintiff and members of the Class. For example, Defendant misidentified Plaintiff as a criminal with a felony and misdemeanor record, and a suspected terrorist and/or narcotic trafficker based solely on a name only match, without verifying other data

points, or consulting with publicly available online records.

69.    The foregoing violations were negligent and/or willful.  Defendant acted in knowing or reckless disregard of its obligations and the rights of Plaintiff and other class members under 15 U.S.C. § 1681e(b).

70.    As a result of Defendant's conduct, Plaintiff and class members suffered actual damages including but not limited to: denial of apartments, damage to reputation, embarrassment, humiliation and other mental and emotional distress.

71.    Plaintiff and members of the Class are entitled to recover actual damages and/or statutory damages, punitive damages, costs and attorneys' fees from the Defendant in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

**COUNT II**
**15 U.S.C. § 1681i**
**On behalf of Plaintiff Individually**

72.    Plaintiff reiterates each of the allegations in the preceding paragraphs as if set forth at length herein.

73.    Defendant violated 15 U.S.C. § 1681i(a)(7) by failing to provide a description of the procedures used to reinvestigate Plaintiff's dispute upon Plaintiff's request.

74.    The foregoing violations were negligent and/or willful.  Defendant acted in knowing or reckless disregard of its obligations and the rights of Plaintiff under 15 U.S.C. § 1681i.

75.    As a result of Defendant's conduct, Plaintiff suffered actual damages including but not limited to: denial of information to which he is entitled by law, damage to reputation, embarrassment, humiliation and other mental and emotional distress.

76.    Plaintiff is entitled to recover actual damages and/or statutory damages, punitive

damages, costs and attorneys' fees from the Defendant in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and § 1681o.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of himself and the Class, seek the following relief:

a. Determining that this action may proceed as a class action under Fed. R. Civ. P. 23(b)(3);

b. Designating Plaintiff as the class representatives for the Class;

c. Designating Plaintiff's Counsel as counsel for the Class;

d. Issuing proper notice to the Class at Defendant's expense;

e. Declaring that Defendant committed multiple, separate violations of the FCRA;

f. Declaring that Defendant acted negligently, willfully, and in deliberate or reckless disregard of the rights of Plaintiff and the Class under the FCRA;

g. Awarding actual and/or statutory damages as provided by the FCRA;

h. Awarding punitive damages;

i. Awarding reasonable attorneys' fees and costs and expenses, as provided by the FCRA;

j. Granting other and further relief, in law or equity, as this Court may deem appropriate and just.

## JURY DEMAND

Plaintiff, on behalf of himself and the Class, demands a trial by jury on all issues triable by a jury.

Respectfully Submitted,

Date: April 23, 2019

/s/Martin E. Wolf

Martin E. Wolf, (Bar No. 09425)
GORDON, WOLF & CARNEY, CHTD.
100 W. Pennsylvania Ave., Suite 100
Towson, MD 21204
Tel. 410.825.2300
mwolf@gwcfirm.com

BERGER MONTAGUE PC
E. Michelle Drake*
John G. Albanese*
43 S.E. Main Street, Suite 505
Minneapolis, MN 55414
Telephone: (612) 594-5999
Facsimile: (612) 584-4470
emdrake@bm.net
jalbanese@bm.net

**pro hac vice* forthcoming

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**Northern Division**

**MARCO A. FERNANDEZ,**

**Plaintiff,**

**v.**

**RENTGROW, INC.,**

**Defendant.**

**Civil Action No. 1:19-cv-01190-JKB**
**Chief Judge James K. Bredar**

**ANSWER TO COMPLAINT AND AFFIRMATIVE DEFENSES**

Defendant RentGrow, Inc. ("RentGrow") by and through its undersigned counsel, hereby responds to the Complaint of Plaintiff Marco A. Fernandez ("Plaintiff"), as follows:

1. Paragraph 1 sets forth legal conclusions to which no responsive pleading is required. To the extent a response is required, RentGrow admits only that Plaintiff alleges claims under the Fair Credit Reporting Act ("FCRA") in this action. RentGrow denies that it violated the FCRA, denies all liability, and denies that Plaintiff is entitled to damages or any other relief.

2. RentGrow admits only that it is a reseller consumer reporting agency and that it provides tenant screening reports to its customers. RentGrow lacks knowledge or information sufficient to admit or deny whether or to what extent management companies and landlords "use the reports to make decisions regarding prospective tenants." RentGrow denies the remaining allegations in paragraph 2.

3. RentGrow lacks knowledge or information sufficient to admit or deny the allegations in the first sentence of paragraph 3. RentGrow admits that Serenity Place at Dorsey Ridge ("Dorsey Ridge") requested a tenant screening report from RentGrow

pertaining to Plaintiff. RentGrow denies Plaintiff's characterization that a consumer report provided by RentGrow was "grossly inaccurate." RentGrow lacks knowledge or information sufficient to admit or deny the remaining allegations in the third sentence of paragraph 3.

4.    RentGrow admits that it provided a tenant screening report to Dorsey Ridge pertaining to Plaintiff, and with respect to the contents of that report, RentGrow refers to the document, which speaks for itself. RentGrow lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 4.

5.    Plaintiff lacks knowledge or information sufficient to admit or deny the allegation in paragraph 5.

6.    RentGrow admits that it provided a tenant screening report to Dorsey Ridge pertaining to Plaintiff, and with respect to the contents of that report, RentGrow refers to the document, which speaks for itself. RentGrow denies all other allegations in paragraph 6.

7.    RentGrow admits that it provided a tenant screening report to Dorsey Ridge pertaining to Plaintiff, and with respect to the contents of that report, RentGrow refers to the document, which speaks for itself.

8.    RentGrow lacks knowledge or information sufficient to admit or deny the allegations of paragraph 8, including, *inter alia*, because the terms "rudimentary review" and "the record" are vague and ambiguous.

9.    RentGrow admits that it provided a tenant screening report pertaining to Plaintiff to a customer in California in 2014, and with respect to the contents of that report, RentGrow refers to the document, which speaks for itself. RentGrow lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 9.

10.     The first sentence of paragraph 10 sets forth legal conclusions to which no responsive pleading is required.  To the extent a response is required, denied. RentGrow denies all other allegations in paragraph 10.

11.     On information and belief, RentGrow denies that Plaintiff was "denied" the opportunity to rent an apartment and denies that any inaccurate reporting "will cause Plaintiff future distress, reputational harm, and embarrassment."  RentGrow lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 11.

12.     Paragraph 12 sets forth legal conclusions to which no responsive pleading is required.  To the extent a response is required, RentGrow admits only that Plaintiff alleges claims under 15 U.S.C. § 1681e(b) in this action.  RentGrow denies that it violated the FCRA, denies all liability, and denies that Plaintiff is entitled to damages or any other relief.

13.     Paragraph 13 sets forth legal conclusions to which no responsive pleading is required. To the extent a response is required, RentGrow admits only that Plaintiff alleges a claim under 15 U.S.C. § 1681i in this action. RentGrow denies that it violated the FCRA, denies all liability, and denies that Plaintiff is entitled to damages or any other relief.

## JURISDICTION

14.     Paragraph 14 sets forth legal conclusions to which no responsive pleading is required.  To the extent a response is required, RentGrow admits only that this Court may properly exercise subject matter jurisdiction over this action.

15.     Paragraph 15 sets forth legal conclusions to which no responsive pleading is required.  To the extent a response is required, RentGrow admits only that it issues consumer reports on residents of this District to customers (who may be landlords and management companies in this District) and that the Court has personal jurisdiction over RentGrow for

purposes of this action. On information and belief, RentGrow denies the remaining allegations in paragraph 15.

16. Paragraph 16 sets forth legal conclusions to which no responsive pleading is required. To the extent a response is required, RentGrow admits only that this District is an appropriate venue for purposes of this action.

**PARTIES**

17. RentGrow lacks knowledge or information sufficient to admit or deny the allegations in paragraph 17.

18. Paragraph 18 sets forth legal conclusions to which no responsive pleading is required. To the extent a response is required, RentGrow lacks knowledge or information sufficient to admit or deny the allegations in paragraph 18.

19. RentGrow denies the address listed as its principal place of business and states that its principal place of business is located at 400 5th Avenue, Suite 120, Waltham, Massachusetts 02451. RentGrow admits the remaining allegations in paragraph 19.

20. Paragraph 20 sets forth legal conclusions to which no responsive pleading is required. To the extent a response is required, RentGrow admits only that it is a reseller consumer reporting agency, as defined in 15 U.S.C. §§ 1681a(f) and 1681a(u). RentGrow denies the remaining allegations in paragraph 20.

**FACTUAL ALLEGATIONS RELATING TO PLAINTIFF**

21. RentGrow lacks knowledge or information sufficient to admit or deny the allegation in paragraph 21.

22. RentGrow lacks knowledge or information sufficient to admit or deny the allegations in paragraph 22.

23.    RentGrow lacks knowledge or information sufficient to admit or deny the allegations in paragraph 23.

24.    RentGrow admits only that Dorsey Ridge requested from RentGrow a tenant screening report pertaining to Plaintiff.  RentGrow lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 24.

30.    Paragraph 30 sets forth legal conclusions to which no responsive pleading is required.  To the extent a response is required, RentGrow lacks knowledge or information sufficient to admit or deny the allegations in paragraph 30.

31.    On information and belief, admitted.

32.    On information and belief, admitted.

33.    RentGrow lacks knowledge or information sufficient to admit or deny the allegations in paragraph 33.

34.    RentGrow admits that it provided a tenant screening report to Dorsey Ridge pertaining to Plaintiff, and with respect to the contents of that report, RentGrow refers to the document, which speaks for itself.

35.    RentGrow lacks knowledge or information sufficient to admit or deny the allegations in paragraph 35.

36.    RentGrow lacks knowledge or information sufficient to admit or deny the allegation in the first sentence of paragraph 36.  RentGrow denies the allegation in the second sentence of paragraph 36.  With respect to the allegation in the third sentence of paragraph 36, RentGrow admits only that it provided a tenant screening report to Dorsey Ridge pertaining to Plaintiff, and with respect to the contents of that report, RentGrow refers to the document, which speaks for itself.

37.    RentGrow lacks knowledge or information sufficient to admit or deny the allegations in paragraph 37, including, *inter alia*, because the terms "should have known" and "simple review" are vague and ambiguous.

38.    On information and belief, RentGrow denies that "Dorsey Ridge denied Plaintiff the opportunity to rent an apartment" and denies Plaintiff's characterization that any report provided by RentGrow was "grossly inaccurate." RentGrow lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 38.

39.    On information and belief, RentGrow admits that Dorsey Ridge was willing to rent Plaintiff an apartment. RentGrow lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 39.

40.    RentGrow admits only that Plaintiff lodged a dispute regarding certain information contained in the tenant screening report provided to Dorsey Ridge, that Plaintiff requested his consumer file from RentGrow, and that RentGrow provided a tenant screening report pertaining to Plaintiff to a customer in California in 2014. With respect to the contents of that report, RentGrow refers to the document, which speaks for itself. RentGrow lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 40.

41.    RentGrow admits only that Plaintiff lodged a dispute regarding certain information contained in the tenant screening report provided to Dorsey Ridge and RentGrow responded. Because, *inter alia*, the terms "contents" and "corrected" are vague and ambiguous, RentGrow lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 41.

42. RentGrow admits only that in January of 2019, Plaintiff requested an additional description of the procedures used to investigate his dispute. RentGrow denies the remaining allegations of paragraph 42.

43. Plaintiff lacks knowledge or information sufficient to admit or deny the allegations in paragraph 43.

44. Plaintiff lacks knowledge or information sufficient to admit or deny the allegation in paragraph 44.

**FACTS DEMONSTRATING THAT DEFENDANT WILLFULLY FAILED TO USE REASONABLE PROCEDURES TO ASSURE MAXIMUM POSSIBLE ACCURACY**

45. Denied.

46. RentGrow lacks knowledge or information sufficient to admit or deny the allegations in paragraph 46.

47. Denied.

48. RentGrow lacks knowledge or information sufficient to admit or deny the allegations in paragraph 48.

49. On information and belief, RentGrow admits only that a settlement was reached in the case of *FTC v. Realpage, Inc., No 3:18-cv-2737*. RentGrow further states that the alleged lawsuit speaks for itself as to its claims, defenses, and legal effect, and on that basis, RentGrow denies any allegations of paragraph 49 inconsistent therewith. Because, *inter alia*, the terms "tenant screening agencies," "governmental scrutiny," and "substantially similar activities" are vague and ambiguous, RentGrow lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 49.

50. RentGrow lacks knowledge or information sufficient to admit or deny the allegations in paragraph 50.

51. Denied.

52. On information and belief, RentGrow denies the first sentence of paragraph 52. RentGrow lacks knowledge or information sufficient to admit or deny the remaining allegations in paragraph 52.

53. Because, *inter alia*, the terms "dangers," "matching," "suspected terrorists," and "well recognized" are vague and ambiguous, RentGrow lacks knowledge or information sufficient to admit or deny the allegations in the first sentence of paragraph 53. With respect to the second and third sentences of paragraph 53, RentGrow admits only that, on information and belief, Trans Union, LLC was the defendant in the alleged cases. Insofar as the outcomes of specific lawsuits are alleged, RentGrow further states that each such alleged lawsuit speaks for itself as to its claims, defenses, and legal effect, and on that basis, RentGrow denies any allegations of paragraph 53 inconsistent therewith.

54. Paragraph 54 sets forth legal conclusions to which no responsive pleading is required. To the extent a response is required, denied.

55. Denied.

56. Denied.

**CLASS ACTION ALLEGATIONS**

57. Paragraph 57 sets forth legal conclusions to which no responsive pleading is required. To the extent a response is required, RentGrow admits only that Plaintiff alleges a class claim in this action. RentGrow denies that class treatment is appropriate in this action, denies any liability with respect to the alleged class, and denies that the alleged class is entitled to damages or any other relief.

58. Paragraph 58 sets forth legal conclusions to which no responsive pleading is required. To the extent a response is required, denied.

59. Paragraph 59 sets forth legal conclusions to which no responsive pleading is required. To the extent a response is required, denied.

60. Paragraph 60 sets forth legal conclusions to which no responsive pleading is required. To the extent a response is required, denied.

61. Paragraph 61 sets forth legal conclusions to which no responsive pleading is required. To the extent a response is required, denied.

62. Paragraph 62 sets forth legal conclusions to which no responsive pleading is required. To the extent a response is required, denied.

63. Paragraph 63 sets forth legal conclusions to which no responsive pleading is required. To the extent a response is required, denied.

64. Paragraph 64 sets forth legal conclusions to which no responsive pleading is required. To the extent a response is required, denied.

65. Paragraph 65 sets forth legal conclusions to which no responsive pleading is required. To the extent a response is required, denied.

66. RentGrow lacks knowledge or information sufficient to admit or deny what Plaintiff "intends" to do in the first sentence of paragraph 66. RentGrow denies all other allegations in paragraph 66.

**COUNT I**
**15 U.S.C. § 1681e(b)**
**On behalf of Plaintiff individually and on behalf of the Class**

67. RentGrow re-alleges and incorporates its responses to all factual allegations set forth in the Complaint.

68. Denied.

69. Denied.

70. Denied.

71. Denied.

**COUNT II**
**15 U.S.C. § 1681i**
**On behalf of Plaintiff Individually**

72. RentGrow re-alleges and incorporates its responses to all factual allegations set forth in the Complaint.

73. Denied.

74. Denied.

75. Denied.

76. Denied.

## RESPONSE TO PRAYER FOR RELIEF

RentGrow denies that Plaintiff is entitled to any of the relief he seeks, both individually and on behalf of putative class members.

## AFFIRMATIVE AND OTHER DEFENSES

RentGrow submits the following affirmative and other defenses to Plaintiff's Complaint. RentGrow re-alleges and incorporates by reference its responses to paragraphs 1 through 76 as if fully set forth in these affirmative defenses.

### FIRST DEFENSE

The Complaint, and all allegations and claims set forth therein, fail to state a claim upon which relief can be granted.

**SECOND DEFENSE**

Plaintiff's individual and class claims are barred in whole or in part because he and putative class members, if any, did not suffer any damages, or, if he or they did suffer damages, such damages were not proximately caused by RentGrow's acts or omissions.

**THIRD DEFENSE**

To the extent Plaintiff and/or putative class members, if any, has or have suffered or will suffer any damages, which RentGrow denies, Plaintiff's individual and class claims are barred in whole or in part because of his failure to mitigate such damages, if any.

**FOURTH DEFENSE**

To the extent Plaintiff and/or putative class members, if any, has or have suffered or will suffer any damages, which RentGrow denies, such damages were caused, in whole or in part, by Plaintiff's and/or putative class members' actions, in that Plaintiff and/or putative class members failed to use ordinary care and diligence or engaged in other conduct contributing to or causing such damages.  In the event any fault of RentGrow is found to have caused or contributed to cause any damages to Plaintiff or putative class members, if any, which is denied, any recovery against RentGrow must be reduced and limited by the comparative or contributory fault of Plaintiff or putative class members, if any.

**FIFTH DEFENSE**

To the extent Plaintiff and/or putative class members, if any, has or have suffered or will suffer any damages, which RentGrow denies, such damages were caused, in whole or in part, by the actions or omissions of other persons or entities over which RentGrow had no control and for which RentGrow is not liable, including, but not limited to, other consumer reporting agencies.

In the event any fault of RentGrow is found to have caused or contributed to cause any damages to Plaintiff or putative class members, if any, which is denied, any recovery against RentGrow must be reduced and limited by the comparative or contributory fault of such other persons or entities.

**SIXTH DEFENSE**

To the extent Plaintiff claims RentGrow willfully violated the FCRA, which RentGrow denies, any violation was not willful, including because RentGrow's interpretation of the FCRA is not objectively unreasonable. *See Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 70 (2007).

**SEVENTH DEFENSE**

Plaintiff has no individual or class claims under 15 U.S.C. § 1681e(b) because RentGrow at all times maintained and followed reasonable procedures to assure maximum possible accuracy of the information regarding Plaintiff and putative class members, if any.

**EIGHTH DEFENSE**

Although RentGrow denies that it committed or has responsibility for any act that could support the recovery of punitive damages, to the extent that Plaintiff seeks, and applicable law generally permits, the recovery of punitive damages on behalf of himself or putative class members, if any, any award of such damages in this case would violate the United States and applicable state constitutions and is therefore barred.

**RESERVATION OF RIGHTS**

RentGrow reserves the right to assert and rely on any other affirmative defenses that may become known to it as this case proceeds.

**WHEREFORE**, RentGrow denies any legal obligation or liability to Plaintiff and prays that Plaintiff takes nothing, and respectfully requests that this Court:

(a) Deny all relief sought by Plaintiff;

(b) Enter judgment in RentGrow's favor on the Complaint; and

(c) Award RentGrow its costs and fees incurred, including but not limited to reasonable attorney's fees, and such other and further relief as the Court deems just and proper.

Dated: July 12, 2019

Respectfully submitted,

**Nixon Peabody LLP**

*<u>/s/ Brian P. Donnelly</u>*
Brian P. Donnelly (Bar No. 19218)
799 9th Street, N.W., Suite 500
Washington, DC 20001-4501
(202) 585-8000
(202) 585-8080 (facsimile)
bdonnelly@nixonpeabody.com

***Counsel for Defendant RentGrow, Inc.***

**CERTIFICATE OF SERVICE**

I certify that on the 12th day of July, 2019, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following:

Martin E. Wolf, (Bar No. 09425)
GORDON, WOLF & CARNEY, CHTD
100 W. Pennsylvania Ave., Suite 100
Towson, MD 21204
Tel.: 410.825.2300
mwolf@gwcfirm.com

BERGER MONTAGUE PC
E. Michelle Drake*
John G. Albanese*
43 S.E. Main Street, Suite 505
Minneapolis, MN 55414
Tel.: (612) 594-5999
emdrake@bm.net
jalbanese@bm.net

**pro hac vice*

*Attorneys for Plaintiff*

/s/ *Brian P. Donnelly*

Brian P. Donnelly
Virginia Bar No. 82052
NIXON PEABODY LLP
799 9th Street NW, Suite 500
Washington, D.C. 20001
Telephone: (202) 585-8191
Facsimile: (202) 585-8080
bdonnelly@nixonpeabody.com

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| MARCO A. FERNANDEZ, individually and as a representative of the class,<br><br>Plaintiff,<br><br>v.<br><br>RENTGROW, INC.,<br><br>Defendant. | Case No.: 1:19-cv-01190-JKB<br><br>**DECLARATION OF JOHN G. ALBANESE IN SUPPORT OF PLAINTIFF'S MOTION FOR CLASS CERTIFICATION** |

I, John G. Albanese, hereby declare as follows:

1. I am one of Plaintiff's Counsel in the above-captioned matter.

2. I submit this Declaration in support of Plaintiff's Motion for Class Certification.

3. Berger Montague specializes in class action litigation and is one of the preeminent class action law firms in the United States. The firm currently consists of over 60 attorneys who primarily represent plaintiffs in complex civil litigation, and class action litigation, in federal and state courts. Berger Montague has played lead roles in major class action cases for over 50 years, and has obtained settlement and recoveries totaling well over $30 billion for its clients and the classes they have represented.

4. Lead counsel from Berger Montague, E. Michelle Drake is a Managing Shareholder and co-chair of the firm's Consumer Protection & Mass Tort Department, and chair of the FCRA Department. Ms. Drake has been practicing law since 2001 and is a graduate of Harvard College, Oxford University, and Harvard Law School. In 2016, Ms. Drake joined Berger Montague as a Shareholder, and prior to that was a partner at Nichols Kaster, PLLP, and ran that firm's consumer protection group.

5.      As set out in Berger Montague's firm resume (attached as Exhibit 14), Ms. Drake has served as lead class counsel in over fifty class and collective actions alleging violations of the Fair Credit Reporting Act, the Fair Debt Collection Practices Act, the Fair Labor Standards Act, various states' unfair and deceptive trade practices acts, breach of contract and numerous other pro-consumer and pro-employee causes of action.  She serves on the Board of the National Association of Consumer Advocates, is a member of the Partner's Council of the National Consumer Law Center, and is an At-Large Council Member for the Consumer Litigation Section for the Minnesota State Bar Association. She was named as a Super Lawyer in 2013-2018 and was named as a Rising Star prior to that. Michelle was also appointed to the Federal Practice Committee in 2010 by the United States District Court for the District of Minnesota. She has been quoted in the New York Times and the National Law Journal, and her cases were named as "Lawsuits of the Year" by Minnesota Law & Politics in both 2008 and 2009.

6.      I am an associate at Berger Montague, in the firm's Consumer Protection & Mass Tort Department and have been actively involved in litigating Fair Credit Reporting Act claims for over seven years. I am a graduate of Columbia Law School and Georgetown University. At Columbia, I was a managing editor of the Columbia Law Review and was elected to speak at graduation by my classmates.

7.      Plaintiff's local counsel Martin E. Wolf is a principal in Gordon, Wolf & Carney, Chtd. Mr. Wolf received his J.D. from the University of Maryland School of Law in 1991, where he was a member of the National Moot Court Team.  Wolf received his B.A. from the Johns Hopkins University in 1980.  He is a member of the state and federal bars of Maryland and also a member of the bars of the United States Supreme Court, the Second, Third, Fourth, Sixth, Eleventh and Federal Circuits of the United States Courts of Appeals, the United States Court of

Federal Claims, and the United States District Court for the Northern District of Ohio.

8. After graduating from law school, Mr. Wolf worked as an associate attorney at Piper & Marbury LLP (now DLA Piper USA) in Baltimore, Maryland. He represented clients in complex litigation and regulatory matters in state and federal courts, and before the Maryland Public Service Commission. He was also an adjunct professor at the University of Maryland School of Law where he taught Appellate Advocacy.

9. Since joining GWC in 2000, a substantial amount of Mr. Wolf's time has been concentrated in representing plaintiffs in consumer class actions. For example, he has served as counsel in class actions in both State and Federal Court including the following: *Smith v. Ace Motor Acceptance Corp.*, Case No. 1:12-cv-02149-JKS (D.Md.); *Stillmock v. Weis Markets, Inc.*, Case No. 1:07-cv-01342-MJG (D. Md.); *Riemer v. Columbia Medical Plan, Inc.*, Civil No. 13-C-96-31528 (Cir. Ct. How. Co.); *Singh v. Prudential Healthcare*, Civil No. AW-00-CV-2168 (D. Md.); *Balthrop v. Kaiser Foundation Health Plan of the Mid-Atlantic States, Inc.*, Civil No. 211347 (Cir. Ct. Mont. Co.); *McKandes v. CareFirst Blue Cross/Blue Shield*, Civil No. AW-04-CV-743 (D. Md.); *Popoola v. Optimum Choice, Inc.*, Civil No. 03-CV-03653 (D. Md.); *Jones v. Equicredit*, Civil No. 24-C-02-00572 (Cir. Ct. Balt. City); *Crowder v. Americredit Financial Services, Inc.*, Civil No. 1:06-cv707 JFM (D. Md.); *Triad Capital Corp. v. Madden*, Case No. 24-C-06006310 (Cir. Ct. Balt. City); *Shelton v. Crescent Bank & Trust*, Civil No.: 1:08-cv-01799-RDB (D. Md.); *Watts v. Capital One Auto Finance, Inc.*, Civil Action No. WMN 09-CV-826 (D. Md.); and *Butler v. C&F Finance Co.*, Case No. 03-C-09002127 (Cir. Ct. Balt. Co.).

10. In 2009, Wolf was named Trial Lawyer of the Year by the Maryland Association for Justice. He is a Fellow in the Litigation Counsel of America, and a member of the National Trial Lawyers Top 100. Wolf is listed in *Best Lawyers in America*, *Who's Who in America,*

*Who's Who in American Law*, *SuperLawyers* and has received an AV-Preeminent peer rating from Martindale-Hubbell. He was selected Lawyer of the Year by *Best Lawyers* for 2012 and 2015 for representing Plaintiffs in Mass Torts/Class Actions for the Baltimore Metropolitan Area and has been awarded the Leadership in the Law Award by The Daily Record for 2014.

11.     Attached as Exhibits are true and correct copies of the following:

**Exhibit 1:**     Document Bates-labeled RG003584-93 (filed under seal);

**Exhibit 2:**     Excerpts from the Transcript of the October 23, 2020 Deposition of Patrick Hennessey (filed under seal);

**Exhibit 3:**     Excerpts from the Transcript of the October 27, 2020 Deposition of Marco Fernandez (unredacted version filed under seal);

**Exhibit 4:**     Excerpts from Plaintiff's 3d Objections & Supplemental Answers to Defendant's Interrogatories, Set I;

**Exhibit 5:**     Documents Bates-labeled PLF-000046-63;

**Exhibit 6:**     Defendant's Supplemental Answer to Plaintiff's Interrogatory No. 3;

**Exhibit 7:**     Declaration of Erich C. Ferrari (filed under seal);

**Exhibit 8:**     Defendant's Supplemental Objections & Responses to Plaintiff's Interrogatory No. 4;

**Exhibit 9:**     Defendant's Supplemental Objections & Responses to Plaintiff's Interrogatories, Set IV;

**Exhibit 10:**    Spreadsheet labeled RFP 19_500 Sample (3), modified to remove Applicant ID, Property Name, Address, Application Result and Applicant Result columns (filed under seal);

**Exhibit 11:**     Document Bates-labeled PLF-000753-780;

**Exhibit 12:**     Excerpts from the Transcript of the December 9, 2020 Deposition

of Staci Lamoureux (filed under seal);

**Exhibit 13:**     Defendant's Objections & Responses to Plaintiff's Interrogatories,

Set II; and

**Exhibit 14:**     Berger Montague PC Firm Resume.


The foregoing statement is made under penalty of perjury and is true and correct to the best of

my knowledge and belief.

Date: August 6, 2021                          /s/John G. Albanese
                                              John G. Albanese

IN THE UNITED STATES DISTRICT COURT PLEAS
FOR THE DISTRICT OF MARYLAND
(NORTHERN DIVISION)
~~~~~~~~~~~~~~~~~~~~

FERNANDEZ, et al.,

Plaintiffs,

vs. Case No. 1:19-CV-01190-JKB

RENTGROW, INC.,

Defendant.

~~~~~~~~~~~~~~~~~~~~

Videotaped ZOOM deposition of
MARCO A. FERNANDEZ

~~~~~~~~~~~~~~~~~~~~

THIS TRANSCRIPT IS DESIGNATED CONFIDENTIAL

~~~~~~~~~~~~~~~~~~~~

October 27, 2020
10:16 a.m. EDT
Location of Witness:
7501 Trafalgar Circle, Suite 232
Columbia, Maryland 21044
Wendy L. Klauss, RPR

was challenging.
Q. How long were you employed with the Navy?
A. I'm currently still employed with the Navy. It's been 16 years.
Q. When you first began your employment with the Navy, what was your first position?
[redacted]
Q. And was a security clearance required to work in that position?
A. Yes.
Q. Are there different levels of security clearance?
A. Yes, sir.
[redacted]
Q. Did the Navy perform a background check on you to determine whether you met that security clearance?

A. Okay. I see it.

MR. GRISWOLD: Michelle, let me know when it pops up on your screen.

MS. DRAKE: I have it.

Q. All right. Exhibit 5 is a document Bates stamped PLF000717 to 718. What is this document?

A. This looks like a welcome letter from Dorsey Ridge.

Q. And did you receive this letter from Dorsey Ridge?

A. Yes.

Q. And would you have received it on November 18, 2018?

A. Yes.

Q. And it says that, if you go to the second page, that the move-in date was November 19, 2018; is that right?

A. Yes.

Q. So you were approved for purposes of leasing the apartment at least as of November 18, 2018, right?

A. Yes.

Q. You sued RentGrow, correct?

A. Yes.

Q. Why?

A. Several reasons: Number one is when I applied to this apartment, I received a call from Suzanne. From what I recall, she said, I don't think you will be able to move into this apartment, based on the information that we got on your background check.

And I remember I was very alarmed, because I knew I've made good decisions, I pay all my bills on time, I've stayed out of trouble, never been convicted of any crime. So I was shocked that she said there was something found in my background.

And I said, There is no way that information could be true, because you saw me in uniform, I couldn't be in the military if that information were true.

So she said, Yeah, that doesn't really make sense, but it's not up to me. I will have to talk to my supervisor to see if she would waive that requirement. And I think the requirement was no convictions, something along those lines.

So she said to me on that phone call, I remember also, she said, If this is not

true, there is a phone number I can give you so you can call. And I Googled the phone number, and that's when -- because I remember calling the number, and I didn't get anywhere, so I Googled the number, and that's where I found out it belonged to RentGrow.

And I started digging, trying to figure out how to get a copy of it. And I think that was it for that day. I can't remember specifically what day she told me, like, You won't be able to move into this community.

But what bothered me the most was, you know, she said to me, you know, We try very hard to keep our community safe, and to me that was a punch in the stomach, honestly, because someone like me, you know, I've served my country for 16 years, make good decisions, pay my bills on time, and I could be denied an apartment or I can be deemed unsafe to a community solely based on my name, that was very upsetting.

So in my professional judgment, I said, there is no way this could be, you know, that this could be okay. But I didn't know

about tenant screening services, I didn't know any of that. I had to educate myself, because I really thought this was on my credit report.

At the time, I really thought that my credit was messed up, this affects my clearance, I have to report to the Navy that there is an error. So I was under a lot of stress, because I have never had anything like this in my record, let alone be denied an apartment.

And when you are living in a hotel and you are, like, having to eat outside every day, it's just not an enjoyable experience. So I couldn't wait to move in, and then had this roadblock.

So as I found out how to obtain a copy of the report, and I received -- I think, that was the email that you showed in one of the exhibits, it was me requesting the information that was issued about me.

And I received a copy of the report, and when I looked at it, it was worse than I actually thought. It was worse than what was described to me over the phone, because that's when I saw all the convictions

in the State of California for petty theft, for -- I think there was something about drug substances with the intention to sell, and also that my name appears to match on the OFAC/SDM list, that very same list that I serve my country to fight against, and I was placed in the same category.

So I found everything on the report very offensive, humiliating, and I started reaching out to people that would know more than me about whether there was any way to, number one, fix this, and learn how to fix it in the future for me and others.

Q. Thank you. So is your claim that RentGrow -- let me strike that.

What do you claim that RentGrow did that violated the law, as to you?

A. They accused me of being a criminal and being a felon, they accused me of being a terrorist or a drug trafficker, and none of that information is true.

So it not only damages my reputation and prevents me from obtaining an apartment right away, but it also deters me from seeking other apartments because, at the

Q. Are you going to be asking the Court to award you some relief?

MS. DRAKE: Object as to form. You can answer.

A. Yes.

Q. Are you seeking relief because you believe you have been injured?

MS. DRAKE: Object as to form. You can answer.

THE WITNESS: Sorry.

MS. DRAKE: That's okay. I was slow. You can answer the question.

A. Yes, I think my reputation was damaged. I was extremely embarrassed. I felt humiliated at the time. I lost sleep over this, because I couldn't wait for the day to correct it, because I can't -- my livelihood depends on my reputation, my good name. It helps me maintain my clearance, keep my job, and be able to move between apartments.

Q. Okay. You were not physically injured by RentGrow's inclusion of criminal history information on your screening report, right?

MS. DRAKE: Object as to form. You

apartment before or after you inquired about the Dorsey Ridge apartment?

A. It was before.

Q. You have not paid money to anyone as a result of RentGrow's inclusion of criminal history information on your screening report, right?

A. No.

Q. You have not suffered any adverse actions by your employer as a result of RentGrow's inclusion of criminal history information on your screening report, right?

A. So far, no.

Q. And you have told them about it, right?

A. Yes.

Q. You testified that you suffered emotional distress from RentGrow including criminal history information in your screening report; is that right?

A. Yes.

Q. Why did you suffer emotional distress from the inclusion of criminal history information on your screening report?

A. Well, number one, because I was

deemed unsafe to this community. That's something that no one ever wants to go through, to show up at a place, know that you lived a great life, paid your bills on time, never committed any crime, and have a landlord tell you that you are unsafe to the community. That's very humiliating.

I mean, that's cruel, because everything I just described to you are choices that I made. I chose to pay my bills on time, I chose my career, I chose to follow the law.

I can't choose my name, unfortunately. It was chosen for me. So to find myself in a position that I never thought I would, that solely based on my name I would be discriminated against, yeah, I was shocked, I was devastated, and like I said earlier, I lost sleep over it, because I just couldn't believe that a serious organization would do this, like, so recklessly.

Q. At the time that you received the screening report that included criminal history information, you knew that information did not pertain to you, correct?

A. Correct.

Q. Would you mind reading that back.

THE NOTARY: Question: "What symptoms of emotional distress have you been experiencing as a result of RentGrow's inclusion of criminal record information about you on a screening report?"

A. As I mentioned earlier, I was very stressed out, I felt humiliated, and I couldn't sleep at night, because I couldn't wait to fix this.

At the time I -- and this is something that wasn't brought up before, but I just mention it now, just the timing of this, when this happened, I was up for my reinvestigation on my clearance, so I was scheduled to speak to an investigator in person, and I was concerned that this would put in jeopardy my okay to work, why I came here.

So it was an extraordinary amount of pressure on me, because it wasn't only about me being able to live in this community, but I was concerned that there was misinformation out there that would prevent me from renewing my clearance and being able to do the job that I do here.

CONFIDENTIAL

A. I wouldn't lose my sleep over something for work, from work. I do my job, and when I leave the office, I don't bring work-related stress home.

Q. Would you say that the stress that you are experiencing from RentGrow's temporary inclusion of criminal history information on a screening report is severe?

A. Yes.

Q. What are some of the symptoms of stress that you are experiencing from this severe emotional distress?

MS. DRAKE: Objection. Asked and answered. You can answer it again.

A. As I said before, I felt humiliated, I felt discriminated against, felt embarrassed, I lost my sleep over it because I was counting the days until I could fix this.

Q. And I'm actually asking after it was fixed, what stress you have experienced?

A. After what again?

Q. After the screening report was fixed by RentGrow, how the stress has manifested itself in your life?

A. I'll be honest with you, I don't

A. Anyone who was mismatched, anyone who was unfairly -- you know, that inaccurate information was included in the reports.

Q. Do you know how many people are in that class that you described?

A. I think that would require conversations that I had with counsel, so I can't answer that.

Q. Are you refusing to answer that on the basis of attorney-client privilege?

A. Yes, sir.

Q. Independent of your conversations with your counsel, do you have an understanding of how many people are in the class that you are seeking to represent?

A. Generally, I remember it to be a large number.

Q. You just looked to your right when you gave that answer. What did you look at?

A. I'm looking at the screen.

Q. Why are you seeking to assert your OFAC search claim on behalf of a class?

A. Because if it was wrong to do it to me, it would be just as wrong to do it for anyone else.

A. Yes, sir.
Q. To whom are you engaged?
A. Her name is Jeralys Torres.
Q. And how long have you and Ms. Torres been in a relationship?
A. I want to say around three years.
Q. And how long have you been engaged?
A. Since summer. I want to say it was July, I believe, July or August. I should remember this date. I'm going to get in trouble, but I can find out.
Q. And that's --
A. So what?
Q. That's July of 2020?
A. Yes, sir.
Q. Are you aware that RentGrow has offered to have judgment taken against it and in your favor in the amount of $20,001 plus your reasonable attorneys' fees and costs in this action?
A. Yes, I am.
MS. DRAKE: You can answer that question, Mr. Fernandez. You can answer it yes or no, but you cannot provide details about how you became aware.

A. Yes.

Q. And you rejected that offer; is that correct?

A. Yes.

Q. Do you believe that you can recover more at trial?

MS. DRAKE: I'll let you answer that -- hold on. You can answer that question yes or no.

A. I don't know. Honestly, I don't know.

Q. Are you aware that RentGrow offered to pay you $100,000 plus your reasonable attorneys' fees and costs to solve this action?

A. Yes.

Q. And you rejected that, correct?

A. Yes.

Q. You think you can recover more than $100,000 at trial? Just yes or no.

MS. DRAKE: You can answer that question yes or no.

A. I don't know that. I mean, I'll be speculating on something I don't know.

Q. Are you aware that RentGrow offered to pay $1,000 to each of the ███ persons who

disputed their OFAC results to RentGrow, plus your reasonable attorneys' fees and costs to settle this action?

A. Yes, I'm aware of it.

Q. And did you reject that offer?

A. Yes.

Q. Do you think that that group of people can recover more at trial than the $71,000 plus fees that was offered?

A. I don't know. I wouldn't know.

Q. Are you aware that RentGrow can recover its fees against you if you are proceeding in bad faith or for the purpose of harassment?

A. Yes.

MS. DRAKE: I'm going to object to that question. You can answer.

A. Yes.

Q. Do you think that rejecting an amount of settlement that is more than you could ever recover if you were successful in your claims at trial is good faith?

A. I would just say this: Money is not what drives me. What drives me is fair treatment and doing what's right. I think if

you looked at my resume, and any reasonable person would understand that in this field, I can pursue a more lucrative career if I wanted to, but I'm driven by purpose. I decided to stay in the military. It's not the only option.

And that's the same way I approach everything in life, it's not always about the money, it's about doing what's right and what fulfills my purpose.

Q. Do you believe that the 70 -- the other 70 people for whom you rejected the settlement offer would have rejected a thousand dollars each?

A. I would be speculating on how other people would behave, but if they are like me, they would also reject it.

Q. So if you are not bringing this lawsuit in the interest of recovering money, then why are you bringing it?

MS. DRAKE: Objection. Mischaracterizes his testimony, but you can answer.

A. What I said earlier is it is not the main reason why. Ultimately, I want this

type of, let's just call it, accident to cease, because if it happened to someone like me, I made everything right to this point, and then this could happen to someone like me, I can't imagine, you know, it happening to someone else.

I can't imagine if I was in an apartment and I had my wife and kids and then I have to scramble for plan B. So those are the things that I think about when I'm making a decision as to how far to take this.

Q. Do you know whether RentGrow continues to use the same process for identifying possible OFAC matches today as it did when processing your screening report in November of 2018?

MS. DRAKE: You may answer, Marco, with a yes or a no.

A. Yes.

Q. And does RentGrow still use the same process today that it did when processing your screening report with regards to OFAC possible matches?

A. Yes.

Q. Is it your understanding that

earlier that -- and maybe to my fault -- the confusion, because I view it all as criminal information, but I'm clear now on the individual claims versus the class claims.

Q. And can you describe which is which?

A. The individual claims would be regarding to the criminal matches for convictions in California.

Q. And what about the claim about the reinvestigation description?

A. That would also be an individual claim.

Q. And what's the class claim?

A. The class claim would be the OFAC match.

Q. Okay. What does it mean to be the class representative?

A. From what I understand, it is a person that serves as an advocate for himself and the other ones affected similarly, and it's engaged in the litigation process, engaged in, you know, any aspects that could contribute or benefit the outcome.

And I'm trying to think of the

right wording, but that's the top of my head, kind of late, what I can come up with.

Q. Is your understanding of the class that you seek to represent that it is more than just the ██ people who disputed their reports?

A. It is. Sorry.

(Reporter clarification.)

Q. I said, is it your understanding that the class you seek to represent is more than the ███ people who disputed their reports, but it is everyone who was mismatched?

A. Yes.

Q. Do you know what the legal phrase "actual damages" means?

A. Actual damages, the way I think of it, is costs that were out of pocket. That's the best way I can describe it.

Q. As to your individual claim for being mismatched with the California criminal records, not the OFAC criminal records, do you seek to recover for the emotional distress that you described?

A. Yes.

Q. Do you know what the legal phrase "actual injuries" means?

REPORTER'S CERTIFICATE

The State of Ohio, )

SS:

County of Cuyahoga. )

I, Wendy L. Klauss, a Notary Public within and for the State of Ohio, duly commissioned and qualified, do hereby certify that the within named witness, MARCO A. FERNANDEZ, was by me first duly sworn to testify the truth, the whole truth and nothing but the truth in the cause aforesaid; that the testimony then given by the above-referenced witness was by me reduced to stenotypy in the presence of said witness; afterwards transcribed, and that the foregoing is a true and correct transcription of the testimony so given by the above-referenced witness.

I do further certify that this deposition was taken at the time and place in the foregoing caption specified and was completed without adjournment.

I do further certify that I am not a relative, counsel or attorney for either party, or otherwise interested in the event of this action.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal of office at Cleveland, Ohio, on this 9th day of November, 2020.

Wendy L. Klauss

Wendy L. Klauss, Notary Public
within and for the State of Ohio

My commission expires July 13, 2024.

DocuSign Envelope ID: 28919AB7-4E68-404E-8E66-0AECB67C91E1

ERRATA SHEET

VERITEXT LEGAL SOLUTIONS MIDWEST

ASSIGNMENT NO: 10/27/2020

| PAGE/LINE(S) / | CHANGE | /REASON |
|---|---|---|
| 16:4, 7 | "ID" to "IG" | transcription error - refers to inspector general |
| 22:24 | "travel" to "family" | misstates testimony |
| 40:24 | "trait" to "trade" | transcription error |
| 42:23 | "TTB" to "TTP" | transcription error |
| 62:24 | "sailer" to "sailor" | transcription error |
| 63:5 | Q. should read "Did you stay in touch with each other" | misstates question as witness remembers it |
| 67:2 | "some" to "something" | transcription error |

12/3/2020
Date

DocuSigned by:
Marco Fernandez
7E04D088C92744D...
Marco A. Fernandez

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

MARCO A. FERNANDEZ, individually and as a representative of the class,

Plaintiff,

v.

RENTGROW, INC.,

Defendant.

Case No.: 1:19-cv-01190-JKB

**PLAINTIFF'S THIRD OBJECTIONS & SUPPLEMENTAL ANSWERS TO DEFENDANT'S INTERROGATORIES, SET I**

Pursuant to Fed. R. Civ. P. 26 and 33, Plaintiff Marco A. Fernandez ("Plaintiff"), by and through his counsel, hereby submits these supplemental answers and objections to Defendant's First Set of Interrogatories to Plaintiff.

**PRELIMINARY STATEMENT**

Plaintiff's answers to these Interrogatories are made on the basis of facts and circumstances as they are presently known to him. Plaintiff has not yet completed his research, analysis, and investigation of all facts relating to this case, and discovery is ongoing. Plaintiff answers and responds to these discovery requests as he interprets and understands them.

Plaintiff expressly reserves the right to supplement, correct, or amend these responses in the event future discovery or events reveal information or documents that would justify such supplementation, amendment, or correction.

Plaintiff's answers to each of Defendant's Interrogatories are made without in any way waiving or intending to waive, but on the contrary, intending to preserve and preserving (a) all questions as to relevance, materiality, and admissibility for any purpose in any subsequent motion proceeding or the trial of this or any other action; and (b) the right to object to the use of any of these responses in any subsequent motion proceeding or the trial of this or any other action.

**SUPPLEMENTAL STATEMENT:**

Plaintiff objects to the inclusion of "attorneys, agents, consultants and all other persons acting on [Marco Fernandez's] behalf" in the definitions of "Plaintiff," "You," or "Your." Defendant's inclusion of Plaintiff's lawyers, agents, consultants, and others acting on Mr. Fernandez's behalf in the definition of "You" implicates a large volume of irrelevant communications, such as Counsel's communications with e-discovery vendors assisting with document management, the vendor's internal communications about document management, Counsel's communications with court reporters assisting with depositions, etc. As framed, and as the term "You" is defined, the request also clearly seeks numerous privileged communications, including work-product and attorney-client privilege, such as communications with experts or consultants. When used in this and prior responses, the term "Plaintiff" refers to Plaintiff Marco Fernandez only and information within his personal knowledge except as otherwise indicated. Plaintiff is not producing information sought in this request when "You" is construed to include a laundry list of individuals including "Plaintiff's lawyers, agents, consultants, and others acting on Mr. Fernandez's behalf."

**ANSWERS**

**INTERROGATORY NO. 1:**

Identify all facts concerning the actual damages You allege in Paragraph 70 that You allegedly suffered as a result of RentGrow's alleged violation of 15 U.S.C. § 1681e(b) of FCRA.

**ANSWER:**

Plaintiff objects to this Interrogatory as overbroad and unduly burdensome. *See Proa v. NRT Mid-Atlantic, Inc.*, 2008 WL 11363286, *14 (D. Md. June 20, 2008) ("To the extent that interrogatories seek 'every fact which supports identified allegations or defenses,' however, they

damages as provided by the Fair Credit Reporting Act in the amount of $100 - $1,000 per violation, as well as punitive damages, costs, attorneys' fees, injunctive relief, and all other and further relief, in law and equity that the Court deems appropriate and just. Damages such as emotional distress and punitive damages are to be determined by the finder of fact.

**SUPPLEMENTAL ANSWER:**

Because this Interrogatory asks Plaintiff to apply facts to law, Plaintiff is answering this Interrogatory with assistance of his counsel.

For misreporting OFAC/SDN information as set forth in Count I to the Complaint, Plaintiff seeks relief on behalf of himself and a class. In his motion for class certification, Plaintiff will seek statutory damages of $100-$1000 and punitive damages for every class member on whom Defendant reported OFAC/SDN information.

Discovery is continuing.


**INTERROGATORY NO. 14**:

Identify all facts concerning Your application for an apartment at Dorsey Ridge.

**ANSWER:**

Plaintiff objects to this Interrogatory as overbroad and unduly burdensome. *See Proa v. NRT Mid-Atlantic, Inc.*, 2008 WL 11363286, *14 (D. Md. June 20, 2008) ("To the extent that interrogatories seek 'every fact which supports identified allegations or defenses,' however, they are generally found overbroad and unduly burdensome.") (quoting *Hiskett v. Wal-Mart Stores, Inc.*, 180 F.R.D. 403, 405 (D. Kan. 1998) and citing also *Clean Earth Remediation and Constr. Serv., Inc. v. Am. Int'l Group, Inc.*, 245 F.R.D. 137, 141 (S.D.N.Y. 2007) ("[A] number of cases have held that interrogatories seeking identification of all facts supporting a particular allegation

are inherently improper.”)); *see also Machinery Sols., Inc. v. Doosan Infracore Am. Corp.*, 323 F.R.D. 522, 528 (D.S.C. 2018) (holding similar). Plaintiff also objects to this Interrogatory as seeking information already in Defendant’s possession.

Subject to, and without waiving, these objections, Plaintiff states as follows:

On or around November 16, 2018, after viewing the Dorsey Ridge apartment complex online, Plaintiff went to the property to tour some of the units. After the tour, and after reviewing different units’ terms, Plaintiff spoke with Suzanne Whatley, leasing agent at Dorsey Ridge, about applying for a specific unit. She gave him a form application, which he completed in person, made a copy of his driver’s license, and took his $200.00 application fee. A day or two later, Plaintiff received a telephone call from Ms. Whatley. She informed Plaintiff that he would not be able to get the apartment, specifically stating that it was due to the report Dorsey Ridge had received from Defendant. Plaintiff was shocked to hear that his report had contained information that would cause him to be ineligible for the apartment, and explained that he in fact had no criminal history, or any negative information. In response to Plaintiff's explanation, Ms. Whatley stated that she would revisit the denial with her supervisor at Dorsey Ridge to see if anything could be done. A day or two after the call, Ms. Whatley called Plaintiff back again, stated that her supervisor had approved waiving the no criminal history requirement and would allow him to rent the unit. She encouraged Plaintiff to get this information corrected as she knew he was in the military and that this would likely affect him in the future. Plaintiff executed the lease for his unit shortly thereafter.

Discovery is continuing.

**<u>INTERROGATORY NO. 15:</u>**

Describe all of Your attempts to secure housing (whether successful or unsuccessful) since

**SUPPLEMENTAL OBJECTION:**

Plaintiff objects to the inclusion of "attorneys, agents, consultants and all other persons acting on [Marco Fernandez's] behalf" in the definitions of "Plaintiff," "You," or "Your." Defendant's inclusion of Plaintiff's lawyers, agents, consultants, and others acting on Mr. Fernandez's behalf in the definition of "You" implicates a large volume of irrelevant communications, such as Counsel's communications with e-discovery vendors assisting with document management, the vendor's internal communications about document management, Counsel's communications with court reporters assisting with depositions, etc. As framed, and as the term "You" is defined, the request also clearly seeks numerous privileged communications, including work-product and attorney-client privilege, such as communications with experts or consultants. When used in this and prior responses, the term "Plaintiff" refers to Plaintiff Marco Fernandez only and information within his personal knowledge except as otherwise indicated. Plaintiff is not producing information sought in this request when "You" is construed to include a laundry list of individuals including "Plaintiff's lawyers, agents, consultants, and others acting on Mr. Fernandez's behalf."


**INTERROGATORY NO. 18:**

If You denied any of RentGrow's Requests for Admission, please set forth in detail Your reasons for each such denial.

**ANSWER:**

Plaintiff objects to this Interrogatory as it seeks information regarding seventeen (17) Requests for Admission involving separate subjects, and thus exceeds the number of Interrogatories Defendant is allowed to propound under Fed. R. Civ. P. 33. *Rawl v. S.C. Dep't of*

*Social Services*, 2015 WL 6725169, *2-3 (D.S.C. Nov. 3, 2015) (finding interrogatory that requests basis for denials of requests for admission counts as separate interrogatories for each request for admission denied, citing cases in support).

Subject to, and without waiving, this objection, Plaintiff responds as follows:

RFA No. 2. Plaintiff has had Secret or Top Secret security clearance since 2005, which is reinvestigated on a routine basis, approximately every five (5) years. The question about denial of housing is a routine question asked during those reinvestigations. Plaintiff has been asked that question in the past.

RFA Nos. 3, 4, 5, 6, 7. Plaintiff has shared the story of his denial of the apartment, the inaccurate report from Defendant, and Plaintiff's resulting embarrassment, distress, and concern of future embarrassment and distress due to having to discuss the denial in an employment-related investigation with family members and friends. Plaintiff was also specifically told by Dorsey Ridge representative that he was being denied the apartment due to Defendant's report.

RFA No. 9. Defendant's inaccurate reporting was recurring – in December 2014 and then in November 2018.

RFA No. 10. Plaintiff incorporates his description of actual damages in Interrogatory No. 1 above.

RFA No. 11. Plaintiff was initially denied the apartment at Dorsey Ridge as a result of Defendant's report.

RFA Nos. 14, 15, 16, 19, 20, 21, 22. Plaintiff is a class member and Plaintiff (14) was denied an apartment initially, as a result of Defendant's report; (15) suffered actual damages as a result of Defendant's conduct; (16) was initially prevented from living at the apartment he applied for as a result of Defendant's report; (19) suffered embarrassment and distress as a result of

Defendant's conduct; (20) read the consumer report that Defendant prepared on him; (21) his prospective landlord, Dorsey Ridge, read the consumer report Defendant prepared on him; and (22) has Top Secret security clearance.

RFA No. 23. Plaintiff does recall having discussed the December 2014 report in an interview related to his security clearance.

Discovery is continuing.

**SUPPLEMENTAL ANSWER:**

RFA No. 2: Plaintiff last underwent a security clearance investigation from fall 2018 through summer of 2019, with the in-person interview piece occurring in or around January 2019. The interview was conducted by a government contractor investigation representative, male, name unknown, in [redacted] Fort Meade, Maryland. Plaintiff was asked about denial of housing. Plaintiff cannot recall with certainty whether the word "initially" was part of the question regarding denial of housing.

**AS TO SUPPLEMENTAL OBJECTIONS:**

Date: December 8, 2020

Martin E. Wolf, Bar No. 09425
GORDON, WOLF & CARNEY, CHTD.
100 W. Pennsylvania Ave., Suite 100
Towson, MD 21204
Tel. 410.825.2300
mwolf@gwcfirm.com

BERGER MONTAGUE PC
E. Michelle Drake (*pro hac vice*)
John G. Albanese (*pro hac vice*)
43 S.E. Main Street, Suite 505
Minneapolis, MN 55414
Tel: (612) 594-5997
Fax: (612) 584-4470

*Counsel for Plaintiff and the Class*

**AS TO ANSWERS:**

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Date; 10/13/2020

DocuSigned by:
Marco Fernandez
7E04D088C98744D...
Marco A. Fernandez

**AS TO OBJECTIONS:**

Date: 10/13/2020

Martin E. Wolf, Bar No. 09425
GORDON, WOLF & CARNEY, CHTD.
100 W. Pennsylvania Ave., Suite 100
Towson, MD 21204
Tel. 410.825.2300
mwolf@gwcfirm.com

BERGER MONTAGUE PC
E. Michelle Drake (*pro hac vice*)
John G. Albanese (*pro hac vice*)
43 S.E. Main Street, Suite 505
Minneapolis, MN 55414
Tel: (612) 594-5997
Fax: (612) 584-4470

*Counsel for Plaintiff and the Class*

7017 0190 0000 9118 2761
Retry
$ 006.70
MAILED FROM ZIP CODE 55414
RentGrow, Inc.
177 Huntington Ave.
STE 1703 #74213
Boston, MA 2115
00101 001724659 7

PLF-000046

December 3, 2018

**RentGrow, Inc**
**177 Huntington Avenue, STE 1703 #74213**
**Boston, MA 02115-3153**
**Tel (800) 898-1351**
**Fax (781) 583-5112**

(Sent Via US Certified Mail)
RE: RentGrow Dispute

To whom it may concern,

I am writing you in regards to a report you issued on me to Serenity at Dorsey Ridge on November 16, 2018. On that report you stated that three charges of Petty Theft (Case #CRL007179 in Merced County Superior Court) AND one charge for Possession of a Controlled Substance for Sale (Case #CRM020649 in Merced County Superior Court) belonged to me. That is incorrect. None of those records belong to me.

The report also falsely attributes an "OFAC-SDN & Blocked Persons" record to me that belongs to Mario Alberto Santana Fernandez, Zapopan, Jalisco, Mexico who was born in 1977. That is also false information.

Attached is the RentGrow Report. Please correct these records and remove them from my report immediately.

Sincerely,

Marco A. Fernandez

# Screening Report - MARCO A FERNANDEZ

Serenity at Dorsey Ridge

**Property Screening Result**
Application Result: REJECT

**Applicant Information**
NAME: MARCO A FERNANDEZ
SSN:
DOB:
CURRENT ADDRESS: San Diego, CA

**Individual Result**
REJECT

**Additional Information**
Reasons for Result
- Criminal History Does Not Meet Property Requirements

Items to Review
- 1 Possible Match in OFAC Name Search
- Rental History Records Found
- Premium National Criminal Records Found

**Additional Applicant Information**
Residence History
This applicant has rented or owned.
TIME AT CURRENT ADDRESS: 3 years 10 months
Employment/Income
PRIMARY INCOME: $5915 per month
PROPOSED RENT: $1737
RENT/INCOME: 29%
TIME AT CURRENT JOB: 14 years 2 months

| SERVICE | REQUEST DATE | COMPLETED DATE | STATUS |
|---|---|---|---|
| Credit Report | 11/16/2018 10:56 AM | 11/16/2018 10:56 AM | Complete |
| Criminal Search | 11/16/2018 10:56 AM | 11/16/2018 11:59 AM | Does Not Meet Property Requirements<br>No National Sex Offender Records Found<br>Criminal Records Found |
| Premium National Civil Court Records Search | 11/16/2018 10:56 AM | 11/16/2018 10:56 AM | Meets Property Requirements<br>No Civil Court Records Found |
| Rental History Search | 11/16/2018 10:56 AM | 11/16/2018 10:56 AM | Meets Property Requirements<br>Records Found |
| OFAC Name Search | 11/16/2018 10:56 AM | 11/16/2018 10:56 AM | 1 Possible Match Found |

EXPERIAN CREDIT REPORT

PERSONAL INFORMATION
Name: MARCO A FERNANDEZ
Also Known As: MARCO ANTONIO COLON
Also Known As: COLON MARCO FERNANDEZ
Date of Birth:

| PRIMARY ADDRESS | | OTHER ADDRESSES | |
|---|---|---|---|
| Address: | PSC 303 BOX 97<br>APO AP 96204-3097 | Address: | SAN DIEGO CA |
| Filed: | 01/9/2018 | Filed: | 12/26/2014 |
| | | Address: | COLUMBIA MD |
| | | Filed: | 02/9/2013 |

EMPLOYMENT
Company: U.S. NAVY
Title: reported 11-09-2012

Company: NAVY INFORMATION OPERAT
Title: reported 12-19-2014

CHECKPOINT MESSAGES
0004 SSN MATCHES
SSN issued between 1983 and 1985

CREDIT SUMMARY

| | | | |
|---|---|---|---|
| Total # of Trades | 21 | 30 Days Late | 0 |
| Currently Satisfactory | 21 | 60 Days Late | 0 |

| | | | |
|---|---|---|---|
| Previously Delinquent | 1 | 90 Days Late | 0 |
| Currently Delinquent | 0 | 120 Days Late | 0 |
| Collections | 1 | Newest Trade | 01/30/2017 |
| Charge-Offs | 0 | Oldest Trade | 07/18/2005 |
| Legal Items | 0 | Inquires | 0 |

| OPEN ACCOUNTS | TOTAL NUMBERS | ACCOUNTS WITH A BALANCE | BALANCE | AVAILABLE | CREDIT LIMIT | DEBT TO CREDIT RATIO | MONTHLY PAYMENT AMOUNT |
|---|---|---|---|---|---|---|---|
| Revolving | 5 | 3 | $28,799 | $2,426 | $31,225 | 92% | $653 |
| Installment | 1 | 1 | $161,599 | $32,201 | $193,800 | 83% | $1,158 |
| Mortgage | 0 | 0 | $0 | $0 | $0 | 0% | $0 |
| Total | 6 | 4 | $190,398 | $34,627 | $225,025 | 85% | $1,811 |

DEPT OF VETERANS AFFAI (SUB# 1994900 )

Account type: Govt overpayment Responsibility: Individual

| | | | | | |
|---|---|---|---|---|---|
| Current Balance: | $0 | Credit Limit: | $125 | Date Opened: | 04/1/2015 |
| Past Due Amount: | n/a | High Balance: | n/a | Last Active On: | 09/13/2015 |
| Monthly Payment: | n/a | Acct. Terms: | REV | Date Updated: | n/a |
| | | | | Balance Date: | 09/29/2015 |

| 2015 | |
|---|---|
| OK | OK |
| SEP | AUG |

Delinquencies; Max: on 08/1/2015
Previous: on 08/1/2015

Remarks: Attorney or outside agency account
Paid account/zero balance

NAVY FEDERAL CR UNION (SUB# 1720115 )

Account type: Auto loan Responsibility: Individual

| | | | | | |
|---|---|---|---|---|---|
| Current Balance: | $0 | Credit Limit: | $35,199 | Date Opened: | 02/24/2014 |
| Past Due Amount: | n/a | High Balance: | n/a | Last Active On: | n/a |
| Monthly Payment: | n/a | Acct. Terms: | 072 | Date Updated: | n/a |
| | | | | Balance Date: | 12/30/2017 |

| 2017 | | | | | | | | | | | | 2016 | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK |
| DEC | NOV | OCT | SEP | AUG | JUL | JUN | MAY | APR | MAR | FEB | JAN | DEC | NOV | OCT | SEP | AUG | JUL | JUN | MAY | APR | MAR | FEB | JAN |

Remarks: Current account
Paid account/zero balance

NAVY FEDERAL CR UNION (SUB# 1720115 )

Account type: Unsecured Responsibility: Individual

| | | | | | |
|---|---|---|---|---|---|
| Current Balance: | $0 | Credit Limit: | $1,500 | Date Opened: | 08/26/2016 |
| Past Due Amount: | n/a | High Balance: | n/a | Last Active On: | n/a |
| Monthly Payment: | n/a | Acct. Terms: | 012 | Date Updated: | n/a |
| | | | | Balance Date: | 03/31/2017 |

| 2017 | | | 2016 | | | | |
|---|---|---|---|---|---|---|---|
| OK | OK | OK | OK | OK | OK | OK | OK |
| MAR | FEB | JAN | DEC | NOV | OCT | SEP | AUG |

Remarks: Current account
Paid account/zero balance

NAVY FEDERAL CR UNION (SUB# 1720115 )

Account type: Unsecured Responsibility: Individual

| | | | | | |
|---|---|---|---|---|---|
| Current Balance: | $0 | Credit Limit: | $500 | Date Opened: | 01/4/2017 |
| Past Due Amount: | n/a | High Balance: | n/a | Last Active On: | n/a |
| Monthly Payment: | n/a | Acct. Terms: | 006 | Date Updated: | n/a |
| | | | | Balance Date: | 03/31/2017 |

| 2017 | | |
|---|---|---|
| OK | OK | OK |

MAR FEB JAN
Remarks: Current account
Paid account/zero balance

NAVY FEDERAL CR UNION (SUB# 1720115 )

| | | | | | |
|---|---|---|---|---|---|
| Account type: Unsecured | | Responsibility: Individual | | | |
| Current Balance: | $0 | Credit Limit: | $1,000 | Date Opened: | 01/30/2017 |
| Past Due Amount: | n/a | High Balance: | n/a | Last Active On: | n/a |
| Monthly Payment: | n/a | Acct. Terms: | 012 | Date Updated: | n/a |
| | | | | Balance Date: | 03/31/2017 |

2017

| | | |
|---|---|---|
| OK | OK | OK |
| MAR | FEB | JAN |

Remarks: Current account
Paid account/zero balance

SYNCB/AMAZON (SUB# 1004694 )

| | | | | | |
|---|---|---|---|---|---|
| Account type: Charge | | Responsibility: Individual | | | |
| Current Balance: | $0 | Credit Limit: | $600 | Date Opened: | 12/25/2014 |
| Past Due Amount: | n/a | High Balance: | $418 | Last Active On: | 02/24/2015 |
| Monthly Payment: | n/a | Acct. Terms: | REV | Date Updated: | n/a |
| | | | | Balance Date: | 03/5/2017 |

| 2017 | 2016 | | | | | | | | | | | | | 2015 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK |
| MAR | FEB | JAN | DEC | NOV | OCT | SEP | AUG | JUL | JUN | MAY | APR | MAR | FEB | JAN | DEC | NOV | OCT | SEP | AUG | JUL | JUN | MAY | APR |

Remarks: Current account
Paid account/zero balance

NAVY FEDERAL CR UNION (SUB# 1720115 )

| | | | | | |
|---|---|---|---|---|---|
| Account type: Unsecured | | Responsibility: Individual | | | |
| Current Balance: | $0 | Credit Limit: | $1,000 | Date Opened: | 06/1/2015 |
| Past Due Amount: | n/a | High Balance: | n/a | Last Active On: | n/a |
| Monthly Payment: | n/a | Acct. Terms: | 012 | Date Updated: | n/a |
| | | | | Balance Date: | 09/30/2015 |

2015

| | | | |
|---|---|---|---|
| OK | OK | OK | OK |
| SEP | AUG | JUL | JUN |

Remarks: Current account
Paid account/zero balance

NAVY FEDERAL CR UNION (SUB# 1720115 )

| | | | | | |
|---|---|---|---|---|---|
| Account type: Unsecured | | Responsibility: Individual | | | |
| Current Balance: | $0 | Credit Limit: | $1,500 | Date Opened: | 12/24/2014 |
| Past Due Amount: | n/a | High Balance: | n/a | Last Active On: | n/a |
| Monthly Payment: | n/a | Acct. Terms: | 006 | Date Updated: | n/a |
| | | | | Balance Date: | 03/31/2015 |

| 2015 | | | 2014 |
|---|---|---|---|
| OK | OK | OK | OK |
| MAR | FEB | JAN | DEC |

Remarks: Current account
Paid account/zero balance

NAVY FEDERAL CR UNION (SUB# 1720115 )

| | | | | | |
|---|---|---|---|---|---|
| Account type: Auto loan | | Responsibility: Individual | | | |
| Current Balance: | $0 | Credit Limit: | $35,102 | Date Opened: | 05/31/2013 |
| Past Due Amount: | n/a | High Balance: | n/a | Last Active On: | n/a |
| Monthly Payment: | n/a | Acct. Terms: | 072 | Date Updated: | n/a |
| | | | | Balance Date: | 03/31/2014 |

2014 2013

| OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK |
|---|---|---|---|---|---|---|---|---|---|---|
| MAR | FEB | JAN | DEC | NOV | OCT | SEP | AUG | JUL | JUN | MAY |

Remarks: Current account
Paid account/zero balance

WELLS FARGO BANK AUTO (SUB# 3130059 )

| | | | | | |
|---|---|---|---|---|---|
| Account type: Auto loan | | Responsibility: Individual | | | |
| Current Balance: | $0 | Credit Limit: | $14,009 | Date Opened: | 10/9/2012 |
| Past Due Amount: | n/a | High Balance: | n/a | Last Active On: | 05/14/2013 |
| Monthly Payment: | n/a | Acct. Terms: | 054 | Date Updated: | n/a |
| | | | | Balance Date: | 05/31/2013 |

| 2013 | | | | | 2012 | | |
|---|---|---|---|---|---|---|---|
| OK | OK | OK | OK | OK | OK | OK | OK |
| MAY | APR | MAR | FEB | JAN | DEC | NOV | OCT |

Remarks: Current account
Paid account/zero balance

NAVY FEDERAL CR UNION (SUB# 1720115 )

| | | | | | |
|---|---|---|---|---|---|
| Account type: Auto loan | | Responsibility: Individual | | | |
| Current Balance: | $0 | Credit Limit: | $25,706 | Date Opened: | 05/13/2009 |
| Past Due Amount: | n/a | High Balance: | n/a | Last Active On: | n/a |
| Monthly Payment: | n/a | Acct. Terms: | 072 | Date Updated: | n/a |
| | | | | Balance Date: | 11/1/2012 |

| 2012 | | | | | | | | | | | 2011 | | | | | | | | | | | | 2010 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK |
| NOV | OCT | SEP | AUG | JUL | JUN | MAY | APR | MAR | FEB | JAN | DEC | NOV | OCT | SEP | AUG | JUL | JUN | MAY | APR | MAR | FEB | JAN | DEC |

Remarks: Current account
Paid account/zero balance

THD/CBNA (SUB# 3170962 )

| | | | | | |
|---|---|---|---|---|---|
| Account type: Charge | | Responsibility: Individual | | | |
| Current Balance: | $0 | Credit Limit: | $500 | Date Opened: | 10/29/2008 |
| Past Due Amount: | n/a | High Balance: | n/a | Last Active On: | n/a |
| Monthly Payment: | n/a | Acct. Terms: | REV | Date Updated: | n/a |
| | | | | Balance Date: | 10/6/2011 |

| 2011 | | | | | | | | | | 2010 | | | | | | | | | | | | 2009 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK |
| OCT | SEP | AUG | JUL | JUN | MAY | APR | MAR | FEB | JAN | DEC | NOV | OCT | SEP | AUG | JUL | JUN | MAY | APR | MAR | FEB | JAN | DEC | NOV |

Remarks: Current account
Credit line closed - grantor's request
Paid account/zero balance

WELLS FARGO HM MORTGAG (SUB# 1005515 )

| | | | | | |
|---|---|---|---|---|---|
| Account type: VA Real Estate Loan | | Responsibility: Individual | | | |
| Current Balance: | $0 | Credit Limit: | $191,400 | Date Opened: | 10/24/2008 |
| Past Due Amount: | n/a | High Balance: | n/a | Last Active On: | 04/15/2011 |
| Monthly Payment: | n/a | Acct. Terms: | 360 | Date Updated: | n/a |
| | | | | Balance Date: | 05/1/2011 |

| 2011 | | | | | 2010 | | | | | | | | | | | | 2009 | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK |
| MAY | APR | MAR | FEB | JAN | DEC | NOV | OCT | SEP | AUG | JUL | JUN | MAY | APR | MAR | FEB | JAN | DEC | NOV | OCT | SEP | AUG | JUL | JUN |

Remarks: Current account
Paid account/zero balance

NAVY FEDERAL CR UNION (SUB# 1720116 )

| | | | | | |
|---|---|---|---|---|---|
| Account type: Unsecured | | Responsibility: Individual | | | |
| Current Balance: | $0 | Credit Limit: | $3,000 | Date Opened: | 11/9/2009 |
| Past Due Amount: | n/a | High Balance: | n/a | Last Active On: | n/a |
| Monthly Payment: | n/a | Acct. Terms: | 036 | Date Updated: | n/a |

Balance Date: 10/30/2010

| 2010 | | | | | | | | | | 2009 | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK |
| OCT | SEP | AUG | JUL | JUN | MAY | APR | MAR | FEB | JAN | DEC | NOV |

Remarks: Current account
Paid account/zero balance

NAVY FEDERAL CR UNION (SUB# 1720115 )

| | | | | | |
|---|---|---|---|---|---|
| Account type: Unsecured | | Responsibility: Individual | | | |
| Current Balance: | $0 | Credit Limit: | $1,000 | Date Opened: | 05/22/2009 |
| Past Due Amount: | n/a | High Balance: | n/a | Last Active On: | n/a |
| Monthly Payment: | n/a | Acct. Terms: | 024 | Date Updated: | n/a |
| | | | | Balance Date: | 11/30/2009 |

| 2009 | | | | | | |
|---|---|---|---|---|---|---|
| OK | OK | OK | OK | OK | OK | OK |
| NOV | OCT | SEP | AUG | JUL | JUN | MAY |

Remarks: Current account
Paid account/zero balance

NAVY FEDERAL CR UNION (SUB# 1720115 )

| | | | | | |
|---|---|---|---|---|---|
| Account type: Auto loan | | Responsibility: Individual | | | |
| Current Balance: | $0 | Credit Limit: | $16,830 | Date Opened: | 12/1/2008 |
| Past Due Amount: | n/a | High Balance: | n/a | Last Active On: | n/a |
| Monthly Payment: | n/a | Acct. Terms: | 060 | Date Updated: | n/a |
| | | | | Balance Date: | 06/30/2009 |

| 2009 | | | | | | 2008 |
|---|---|---|---|---|---|---|
| OK | OK | OK | OK | OK | OK | OK |
| JUN | MAY | APR | MAR | FEB | JAN | DEC |

Remarks: Current account
Paid account/zero balance

NAVY FEDERAL CR UNION (SUB# 1720115 )

| | | | | | |
|---|---|---|---|---|---|
| Account type: Auto loan | | Responsibility: Individual | | | |
| Current Balance: | $0 | Credit Limit: | $17,617 | Date Opened: | 06/24/2008 |
| Past Due Amount: | n/a | High Balance: | n/a | Last Active On: | n/a |
| Monthly Payment: | n/a | Acct. Terms: | 060 | Date Updated: | n/a |
| | | | | Balance Date: | 12/31/2008 |

| 2008 | | | | | | |
|---|---|---|---|---|---|---|
| OK | OK | OK | OK | OK | OK | OK |
| DEC | NOV | OCT | SEP | AUG | JUL | JUN |

Remarks: Current account
Paid account/zero balance

WELLS FARGO HM MORTGAG (SUB# 1995515 )

| | | | | | |
|---|---|---|---|---|---|
| Account type: VA Real Estate Loan | | Responsibility: Individual | | | |
| Current Balance: | $161,599 | Credit Limit: | $193,880 | Date Opened: | 05/6/2011 |
| Past Due Amount: | n/a | High Balance: | n/a | Last Active On: | 10/12/2018 |
| Monthly Payment: | $1,158 | Acct. Terms: | 360 | Date Updated: | n/a |
| | | | | Balance Date: | 11/7/2018 |

Late Payments over the last 87 months :
1 payment over 30 days late;

| 2018 | | | | | | | | | | | 2017 | | | | | | | | | | | | 2016 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OK | OK | OK | OK | OK | OK | OK | OK | OK | 30 | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK |
| NOV | OCT | SEP | AUG | JUL | JUN | MAY | APR | MAR | FEB | JAN | DEC | NOV | OCT | SEP | AUG | JUL | JUN | MAY | APR | MAR | FEB | JAN | DEC |

Delinquencies: Max: on 02/1/2018
Previous: on 02/1/2018
Remarks: Acct delinquent 30 days - now current
Open

MILITARY STAR (SUB# 1327980 )

PLF-000052

Account type: Charge Responsibility: Individual

| | | | | | |
|---|---|---|---|---|---|
| Current Balance: | $7,880 | Credit Limit: | $8,200 | Date Opened: | 11/25/2005 |
| Past Due Amount: | n/a | High Balance: | $8,352 | Last Active On: | 10/13/2018 |
| Monthly Payment: | $227 | Acct. Terms: | REV | Date Updated: | n/a |
| | | | | Balance Date: | 11/14/2018 |

2018 2017 2016

OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK
NOV OCT SEP AUG JUL JUN MAY APR MAR FEB JAN DEC NOV OCT SEP AUG JUL JUN MAY APR MAR FEB JAN DEC

Remarks: Current account
Open

NAVY FEDERAL CR UNION (SUB# 1223565 )

Account type: Credit card Responsibility: Individual

| | | | | | |
|---|---|---|---|---|---|
| Current Balance: | $17,211 | Credit Limit: | $17,300 | Date Opened: | 07/10/2005 |
| Past Due Amount: | n/a | High Balance: | $17,969 | Last Active On: | 10/12/2018 |
| Monthly Payment: | $344 | Acct. Terms: | REV | Date Updated: | n/a |
| | | | | Balance Date: | 10/24/2018 |

2018 2017 2016

OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK
OCT SEP AUG JUL JUN MAY APR MAR FEB JAN DEC NOV OCT SEP AUG JUL JUN MAY APR MAR FEB JAN DEC NOV

Remarks: Current account
Open

NAVY FEDERAL CR UNION (SUB# 1728115 )

Account type: Line of credit Responsibility: Individual

| | | | | | |
|---|---|---|---|---|---|
| Current Balance: | $3,708 | Credit Limit: | $5,000 | Date Opened: | 11/6/2000 |
| Past Due Amount: | n/a | High Balance: | $5,000 | Last Active On: | n/a |
| Monthly Payment: | $82 | Acct. Terms: | REV | Date Updated: | n/a |
| | | | | Balance Date: | 09/29/2018 |

2018 2017 2016

OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK OK
SEP AUG JUL JUN MAY APR MAR FEB JAN DEC NOV OCT SEP AUG JUL JUN MAY APR MAR FEB JAN DEC NOV OCT

Remarks: Current account
Open

MEDICAL PAYMENT DATA (SUB# 1983091 - YC )
Responsibility: Individual

| | | | | | |
|---|---|---|---|---|---|
| Current Balance: | $315 | Balance Date: | 10/31/2018 | Date Assigned: | 11/6/2013 |
| Original Amount: | $315 | Last Active On: | n/a | Date Updated: | n/a |

Remarks: FCBA - disputed account
Attorney or outside agency account

Experian P.O Box 2104 Allen TX 75013

PREMIUM NATIONAL CRIMINAL RECORDS SEARCH

| REQUEST DATE | COMPLETED | STATUS |
|---|---|---|
| 11/16/2018 10:56 AM | 11/16/2018 11:59 AM | Does Not Meet Property Requirements<br>No National Sex Offender Records Found<br>Criminal Records Found |

FERNANDEZ, MARCO ANTONIO RECORD 1 OF 2

Last Name: FERNANDEZ
First Name: MARCO
Middle Name: ANTONIO

DOB: [redacted]
Record Type: Criminal
State Of Record: CA
Database: Merced County - Superior Court - Historical Data (Inactive: 12/1/2014)

PETTY THEFT UNDER 950.00 — RECORD 1 - CHARGE 1

File Date: 01/11/2012 — Case #: CRL007179
State Of Record: CA
Offense: PETTY THEFT UNDER 950.00
Offense Degree: MISDEMEANOR
Offense Date: 11/16/2011
Disposition: CONVICTION: GUILTY PLEA
Disposition Date: 02/21/2012
Arrest Agency: LOS BANOS POLICE DEPARTMENT
Statute Code: PC484(A)/488
Filing Type: COMPLAINT
Case Disposition: CONVICTION: NOLO PLEA
Case Type: MISDEMEANOR - LOS BANOS
Probation Length Sentenced: 24 MONTHS
Probation Type: PROBATION: COURT
Case Disposition Date: 2012-03-19
Original Degree of Offense: MISDEMEANOR
Count: 1
Year of Birth: 1984
Case Category: MISDEMEANOR: PROPERTY OFFENSE

PETTY THEFT UNDER 950.00 — RECORD 1 - CHARGE 2

File Date: 01/11/2012 — Case #: CRL007179
State Of Record: CA
Offense: PETTY THEFT UNDER 950.00
Offense Degree: MISDEMEANOR
Offense Date: 11/22/2011
Disposition: CONVICTION: GUILTY PLEA
Disposition Date: 02/21/2012
Arrest Agency: LOS BANOS POLICE DEPARTMENT
Statute Code: PC484(A)/488
Filing Type: COMPLAINT
Case Disposition: CONVICTION: NOLO PLEA
Case Type: MISDEMEANOR - LOS BANOS
Probation Length Sentenced: 24 MONTHS
Probation Type: PROBATION: COURT
Case Disposition Date: 2012-03-19
Original Degree of Offense: MISDEMEANOR
Count: 2
Year of Birth: 1984
Case Category: MISDEMEANOR: PROPERTY OFFENSE

PETTY THEFT UNDER 950.00 — RECORD 1 - CHARGE 3

File Date: 01/11/2012 — Case #: CRL007179
State Of Record: CA
Offense: PETTY THEFT UNDER 950.00
Offense Degree: MISDEMEANOR
Offense Date: 11/30/2011
Disposition: CONVICTION: GUILTY PLEA
Disposition Date: 02/21/2012
Arrest Agency: LOS BANOS POLICE DEPARTMENT
Statute Code: PC484(A)/488
Filing Type: COMPLAINT
Case Disposition: CONVICTION: NOLO PLEA
Case Type: MISDEMEANOR - LOS BANOS
Probation Length Sentenced: 24 MONTHS
Probation Type: PROBATION: COURT
Case Disposition Date: 2012-03-19
Original Degree of Offense: MISDEMEANOR
Count: 3
Year of Birth: 1984
Case Category: MISDEMEANOR: PROPERTY OFFENSE

FERNANDEZ, MARCO ANTONIO RECORD 2 OF 2

Last Name: FERNANDEZ
First Name: MARCO
Middle Name: ANTONIO
DOB: 00/00/1984
Record Type: Criminal
State Of Record: CA
Database: Merced County - Superior Court - Historical Data (Inactive: 12/1/2014)

CONTROLLED SUBSTANCE - POSSESSION FOR SA- RECORD 2 - CHARGE 1
Case #: CRM020649

File Date: 12/09/2011
State Of Record: CA
Offense: CONTROLLED SUBSTANCE - POSSESSION FOR SALE
Offense Degree: FELONY
Offense Date: 10/15/2011
Disposition: CONVICTION: NOLO PLEA
Disposition Date: 08/06/2012
Arrest Agency: MERCED POLICE DEPARTMENT
Statute Code: HS11378
Filing Type: COMPLAINT
Case Disposition: CONVICTION: NOLO PLEA
Case Type: FELONY - MERCED
Probation Length Sentenced: 36 MONTHS
Probation Type: PROBATION: FORMAL
Case Disposition Date: 2012-06-06
Original Degree of Offense: FELONY
Count: 2
Year of Birth: 1984
Case Category: FELONY: DRUG OFFENSE

PREMIUM NATIONAL CIVIL COURT RECORDS SEARCH

| REQUEST DATE | COMPLETED | STATUS |
|---|---|---|
| 11/16/2018 10:56 AM | 11/16/2018 10:56 AM | Meets Property Requirements<br>No Civil Court Records Found |

RENTAL HISTORY SEARCH

| REQUEST DATE | COMPLETED | STATUS |
|---|---|---|
| 11/16/2018 10:56 AM | 11/16/2018 10:56 AM | Meets Property Requirements<br>Records Found |

PERSONAL INFORMATION
Name: Marco Fernandez SSN: [redacted]
DOB: [redacted] DL: DL State:
Address: [redacted] San Diego, CA [redacted]
Employment: Navy Information Operations Command - Systems Architect; Annual Income: 6232 Years on Job:

Tenant Information
Lease Address: 1440 Hotel Circle North APT 334 San Diego, CA 92108
Property Information: Alliance Residential Presidio View
Property Address: 1440 Hotel Circle North San Diego, CA 92108
Reasons for Result:
This Payment History meets requirements
The following elements in this Payment History did not contribute to the Rental History Evaluation:
- NSF payments are too old to be considered in the Rental History Evaluation

Lease information:

| | | | |
|---|---|---|---|
| Begin: | Nov 24, 2016 | Move in: | Dec 24, 2014 |
| End: | Nov 23, 2017 | Move out: | Nov 9, 2017 |
| Notice: | | | |

Payment History:

P P P P P P P P P P P

P P P P P P P P P P P N

Rent: $1722.00 Total Rent Paid: $59718.21 Total Write-Offs: $0.00

OFAC/SDN SEARCH

| REQUEST DATE | COMPLETED | STATUS |
|---|---|---|
| 11/16/2018 10:56 AM | 11/16/2018 10:56 AM | 1 Possible Record Found |

Database(s) Searched: US Treasury Department - OFAC - SDN & Blocked Persons

FERNANDEZ SANTANA, MARIO ALBERTO - *INDIVIDUAL*

| ADDRESS | DATABASE |
|---|---|
| Av. Moctezuma 4297, Col. Jardines del Sol<br>Zapopan, Jalisco<br>Mexico | US Treasury Department - OFAC - SDN & Blocked Persons |

| RECORD ID | PROGRAM | REMARKS |
|---|---|---|
| 21070 | SDNTK | DOB 09 May 1977; POB Guadalajara, Jalisco, Mexico; citizen Mexico; Gender Male; R.F.C. FESM770509RQ7 (Mexico); C.U.R.P. FESM770509HJCRNR06 (Mexico); Linked To: FLORES DRUG TRAFFICKING ORGANIZATION; Linked To: EVENTOS LA MORA, S.A. DE C.V.; Linked To: MONTALVA INMOBILIARIA, S.A. DE C.V. |

CUSTOMER ACKNOWLEDGEMENT

Your use of the information in this report is strictly subject to the terms of your screening agreement with RentGrow and all applicable laws and regulations, including the federal Fair Credit Reporting Act, 15 U.S.C. § 1681 et seq. ("FCRA"). Any credit, criminal, civil or rental history information about the individual to whom this tenant screening report pertains was obtained from public records or third-party consumer reporting agencies. RentGrow, Inc. follows reasonable procedures to assure maximum possible accuracy of the information in this report but cannot guarantee the accuracy or truthfulness of the records. RentGrow will suppress information that the applicant disputes as inaccurate or incomplete, and will notify you of the results of any dispute. RentGrow does not manage or rent properties, does not set applicant eligibility criteria, and does not make rental decisions. All eligibility criteria are set, and all rental decisions are made, by the responsible property manager or owner.

Processing Information

DATE ENTERED: 11/16/2018 10:56 AM
INPUT BY: swhatley
POLICY: QUE01
MARKET SOURCE: Property Website
Reference: 33926952

# RentGrow

## A Summary of Your Rights Under the Fair Credit Reporting Act

***Para información en español, visite*** www.consumerfinance.gov/learnmore ***o escribe al Consumer Financial Protection Bureau, 1700 G Street N.W., Washington, DC 20552.***

The federal Fair Credit Reporting Act (FCRA) promotes the accuracy, fairness, and privacy of information in the files of consumer reporting agencies. There are many types of consumer reporting agencies, including credit bureaus and specialty agencies (such as agencies that sell information about check writing histories, medical records, and rental history records). Here is a summary of your major rights under the FCRA. **For more information, including information about additional rights, go to** www.consumerfinance.gov/learnmore **or write to: Consumer Financial Protection Bureau, 1700 G Street N.W., Washington, DC20552.**

- **You must be told if information in your file has been used against you.** Anyone who uses a credit report or another type of consumer report to deny your application for credit, insurance, or employment – or to take another adverse action against you – must tell you, and must give you the name, address, and phone number of the agency that provided the information.

- **You have the right to know what is in your file.** You may request and obtain all the information about you in the files of a consumer reporting agency (your "file disclosure"). You will be required to provide proper identification, which may include your Social Security number. In many cases, the disclosure will be free. You are entitled to a free file disclosure if:

  - a person has taken adverse action against you because of information in your credit report;
  - you are the victim of identity theft and place a fraud alert in your file;
  - your file contains inaccurate information as a result of fraud;
  - you are on public assistance;
  - you are unemployed but expect to apply for employment within 60 days

  In addition, all consumers are entitled to one free disclosure every 12 months upon request from each nationwide credit bureau and from nationwide specialty consumer reporting agencies. See www.consumerfinance.gov/learnmore for additional information.

- **You have the right to dispute incomplete or inaccurate information.** If you identify information in your file that is incomplete or inaccurate, and report it to the consumer reporting agency, the agency must investigate unless your dispute is frivolous. See www.consumerfinance.gov/learnmore for an explanation of dispute procedures.

- **Consumer reporting agencies must correct or delete inaccurate, incomplete, or unverifiable information.** Inaccurate, incomplete, or unverifiable information must be removed or corrected, usually within 30 days. However, a consumer reporting agency may continue to report information it has verified as accurate.

© 2018 RentGrow, Inc. All rights reserved.

# RentGrow

- **Consumer reporting agencies may not report outdated negative information.** In most cases, a consumer reporting agency may not report negative information that is more than seven years old, or bankruptcies that are more than 10 years old.
- **Access to your file is limited.** A consumer reporting agency may provide information about you only to people with a valid need -- usually to consider an application with a creditor, insurer, employer, landlord, or other business. The FCRA specifies those with a valid need for access.
- **You must give your consent for reports to be provided to employers.** A consumer reporting agency may not give out information about you to your employer, or a potential employer, without your written consent given to the employer. Written consent generally is not required in the trucking industry. For more information, go to www.consumerfinance.gov/learnmore.
- **You may limit "prescreened" offers of credit and insurance you get based on information in your credit report.** Unsolicited "prescreened" offers for credit and insurance must include a toll-free phone number you can call if you choose to remove your name and address from the lists these offers are based on. You may opt out with the nationwide credit bureaus at 1-888-5-OPTOUT (1-888-567-8688).
- **You may seek damages from violators.** If a consumer reporting agency, or, in some cases, a user of consumer reports or a furnisher of information to a consumer reporting agency violates the FCRA, you may be able to sue in state or federal court.
- **Identity theft victims and active duty military personnel have additional rights.** For more information, visit www.consumerfinance.gov/learnmore.
- **You have a right to place a 'security freeze' on your credit report, which will prohibit a consumer reporting agency from releasing information in your credit report without your express authorization.** The security freeze is designed to prevent credit, loans, and services from being approved in your name without your consent. However, you should be aware that using a security freeze to take control over who gets access to the personal and financial information in your credit report may delay, interfere with, or prohibit the timely approval of any subsequent request or application you make regarding a new loan, credit, mortgage, or any other account involving the extension of credit. A security freeze does not apply to a person or entity, or its affiliates, or collection agencies acting on behalf of the person or entity, with which you have an existing account that requests information in your credit report for the purposes of reviewing or collecting the account. Reviewing the account includes activities related to account maintenance, monitoring, credit line increases, and account upgrades and enhancements.
- **As an alternative to a security freeze, you have the right to place an initial or extended fraud alert on your credit file at no cost.** An initial fraud alert is a 1-year alert that is placed on a consumer's credit file. Upon seeing a fraud alert display on a consumer's credit file, a business is required to take steps to verify the consumer's identity before extending new credit. If you are a victim of identity theft, you are entitled to an extended fraud alert, which is a fraud alert lasting 7 years.

© 2018 RentGrow, Inc. All rights reserved.

# RentGrow

**States may enforce the FCRA, and many states have their own consumer reporting laws. In some cases, you may have more rights under state law. For more information, contact your state or local consumer protection agency or your state Attorney General. For information about your federal rights, contact:**

| TYPE OF BUSINESS: | CONTACT: |
|---|---|
| 1.a. Banks, savings associations, and credit unions with total assets of over $10 billion and their affiliates<br><br>b. Such affiliates that are not banks, savings associations, or credit unions also should list, in addition to the CFPB: | a. Consumer Financial Protection Bureau<br>1700 G Street, N.W.<br>Washington, DC 20552<br><br>b. Federal Trade Commission:<br>Consumer Response Center – FCRA<br>Washington, DC 20580 |
| 2. To the extent not included in item 1 above:<br><br>a. National banks, federal savings associations, and federal branches and federal agencies of foreign banks<br><br>b. State member banks, branches and agencies of foreign banks (other than federal branches, federal agencies, and Insured State Branches of Foreign Banks), commercial lending companies owned or controlled by foreign banks, and organizations operating under section 25 or 25A of the Federal Reserve Act<br><br>c. Nonmember Insured Banks, Insured State Branches of Foreign Banks, and insured state savings associations<br><br>d. Federal Credit Unions | a. Office of the Comptroller of the Currency<br>Customer Assistance Group<br>1301 McKinney Street, Suite 3450<br>Houston, TX 77010-9050<br><br>b. Federal Reserve Consumer Help Center<br>P.O. Box. 1200<br>Minneapolis, MN 55480<br><br>c. FDIC Consumer Response Center<br>1100 Walnut Street, Box #11<br>Kansas City, MO 64106<br><br>d. National Credit Union Administration<br>Office of Consumer Protection (OCP)<br>Division of Consumer Compliance and Outreach (DCCO)<br>1775 Duke Street<br>Alexandria, VA 22314 |
| 3. Air carriers | Asst. General Counsel for Aviation Enforcement & Proceedings<br>Aviation Consumer Protection Division Department of Transportation<br>1200 New Jersey Avenue, S.E.<br>Washington, DC 20590 |
| 4. Creditors Subject to the Surface Transportation Board | Office of Proceedings, Surface Transportation Board<br>Department of Transportation<br>395 E Street, S.W.<br>Washington, DC 20423 |
| 5. Creditors Subject to the Packers and Stockyards Act, 1921 | Nearest Packers and Stockyards Administration area supervisor |
| 6. Small Business Investment Companies | Associate Deputy Administrator for Capital Access<br>United States Small Business Administration<br>409 Third Street, S.W., 8th Floor<br>Washington, DC 20416 |

© 2018 RentGrow, Inc. All rights reserved.

# RentGrow

| | |
|---|---|
| 7. Brokers and Dealers | Securities and Exchange Commission<br>100 F Street, N.E.<br>Washington D.C. 20549 |
| 8. Federal Land Banks, Federal Land Bank Associations, Federal Intermediate Credit Banks, and Production Credit Associations | Farm Credit Administration<br>1501 Farm Credit Drive<br>McLean, VA 22102-5090 |
| 9. Retailers, Finance Companies, and All Other Creditors Not Listed Above | FTC Regional Office for region in which the creditor operates <u>or</u> Federal Trade Commission: Consumer Response Center – FCRA<br>Washington, DC 20580<br>(877) 382-4357 |

© 2018 RentGrow, Inc. All rights reserved.

**RentGrow**

# Remedying the Effects of Identity Theft

*Para información en español, visite www.consumerfinance.gov/learnmore o escribe al Consumer Financial Protection Bureau, 1700 G Street N.W., Washington, DC 20552.*

You are receiving this information because you have notified a consumer reporting company that you believe that you are a victim of identity theft. Identity theft occurs when someone uses your name, Social Security number, date of birth, or other identifying information, without authority, to commit fraud. For example, someone may have committed identity theft by using your personal information to open a credit card account or to get a loan in your name. For more information, visit www.consumerfinance.gov/learnmore or write to: Consumer Financial Protection Bureau, 1700 G Street N.W., Washington, DC 20552.

The Fair Credit Reporting Act (FCRA) gives you specific rights when you are, or believe that you are, the victim of identity theft. Here is a brief summary of the rights designed to help you recover from identity theft.

1. **You have the right to ask that nationwide consumer reporting companies place "fraud alerts" in your file to let potential creditors and others know that you may be a victim of identity theft.** A fraud alert can make it more difficult for someone to get credit in your name because it tells creditors to follow certain procedures to protect you. It also may delay your ability to obtain credit. You may place a fraud alert in your file by calling just one of the three nationwide consumer reporting agencies. As soon as the agency processes your fraud alert, it will notify the other two, which then also must place fraud alerts in your file.

   - Equifax: 1-800-525-6285; www.equifax.com
   - Experian: 1-888-397-3742; www.experian.com
   - TransUnion: 1-800-680-7289; www.transunion.com

   An initial fraud alert stays in your file for at least 1 year. An extended alert stays in your file for seven years. To place either of these alerts, a consumer reporting agency will require you to provide appropriate proof of your identity, which may include your Social Security number. If you ask for an extended alert, you will also have to provide an identity theft report. An identity theft report includes a copy of a report you have filed with a federal, state, or local law enforcement agency, and additional information a consumer reporting agency may require you to submit. For more detailed information about the identity theft report, visit www.consumerfinance.gov/learnmore.

2. **You have the right to free copies of the information in your file (your "file disclosure").** An initial fraud alert entitles you to a copy of all the information in your file at each of the three nationwide agencies, and an extended alert entitles you to two free file disclosures in a 12-month period following the placing of the alert. These additional disclosures may help you detect signs of fraud, for example, whether fraudulent accounts have been opened in your name or whether someone has reported a change in your address. Once a year, you also have the right to a free copy of the information in your file at any consumer reporting agency, if you believe it has inaccurate information due to fraud, such as identity theft. You also have the ability to obtain additional free file disclosures under other provisions of the FCRA. See www.consumerfinance.gov/learnmore.

© 2018 RentGrow, Inc. All rights reserved.

RentGrow

3. **You have the right to obtain documents relating to fraudulent transactions made or accounts opened using your personal information.** A creditor or other business must give you copies of applications and other business records relating to transactions and accounts that resulted from the theft of your identity, if you ask for them in writing. A business may ask you for proof of your identity, a police report, and an affidavit before giving you the documents. It also may specify an address for you to send your request. Under certain circumstances, a business can refuse to provide you with these documents. See www.consumerfinance.gov/learnmore.

4. **You have the right to obtain information from a debt collector.** If you ask, a debt collector must provide you with certain information about the debt you believe was incurred in you name by an identity thief - like the name of the credit and the amount of the debt.

5. **If you believe information in your file results from identity theft, you have the right to ask that a consumer reporting agency block that information from your file.** An identity thief may run up bills in your name and not pay them. Information about the unpaid bills may appear on your consumer report. Should you decide to ask a consumer reporting agency to block the reporting of this information, you must identity the information to block, and provide the consumer reporting agency with proof of your identity and a copy of your identity theft report. The consumer reporting agency can refuse or cancel your request for a block if, for example, you don't provide the necessary documentation, or where the block results from an error or a material misrepresentation of fact made by you. If the agency declines or rescinds the block, it must notify you. Once a debt resulting from identity theft has been blocked, a person or business with notice of the block may not sell, transfer, or place the debt for collection.

6. **You also may prevent businesses from reporting information about you to consumer reporting agencies if you believe the information is a result of identity theft.** To do so, you must send your request to the address specified by the business that reports the information to the consumer reporting agency. The business will expect you to identify what information you do not want reported and to provide an identity theft report.

7. **You have a right to place a 'security freeze' on your credit report, which will prohibit a consumer reporting agency from releasing information in your credit report without your express authorization.** The security freeze is designed to prevent credit, loans, and services from being approved in your name without your consent. However, you should be aware that using a security freeze to take control over who gets access to the personal and financial information in your credit report may delay, interfere with, or prohibit the timely approval of any subsequent request or application you make regarding a new loan, credit, mortgage, or any other account involving the extension of credit. As an alternative to a security freeze, you have the right to place an initial or extended fraud alert on your credit file at no cost. An initial fraud alert is a 1-year alert that is placed on a consumer's credit file. Upon seeing a fraud alert display on a consumer's credit file, a business is required to take steps to verify the consumer's identity before extending new credit. If you are a victim of identity theft, you are entitled to an extended fraud alert, which is a fraud alert lasting 7 years. A security freeze does not apply to a person or entity, or its affiliates, or collection agencies acting on behalf of the person or entity, with which you have an existing account that requests information in your credit report for the purposes of reviewing or collecting the account. Reviewing the account includes activities related to account maintenance, monitoring, credit line increases, and account upgrades and enhancements.

© 2018 RentGrow, Inc. All rights reserved.

RentGrow

To learn more about identity theft and how to deal with its consequences, visit www.consumerfinance.gov/learnmore, or write to the Consumer Financial Protection Bureau. You may have additional rights under state law. For more information, contact your local consumer protection agency or your state Attorney General.

In addition to the new rights and procedures to help consumers deal with the effects of identity theft, the FCRA has many other important consumer protections. They are described in more detail at: www.consumerfinance.gov/learnmore.

© 2018 RentGrow, Inc. All rights reserved.

**UNITED STATUS DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| MARCO A. FERNANDEZ,<br><br>Plaintiff,<br>v.<br><br>RENTGROW, INC.,<br><br>Defendant | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No.: 1:19-cv-0119-JKB |

**RENTGROW'S SUPPLEMENTAL ANSWER TO INTERROGATORY NO. 3**

Defendant RentGrow, Inc. ("RentGrow"), pursuant to Fed. R. Civ. P. 26 and 33, hereby supplements its Objections and Responses to Plaintiff's First Set of Interrogatories, Interrogatory No. 3, as follows:

Subject to its objections, RentGrow will respond to the interrogatories to the best of its current knowledge, information, and belief based upon a reasonable and diligent investigation. RentGrow does not concede that any information disclosed in its responses to these interrogatories is relevant to any party's claim or defense or proportional to the needs of this case. RentGrow reserves its right to raise objections regarding the competence, relevance, materiality, discoverability, or admissibility of the information or documents disclosed or identified in its responses in any subsequent proceedings or trial of this or any action in which Plaintiff seeks to use such information. RentGrow reserves the right to amend or supplement its responses, and to make further objections to the requests, should additional discoverable information or bases on which to make objections become known.

## GENERAL OBJECTIONS

1. RentGrow incorporates by reference its General Objections and Specific Objections as set forth in RentGrow's Objections and Responses to Plaintiff's First Set of Interrogatories.

## INTERROGATORIES

**INTERROGATORY NO. 3:**

Identify the total number of consumers since April 23, 2017 on whom You reported OFAC/SDN Information.

**RESPONSE:** RentGrow objects on the ground that the term "on whom You reported OFAC/SDN information," is vague and ambiguous and does not sufficiently identify the information requested. Subject to and without waiving its objections, RentGrow responds as follows:

RentGrow reported OFAC/SDN information indicating a "possible match" with respect to 79,022 consumers between April 23, 2017 and May 24, 2019 7:28 a.m., at which point RentGrow's matching algorithm was changed.

**SUPPLEMENTAL RESPONSE:** RentGrow reasserts and incorporates its objections to this interrogatory. After a further diligent search and reasonable inquiry, RentGrow states that it reported OFAC/SDN information indicating a "possible match" with respect to 79,022 tenant screenings between April 23, 2017 and May 24, 2019 7:28 a.m., at which point RentGrow's matching algorithm was changed. After deduplicating these 79,022 tenant screenings, RentGrow has determined that it reported OFAC/SDN information indicating a "possible match" with respect to 71,036 unique consumers between April 23, 2017 and May 24, 2019 7:28 a.m. Duplicates were identified by removing multiple screenings for the same applicant (defined as an applicant with the same first name, last name, and date of birth) at the same property, which may occur when a property inadvertently submits multiple screening requests for the same applicant. During this same timeframe, RentGrow screened 6,344,346 unique consumers (defined as an applicant with the same

first name, last name, and date of birth at the same property) against the OFAC/SDN list and received disputes concerning the accuracy of the OFAC/SDN "possible match" information from only 71 consumers.

Dated: July 22, 2021

*/s/ Louis J. Cannon, Jr.*
Louis J. Cannon, Jr. (17157)
**BAKER & HOSTETLER LLP**
1050 Connecticut Avenue NW
Suite 1100
Washington, DC 20036
Telephone: (202) 861-1563
Fax: (202) 861-1783
LJcannon@bakerlaw.com

Joel Griswold (*pro hac vice*)
**BAKER & HOSTETLER LLP**
SunTrust Center
200 S. Orange Ave., Suite 2300
Orlando, Florida 32801-3432
Telephone: (407) 649-4088
jcgriswold@bakerlaw.com

Bonnie Keane DelGobbo (*pro hac vice*)
**BAKER & HOSTETLER LLP**
One North Wacker Drive, Suite 4500
Chicago, Illinois 60606
Telephone: (312) 416-8185
Facsimile: (312) 416-6201
bdelgobbo@bakerlaw.com

*Attorneys for Defendant RentGrow, Inc.*

**UNITED STATUS DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

MARCO A. FERNANDEZ,
Plaintiff,
v.
RENTGROW, INC.,
Defendant

Case No.: 1:19-cv-0119-JKB

**VERIFICATION**

Pursuant to 28 U.S.C. § 1746, I, Patrick Hennessey, verify under penalty of perjury that, based upon my review of documents and information maintained in the regular course of business and to the best of my knowledge, the answers to RentGrow's Supplemental Answer to Interrogatory No. 3 is true and correct.

Dated: 7/23/2021 | 6:11 AM PDT

By: DocuSigned by: DFB6D8AD03E1445...
Patrick Hennessey
Vice President and General Manager
RentGrow, Inc.

**CERTIFICATE OF SERVICE**

I hereby certify that on July 22, 2021, I served a copy of RentGrow's Supplemental Answer to Interrogatory No. 3 by causing a copy of same to be delivered by e-mail to counsel for Plaintiff Marco Fernandez.

Martin E. Wolf, Bar No. 09425
**GORDON, WOLF & CARNEY, CHTD.**
100 W. Pennsylvania Ave., Suite 100
Towson, MD 21204
Tel. 410.825.2300
mwolf@gwcfirm.com

**BERGER MONTAGUE PC**
E. Michelle Drake (pro hac vice)
John G. Albanese (pro hac vice)
43 S.E. Main Street, Suite 505
Minneapolis, MN 55414
Tel: (612) 594-5997
Fax: (612) 584-4470
emdrake@bm.net
jalbanese@bm.net

*Counsel for Plaintiff and the Class*

*/s/ Louis J. Cannon, Jr.*

**UNITED STATUS DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| MARCO A. FERNANDEZ, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No.: 1:19-cv-0119-JKB |
| | ) | |
| RENTGROW, INC., | ) | |
| | ) | |
| Defendant | ) | |
| | ) | |

**RENTGROW'S SUPPLEMENTAL OBJECTIONS AND RESPONSES TO PLAINTIFF'S INTERROGATORY NUMBER 4**

Defendant RentGrow, Inc. ("RentGrow"), pursuant to Rules 26 and 34 of the Federal Rules of Civil Procedure, hereby supplements its Objections and Responses to Plaintiff's Interrogatory Number 4.

Subject to its objections, RentGrow will responds to the best of its current knowledge and based upon a reasonable and diligent investigation. RentGrow does not concede that any document produced or statement made in response is relevant to any party's claim or defense or proportional to the needs of the case. RentGrow reserves its right to raise objections regarding the competence, relevance, materiality, discoverability, or admissibility of the information or documents disclosed or identified in its responses in any subsequent proceedings or trial of this or any action in which Plaintiff seeks to use such information. RentGrow reserves the right to amend or supplement its responses, and to make further objections to the requests, should additional discoverable information or bases on which to make objections become known.

## GENERAL OBJECTIONS

1.      RentGrow incorporates by reference its General Objections and Specific Objections as set forth in RentGrow's Objections and Responses to Plaintiff's First Set of Interrogatories.

SPECIFIC OBJECTIONS AND SUPPLEMENTAL RESPONSES

**INTERROGATORY NO. 4**: State the criteria(s) or formula(s) You have utilized, at all times during the Class Period, for associating a given consumer with particular OFAC/SDN information. If, for example You match based on name, Your answer should provide a list of all conditions that are sufficient for a consumer's name to be similar enough to a name on an OFAC/SDN list to warrant the OFAC/SDN information being included on the consumer's report. If You require matching across multiple fields, such as name and date of birth, before such information can be included on a consumer report, Your answer should describe the circumstances in which more than one field must match and should describe the required level of the match to each element in detail. In lieu of responding to this Interrogatory with a narrative, Plaintiff would accept an extracted copy of Your matching algorithm/code, including all comments to such code. The same is required for each element that You use for matching.

**RESPONSE**:

        RentGrow objects to the extent the interrogatory seeks confidential and proprietary trade-secret information—specifically RentGrow's source code, script or similar code—that is likely to cause competitive harm if publicly disclosed. RentGrow also objects on the ground that the term "comments to such code" is vague and ambiguous and does not sufficiently identify the information requested.

        Subject to and without waiving its objections, RentGrow responds as follows:

        Prior to May 24, 2019 at 7:28 a.m., RentGrow reported OFAC/SDN information indicating a "possible match" with respect to a consumer if, based on a comparison of the consumer's name with the names appearing on the most recent SDN list downloaded daily from the OFAC website (the "SDN List"), either of the following conditions was met:

        (1) The consumer's first name was an exact match, or within one character of, a first name appearing on the SDN List AND the consumer's last name was an exact

match, or within one character of, the corresponding last name on the SDN List; or

(2) The consumer's first name was an exact match, or within one character of, a last name appearing on the SDN List AND the consumer's last name was an exact match, or within one character of, the corresponding first name on the SDN List.

Beginning May 24, 2019 at 7:28 a.m., RentGrow has reported OFAC/SDN information indicating a "possible match" with respect to a consumer if, based on a comparison of the consumer's name and date of birth with the names and dates of birth appearing on the SDN List, either of the following conditions is met:

(1) The consumer's first name is an exact match with a first name appearing on the SDN List AND the consumer's last name is an exact match with the corresponding last name on the SDN List AND the consumer's full date of birth (month, day and year) is an exact match with the corresponding full date of birth on the SDN List; or

(2) The consumer's first name is an exact match with a last name appearing on the SDN List AND the consumer's last name is an exact match with the corresponding first name on the SDN List AND the consumer's full date of birth (month, day and year) is an exact match with the corresponding full date of birth on the SDN List.

**SUPPLEMENTAL RESPONSE**:

RentGrow reasserts and incorporates its objections to this interrogatory. After a further diligent search and reasonable inquiry, at no time has RentGrow ever reported an OFAC/SDN "match" for any tenant applicant. All OFAC/SDN information reported is reported as a "possible match" and at no time has a "possible match" ever been used as part of the "result" that is generated by comparing consumer information with a property's qualification criteria. When a "possible match" appears, the property may ignore it, apply Treasury Department guidelines to resolve it, or direct the consumer to RentGrow for further assistance.

During the relevant time period up until July 27, 2017, RentGrow reported OFAC/SDN information indicating a "possible match" with respect to a consumer if, based on a comparison of

the consumer's name with the names appearing on the most recent SDN list downloaded daily from the OFAC website (the "SDN List"), either of the following conditions was met:

(1) The consumer's first name was a soundex match and within two or fewer characters of a first name appearing on the SDN List OR an exact spelling match, or within two or fewer characters of, a first name appearing on the SDN List AND the consumer's last name was a soundex match and within two or fewer characters of the corresponding last name appearing on the SDN List OR an exact spelling match, or within two or fewer characters of, the corresponding last name on the SDN List; or

(2) The consumer's first name was a soundex match and within two or fewer characters of a last name appearing on the SDN List OR an exact spelling match, or within two or fewer characters of, a last name appearing on the SDN List AND the consumer's last name was a soundex match and within two or fewer characters of the corresponding first name appearing on the SDN List OR an exact spelling match, or within two or fewer characters of, the corresponding first name on the SDN List.

From July 27, 2017 through May 24, 2019 at 7:28 a.m., RentGrow reported OFAC/SDN information indicating a "possible match" with respect to a consumer if, based on a comparison of the consumer's name with the names appearing on the most recent SDN list downloaded daily from the OFAC website (the "SDN List"), either of the following conditions was met:

(1) The consumer's first name was an exact spelling match, or within one character of, a first name appearing on the SDN List AND the consumer's last name was an exact spelling match, or within one character of, the corresponding last name on the SDN List; or

(2) The consumer's first name was an exact spelling match, or within one character of, a last name appearing on the SDN List AND the consumer's last name was an exact spelling match, or within one character of, the corresponding first name on the SDN List.

Beginning May 24, 2019 at 7:28 a.m., RentGrow has reported OFAC/SDN information indicating a "possible match" with respect to a consumer if,  based on a comparison of the consumer's name and date of birth with the names and dates of birth appearing on the SDN List, either of the following conditions is met:

(1) The consumer's first name is an exact spelling match with a first name appearing on the SDN List AND the consumer's last name is an exact spelling match with the corresponding last name on the SDN List AND the consumer's full date of birth (month, day and year) is an exact match with the corresponding full date of birth on the SDN List; or

(2) The consumer's first name is an exact spelling match with a last name appearing on the SDN List AND the consumer's last name is an exact spelling match with the corresponding first name on the SDN List AND the consumer's full date of birth (month, day and year) is an exact match with the corresponding full date of birth on the SDN List.

In some cases, a name may have multiple words (each a "name part") or special characters such as hyphens, apostrophes or periods. When a name has multiple words, the algorithm looks for possible matches with all "name parts" compared to the first or last name(s). The algorithm also looks for possible matches with all "name parts" compared to the full first or last name by disregarding the space character between multiple words in the first or last name.

When a name has special characters (e.g., hyphens, apostrophes, or periods) such special characters are discarded.

Dated: October 8, 2020

*/s/ Louis J. Cannon, Jr.*

Louis J. Cannon, Jr. (17157)
**BAKER & HOSTETLER LLP**
1050 Connecticut Avenue NW
Suite 1100
Washington, D.C. 20036
Telephone: (202) 861-1563
Fax: (202) 861-1783
LJcannon@bakerlaw.com

Joel Griswold
**BAKER & HOSTETLER LLP**
SunTrust Center
200 S. Orange Ave., Suite 2300
Orlando, Florida 32801-3432
Telephone: (407) 649-4088
jcgriswold@bakerlaw.com

Bonnie Keane DelGobbo
**BAKER & HOSTETLER LLP**
One North Wacker Drive,
Suite 4500
Chicago, Illinois 60606
Telephone: (312) 416-8185
Facsimile: (312) 416-6201
bdelgobbo@bakerlaw.com

*Attorneys for Defendant RentGrow, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on October 8, 2020 I served a copy of RentGrow's Supplemental Objections and Responses to Plaintiff's Interrogatory Number 4 by causing a copy of same to be delivered by e-mail to counsel for Plaintiff Marco Fernandez.

*/s/ Louis Cannon*

**FOR THE INTERROGATORY ANSWERS**

I certify under penalty of perjury that the foregoing is true and correct to the best of my knowledge and information. Not all matters set forth in the foregoing responses are within my personal knowledge, and I believe that no single person at RentGrow, Inc. has personal knowledge of all issues relevant to or contained in these responses. These responses are baaed on information gathered by and from individuals authorized to act on behalf of RentGrow, Inc.

10/7/2020 | 8:35 PM PDT

Executed on October ____, 2020

By: DocuSigned by:
DFB6D8AD03E1445...
________________________

Patrick Hennessy
Vice President and General Manager of Resident Screening

4825-3365-5246.1

**UNITED STATUS DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| MARCO A. FERNANDEZ,<br><br>Plaintiff,<br>v.<br><br>RENTGROW, INC.,<br><br>Defendant | Case No.: 1:19-cv-0119-JKB |

**RENTGROW'S SUPPLEMENTAL OBJECTIONS AND RESPONSES TO "PLAINTIFF'S INTERROGATORIES TO DEFENDANT, SET IV"**

Defendant RentGrow, Inc. ("RentGrow"), pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, hereby provides its Supplemental Objections and Responses to "Plaintiff's Interrogatories to Defendant, Set IV" dated February 10, 2020 ("Interrogatories").

Subject to its objections, RentGrow will respond to the Interrogatories to the best of its current knowledge, information, and belief based upon a reasonable and diligent investigation. RentGrow does not concede that any information disclosed in its responses to these Interrogatories is relevant to any party's claim or defense or proportional to the needs of this case. RentGrow reserves its right to raise objections regarding the competence, relevance, materiality, discoverability, or admissibility of the information or documents disclosed or identified in its responses in any subsequent proceedings or trial of this or any action in which Plaintiff seeks to use such information. RentGrow reserves the right to amend or supplement its responses, and to make further objections to the requests, should additional discoverable information or bases on which to make objections become known.

## GENERAL OBJECTIONS

1. RentGrow incorporates its objections to Plaintiff's instructions and definitions set forth in RentGrow's Objections and Responses to Plaintiff's First Set of Interrogatories.

2. RentGrow objects to each Interrogatory to the extent it is unlimited in time or not limited to the two-year statute of limitations period applicable to Plaintiff's claims.

3. RentGrow objects to each Interrogatory to the extent it seeks information protected by the attorney-client privilege, work product doctrine, joint defense privilege, self-examination privilege, or any other applicable privilege, prohibition, or limitation. Any inadvertent disclosure of information that is the subject of a claim of privilege or other protection is not intended as, and shall not be deemed, a waiver of such claim.

4. RentGrow objects to each Interrogatory to the extent it seeks the disclosure of information that is not relevant to any party's claim or defense.

5. RentGrow objects to each Interrogatory to the extent it is vague or ambiguous.

6. RentGrow objects to each Interrogatory to the extent it is overbroad, or unduly burdensome, or disproportional to the needs of the case.

7. RentGrow objects to each Interrogatory to the extent it calls for a legal conclusion.

8. RentGrow objects to each Interrogatory, definition, or instruction to the extent it is inconsistent with, or imposes burdens greater than required under, the applicable Federal Rules of Civil Procedure or the Local Civil Rules.

## INTERROGATORIES

**INTERROGATORY NO. 10**:  If You contend that any reports You issued during the Class Period accurately identified a consumer as being on the OFAC/SDN List, identify the report and explain the basis for Your believe that the report was accurate. Your response should provide all information about the consumer that You contend matches information on the OFAC/SDN List, as well as any other basis for Your contention.

**ANSWER**:  In addition to the foregoing General Objections, RentGrow objects to Interrogatory No. 10 as overbroad, unduly burdensome, and disproportional to the needs of the case because it is Plaintiff's burden, not RentGrow's, to demonstrate that his report and the reports of members of the putative class are inaccurate.  RentGrow also objects to the Interrogatory No. 10 as overbroad, unduly burdensome, and disproportional to the needs of the case because it seeks information outside of the two-year statute of limitations period applicable to Plaintiff's claims. RentGrow also objects to Interrogatory No. 10 as premature, overbroad, unduly burdensome, and disproportional to the needs of the case because it seeks information about individuals other than Plaintiff Marco Fernandez and the Court has not certified this case as a class action.  RentGrow also objects to Interrogatory No. 10 on the ground that it is based on the inaccurate factual premise that RentGrow reports individuals "as being on the OFAC/SDN List," when RentGrow only reports that applicants are a "possible match" for that list.  RentGrow also objects to Interrogatory No. 10 as premature, because discovery is ongoing and RentGrow has not completed its investigation of the allegations made by Plaintiff in his Complaint.

Subject to and without waiving its Objections, RentGrow states that no algorithm can determine with certainty whether a consumer who is applying to rent an apartment is or is not the same person whose name appears on the Treasury Department's OFAC/SDN List.  For that reason, when RentGrow provides consumer reports to its clients, it states that consumers are a "possible match" for the OFAC/SDN List, rather than saying that the consumer is a

"match." Moreover, determining whether a person identified as a "possible match" for the OFAC/SDN List was in fact the same person whose name appears on the OFAC/SDN List would require an individualized investigation into the particularized circumstances of that person and his or her identity, which the Treasury Department explains should be undertaken by RentGrow's clients as the recipients of the consumer reports.

*/s/ Joseph F. Yenouskas*
Joseph F. Yenouskas (Bar No. 14466)
GOODWIN PROCTER LLP
1900 N Street, NW
Washington, DC 20036
Telephone: (202) 346-4143
jyenouskas@goodwinlaw.com

Attorneys for Defendant RentGrow, Inc.

Dated: April 7, 2020

**CERTIFICATE OF SERVICE**

I certify that I have, this 7th day of March 2020, served RentGrow's Supplemental Objections and Responses to "Plaintiff's Interrogatories to Defendant, Set IV" by causing a copy to be sent by e-mail to counsel for Plaintiff Marco Fernandez.

*/s/_ Joseph F. Yenouskas*

p7 Are you counted among the managers ready for the future?
p12 Successful chapters have several things in common. Find out the top 10 and how your chapter can be successful too.
p18 Focus on building the future, not navigation uncertainties.
RESIDENTIAL Resource
NARPM®
THE OFFICIAL MONTHLY NEWS MAGAZINE OF THE NATIONAL ASSOCIATION OF RESIDENTIAL PROPERTY MANAGERS
Certified Support Staff:
It is a Win-Win!
The newest NARPM® designation has taken off! Check out how one NARPM® member has started down the road to designation, striving to be the best support specialist she can be.
SEPT/OCT 2008 ISSUE | 638 INDEPENDENCE PARKWAY, SUITE 100, CHESAPEAKE, VA 23320 USA | WWW.NARPM.ORG

PLF-000753



DISCOVER KAUA'I
at the 20th Annual Convention & Trade Show
Join us in the tropical garden paradise of KAUAI, LIHUE, HAWAII for great networking and educational opportunities at the 20th Annual Convention and Trade Show. Visit WWW.NARPM.ORG for all the event details.
NARPM®
Endless Possibilities

PLF-000754

# IN THIS ISSUE Sept/Oct 2008

## FEATURE ARTICLES

**p7** **How Are You Staying Ahead of the Technology Curve?**
As technology continues to connect us faster and from greater distances, it is important that property managers are ready to be leaders of the future. The Coach returns to give us some innovative tips.

**p10** **Certified Support Staff: It is a Win-Win!**
Roxanne Mikolon enthusiastically tells us about her road to success on becoming the best Certified Support Specialist (CSS[sm]) she can be.

**p14** **Falling Into September**
With Autumn right around the corner, you and your rentals need to be prepared for the slower demand period. Rob Massey, Jr., CPM®, gives us a few reminders on how to keep on top of things.

**p18** **Positioning Yourself for Greater Success**
Now is the time to be thinking about where you stand in the race for success next year. Learn a few tricks from Robert Cain on how to keep your thinking cap on.

**p21** **Understanding the Office of Foreign Assets Control**
Find out why OFAC should be part of your everyday screening process from RentGrow CEO Mike Lapsley.

**p22** **Making the Transition from a Home Office**
Chris Warren, RMP®, understands the challenges small business owners face and shows us how making the transition from a home office to a commercial office can be a great move for your business.

## MONTHLY COLUMNS

**p5** **President's Message**

**p6** **From the Desk of the Executive Director**

**p8** **Legislative Scoop**

**p12** **The RVP Bulletin**

**p16** **Technology Matters**

**p24** **Welcome New Members**

**p26** **Ambassador Program**

**p27** **Designation Classes**

**EDITORIAL MISSION**
Since 1989, the NARPM® news magazine has been a key focal point for the organization. The *Residential Resource* keeps members up-to-date on association events, and provides valuable industry advice and insight. NARPM® members receive the *Residential Resource* as part of their membership, included in their annual dues.

The *Residential Resource* is published monthly, with one combined issue for September/October. Articles can be submitted by e-mail to either publications@narpm.org or communications@narpm.org. Items mailed in for publication cannot be returned. Address changes may be forwarded to NARPM® at 638 Independence Parkway, Suite 100, Chesapeake, VA 23320. The Communications Chair and Graphic Designer reserve the right to edit or refuse all publications for content and selection.

Copyright © 2008 National Association of Residential Property Managers. All rights reserved. Materials may not be reproduced or translated without written permission. E-mail publications@narpm.org for reprint permission.

Statements of fact and opinion are the responsibility of the authors alone and do not imply an opinion on the part of the officers, staff or members of NARPM®. Any legal matters or advice mentioned herein should be discussed with an attorney, accountant or other professional before use in a particular state or situation. NARPM® does not endorse any advertisement in this publication. All readers are responsible for their own investigation and use of the products advertised.

The *Residential Resource* was designed and created for the members of the National Association of Residential Property Managers by Organization Management Group, Inc. in Chesapeake, Virginia. (www.managegroup.com)

**NARPM® NATIONAL**
638 Independence Parkway, Suite 100
Chesapeake, VA 23320

P: 800-782-3452
F: 866-466-2776
www.narpm.org

**OFFICERS**

**Betty Fletcher, MPM® RMP®**
President
president@narpm.org
501-907-7091 x 101

**Vickie Gaskill, MPM® RMP® CPM®**
Treasurer
treasurer@narpm.org
800-755-5397

**Fred Thompson, MPM® RMP®**
President-Elect
presidentelect@narpm.org
407-571-3650

**Sylvia L. Hill, MPM® RMP® CPM®**
Past President
pastpresident@narpm.org
408-997-7100 x 104

**REGIONAL VICE PRESIDENTS**

**R. Scott Corbridge, RMP®**
region1vp@narpm.org
941-377-8400

**Tony A. Drost, MPM® RMP®**
region4vp@narpm.org
208-321-1900

**Elizabeth Morgan, MPM® RMP®**
region2vp@narpm.org
727-569-2312

**Harold E. Kalles, MPM® RMP®**
region5vp@narpm.org
253-848-9393

**Susan Albern, MPM® RMP®**
region3vp@narpm.org
970-669-0842

**James Emory Tungsvik, MPM® RMP®**
region6vp@narpm.org
253-852-3000

**COMMITTEE CHAIRS**

**Marc Banner, MPM® RMP®**
Long Range Planning
longrangechair@narpm.org
208-377-8889

**Anne B. McCawley, RMP®**
Member Services
memberservices@narpm.org
480-969-1818

**Jayci Grana, RMP®**
Communications
communications@narpm.org
407-629-6643

**John Parker, MPM® RMP®**
Governmental Affairs
govtaffairschair@narpm.org
253-581-5199

**Darryl Kazen, MPM® RMP®**
Professional Development
profdevelopment@narpm.org
817-281-1300

**Steve Stein, CRS® GRI**
Governmental Affairs
govtaffairschair@narpm.org
540-434-1173

**NARPM® NATIONAL**

**Gail S. Phillips, CAE**
Executive Director
executivedirector@narpm.org

**Cher Leadbeater**
Administrative Assistant
info@narpm.org

**Mark Dunlap**
Chapter Support Manager
mdunlap@narpm.org

**Kristi A. Dunlap**
Communications & Graphic Designer
publications@narpm.org

**Monique Owens**
Member Support Specialist
mowens@narpm.org

**Carla Earnest, CMP**
Conferences & Conventions Coordinator
conventioninfo@narpm.org

*An award-winning publication, the Residential Resource has won a 2007 APEX Award of Excellence, a 2006 Gold MarCom Creative Award and a 2006 Communicator Award of Distinction for Print Media.*

# PRESIDENT'S Message

Happy birthday to us, happy birthday to us, happy birthday NARPM® colleagues, happy birthday to us!

**SEPTEMBER IS FOR CELEBRATING!**

Several of my most favorite people celebrate their birthdays in September and this year we get to also celebrate the 20th NARPM® Annual Convention. Luckily we are invited to join in that celebration!

The NARPM® Annual Convention is a great opportunity to network with existing NARPM® colleagues and to meet new ones. Networking, as it turns out, is an activity with multiple benefits. Referrals are just one example. The greater your network, the greater the opportunity that *you* will be the one referred when your colleague knows someone who is in need of a professional in your local area. It happens all the time. However, your colleagues must meet and get to know you before they can refer your services with confidence.

Another benefit is the chance to develop friendships. The friendships I have developed with amazing NARPM® colleagues from all across the country is a great benefit of my personal membership. They have skills, knowledge and experience that extend well beyond mine. Thankfully they are always willing to share with me. Not a single request for help has ever been denied. Thanks to each of you for helping me to become a more proficient and professional manager.

Within the NARPM® membership, there are a variety of methods and processes used to achieve success. Everyone puts their own personal perspective on each idea as they work it into their existing business. No one manager can utilize every additional revenue stream. The resulting costs to our clients would become overwhelming. So, take what feels right for you and leave the rest. Remember that to successfully sell a new option to a client or customer, you must first believe it will be beneficial for them. If the only benefit you see is for you, then that will show in your presentation and the option will not succeed. However, if the option offers a win-win for both you and your client's profitability then it will be successful.

What is an annual convention without the education? The number one reason why a manager joins NARPM® is because of the education available. Each convention starts with designation classes offered prior to the opening session. In addition to learning from the class material, there are real-life examples offered by the students.

There is also great education found within the convention schedule itself. Each one of the general sessions and workshops offers a wealth of information. Some years the number of sessions offered are limited by the physical space of the hotel site, but the quality is always there. Learn more about increasing your profitability from someone who has been there and done that, learn the ins and outs of using the latest cool tool available, find out what to do when your office burns, or how to survive a fair housing complaint. These sessions offer practical application, not just theory.

Education is also found in unexpected places like the lunch table, poolside and at the extra ticketed events. The great thing about NARPM® members is our willingness to share with each other. At times the lessons learned are centered on the "how to" and at other times the lesson is about how "not to". Either way there is benefit, however, you have to be there to participate!

The annual convention is also a time to celebrate all of the professional designations earned. We will be awarding a record number of designations this year in Hawaii. Will you be among them? If not, then begin making your plans now to receive your CSS℠, RMP®, MPM® or your company's CRMC® designation at the 2009 Convention in the magical city of Orlando, FL.

What would a convention be without a trade show? This is a unique opportunity to sit and visit face-to-face with our outstanding affiliate members. Use this time to say "thanks" to affiliates you are currently using and to explore how other affiliate's product will benefit your business.

I look forward to meeting you and getting better acquainted later this month at the NARPM® 20th Annual Convention. I will be easy to spot—I will be the one looking for *you*!

Betty Fletcher

**Betty Fletcher, MPM® RMP®**
2008 NARPM® President







**CONVENTION IS RIGHT AROUND THE CORNER** and we know everyone who is attending is excited about the "Endless Possibilities" that will be taking place in Kauai, Hawaii. This convention has been designed to give time for attendees to enjoy the beauty of the island and see its many natural wonders.

The NARPM® leadership traveled to Kauai in June to view the property and to ensure your visit will immerse you in the island culture. The interesting part of Kauai is the chickens that run wild as there are no predators (other than cars) on the island. These chickens will greet you early in the morning and be there as you enjoy the activities that are planned. While in Kauai, take time to see the lovely waterfalls and the blow hole past the tree tunnel. Just ask the natives where the tree tunnel is and the blow hole is right down the road. Take time to be a tourist and enjoy the island and all the scenery it offers.

The committee has designed the convention to offer additional break out sessions when all the planned activities are over. There will be user group meetings and other break outs that aren't part of the formal NARPM® agenda. The evenings in Kauai are lovely. It will be getting dark around 6:30 pm, so the Island Breeze Luau that is planned for Friday night will bring all the excitement of flames and dancing. You won't want to miss this cultural event!

NARPM® has still been busy working on numerous other ventures while the convention planning is underway. We have begun discussion with IREM®, NAA and CAI about forming strategic alliances that will bring us together to offer members of each organization a chance to network and participate in each other's events. We will be able to talk together as one voice legislatively and work for the betterment of the property management industry as a whole. All four groups have different strengths and, through an alliance, we can help all our members while bringing more awareness to NARPM® as a professional organization that serves the residential property manager.

Finally, have you used the new referral system on www.narpm.org? Go to "Search for a Property Manager" and, once you locate a company you would like to work with, click on the more information line and you will see the complete information on the company along with a click through to "Refer a Client Lead to a Member." This is a great new tool that NARPM® has added to your membership benefits. Try it out and if you have any problems, let us know.

Well, another month has come to an end and I hope to see you in Kauai! Please remember if you have any questions or concerns, don't hesitate to e-mail me executivedirector@narpm.org and I will see what I can do to help you.

The interesting part is the chickens that run wild and will greet you early in the morning and be there as you enjoy the activities that are planned.

*Gail S. Phillips*

**Gail S. Phillips, CAE**
Executive Director



# How Are You Staying Ahead of **the Technology Curve?**

**Ernest F. Oriente, The Coach,** *is the founder of PowerHour® a professional business coaching/recruiting service and the author of SmartMatch Alliances™. Since 1988, he has been delivering customized training, by telephone, in leadership, Internet marketing and sales for property management companies, apartment locator/corporate housing services and multi-housing sales/service companies worldwide. Contact Ernest at 435-615-8486 or ernest@powerhour.com.*

Technology continues to connect us faster and from greater distances, until time zones and the miles between us no longer matter. These changes are happening at a blistering pace and timely information is allowing property management leaders to operate their companies and their properties with a new set of rules. Thomas Friedman, author of "The Lexus And The Olive Tree" says, "the future will require a complete integration of capital, technology and timely information for leaders to lead." As a property management professional, are you ready to be a leader of the future? It is important to realize just how fast information and ideas are reaching us—with the tap of a keystroke. Did you know...

- It took commercial radio 38 years to reach an audience of 50 million, it took 13 years for television, but the Internet only took five years to grow as large as it is today.
- According to the Department of Commerce, Internet traffic has been doubling every 60 days.
- Nua Internet Surveys (www.nua.ie) reports 471 million online users with 251 million, or 53 percent, in North America.
- The Internet is adding one new user in North America every 1.75 seconds or 49,317 per day.
- In the first quarter of 2008, Dell Computers generated sales of 150 million dollars per day.
- E-commerce will total 800 billion dollars in 2008 and will grow to 1.3 trillion over the next 24 months.

As a property management professional, do the above trends surprise you? Are you and your property management teams ready to leverage these trends for your competitive advantage? Remember, with the pace of technology, only the leaders who embrace this rapid pace will survive and thrive into the future! Many of our property management clients are using the statistics above to create some very innovative ways of applying capital, technology and timely information. Here are a few examples:

- Property management companies are using comprehensive internal websites (intranets), to maximize the flow of information and ideas within their company. Our property management clients are linking their marketing information to the intranets of their corporate clients.
- Post Properties is offering their residents Internet access and e-mail accounts.
- Our clients have specifically designed their websites to capture the e-mail addresses of prospective future residents for future marketing.
- Apartment communities have online forms for handling maintenance requests and other resident services.
- Our clients are conducting training and sharing real-time communication with their teams by teleconference, including online presentations.

In addition to the examples above, leading vendors in the industry are providing real-time website information. Homestore (www.homestore.com) provides password-protected real-time access for its advertisers to a secured portion of their website. This means advertising clients can make changes to their rental rates, update property information, review web page activity and analyze monthly/year-to-date marketing reports. Lead Tracking Solutions (www.ltstteam.com) also provides real-time access. This allows their clients to review important marketing information, compare the results of their marketing with other properties within their company, download and listen to actual in-bound telephone calls from future residents, download marketing information for their own internal spreadsheets and reports, e-mail reports to others within their company, and define their own parameters for custom reports of their marketing statistics.

**Steve Stein, CRS® GRI** *is broker/owner of Mountain Valley Management, Inc. in Harrisonburg, VA. He is also broker/owner of Stein & Associates, Inc. Steve is a 28 year veteran of the real estate industry and has been a NARPM® member since 1997. He is currently serving as the Governmental Affairs Committee Co-Chair.*

# Legislative Scoop

We all get those annoying communications offering everything from specials on health insurance and time share vacation packages to opportunities to help a family member of a deposed foreign public official stash their millions in your bank account. Laws were put in place to arm the general public with a tool to fend off these unsolicited contacts. However, these laws impact all businesses, not just these mass broadcasting solicitation services.

As we build business by looking for new accounts, we may utilize many resources that generate leads. Now begs the question of how to act on these leads without running afoul of the law and exposing yourself to significant penalties. To illustrate this I have posed a few "what if" questions and answers to address some of the more common resources.

I represented a seller or landlord, who, upon expiration of our listing agreement, elected to go to another real estate firm. His listing with the second firm has now expired. Can I call him to inquire about his listing? The general rule is that you, as a real estate professional, cannot call a person on the Do Not Call Registry unless you have an "existing business relationship" with the person. The rule defines an "existing business relationship" as one which extends for eighteen months after the end of the transaction. As long as your call to the seller or landlord occurs within eighteen months after the expiration of the agreement, you will not run afoul of the rules.

It is also important to note that many states further restrict your ability to make solicitation calls to the hours of 8 a.m. to 9 p.m. In Virginia, for example, see Va. Code Ann. §59.1-511.

Can I call a person with an expired listing? Before you initiate any such call, you must verify that the number has not been registered on the Do Not Call Registry. You can find the registry at http://telemarketing.donotcall.gov. If you see their phone number on the registry, you should refrain from contacting them by telephone. Federal law requires that all companies keep their own internal Do Not Call List. This internal list is for parties who you make a phone contact with and ask not to be called by you again. You must therefore also check with your company's list before contacting the seller or landlord. If the seller or landlord is on your internal list, then you cannot call them, regardless of your relationship. However, the fact that their number is on the registry does not prevent you from sending them a mailing or approaching them in person.

You see a classified ad in the newspaper or see a for-rent-by-owner sign in the yard of a property. Can I call a For-Rent-By-Owner (FRBO) landlord? If you are seeking to list the FRBO landlord's property or to offer your services as a property manager and his number is on the registry, then the rules are the same as for a landlord with an expired listing. However, if you are a tenant representative, you may contact the FRBO landlord about a client's potential interest in the property. However, you can only discuss with the FRBO landlord your client's interest in the property and cannot use your client's interest as a way to discuss the possibility of the FRBO landlord listing his property with your agency.

A person calls my office to inquire about a listing. Can I call this person back if their number is on the registry? This is another exception to the general rule. When a person initiates the contact, then you have the right to contact that person for the next three months. Your calls are not limited to their original inquiry. There is no limit on what you may discuss with the person during those three months and thus you could discuss other listings.

I placed a sign-in sheet at an open-house. Must I verify whether each person is on the registry? And if they are on the registry, can I still call them? The first question is whether this constitutes an inquiry by the person which would then allow you to contact them for the next three months. The second concern is whether the person had a reasonable expectation of getting a follow-up call when he/she signed the sheet.

As you can see, whether the rules apply is a question of interpretation. Under these circumstances, it would be safer to place a notice on your sign-in sheet which would alert the person that they are consenting to receive a follow-up call, and giving the person the ability to decline receiving such a call.

What choices do I have to check out these phone numbers to see if they are on the registry? The term "scrub" is used in the legislation to address the research associated with identifying if a number is eligible for contact before calling. You can subscribe to the government Do Not Call list by applying for a SAN (subscription account number). There is a fee associated with this service based on the number of area codes you wish to subscribe to. The first few are free.

However, it is difficult to try and look up all these numbers on the FTC government site to see if they are on the registry list. Some may find it cumbersome and time consuming as well as a significant budget expense depending on the number of area codes you wish to subscribe to. There are fee based services that you can subscribe to which may offer nation wide coverage and will "scrub" the number to see if it is on the list.

How can I launch a successful e-mail advertisement campaign and comply with the CAN-SPAM Act? The CAN-SPAM (Controlling the Assault of Non-Solicited Pornography and Marketing) Act, sets requirements for any e-mail that advertises or promotes a commercial product or service, including website content. It would be a prudent practice to include your identity information in the signature box for all staff in your office for outgoing e-mails. Here are four key requirements for commercial e-mails:

- Accurate header information. "To" and "From" fields, as well as the originating domain name and e-mail address, must be accurate and identify the person who initiated the e-mail.
- No deceptive subject lines. The subject line can't mislead the recipient about the content or subject matter of the message. Your message must contain clear notice that the content is an advertisement or solicitation and that the recipient can opt-out of receiving e-mail from you.
- Easy opt-out method. You must provide a return e-mail address or another Internet-based response mechanism that allows recipients to ask you not to send future e-mail messages. When you receive an opt-out request, the law gives you 10 business days to stop sending e-mail to the requester's e-mail address.
- Display a valid physical mailing address.

Can I send advertisements for my services by fax to clients, customers or prospective clients? It is unlawful for you to send unsolicited advertisements to any fax machine, including those at both businesses and residences, without the recipient's prior express invitation or permission. An "unsolicited advertisement" is "any material advertising the commercial availability or quality of any property, goods or services which is transmitted to any person without that person's prior express invitation or permission, in writing or otherwise." However, you may always send fax advertisements to recipients with whom you have an "established business relationship" (EBR), as long as the fax number was provided voluntarily by the recipient. Specifically, you can send such a fax to an EBR customer if you also:

- Obtain the fax number directly from the recipient through an application, contact information form, membership renewal form, etc.;
- Obtain the fax number from the recipient's own directory, advertisement or website, unless the recipient has noted on such materials that it does not accept unsolicited advertisements at the fax number in question;
- Take reasonable steps to verify that the recipient consented to have the number listed, if obtained from a directory or other source of information compiled by a third party.

If you had an EBR with the recipient and possessed the recipient's fax number before July 9, 2005, you may send the fax advertisements without demonstrating how the number was obtained.

If pursuant to these rules, you must provide notice and contact information on the fax that allows recipients to "opt-out" of future faxes. The notice must:

- Be clear, conspicuous and located on the first page of the advertisement;
- State that the recipient may make a request that you not send any future faxes and that failure to comply with the request within 30 days is unlawful;
- Include a telephone number, fax number and cost-free mechanism (including a toll-free telephone number, local number, toll-free fax number, website address or e-mail address) to opt-out of faxes that must be available 24 hours a day, seven days a week.

If you receive a request not to send more faxes, you must honor that request within the shortest reasonable time from the date of the request, not to exceed

**Continued on page 15.**

## SOURCES

**Federal Communications Commission at www.FCC.gov.**

**Federal Trade Commission at www.FTC.gov.**

**Sarah Louppe Petcher Associate General Counsel, Northern Virginia Association of REALTORS®, Inc.**





**Roxanne Mikolon**

*joined PRANDI Property Management, Inc., CRMC® in October 2001. Her administrative background and enthusiasm serve her well. She likes working with owners, tenants and vendors, and enjoying a good relationship with all. Roxie's heart is with her family which includes her husband of almost 40 years, Joe, her grown daughter, son, step-children and grandchildren.*

# Certified Support Staff
# It is a Win-Win!

It all started for me in Salt Lake City, Utah. At the Annual Convention and Trade Show in 2005, NARPM® announced that they would soon be offering a Certified Support Specialist (CSS℠) designation. I was very excited and was ready to sign up.

I have worked at PRANDI Property Management, Inc., CRMC® for six and a half years. My employer, Melissa Prandi, MPM® RMP®, promotes constant learning. In 2003, PPM earned the CRMC® designation. I could not imagine a better place to grow and learn, as we are all, at PPM, supported in this and are urged to go for it!

The CSS℠ designation was a while coming, however, because NARPM® wanted to be sure that all was in place, the online classes would be ready to go and that the support would be there. As for support and encouragement, NARPM® National Administrative Assistant Cher Leadbeater was the best. She put up with, and promptly responded to, my questions. The folks at the technical department at America's Best Online Real Estate Education were wonderful as well. Their classes are very easy to use and offer excellent information.

I loved the Client Focused Communications and ADA Fair Housing online classes. Client Focused Communications is an area we can all relate to and this class will, without a doubt, open your eyes. And I thought I knew about Fair Housing! I have attended local classes and they only touch the surface. I also took Ethics in Monterey, California with Suzanne Cameron, MPM® RMP®. Another excellent class! I sat alongside property mangers and company owners who have been in the business for some time and are NARPM® members, who were there to refresh and reinforce their knowledge. Others were new members and first-timers.

What this designation means to me is that I can proudly say I earned it and will practice the principals of an ethical assistant who can exercise good client focused relations and adhere to the fair housing practices, whether at work or in my personal life.

What's next for me is continuing to attend my local NARPM® chapter meetings, state and national conferences, networking and building relationships. Taking the great classes that are offered by NARPM® and our local organizations. A commitment to never stop growing and learning. Each day is a new day and is filled with new challenges. Thank heaven property management is not your boring nine to five job.

If you or someone you know in property management is considering applying for the CSS℠ designation, don't hesitate. It is easy, fun and rewarding. You have two years to accomplish all the requirements. Go for it! It's a win-win!

**The CSS℠ designation is the newest certification available from NARPM®. Virtually all requirements of the CSS℠ designation can be earned at the local level. Four educational courses are required to earn this designation.**

**For additional information on requirements, visit www.narpm.org or request a brochure from NARPM® National.**

STARKER SERVICES, INC.

National Exchange Intermediary
visit Starker.com

John W. Mangham, MPM, CPA
Regional Manager

"Deferring capital gains taxation for NARPM members and their clients since 1992"

2221-D Peachtree Road, Suite 220
Atlanta, Georgia 30309

(800) 332.1031
Fax (408) 356.0808



# INTRODUCING A NEW MARKETING SOLUTION

RentList.com helps Property Managers connect with landlords and homeowners quickly and easily. With innovative solutions to help you market your business to landlords around the country, RentList.com is today's answer to yesterday's problems.

What you can expect from RentList.com:

- **Optimum Search Engine Placement**
- **Qualified Sales Leads E-mailed to You...Instantly!**
- **Direct Link to Your Company Website**
- **Google Map Displaying Your Properties***
- **Online Statistics for Listing Views, E-mail Inquiries and Clicks Through to Your Site**
- **And More!**

## Maximize Your Exposure

It doesn't matter if you've never tried online marketing or have already established a presence on the Web. RentList.com, starting at just $99 per month, has an affordable option for you, even better than the Yellow Pages or other advertising alternatives.

* Only properties that are listed at RentalHouses.com will be displayed.

**To learn more about RentList, please call 866-378-9017 or visit us at RentList.com.**

©2008 Consumer Source Inc. All rights reserved. All trademarks used are the property of their respective owners.

# REGIONAL Communications

CONNECTING THE EXPANDING NARPM® MEMBERSHIP ONE REGION AT A TIME.

**Elizabeth "Betsy" Morgan, MPM® RMP® GRI PRM®** *has been in property management for 25 years. Before taking on her current position as director of residential property management for Prudential Tropical Realty in the Tampa Bay area, she handled a personal portfolio of 250 units, then became a regional and state director of property management for Coldwell Banker Residential, Inc. She enjoys teaching, volunteer service and being a grandmother of five.*

## The RVP Bulletin

In my role of Region 2 Vice President over the past year and half, I have gotten to visit with all the chapters in Florida and also hear from the other RVPs about what is happening with chapters throughout the nation. Chapters always have challenges. That is just a given in the life of a volunteer organization, but I have noted some key practices in successful chapters.

When I was looking for a way to share those practices with all of you, I borrowed an idea from Attorney Harry Heist who gave a presentation on the "10 Habits of Successful Property Managers" at the FARPM, Inc. convention. I noticed from the notes I took at that presentation that his habits could be equally well applied to "10 Habits of Successful NARPM® Chapters." I am sure you can visualize how he might have expanded on them for successful property managers. Successful chapters know these things, but most importantly they act on them.

**❶ BIGGER IS NOT ALWAYS BETTER**

Successful chapters, no matter what their size, have a business plan. They plan for quality, not just quantity of members and services. They have enough members to share the organizational workload and get everyone involved in some way. They have a marketing plan.

**❷ EDUCATION IS KEY TO YOUR SUCCESS**

Successful chapters emphasize the Code of Ethics at every meeting. They teach the power of NARPM® resources. (National and local websites, list serves, the *Residential Resource* magazine, RVPs and National support.)

They offer a variety of course instructors, police, environmental specialists, CPAs, accountants, lawyers, judges, legislators, estate planners, business development experts, affiliates, etc. They also network and use colleague support as a source of education.

**❸ PEOPLE WILL DISAPPOINT YOU**

Successful chapters need to be cautious and a bit paranoid. They have the chapter functioning legally. They make no exceptions to the implementation of their policies and procedures.

**❹ BE PREPARED FOR THE WORST**

Successful chapters talk about natural disasters and how they can help one another. They plan for tech failures (president's computer crashes—where is the back-up data?). They hold volunteers accountable (where are the minutes, the treasurer records, etc.?). They have back-up meeting locations for unexpected meeting location changes

**❺ KNOW YOUR MEMBERS**

Successful chapters hold social events and provide networking time at regular meetings. They keep records of their members' areas of service and specialties for referrals. They seek out information about their members' skills. They seek out NARPM® members from other areas as resources.

**❻ MAINTAIN EXCELLENT COMMUNICATION**

Successful chapters do not rely on the memory of past leaders. They keep clear and accurate minutes of meetings. They keep record of notices to members about meetings. They are ready each year for the Chapter of Excellence submission. They use a contact management system like Constant Contact. They expose themselves to affiliated members, officers of the other chapters in their region, their NARPM® RVP and visitors.

**❼ KEEP CONTROL**

Successful chapters run Board meetings and event meetings from an agenda. They are careful to avoid emotionally charged conflict among members.

**❽ MAKE MONEY**

Successful chapters have consistent revenue. They set a budget and determine the sources from which revenue will come. They spend money to grow and give back to their communities.



# 2008 Endless Possibilities Theme Logo Apparel

Great News! Our affinity partner, Lands' End Business Outfitters, is offering apparel featuring the Endless Possibilities logo.

LANDS' END
BUSINESS OUTFITTERS
NARPM
Endless Possibilities

At Lands' End you'll find:

- Clothes men and women want to wear, even after work.
- More sizes - extra smalls to big-and-talls.
- 10% discount on product and logo application.
- No minimums. Order just one item with your logo if you want.
- If you're not satisfied, return any item for any reason. That's Guaranteed. Period.

**To place your order, call 1-800-374-3695 or shop online at http://ces.landsend.com/NARPM.**

**❾ PARTICIPATE IN PROFESSIONAL ORGANIZATIONS**

Successful chapters interact with other professional organizations. They join local Chambers of Commerce as a chapter. They are actively engaged with their Board of REALTORS®. They seek out their local IREM® chapter for joint interests. They seek out investor groups.

**❿ TAKE VACATIONS**

Successful chapters work from a calendar planned a year in advance. They include down time for their members so meeting schedules are not burdensome. They elect leaders that are organized and systematic in their approach to the chapter business.

You can help make your chapter a success. Those who take an active volunteer role in the workings of their organization reap the rewards of membership. Be a participant not just an observer!

Articles in the *Residential Resource* are for, by and about the membership. All NARPM® members and affiliates are encouraged to send their stories, press releases and photos to publications@narpm.org.

**Interested in advertising?** The year isn't over yet and there is still time to get your message out to the membership! Just contact publications@narpm.org.

The Landlord
Inspector™
Streamline Your Inspections
*Move-in, Move-out, Survey
*Runs on UMPC, Tablet, Notebook
*Customize by property
*Maintain inspection history
*Comprehensive reporting
*Quick and easy to use
Sales@promas.com
888-591-5179
Free demo - www/promas.com/yourdata.htm
PROMAS not required



# FALLING Into September

**Rob Massey, Jr., CPM®** *has served as a local chapter president for NARPM®, the Institute of Real Estate Management, and the Apartment Association in his hometown of Louisville, KY. He has taught several property management classes and managed nearly 1,000 apartments and houses before scaling back his property management company to pursue the national internet listing service he founded known as RentalHouses.com. He served as vice president of industry development for Rentals.com for one year subsequent to the acquisition of RentalHouses.com by Consumer Source in January of 2007. Currently, he serves as a consultant for Rentals.com, focusing his efforts on industry and association relations for the company. Rob can be reached at rob.massey@rentals.com.*

The sun appears lower in the sky, the days are a little shorter, the air feels a little less hot and, in many parts of the country, it is only a matter of days before the leaves will be showing new color. Fall is a beautiful time of the year and with the start of school in most areas it may be a period of slower renting.

Hopefully, with a little break in the action everyone will take advantage of the opportunity to visit Lihue, Hawaii on the Island of Kauai and attend the NARPM® 20th Annual Convention and Trade Show. Not only will it be a great opportunity to expense a trip to a fantastic part of the world, it will also provide a wonderful occasion to attend relevant classes and workshops, continue your pursuit of a designation, network with property managers from all over the world, and learn about goods and services that allow us do our work more efficiently.

Before and after you attend the convention, it is important to recognize that slower renting periods, regardless of the time of year, necessitate our offering the best value to our clients/owners and customers/renters to remain competitive and effective in our respective markets. While the flow of new business may not slow down during weaker leasing periods, the expectations of new clients do not either. The following reminder tips can assist us in keeping our turnover times to a minimum during these slower demand periods.

### PRE-LEASING

As long as the resident who is moving out is cooperative in allowing access and keeping the property in showable condition, this tactic can reduce down time. If successful in securing a lease prior to the current resident vacating, then be sure and include a clause in the lease making the occupancy contingent upon the current resident vacating as planned.

### MARKETING YOUR VACANCIES

Don't forget to get the sign in the yard and rental listing online as early as possible. Remember that no listing service has a lock on all search engines and phrases. Utilizing more than one website will likely produce more leads.

### HOUSE PREPARATION

Paint, clean the house and carpets, and make the exterior of the house and yard appear as if a homeowner was occupying it. Never allow it to look like a rental. This single step can elevate your listing above the others. Fortunately, in many areas of the country, this time of year it is not necessary to maintain minimum heat or air-conditioning in vacant houses which will lower some turnover costs during this period. Generally, the grass requires less attention in September which might also save money but, with leaf removal right around the corner, the cost could increase.

### LOWER THE RENT

Keep in mind that for every two and a half weeks that a vacancy sits on the market, the rent could have been lowered by five percent of the annual rent. Make sure that your clients understand how the math may work to their benefit. During slower periods of the year it is especially important to lower the rent quickly if a property is sitting vacant without a regular stream of prospects calling.

### MARKETING YOUR COMPANY

Consider beefing up your online marketing. With a slower renting season, more time can be devoted to growing your portfolio. There are Internet listing service websites now which have sister websites that allow for additional promotion of your property management services. These are especially good since they usually have great search engine returns and frequently link with your website and your property listings. As an additional benefit, having these third party websites link to your company website will also assist with moving your company website up in search engine returns.

**ALTER LEASE EXPIRATION DATES OF NEW LEASES**
Once a renter has been found, consider tailoring the new lease termination date to a more favorable time of the year. It may simply be a matter of offering to extend the lease to the spring of the year following the one year anniversary. Or, it could mean backing it up a few months to the following summer or whenever the best season for re-renting is. The point here is don't feel stuck in the wrong cycle if your market is regularly slow during the month that it is rented. Many residents will deviate from a standard one year lease when presented with the opportunity.

**SUMMING IT UP**
Slower markets for renting don't have to be difficult if a few extra steps are taken to help move vacancies along irrespective of when they hit your part of the country.

No matter what your market is like in September, take advantage of the change in seasons by attending the National Convention in Kauai, September 23-26, and by enjoying the cycle of nature that reminds us that some change can be very pleasant.

**LEGISLATIVE SCOOP, CONTINUED FROM PAGE 9.**

30 days. You are also prohibited from sending future fax advertisements to the recipient unless the recipient subsequently provides prior express permission to the sender.

Do I need to establish a "Do Not Call, Fax or E-Mail" office policy? Absolutely! Regardless of whether you plan or do not plan to engage in soliciting business using the phone, fax or e-mail you should have a written policy and procedure guide to address this business activity. Additionally, there are reports of scammers who may call your office and ask for your policy and, if you do not have one, trick you into a violation so they can be the beneficiary of a reward from a legal action against you.

How can I register phone numbers on the National Do Not Call Registry? In addition to regular phone numbers already open game, all cell phones numbers were available for release to telemarketing companies as of October 13, 2007. If you have not already had the pleasure, it is only a matter of time before you will start to receive unsolicited calls. You will be charged for these incoming calls according to your phone service contract rates. Call the Do Not Call registration line at 888-382-1222 from your phone (regular or cellular) and register your phone. This is the National Do Not Call list. You must call the registration line from the cell phone assigned to the number you want to have blocked. The whole process takes about 20 seconds that are well worth it.

Track-iT SYSTEMS, INC

**iMaintenance Solutions:**

* **Track** your maintenance from **Start to Finish**
* Proven **4-way communication** with Owners, Tenants, Property Managers and Assistant Managers
* Supports **Portfolio & Departmental** management
* **Email** notification to Property Managers & Vendors
* **Attach** documentation seamlessly to maintenance requests and invoices

BOTTOM LINE: Bring in New Management. Rent More Houses. Peace of Mind.

www.track-it-systems.com
866-415-0600
lee@track-it-systems.com




# *Thriving in Uncertain Times*

**Kerry Meade** *is COO of PropertyBoss Solutions, a provider of property management software solutions that empower your business through increased occupancy rates, reduced operating costs and improved management visibility. He has over fourteen years experience working with technology firms focused on improving the profitability of high growth businesses. For more information about Kerry or PropertyBoss Solutions, visit propertyboss.com or call Kerry at 864-297-7661 x25.*

Property managers devote years to planning and building the processes that support their business. Whether they are attempting to increase occupancy rates, reduce rent collection times or streamline external communications, their business and infrastructure rely on fundamental and critical processes that ensure cash keeps flowing in and owners and residents are happy. When everything is working according to plan, they can experience above average results that truly distinguish them from their competitors. They have built procedures that work and they are able to reap the profits.

Unfortunately, life and business rarely stay smooth and predictable for long. Disruptions and unforeseen events often provide a very unwelcome but real test as to the viability of a business and their processes. In our experience, the three most common disruptions that test a property management company are personnel changes, disruptions in technology and volatile market conditions.

Although it is impossible to predict the exact nature of the next disruption, there are key infrastructure elements that can be put into place prior to a disruption that can help the organization weather these unforeseen events.

#### YOUR MOST VALUABLE ASSET

Think about a time when your company overcame an insurmountable challenge or averted a near disaster. I'll bet that one person or a small group of people made all the difference. Most successful organizations can readily list the person or people upon whom success is dependent. The accomplishments of these individuals are, without a doubt, worthy of praise and a justifiable sense of pride for you and your company. They may also be your weakest link.

Key employees typically have both a very strong command of the formal requirements of the job as well as a deep knowledge of all the undocumented processes that keep the organization running. These often include items like the ability to reconcile rents back to the general ledger, the most efficient way to post, collect and process rents, and a general knowledge of the company's residents, owners and vendors. When all is running smoothly, these items may seem to work effortlessly. Unfortunately, employees get sick, personal situations arise and, as much as you may not want it to happen, people may leave the company. In situations like these it is not uncommon to lose key accounts, experience rapid erosion of profitability or even find the business paralyzed as you try to survive the unexpected absence.

There are a couple of things you can do to lessen the impact of the temporary or permanent loss of a key employee. First, use the knowledge of your best employees to establish formal processes and to formalize those processes within your property management software solution. By reflecting your daily activities in an automated solution you not only reduce the overall workload on your employees (and perhaps reduce their desire to be away from the office), but you also reduce the risk of your business being dependent upon a single individual.

Second, take the initiative to cross-train your employees in different areas of your business. This effort is often difficult to implement given the daily demands on your employees, but I have worked with property managers who successfully implemented this vital activity through group training on their business solution. The process not only improves the employee's ability to cover for another employee during their departure but also improves their performance within their own job. Cross-training also has the added benefit of introducing an often needed change of pace that benefits the employee's morale, as well as the company's bottom line. For more ideas on employee development see "Technology Matters: Software Training Success" July 2007.

#### CONTROL-ALT-DELETE

Most companies employ some sort of technology to make life easier and help their businesses run more smoothly. Whether it is Excel, QuickBooks or a property management software solution, it is almost impossible to find a successful property management company that does not rely on technology as a key

element of their business (yes, I know, there are a few of you holding out for the comfort of pencil and paper). These solutions increase the number of properties a manager can successfully manage and enable the business to become stronger and more financially sound.

For instance, today's property management software solutions can streamline and automate many key activities such as posting and processing rents, e-mailing tenant letters and notifications, managing work orders and handling entire move-in and move-out processes. In addition, more advanced solutions can handle critical revenue and cash related activities such as online applications and portals, ACH and credit card payments and seamless integration with accounting packages. The net result is that property management companies today have a complete line of powerful tools that can have a tremendous positive impact on a business.

But, as everyone who has ever spent more than five minutes on a computer can attest, sometimes technology does not work as anticipated or, worse yet, just stops working entirely. When this fiasco occurs, the valuable store of information about your business and, in fact, your entire business itself, may be at risk. Loss of data can be one of the most crippling events to strike a property management company. With all of your financials, operations and processes lost, it can be a timely and expensive endeavor to rebuild all of that information from scratch.

Fortunately, there are several proactive things you can do to ensure that when a technology disaster strikes, and it will, that you can be back up in minutes versus days, weeks or even months.

First, ensure that your software solution is storing its data in an enterprise class database. All databases are not created equal and those designed from the ground up to support scaled deployments have greater stability, security and reliability when it comes to protecting data. Many of the older database technologies like Btrieve, dBase, Paradox and Access (.mdb) do not provide the reliability and scalability of modern databases like Sybase iAnywhere and Microsoft SQLServer.

Second, ensure that data backups are a routine part of your schedule. You may ask "How often should I backup my data?" Well, how many days of work are you comfortable losing? A backup program is only as good as the most recent version you have backed up. For more ideas on data backup see "Technology Matters: Back Up to Speed" April 2008.

Finally, explore the availability of a flexible software platform. A key issue from both business scalability and disaster recovery is whether your provider supports your ability to move seamlessly between self-hosted and web-hosted solutions. As your business needs change or when a disaster occurs, a key question you need to ask is can your software provider quickly move your data to a new deployment method that reflects the demands of your current situation? For example, if your software server crashes or is lost in a fire or flood, could you quickly move your data to your software provider's web servers? Alternately, if your Internet connection is cut by a backhoe (we had one client without Internet access for ten days), could you quickly move your data to a local computer server? In addition, business conditions such as adding and closing offices or losing a key IT person can also require a change in deployment method to improve operational efficiency or meet new business challenges.

**UNCERTAIN FORECAST**

Today's property managers fully understand that uncertainty is the new certainty. Real estate markets are under intense pricing and financial pressure, owners of investment properties are facing all-time high foreclosure rates. And, whether or not a market is hot seems to change about as frequently as the weather. Conversely, well-funded owners and property managers are currently presented with attractive buying opportunities, some residential rental markets are experiencing healthy growth and people continue to need a place to call home, rental or otherwise. The only thing today's property managers can count on is that change is going to happen.

The property mangers I have spoken with who are doing well, and even thriving in these difficult markets, are not people who have foreseen some particular trend before its time and ridden it to success. On the contrary, successful property managers have built their businesses and infrastructures with a sense of general business agility in mind. They focus on sound business processes that reduce waste, infrastructures that automate processes where possible and internal systems that can meet their current needs and also quickly scale.

There are several keys things a property manager can do to not only survive, but thrive, during uncertain times. First, conserve cash. It sounds simple, but cash truly is king and critical to surviving in today's market. Automation of repetitive property management functions is a great way to reduce operating costs, freeing up personnel to engage in revenue generating activities such as increasing occupancy rates and even provide better service to residents.

**Continued on page 20.**

**"Life is what happens to you while you're busy making other plans." -John Lennon**





**Robert L. Cain**, *publisher of the Rental Property Reporter, is a nationally recognized speaker and writer on property management and real estate issues. For fifteen years he has published newsletters and other information for landlords and has spoken to numerous audiences on property management and real estate issues to enthusiastic acclaim. For a free sample copy of the Rental Property Reporter call 800-654-5456 or e-mail bobcain@rentalprop.com.*

# Positioning Yourself for Greater Success

On your mark…get set…go! Now is the time to be thinking about where you stand in the race for success next year. It is a race, you know. It is a race between you and a neighborhood that may be declining or improving. It is a race between you and properties that always need updating and repairing. It is a race between you, the government and its agencies that incessantly pass laws and create new regulations that not only cost you money, but make it markedly more difficult to earn a fair profit. And finally, it is a race between you and your tenants.

It is a race between you and your good tenants to not only keep them as tenants, but to make them such happy customers that the idea of moving will never even be a flicker in their subconscious. It is a race between you and bad tenants to get them out before they do too much damage, drive off your good tenants and receive ever more immunity for their outrages from the courts and legislatures.

How to win the race? The first requirement is knowing what you have to do to win. John Maciha writes in *The Eleven Commandments of Budgeting* to "use the budget process to analyze your real estate or property management business. Are you positioned properly for the short range as well as the long range? Are upgrades needed to remain competitive? Do you need to hire more people or get more equipment?"

The first thing you do, then, is to figure out where you are and where you want to be. What is your position in the market now? Is it what you had planned?

It is time to sit yourself down and plan what you want to happen in the next year. I always have a problem doing that myself. I can find all kinds of things to do, including Freecell, watching sports on television and sweeping the patio, rather than figure out what I want to get accomplished and where I want to be. My brain dries up. Over the years, though, I have learned a few tricks to get my brain primed to gush forth some pretty good ideas. I will tell you about three in this article.

### TRICK #1: 20-IDEAS

This one works for me just about every time. I wish I could claim credit for it, but I can't. I first heard about it from the world-famous motivational speaker Brian Tracy. And I don't imagine it originated with him either. What you do is write down the question or problem you want to find an answer or solution to, such as "How can I attract better tenants?" Now you write down 20 possible solutions. It is called "mind storming."

You have to be careful with yourself. Don't pass judgment on the ideas as you go along, just write them down. Most important, sit there until you come up with all 20. It has to be done in one sitting. No getting up, mowing the lawn, fixing that leaky faucet in a rental you have been putting off for a couple of months—stick with it!

The first four or five will be easy. The old standby ideas come to mind first. The next few will be a little more difficult. By the time you get to 16 or 17 you will have come up with some pretty good ideas. That is why you sit there and mind storm until all 20 are on paper. Just watch—chances are you will get so many good ideas that it may take several weeks to implement them all.

### TRICK #2: 10-MINUTES A DAY

Jay Johnson of Note Finders of America writes, "Zig Ziglar advocates spending 10 minutes a day, immediately after awaking, writing down 10 ways you could become more effective at what you do."

Would you spend 10 minutes a day if you were guarunteed to accomplish what you want? My bet is no because most people don't believe that this can work—it's too simple. But the magic here is that it really does work.

There's brilliance in what Mr. Ziglar suggests. First, it will get you thinking about what it is you want. Second, it will get your mind on the right track and you will find solutions to obstacles or problems you might be experiencing. Third, you will get a continual

supply of fresh ideas. And, last but not least, by committing to a daily ritual, such as spending your first 10 minutes focusing upon what you want, you will open pathways to the powerful subconscious mind. The subconscious mind can help you solve any problem or overcome any obstacle.

**TRICK #3: PLAY WITH NUMBERS**

This is nothing more than basic goal setting. Figure out where you want to be financially at the end of a year, five years, ten years, etc. Write the figure down.

Now comes the more difficult part. Break the figure down incrementally to find out where you must be in a year, in six months, in a month. Then you have a goal to work toward and you are able to measure your progress.

Need more ideas on how to progress? Go back and use tricks one and two. Positioning yourself for success takes planning. Block out some time now before the end of the year to get yourself ready to be even more successful in the rental property business next year—to win the race against the neighborhood, the government and your tenants.

## IN MEMORY OF NANCY J. RYAN, MPM® RMP®

Nancy J. Ryan, MPM® RMP®, lost her battle with cancer on Saturday, July 12, 2008. Nancy joined NARPM® in 1991 and was a member of the Colorado Springs Chapter. In 2007, she served as the chapter's education chair. Funeral services were held Friday, July 18th.

---

**PROFESSIONAL MEMBERS**

Jewett K. Spencer
Real Estate Consultants
PO Box 1107
Kealakekua, HI 96750
808-322-8888

Vickie Williams
RE/MAX Honolulu
92-1314 Palahia Street
Kapolei, HI 96707
808-927-0900

Angie Zengilowski
RE/MAX Alliance
4701 Columbus St #200
Virginia Beach, VA 23462
757-456-2345

**SUPPORT STAFF**

Rod Shaul
Boises Best Prop. Managers
124 E Pine Ave.
Meridian, ID 83642
208-850-9887

Cynthia Thomas
Pierce Property Mgmt.
550 S Montezuma #C
Prescott, AZ 86303
928-445-8750

**AFFILIATES**

Janine Spinks
Domin-8 Enterprise Solutions
4660 Duke Dr #210
Mason, OH 45040
513-492-5800

**Membership listing continued from page 25.**



## 2007/2008 Designation Candidates & New Designees

**RMP® CANDIDACY**
B. Scott Abernathy
Melva Albone
Linda Allen
Carrie Appling-Lake
Karen Ayers
Richard Bailey
Leslye Baumann
Shawn Beard
Johleen Belliston
Debbie Bennett
John Bradford
Tina Bradley
Michele Brassard
Alicia Brim
Charlie Brown
Lana Byrne
Linda Chatten
Sandra Clark
Dawn Crawford
Marc Cunningham
Jerry Dean Holt, Jr.
Dennis Flesher
Leeann Ghiglione
Hardeman Godbee
Bob Gunson
Alicia Hay
Phillip Henderson
Ronald Herdt
Eric Hoglund
Karl Jennings
Louis Kahn
W. Sean Kerr
Jan Kim
Betty Kirby
Leslie Latham
Traci Lewis Van Camp
Donna Littleton
Dan Lopez
Tina Lopez
Stella Louck Beech
Anthony Marotta
Carolyn Matthews
Paul Matthews
Jackie McCormick
Barbara McDonald
Jock McNeil
Michael McVety
Mary Molina
Nancy Myers
Jennifer Newton
Tracy Norris
Beverly Perina
Fric Pesek
Frank Rivera
William Rowan
Linda Sasaki
Nick Scarabosio
Lynn Sedlack
Tom Sedlack
Taylor Simonton
Deborah Smith
Mark Smith
Shana Smith
Pamela Taeuffer
Erika Toikka
Kellie Tollifson
Mark Vonder Meulen
Leisa Marie Wells
Marc Witmer

**MPM® CANDIDACY**
R. Scott Corbridge, RMP®
Cary Efurd, RMP®
Lynda Farren, RMP®
Leslie Feldkamp, RMP®
William Ferguson, RMP®
Denis Flesher
Dave Fletcher, RMP®
Dorothy Hardee, RMP®
Linda Holzer, RMP®
Nat Holzer, RMP®
Michelle Horneff-Cohen, RMP®
Marty Hutchison, RMP®
Paul Irey, RMP®
Kevin Knight, RMP®
Elizabeth Loop, RMP®
Robert Lynde, RMP®
Kathryn MacGeraghty, RMP®
Barbara Mayo, RMP®
Michael McCreary, RMP®
Kandy Meehan, RMP®
James Pickett, RMP®
Worth Ross, RMP®
Barbara Smith, RMP®
Candice Swanson, RMP®
Gary Walker
Chris Warren, RMP®

**CSS℠ CANDIDACY**
Krista Alcott
Karen Birdy
Kimberly Cowen
Lynette Field
Olivia Johnson
Roxanne Mikolon

**CRMC® CANDIDACY**
Bennett Property Mgmt.
Anne B. McCawley, RMP®

First Rate Property Mgmt.
Tony A. Drost, MPM®

IPM Corporation
Kittredge Garen, MPM®

Rollingwood Mgmt., Inc.
Michael Francis, MPM®

**NEW RMP® DESIGNEES**
Cindy Hoover, RMP®

**NEW MPM® DESIGNEES**
Anne McCawley, MPM®
Geri Stephens, MPM®

**NEW CRMC® DESIGNEES**
All Seasons, LLC
Carolyn Rogers, MPM®

Realty Mgmt. Associates
Marc Banner, MPM®

**TECHNOLOGY MATTERS, CONTINUED FROM PAGE 16.**

Second, take advantage of resources such as online prospect portals, listing services, dynamic property availability feeds and guest and prospect management tools designed to help increase your conversions. There are many options available, and a good solution will offer full integration in each of these areas.

Finally, employ systems that are built for tomorrow's growth but only require you to pay for today's usage. The only thing worse than being saddled with large, expensive systems that are way too complicated and expensive compared to what you need, is getting locked into a system (or having no system) that meets today's needs but cannot quickly ramp for tomorrow's customers. When evaluating the systems upon which you are going to build your business in uncertain times, be sure to understand how quickly they can scale up (and as much as you may not want to think about it, how quickly they can scale down), how well they meet your total solution needs, and their proven ability to help customers similar in size and function to you. All solutions are not created equal, so be sure to ask about encryption, database security and backup procedures to ensure that they can protect your valuable data. For more ideas on selecting the right solution for you see "Technology Matters: Shopping for Software" May 2008.

### PLAN TO BUILD, PREPARE FOR LIFE

There are many options available for today's property manager to help navigate the uncertainty and volatility that life and business hold in store. Those who proactively put systems in place that allow them to respond to unforeseen events will have the ability to focus their efforts on building the future.

The PROMAS
Landlord
Software Center™

**Property Management Software**

**1/2 Dozen Reasons to Buy**

1. Owner statements on-line
2. Import images and documentation
3. Electronic owner proceed checks
4. Letters using Microsoft Word
5. Print MICR encoded deposit slips
6. Rock solid accounting

**sales@promas.com**
**888-591-5179**
**Free Demo - www.promas.com**
***Yardi balances can be imported***



# Understanding the Office of **Foreign Assets Control**

**Mike Lapsley** *is president and CEO of RentGrow, Inc., the resident screening experts. www.rentgrow.com.*

There is no doubt about it: there is a lot of confusing information out there today about OFAC. Most property owners expect OFAC to be part of their everyday screening process, but not everyone understands why that is. So what exactly is it, and what does it mean for you, as a property manager? This article will provide you with the information you need to answer that question, starting with the most basic definition.

OFAC, or the Office of Foreign Assets Control, falls under the United States Department of the Treasury. According to its website, OFAC "administers and enforces economic and trade sanctions based on U.S. foreign policy and national security goals against targeted foreign countries, terrorists, international narcotics traffickers, and those engaged in activities related to the proliferation of weapons of mass destruction." The OFAC acts under Presidential wartime and national emergency powers, as well as authority granted by specific legislation, to impose controls on transactions and freeze foreign assets under U.S. jurisdiction. OFAC is the successor to the Office of Foreign Funds Control (the FFC'), which was established at the advent of World War II following the German invasion of Norway in 1940.

In order to support this mission, OFAC maintains and regularly updates a Specially Designated Nationals (SDN) list. According to the OFAC website, these individuals' "assets are blocked and U.S. persons are generally prohibited from dealing with them."

### WHY YOU SHOULD CARE ABOUT OFAC

Since the passage of the Patriot Act in 2001, all federally backed mortgages have carried a paragraph that tells owners that they are in default of the mortgage if they "knowingly" permit anyone to live on the property who is named on the SDN list of terrorists, drug kingpins, money launderers, etc.

While the definition of "knowingly" will, no doubt, cause debates in legal circles, we find that most property owners with federally guaranteed mortgages prefer to err on the side of caution. OFAC screening ensures that owners are in compliance with their mortgage terms, which gives them the ability to defend themselves in the unlikely event that someone on the SND list is found living on their property.

### SCREENING SOLUTIONS

The best solution is simply to have a system in place that incorporates OFAC screening into your everyday screening processes. It is important to make sure your screening solution also checks against the FBI Most Wanted database (some call it the "fugitive list").

Keep in mind that OFAC is a name search only; just because a "hit" or name match comes back doesn't mean the applicant is involved in terrorist plots or narcotics trafficking. Determining whether a hit is valid involves a number of "due diligence" steps as outlined on OFAC's website. Your first step is always to crosscheck results to confirm an individual's identity. Rest assured, valid, positive hits are extremely rare (we have yet to come across one ourselves), while "false positives" can certainly be more common since this is, as we mentioned above, a name search only.

The most important thing for you to know about OFAC is that it is actually more about complying with your mortgage terms than it is about identifying terrorists. For the most part, it is an issue most of you will never have to face. While relatively new and certainly not foolproof, an OFAC search does provide peace of mind to property owners in terms of feeling that you are fully protected in meeting the terms of your financing documents.

However, we continue to conduct regular OFAC checks as a free service—and we even take it a step further to include the FBI's most wanted list in that search—so it is important for property managers to better understand the process.

**For additional information on the Office of Foreign Assets Control, visit www.ustreas.gov/offices/enforcement/ofac.**



**Chris Warren, RMP®** *is the owner and broker for SmartSource Realty (sales), Chris Warren Realty (leasing and property management), and Maintenance Made Simple. He received his BBA in Marketing in 1991 and his MBA in 2000. Chris is a licensed real estate broker and loan officer.*

# Making the Transition **From Home Office**

As a small business owner, it can be very challenging to grow your business, remain profitable and maintain a balance in life with your family. Some property managers can manage 50-100 properties without the need of a full-time employee or commercial office. However, once the portfolio exceeds 100 units, an owner needs to consider hiring an employee and opening a commercial office.

One of the best decisions I ever made was to purchase an office condo. As a property manager and landlord, I don't mind having mortgage debt as long as someone else pays the mortgage. Why not apply the same concept with a commercial office?

I own two separate commercial office condos that are about 1,000 sq. ft. each. We sublease 50 percent of the space to our mortgage broker, attorney and real estate sales agents. Our office condo has a dedicated conference room, a shared reception area, bathroom and kitchen. Our tenants use the conference room by appointment, and we offer free usage of our fax machine, printer and digital scanner/sender. Hi-speed Internet is also included, and our tenants setup a separate phone line or VOIP system through our Internet connection. Our phone system also supports multiple companies with separate business lines offering full voice mail and voice attendant.

The monthly cost of renting an office in your area will vary in costs depending on rent, utilities, location, and Internet and phone lines. If the lease is a triple net lease, and requires that you pay the property taxes, the costs will increase substantially.

There is a huge demand for small business owners needing to lease a commercial suite to conduct business or meet customers. Many small businesses can't afford the overhead cost of leasing a larger office

Many businesses compliment a property management firm. Consider subleasing to a real estate agent who works with an investment group, a real estate attorney, insurance agent, mortgage broker or builder/contractor. Renting office suites to small business owners will lead to profitability and a greater cash flow. This cash flow may be used to pay down the mortgage on your building in a shorter time frame.

If you partner and sublease with a small business owner, consider sharing employee costs. You may be able to cross-train a receptionist or assistant to help you and your tenant partner. This can reduce your overhead cost until your business grows enough to support the cost of a full-time employee.

My business has grown, and I now have several employees. Leveraging my office condo helped me manage my overhead and make the transition from a home office to commercial space much easier. I still work at home, but my staff answer calls, draft leases and handle all maintenance, accounting, etc. This has provided the best balance for my business. Now, I can actually take a vacation. Before I had an office and a team of resources, it was impossible to take a vacation.

**I still work at home, but my staff answer calls, draft leases and handle all maintenance, accounting, etc. This has provided the best balance for my business. Now, I can actually take a vacation.**

Owning a commercial office can make your business even more profitable if you sell your business in the future. You could package the business and office together for sale, or sell the business only and keep the office and lease to a new owner. Both scenarios are attractive offerings to a future buyer.

I encourage property managers to consider making the investment to purchase an owner-occupied office and sublease to business professionals. Not only can you have a free office, you may generate business leads from your business-tenant relationships.

PLF-000774

JA144



www.RentalHomePros.com

Your New Home on the Internet

RENTAL HOME
PROFESSIONALS

**Designed with NARPM® members in mind, RentalHomePros.com will quickly become your home on the Internet. This new site will allow you to:**

- Attract more clients
- Enter your rental listings once and market them multiple places on the web
- Mark a listing "on the market" or "off the market" without having to recreate the listing
- Advertise all of your listings for one low monthly fixed price
- Get a comparative market analysis, with the ability to access data regarding specific markets including:
  - Rental rates for comparable properties, including rates per square foot
  - Average days on market for listings
  - Average days vacant for listings
- Market Reporting, including:
  - Marketing Traffic Summary - Your Properties on the Market Now
  - Marketing Traffic per Property
  - Marketing Traffic per Agent
  - Marketing Data - My Company's Inventory
- 90 Day Money Back Guarantee
- Affordable Pricing:

| Total Units Managed | Member Price per Month | Annual Price 1st 90 days*** (Discount) | Effective Monthly Price | After 90 days Annual Price 1 month Free (Discount) | Effective Monthly Price | Non-member Monthly Price* |
|---|---|---|---|---|---|---|
| 1 - 99 | $49 | $441 | $36.75 | $539 | $44.92 | $79 |
| 100 - 249 | $99 | $891 | $74.25 | $1,089 | $90.75 | $149 |
| 250 - 499 | $199 | $1,791 | $149.25 | $2,189 | $182.42 | $299 |
| 500 + | $299 | $2,691 | $224.25 | $3,289 | $274.08 | $429 |

***For companies that join during the first 90 days of the service going live, we are offering a 3 month discount if you pay a year in advance.

*Based on FTC ruling and filing against several MLS services across the country, wether it is mandatory that we permit non-NARPM members the opportunity to join. As you can see from the price difference, anyone qualified to become a NARPM member (Residentail Home Professionals) would be much better off financially to join NARPM when joining RENTAL HOME PROFESSIONALS.

**Find out more today:** www.rentalhomepros.com
info@rentalhomepros.com
phone: 866-828-5341

PLF-000775

# MEMBERSHIP Growth

A WARM WELCOME TO ALL THE NEW MEMBERS WHO JOINED FROM JUNE 26 – JULY 22.

**NARPM® offers different types of membership so that everyone in the residential property management industry can participate.**

## PROFESSIONAL MEMBERS

Vida Allen
Quam Properties Hawaii, Inc.
5095 Napilihau Street #201
Lahaina, HI 96761
888-665-1315

Ann Anderson
Accel Property Mgmt. & Investments
6704 North 26th Street
McAllen, TX 78504
956-827-3707

Donna Apisa
Oceanfront Realty International, Inc.
PO Box 223190
Princeville, HI 96722
808-826-6585

Alice Bennett-Moran
CJ Kimberly REALTORS®
75-5875 Kahakai Road
Kailua-Kona, HI 96740
808-329-7000

Barbara C. Brock
The Agency, Inc.
815 S Missouri Ave.
Lakeland, FL 33815
863-686-1416

Michael W. Buchanan
Nai'a Properties, Inc.
4260 L Honoapiilani Road
Lahaina, HI 96761
808-669-0402

Elias Camhi
ELDA Management Services, Inc.
7322 Southwest Freeway #770
Houston, TX 77074
281-894-8659

Nica Caoile
Century 21 Homefinders
POB 2338
Kailua-Kona, HI 96745
808-937-3604

Rose Cisneroz
Von Kaenel Real Estate Services
3190 S Bascom Avenue #200
San Jose, CA 95124
408-559-8355

Kathy Cole
Day-Lum Rentals & Management
2 Kamehameha Avenue
Hilo, HI 96720
808-935-4152

Richard Cooper
Giovannoni & Cooper Prop. Mgmt.
PO Box 204
Healdsburg, CA 95448
707-433-1497

Janet Lee Cunningham
33rd Company, Inc.
10451 Glenn Eagle Circle
St. Paul, MN 55129
651-777-5500

Miranda C. Desoto
Paradise Living Propertie, Inc.
1087 Limahana Pl #5
Lahaina, HI 96761
808-667-408

Linda Edwards
Heritage Property Management
3002 I-70 Business Loop #2
Grand Junction, CO 81504
970-243-3186

Eric Lee Gibson
Basalt Realty
3022 County Road 112
Carbondale, CO 81621
970-927-9955

Gina Hara
Clyde Abe Realty, Inc.
PO Box 30048
Honolulu, HI 96820
808-941-2154

Russell Hatchcock
East Valley Property Management
1855 E Southern Avenue #112
Mesa, AZ 85204
480-926-9001

Marie H. Hazen
Hammock Realty
744 E Burgess Road #E-102
Pensacola, FL 32504
850-479-4600

Jennifer Hourscht
Casa Vista Properties, Inc.
6700 N Oracle Rd #503
Tucson, AZ 85704
520-742-1455

Joan Kashimoto
Property Profiles, Inc.
98-030 Hekaha St. #26
Aiea, HI 96701
808-487-9500

George F. Kenner
Kenner Property Management
13004 Campo Road
Jamul, CA 91935
619-741-0297

Duke Kimhan
Realty Experts HI
2509 Lai Road
Honolulu, HI 96816
808-487-0777

Karen Kondo
Monte D Fitts REALTORS®
2435 Kaanapali Pkwy #A-1
Lahaina, HI 96761
808-667-9703

Dorothy K. Kuromoto
DK Realty
PO Box 2098
Aiea, HI 96701
808-488-3820

Ari Lund
Get There First Realty, CRMC®
4931 Airline Rd
Dallas, TX 75205
214-522-5700

Bradford G. Lusk
Prince Properties
75-5706 Hanama #108
Kailua-Kona, HI 96740
808-930-0007

Shauna Macke
RE/MAX Alliance
4701 Columbus Street #200
Virginia Beach, VA 23462
757-456-2345

Sue Maruyama-Strickland
Garden Island Properties
4-928 Kuhio Hwy
Kapaa, HI 96746
808-822-4871

Jason McGuire
RE/MAX Infinity
3782 Hwy 90
Pace, FL 32571
850-995-0030

Robert McNeff
Pali Kai
969 S Kihei Road
Kihei, HI 96753
808-875-8988

Nickolas Meer
Meer & Company, Inc., CRMC®
4545 E Colfax Avenue
Denver, CO 80220
303-322-1550

Cherlyn Merz
Stellar Homes Realty
PO Box 44409
Tacoma, WA 98449
253-539-5259

**BENEFITS OF JOINING**

- Business Building Referrals
- Networking Opportunities
- Industry-Related News
- Annual Convention and Trade Show
- Leadership Training
- Regional/State Conferences
- Educational Opportunities
- Nationally Recognized Professional Designation Program
- Local Chapters
- National & Local Affiliates
- Award-Winning Publications
- International Web Exposure

Cori K. Meyers
Kapolei Realty
1001 Kamokila Blvd., Suite 109
Kapolei, HI 96707
808-674-1191

Regina Mitchell
Real Estate Consultants
PO Box 1107
Kealakekua, HI 96750
808-322-8888

Christel Montez
Hill Country Property Management
4202 Spicewood Springs Rd #220
Austin, TX 78759
512-346-3309

Jennifer L. Moscovich
Maui Lodging.com, LLC
4242 L Honoapiilani Road #C1
Lahaina, HI 96761
808-669-0089

Rick Mubarak
Mubarak Realty Management
10460 Campus Way South
Upper Marlboro, MD 20774
240-573-4273

Dan O'Hanlon
Sullivan Properties, Inc.
PO Box 1207
Lahaina, HI 96767
808-669-0423

Cheryl Okamura-Fansler
CF Properties & Management, LLC
7202 Kuaehu Street
Honolulu, HI 96825
808-284-9183

Michelle Olson
Blue Apple Property Mgmt. & Sales
6377 S Revere Pkwy #100
Greenwood Village, CO 80111
303-799-5166

Theresa A. Perez
Atr Properties, Inc.
PO Box 1426
Kamuela, HI 96743
808-329-6020

Kathy Pettigrew
Venetian Property Mgmt., LLC
PO Box 5653
Beaverton, OR 97006
503-317-1061

J. C. Posey
Posey Property Management, Inc.
2701 West 15th Street
Plano, TX 75075
972-867-8400

Rod Quam
Quam Properties Hawaii, Inc.
5095 Napilihau Street #201
Lahaina, HI 96761
888-665-1315

Eugene Richards
ChamplainApartments.com
168 Summit St.
Burlington, VT 05401
802-343-9909

Stephen Richards
ChamplainApartments.com
168 Summit St.
Burlington, VT 05401
802-343-9909

Wayne Richardson III
RE3LLC Real Estate
3-3586 Kuhio Hwy #2
Lihue, HI 96766
808-245-5758

Susan F. Robinson
Susan F. Robinson, Inc.
8001 San Miguel Canyon Road
Prunedale, CA 93907
831-663-1177

J. William Sanborn
Trans-Pacific Properties, LLC
PO Box 190
Kamuela, HI 96743
808-887-1122

Laurie Singer-Peterson
Carnahan & Associates
22020 Ventura Blvd.
Woodland Hills, CA 91364
818-884-1500

Tammy Soares
Maui Island Living, Inc.
PO Box 10157
Lahaina, HI 96761
808-280-6014

Zandra Souza Amaral
Aina Hawaii ZSA Properties
365 Hoalike Street
Kihei, HI 96753
808-879-7445

**Continued on page 19.**

**BUSINESS PRODUCTS/SERVICES**
1-800-Water Damage
ACN BC Communications
Air Klean
Alpha Ecological
American Blinds & Draperies
Appliance Warehouse of America
Atlantic Publishing Company
BELFOR
Castle Insurance
Centex House Leveling
Coastal Residential Corp.
CORT
Crime Intervention
Door to Door Storage & Moving
FARPM
Hayes Insurance
JGS Insurance
Kelnhofer Group, Inc.
Kellogg & Andelson Accountancy
LandLordLocks.com, Inc.
LandlordSource
Lands' End Business Outfitters
NCSPLUS, Inc.
Northstar Moving Corporation
Nu-Set Lock
PayLease, Inc.
Peachtree Business Products
Peak Inside, LLC
Prosper Real Estate Investors
Rekey.com Locksmith Services
Renters Legal Liability, LLC
Runzheimer International, Ltd.
Safety Home Address
Signet Mortgage Corporation
Special Asset Management, LLC
Starker Services, Inc.
Synergetic Systems, LLC
Two Men and a Truck International

**INTERNET TOOLS/MARKETING**
All Property Management
AmericanRentals.biz
Cbeyond
ezLandlordForms
ForRentByOwner.com
HomeRentals.net
HometownRent.com
Info on the Web
Kwikrents.com
LeaseBuyOption.com
MyNewPlace
Oodle
Property Bridge, LLC
Rent Marketer, Inc.
Rent.com
Rent2Buy America, LLC
RentalHomesPlus
RentalHunt.com
RentalResource.com
Rentals.com
Rental Source
RentBlurb.com
RentMLS.com
ResidentSource
Resite Online
Vacation Places to Stay

**LEGAL SERVICES**
Law Offices of Davis, Rothwell, Mullin, Earle & Xóchihua, PC
Law Offices of Heist, Weisse & Lucrezi

**MAINTENANCE**
911 Restoration
A & K Appliance Distributing
All Pro Building Maintenance
Bo Dean's Window Replacement
Clean-N-Gleam Professional
Crime Clean of Texas, Inc.
DMC Construction
Gillespie Home Inspection
HSA Home Warranty
Marcy Works, Ltd.
Orkin, Inc.
Pacific Pest Management, Inc.
Paul Davis Restoration
Playground Specialists, Inc.
Power Lift Foundation Repair
Replacement Steps
RR Roofing
ServPro of Norfolk
Sherwin-Williams Company
Snappy Electric & Plumbing

**SOFTWARE**
APPFOLIO, Inc.
Davis Computing Solutions
Dick Jonilonis & Associates
DIY Real Estate Solutions
Domin-8 Enterprise Solutions
Grand Terra, LLC
Nims & Associates
PMM Property Management Master, Inc.
PROMAS Landlord Software Center
PropertyBoss Solutions, LLC
Propertyware, Inc.
Property Genie
Recombo
Track-iT Systems, Inc.

**TENANT SCREENING**
ACRAnet
Background Info USA
Contemporary Information Corp.
Credit Retriever
Gambino Information Services
Investigative Screening & Consulting
LandlordSolutions
MOCO, Inc.
National Tenant Information Services, Inc.
National Tenant Network
On-Site.com
Pacific Screening, Inc.
Reliable Background Screening
RentGrow, Inc.
TVS Tenant Verification Service
VeriQuest Screening Solutions
William Davis REALTORS®
Yardi Systems

# AMBASSADOR Program

EARN REWARDS AND ACHIEVE AMBASSADOR STATUS FOR REFERRING NEW NARPM® MEMBERS.

Who better to spread the word of the benefits of NARPM® than its members? To achieve Ambassador status, you must refer five new members in one year. You will then receive an award certificate and a $245 NARPM® credit that can be used toward your annual dues, upcoming events, education classes, and more! You can earn multiple award certificates in a 12-month period, so be sure you continue referring new members even after you have achieved Ambassador status.

1. Contact NARPM® National for Membership Application brochures. Upon request, National can mail the application directly to the prospective member.
2. The 12-month period to obtain five new members starts the day the first application is processed.
3. When the fifth application is received, an award certificate and a recognition certificate will be issued and dated. A $245 NARPM® credit will also be issued.

## JUNE 26, 2008 – JULY 22, 2008

| NEW MEMBER | REFERRING MEMBER |
|---|---|
| Christel Montez | Julie Potts, MPM® RMP® |
| Jennifer Hourscht | Nancy Keupp |
| George F. Kenner | Sylvia Hill, MPM® RMP® |
| Ann Anderson | Robert Basso |
| Ari Lund | Mark Kreditor, MPM® RMP® |
| Tammy Soares | Harold Kalles, MPM® RMP® |
| J. C. Posey | Dave Christensen, RMP® |
| Laurie Singer-Peterson | Matt Babich |
| Vickie Williams | Ryan Sand |
| Jennifer L. Moscovich | Karen Kondo |
| Alice Bennett-Moran | Mary M. Love, MPM® RMP® |
| Kathy Cole | Betty Kirby |
| Nica Caoile | Geri Stephens, MPM® RMP® |
| Regina Mitchell | Geri Stephens, MPM® RMP® |
| Jewett Spencer | Geri Stephens, MPM® RMP® |
| J. William Sanborn | Geri Stephens, MPM® RMP® |
| Stephen Richards | Gene Richards |
| Nickolas Meer | Peter Meer, MPM® RMP® |
| Theresa A. Perez | Geri Stephens, MPM® RMP® |
| Bradford G. Lusk | Erica Toikka |
| Carol Imaino | Roxanna Faith, CRS® SRES® |
| Katie Turner | John Bickerton |
| Joan Kashimoto | Lurline Johnson |
| Cherlyn Merz | Roy Gadley |
| Shauna Macke | Dawn Crawford |
| Jason McGuire | Brian Hagensick |
| Marie H. Hazen | Jane Whitam |
| Susan F. Robinson | Linda Chatten |
| Angie Zengilowski | Dawn Crawford |

**START REFERRING NEW MEMBERS TODAY!**

**2008 AMBASSADORS**

Brian Birdy
Dave Christensen, RMP®
Dawn Crawford
Louis Kahn
Mark Kreditor, MPM® RMP®
Kevin Martin
Barbara Mayo, RMP®
Jennifer Newton
James Pickett, RMP®
Melissa Prandi, MPM® RMP®
Tonya Scarlette
Geri Stephens, MPM® RMP®

# DESIGNATION Classes

DEMONSTRATE THAT YOU HAVE EXPERT KNOWLEDGE ABOUT RESIDENTIAL PROPERTY MANAGEMENT.

**Interested in Sponsoring?** Opportunities are available to chapters that would like to further member education and increase their chapter funds. However, it takes time to plan a class so give your chapter five to six month's lead-time if you wish to sponsor.

| DATE | LOCATION | CLASS | INSTRUCTOR |
|---|---|---|---|
| Sept. 22, 2008 | Kauai, Hawaii | RMP® Office Operations | Dave Holt, MPM® |
| Sept. 22 & 23, 2008 | Kauai, Hawaii | MPM® Maintenance Co. | Ray Scarabosio, MPM® |
| Sept. 23, 2008 | Kauai, Hawaii | RMP® Marketing | Dave Holt, MPM® |
| Sept. 25, 2008 | Kauai, Hawaii | Ethics | Darryl Kazen, MPM® |
| Oct. 21, 2008 | Nashville, Tennessee | RMP® Tenancy | Darryl Kazen, MPM® |
| Oct. 22, 2008 | Nashville, Tennessee | Ethics | Darryl Kazen, MPM® |

**Online Designation Courses** are now available through America's Best Real Estate Education. For information and/or to enroll visit www.narpm.org.

1. **Mail** form below to NARPM®, 638 Independence Parkway, Suite 100, Chesapeake, VA 23320.
2. **Fax** your form with credit card payment to 866-466-2776. Please do not mail the original.
3. **Online** registration is also available through Internet Member Services at www.narpm.org.

## FEES

| RMP® Classes | Early Registration* | Registration |
|---|---|---|
| Member | $195 | $225 |
| Nonmember | $295 | $325 |
| Retake | $100 | $130 |
| RMP®/MPM® | $97.50 | $127.50 |
| **MPM® Classes** | | |
| Member | $395 | $450 |
| Nonmember | $495 | $550 |
| Retake | $300 | $355 |
| MPM® | $197.50 | $252.50 |
| **Ethics Class** | | |
| Member | $45 | $45 |
| Nonmember | $95 | $95 |

**to receive the early registration price, payment must be postmarked, faxed or e-mailed 30 days prior to the class.*

## CLASS INFORMATION

- See individual class flyers for times and additional information.
- Flyers may be downloaded from www.narpm.org.
- RMP® classes qualify for 6 hours of NARPM® certification.
- MPM® classes qualify for 12 hours of NARPM® certification.
- All materials will be given to students on the day of the class.
- All attendees are required to make their individual hotel reservations.

## CANCELLATION POLICY

Cancellations must be received in writing. If cancellation notice is received at least 30 days prior to the class, a full refund will be issued less a $25 processing fee. If cancellation notice is received less than 30 days before the class, a 50% refund will be issued. No refunds will be made on the day of the class; however, the registration fee can be applied to a later class with a $25 transfer fee.

If NARPM® cancels the course because minimum registrations have not been met or for any other reason, then tuition paid will be fully refundable. All courses are subject to cancellation by NARPM®.

Name ______________________

Company ______________________

Address ______________________

City/ST/Zip ______________________

Phone ______________ Fax ______________

E-mail ______________________

**Register for Classes**

| Name of Class | Class Date | Cost |
|---|---|---|
| ______________ | __________ | $ ______ |
| ______________ | __________ | $ ______ |
| ______________ | __________ | $ ______ |
| | Total | $ ______ |

**Method of Payment**

☐ I have enclosed a check for $ ________ Check # ____________

☐ Please charge my credit card in the amount of $ ____________

☐ Visa ☐ MasterCard ☐ Discover ☐ American Express

Card Number ______________ Exp. Date ________

Name of Cardholder ______________________

Signature ______________________

*I authorize NARPM® to charge my credit card.*

PLF-000779

**More than 90% of renters use the Internet to research rental housing.**

# Are you where renters are?

**RentalHomesPlus** targets renters specifically looking for single family home, townhouse and duplex rental properties. Powered by Apartments.com, RentalHomesPlus offers renters free searches of a national database of rental homes. In addition, the site provides property owners & managers with a valuable and cost-effective resource for advertising vacancies.

## Advertise your properties with RentalHomesPlus and get:

- **Exposure** - Your RentalHomesPlus listing receives exposure to millions of renters
- **Experience** - We've been in the business of driving qualified leads to all types of properties for years
- **Value** - Advertising your property online is a cost effective way to reach renters

**Start your listing today!**
**Contact:**
**(866) 399-4944**
**sales@rentalhomesplus.com**
**www.rentalhomesplus.com**

NARPM®
638 Independence Parkway, Suite 100
Chesapeake, VA 23320

PLF-000780

**UNITED STATUS DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| MARCO A. FERNANDEZ,<br><br>Plaintiff,<br>v.<br><br>RENTGROW, INC.,<br><br>Defendant | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No.: 1:19-cv-0119-JKB |

**RENTGROW'S OBJECTIONS AND RESPONSES TO "PLAINTIFF'S INTERROGATORIES TO DEFENDANT, SET II"**

Defendant RentGrow, Inc. ("RentGrow"), pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, hereby states its Objections and Responses to "Plaintiff's Interrogatories to Defendant, Set II" dated December 12, 2019 ("Interrogatories").

Subject to its objections, RentGrow will respond to the Interrogatories to the best of its current knowledge, information, and belief based upon a reasonable and diligent investigation. RentGrow does not concede that any information disclosed in its responses to these Interrogatories is relevant to any party's claim or defense or proportional to the needs of this case. RentGrow reserves its right to raise objections regarding the competence, relevance, materiality, discoverability, or admissibility of the information or documents disclosed or identified in its responses in any subsequent proceedings or trial of this or any action in which Plaintiff seeks to use such information. RentGrow reserves the right to amend or supplement its responses, and to make further objections to the requests, should additional discoverable information or bases on which to make objections become known.

**GENERAL OBJECTIONS**

1. RentGrow incorporates its objections to Plaintiff's instructions and definitions set forth in RentGrow's Objections and Responses to Plaintiff's First Set of Interrogatories.

2. RentGrow objects to each Interrogatory to the extent it is unlimited in time or not limited to the two-year statute of limitations period applicable to Plaintiff's claims.

3. RentGrow objects to each Interrogatory to the extent it seeks information protected by the attorney-client privilege, work product doctrine, joint defense privilege, self-examination privilege, or any other applicable privilege, prohibition, or limitation. Any inadvertent disclosure of information that is the subject of a claim of privilege or other protection is not intended as, and shall not be deemed, a waiver of such claim.

4. RentGrow objects to each Interrogatory to the extent it seeks the disclosure of information that is not relevant to any party's claim or defense.

5. RentGrow objects to each Interrogatory to the extent it is vague or ambiguous.

6. RentGrow objects to each Interrogatory to the extent it is overbroad, or unduly burdensome, or disproportional to the needs of the case.

7. RentGrow objects to each Interrogatory to the extent it calls for a legal conclusion.

8. RentGrow objects to each Interrogatory, definition, or instruction to the extent it is inconsistent with, or imposes burdens greater than required under, the applicable Federal Rules of Civil Procedure or the Local Civil Rules.

## INTERROGATORIES

**INTERROGATORY NO. 6**:  State the criteria(s) or formula(s) You have utilized, in effect at the time of Plaintiff's report in November 2018, for associating a given consumer with particular Criminal Record information. If, for example You match based on name, Your answer should provide a list of all conditions that are sufficient for a consumer's name to be similar enough to a name on a Criminal Record to warrant the Criminal Record information being included on the consumer's report. If You require matching across multiple fields, such as name and date of birth, before such information can be included on a consumer report, Your answer should describe the circumstances in which more than one field must match and should describe the required level of the match to each element in detail. In lieu of responding to this Interrogatory with a narrative, Plaintiff would accept an extracted copy of Your matching algorithm/code, including all comments to such code.  The same is requested for each element that You use for matching.

**ANSWER**:  In addition to the foregoing General Objections, RentGrow objects to Interrogatory

No. 6 as overbroad, unduly burdensome, and disproportional to the needs of the case because it

seeks information about "a given consumer" rather than about Plaintiff Marco Fernandez.

RentGrow also objects to Interrogatory No. 6 on the ground that the terms and phrases "Criminal

Record," "criteria(s), "formula(s), "conditions," and "comments to such code" are vague,

ambiguous and/or undefined.  RentGrow also objects to Interrogatory No. 6 to the extent that it

seeks "an extracted copy of Your matching algorithm/code, including all comments to such

code" because Fed. R. Civ. P. 34, not Fed. R. Civ. P. 33, governs production of documents and

electronic information.  RentGrow also objects to Interrogatory No. 6 to the extent it seeks an

"extracted copy of Your matching algorithm/code, including all comments to such code,"

because that is confidential and proprietary information that is likely to cause competitive harm

if publicly disclosed.

Subject to and without waiving its Objections, RentGrow states that it receives criminal

history information from reputable and reliable third-party vendors. After confirming that a

criminal history record from a vendor is complete and reportable under the FCRA and other

applicable law, RentGrow applies a proprietary matching process to ensure that the criminal

record matches the applicant to a high degree of certainty. The matching process, which has both automated and manual components, evaluates many factors to match a criminal record to a consumer, including name, date of birth (full or partial), the location of the record and the applicant's state of residence, and a complete address history search. RentGrow is deeply committed to assuring maximum possible accuracy of the criminal histories that are reported, and consistently achieves an accuracy rate of 99%.

**INTERROGATORY NO. 7**:  Describe in detail how the Criminal Records from California were included on Plaintiff's report that You sent to Dorsey Ridge apartments in November 2018.

**ANSWER**:  In addition to the foregoing General Objections, RentGrow objects to Interrogatory No. 7 to the extent it seeks confidential and proprietary trade-secret information that is likely to cause competitive harm if publicly disclosed.  RentGrow also objects to Interrogatory No. 7 on the ground that the phrase "Criminal Record" is vague and ambiguous.

Subject to and without waiving its objections, RentGrow states that it received criminal history information from its vendor in connection with the screening request regarding Plaintiff. RentGrow's criteria evaluated multiple data points on the criminal history information and the information provided by Plaintiff and the property, such as Plaintiff's name (first, middle, and last), date of birth (complete or partial), Plaintiff's state of residence and the state of the criminal record, and any addresses associated with both the record and Plaintiff before matching the records to Plaintiff. Specifically, the criminal records RentGrow received from its vendor were included on Plaintiff's tenant screening report because the record matched Plaintiff's first name, last name, middle initial (Plaintiff provided the middle initial "A" and the record included the middle name "Antonio"), year of birth (the records contained only the year of birth, which matched Plaintiff's year of birth), and the state of the record (California) matched his state of residence (California). The criminal records that RentGrow received from its vendor did not

include an address. Based on RentGrow's proprietary matching process, these data points were sufficient to match the records to Plaintiff on the initial screening report.

**INTERROGATORY NO. 8**: Identify all persons who have or may have information or knowledge with respect to any allegations in the Complaint or Your Answer. With respect to each person identified, state what information You believe each person may possess.

**ANSWER**: In addition to the foregoing General Objections, RentGrow objects to Interrogatory No. 8 to the extent it seeks information protected by the attorney-client privilege and the work product doctrine. RentGrow also objects to Interrogatory No. 8 as premature because discovery and RentGrow's investigation are ongoing. RentGrow also objects to Interrogatory No. 8 as overly broad, unduly burdensome, and disproportional to the needs of the case because it purports to require RentGrow to identify "all persons" who "may have information or knowledge" of "any allegations" in the Complaint. RentGrow also objects to Interrogatory No. 8 as overly broad, unduly burdensome, and disproportional to the needs of the case to the extent it seeks information about the claims of putative class members, because the Court has not certified and may never certify the case as a class action.

Subject to and without waiving its Objections, RentGrow states that persons likely to have knowledge of Plaintiff's claims include Plaintiff; Plaintiff's family, friends, and co-workers; Plaintiff's medical providers; individuals who have interviewed or will interview Plaintiff about his security clearance or who have investigated or will investigate Plaintiff's security clearance; and individuals at the Dorsey Ridge Apartments. RentGrow also refers Plaintiff pursuant to Fed. R. Civ. P. 33(d) to (a) documents bates labeled RG000001 – RG000562 that RentGrow produced to Plaintiff on September 27, 2019 in response to Plaintiff's Requests for Production to Defendant, Set I; and (b) documents that RentGrow provided to Plaintiff on February 5, 2019 in response to his request for a copy of his consumer file, for

additional persons who may have knowledge of his claims.  RentGrow's investigation is

ongoing, and it reserves the right to amend or supplement this response as it obtains additional

information.


*/s/ Joseph F. Yenouskas*
Joseph F. Yenouskas (Bar No. 14466)
GOODWIN PROCTER LLP
1900 N Street, NW
Washington, DC 20036
Telephone:  (202) 346-4143
jyenouskas@goodwinlaw.com

Attorneys for Defendant RentGrow, Inc.

Dated:  January 13, 2020

**CERTIFICATE OF SERVICE**

I certify that I have, this 13th day of January 2020, served RentGrow's Objections and Responses to "Plaintiff's Interrogatories to Defendant, Set II" by causing a copy to be sent by e-mail to counsel for Plaintiff Marco Fernandez.

/s/ *Joseph F. Yenouskas*

**In the Matter Of:**

*FERNANDEZ vs*

*RENTGROW*

---

*PATRICK HENNESSEY*

*October 23, 2020*

---



IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

Case No.: 1:19-cv-01190-JKB

-------------------------------------------------

MARCO A. FERNANDEZ, individually and as a representative of the class,

Plaintiff,

-vs-

RENTGROW, INC.,

Defendant.

-------------------------------------------------

REMOTE DEPOSITION OF PATRICK HENNESSEY - RENTGROW, INC.

October 23, 2020 - 9:30 A.M. EDT

JOB NO. 2020-92137

OCTOBER 23, 2020

9:30 A.M. EDT

REMOTE DEPOSITION of PATRICK HENNESSEY, before S. Arielle Santos, Certified Court Reporter, Certified LiveNote Reporter and Notary Public.

account management group, is that the group that you were in when your title was account manager?

**A That's correct.**

Q Okay.

So is it fair to say you are basically managing the account managers at that point?

**A That's correct.**

Q Okay. And then you also said your customer service group.

What is the customer service group?

**A So our clients are large property management firms, and so they have multiple properties in a geographic location or scattered throughout multiple geographic locations.**

**And so customer service would provide support to the people who work at the properties; so property managers and leasing agents and whatnot. And then the**

Mr. Fernandez was -- (Audio Distortion).

(Reporter Clarification.)

BY MS. DRAKE:

Q -- was matched with someone on the OFAC list or was a possible match to someone on the OFAC list?

**A So the -- the way OFAC data works is a little bit different. So it wouldn't be comparing an individual to an OFAC list. It's comparing names that were entered into the screening system to names that appear on the OFAC list.**

**And so I think it is more appropriate to say, Was the name Marco Fernandez a potential match to a name that appears on the OFAC list? And the answer to that is yes.**

Q In 2014, you think it was?

**A I can't speak to that. OFAC lists are dynamic, and so it could change on a daily basis, if not more.**

Q Okay.

At all times from April 2017 to the present, has the process of comparing an applicant name to the list of OFAC names been one which is computerized?

**A Yes. Yes, it is.**

Q Okay.

Has there ever been a point in time, for example, where a human being would sit down and look at the name of the applicant and then look at the name on the OFAC list and just make a decision about whether they were a match or a possible match?

**A So from the time the OFAC data came into play post-9/11 -- and that pre-dates my employment with the company -- but through today, our -- our approach has always been in line with the approach of the Treasury Department and guidance from Treasury where it is essentially a name lookup online.**

Q Right.

**tool for the OFAC list.**

Q Isn't it true that on the Treasury Department's online lookup tool you can require an exact name match?

**A That is within the range of options that the Treasury Department makes available.**

Q And did you select that option?

**A What do you mean exactly?**

Q Did you ever require an exact name match?

**A As a result of Mr. Fernandez's litigation, we are now looking for an exact name match.**

**But throughout the entire time we offered OFAC searches, it's been within the range of guidance set forth by Treasury.**

Q Why did Mr. Fernandez's litigation prompt you to require an exact name match?

**A It was the first time we had**

been sued over OFAC data, and any time a lawsuit is brought about, it would be something that would spur a conversation.

Q You had 71 OFAC disputes, right?

A I am not sure of that exact number.

Is there a timeline you are referencing for 71?

Q What do you do when you get a dispute? Does that ever prompt a conversation?

A If the volume of disputes grows materially, yes. Absolutely.

You know, over the last several years we have conducted millions and millions of screens and had approximately a hundred total OFAC disputes.

And so as a percentage of total screening, over 99 percent of reports don't contain any OFAC data, and then of the ones that did, the dispute rate was incredibly low.

**A That's correct.**

Q But you did not use that for the OFAC comparison, correct?

**A That's correct.**

Q Why not?

**A I would say there's two reasons. First, our approach fell within the range of guidance issued by the Treasury Department.**

**And second, I think it is sort of tying onto that, a number of OFAC records don't contain dates of birth. And so it wouldn't necessarily be a helpful identifier.**

Q Isn't it true that the records that don't contain date of birth are normally for corporations?

**A I don't know that.**

Q Do you know that there are corporations on the OFAC list?

**A Yes, I do.**

Q Do you know that you matched

individual human beings to corporations on the OFAC list?

**A I'm sorry. Could you repeat that?**

Q Do you know that you matched individual human beings to corporations on the OFAC list?

**A We -- we have never matched a human being to anything on the OFAC list. All our system does is provide possible hits for names that are provided to names on the OFAC list.**

Q Do you think that is a good system?

**A I don't know that it's my place to give an opinion. But it's the system set forth by the Treasury Department.**

Q You think the Treasury Department thinks that you should consider an individual human being as a possible match to a corporation?

**A The Treasury Department provides**

**functionality to enter a name and then it's compared to the names on the list. I don't know that they differentiate between the types of names or what they represent. It's a data point to a data point.**

Q Yeah.

Now, the functionality that the Treasury Department provides is on their website, right?

**A That's correct. The search tool they offer is on the website.**

Q Right.

You can enter a name on the Treasury Department website, and then it would return a result based on sort of the --

(Reporter Clarification.)

BY MS. DRAKE:

Q I said the Treasury Department provides a website where you can enter a name and then it will return a result

on his report, aligned with that line 14 that we were just talking about?

**A Do you mind if I quickly review the 2018 report?**

Q Not at all. I am happy for you to do so.

Let me --

**A I don't believe it's been shared yet.**

Q Yep. It's in that very lengthy file disclosure, but I believe that I have it as a standalone document that might be easier for you to review, so just give me one moment.

**A Sure.**

MS. DRAKE: This is the 2018 report.

(Exhibit 8, PLF-000012 - 021, is Marked.)

BY MS. DRAKE:

Q Does this Exhibit 8 appear to be the November -- I'm sorry. I kept saying

December earlier.

Did you understand when I was saying the December 2018 report that I meant the November 2018 report?

**A (Reviewing.) Yes, that is correct.**

Q Okay.

Does this appear to be the November 2018 report that RentGrow issued on Mr. Fernandez?

**A Yes, it does.**

Q Okay.

Take your time to review this and my question, again -- I am happy to help you toggle back and forth between the two documents. I think you're actually able to do that.

My question is just whether it was as a result of sort of the matching criteria set forth in line 14 that Mr. Fernandez was initially matched to the criminal records from California?

So -- so it's your theory that it would have taken too long to obtain a record that had his full date of birth?

**A I would be theorizing about our client's approach to how they run their business. But that -- that -- I would say that that's probably their theory.**

Q So ultimately, it's your view that the product that the client selected was one where a full date of birth would not necessarily be obtained on the criminal record, correct?

**A So our process is to have reasonable policies to ensure maximum possible accuracy of the data that we have. And so I think our table, as you referred to it, that kind of maps out the matching logic does just that. And you know, we -- there's obviously a lot of thought that went into that.**

**And so that is our approach to handling the data that we receive back**

**from our vendor.**

Q You just said a "maximum possible accuracy."

What does that mean?

**A I said we have reasonable procedures to provide for maximum possible accuracy.**

Q Yeah.

What is maximum possible accuracy?

**A That means trying to get it right as many times as possible.**

Q Do you think you could have gotten it right more times if you had obtained full dates of birth?

**A I think we have reasonable processes to ensure maximum possible accuracy, and so I don't -- I don't know that there's much beyond that.**

Q Could you have gotten it right more times if you had obtained full dates of birth?

**looking at our processes and procedures that we have in place to work with the data to ensure maximum possible accuracy.**

Q Do you -- do you ever, like, take a sample of reports and then go out and obtain the underlying criminal records and see if you did a good job matching consumers with criminal records based on full data?

**A We -- we purchase our data from third-party CRAs where that would essentially be their obligation.**

Q So it's -- your view is that's not your obligation, that's your vendor's obligation?

**A Our view is that we work with our trusted partner who is a large CRA who, under the laws that govern them, would be doing that.**

Q So is that something that RentGrow does; yes or no?

**A Could you repeat the question**

something that RentGrow does?

**A RentGrow, as the re-seller, is responsible for the identity matching portion.**

Q Okay.

So you get a bunch of records back from Backgroundchecks.com and then RentGrow uses the criteria in that PowerPoint we looked at a couple of minutes ago to determine which of the records from the vendor should be included on your report; is that correct?

**A We use the algorithms that apply that logic that that document summarizes; yes, that's correct.**

Q Okay.

So it's not the vendor's responsibility to ensure an accurate match, correct? That's what RentGrow does, right?

**A It's the vendor's responsibility to have reasonable procedures to ensure**

have, correct?

**A We would have to ask the clients, correct.**

Q Okay.

Does -- does RentGrow ever make the decision about whether a tenant can or cannot lease an apartment?

**A No. Absolutely not. RentGrow doesn't own or operate apartments or make leasing decisions.**

Q Okay.

So what does it mean when it says "accept" or "reject" on a RentGrow report?

**A So that is the outcome of the screening based on the client's criteria that's been applied.**

Q Okay.

So you applied a client's criteria to the data, but they are free to disregard the recommendation or the notation on the report, correct?

**A We -- we wouldn't make a recommendation. It's their criteria that's supplied. But we -- we don't know if a client was to adhere to their policies and procedures or not.**

Q Okay.

Do you -- does RentGrow ever mark applicants as accept or reject based on the fact of a possible OFAC match?

**A Oh, no. Absolutely not.**

Q Okay.

So RentGrow, even if a client asked, you would not be willing to mark an applicant as accept or reject based on a possible OFAC match, correct?

**A That's right. OFAC data is not used in that manner, so that would never happen.**

Q Okay.

So the only person who would know if an applicant has been accepted or rejected from a possible tenancy based on

that OFAC data would be either the landlord or the applicant, correct?

A I -- I don't know for sure. I might be splitting hairs here. I am not an attorney or an expert in this area.

But if you -- if you're on the -- if someone is on the OFAC list, I believe the government says you can't do business with that person. So I don't know that the landlord would have the ability to make an approved or declined decision anyhow.

You know, things like credit data, that the landlords have the ability to define their parameters.

OFAC is completely different and that's why it's approached completely different, where data points are compared and we return back possible hits within the guidance of -- of the Treasury Department. And then it's the obligation of our client, the end user, to follow

**the steps set forth by Treasury.**

**So we -- we wouldn't know.**

Q Okay. That's a -- you know, that's a fine point.

So the landlord -- in your view, the landlord has to figure out is this possible match an actual match, and if the landlord determines it's an actual match, then the landlord may not do business with that person, correct?

**A That is the Treasury Department's view.**

Q Okay.

So the only way to know whether the landlord decided not to do business with this person or not would be presumably to either ask the landlord or to ask the person, correct?

**A In your hypothetical, if the landlord found a record and contacted the FBI as instructed, the FBI would probably know as well.**

Q As submitted by the landlord or property management company, correct?

**A That's correct.**

Q What about Social Security?

**A Not everyone has a Social Security number and Social Security can't necessarily be required, and so there are people who elect not to provide their Social or don't have one. And so in some cases, you would see Social Security number -- you would have a Social Security number, in other cases would you not.**

Q Okay.

But for the most part, you have them, correct?

**A I don't know that it's for the most part. But for a significant percentage we would have Social Security numbers.**

(Simultaneous Crosstalk.)

Q You think -- it might be less

**my employment with the company.**

Q Okay. That is a very fair answer. Let me rephrase the question.

During -- during -- how about we just limit it to the time during which you have been -- I am going to limit it to the last eight and a half years.

Are you aware at any point during the last eight and a half years, whether RentGrow has had any interactions with any regulatory or enforcement authority regarding its matching procedures for criminal records?

**A Not that I am aware of, no.**

Q How about OFAC records?

**A Have we been contacted by any regulatory authority about our reasonable processes for providing possible OFAC hits?**

Q Correct.

**A Not that I am aware of, no.**

Q During the last eight and a half

A C K N O W L E D G E M E N T

STATE OF ____________

COUNTY OF ___________

I, the undersigned, hereby certify that I have read the transcript of my testimony taken under oath in my deposition; that the transcript is a true and complete and correct record of my testimony, and that the answers on the record as given by me are true and correct.

_________________________

PATRICK HENNESSEY

Signed and subscribed to before me this _______ day of ______________, 20__.

________________________________

Notary Public

I, S. Arielle Santos, Certified Shorthand Reporter, Certified LiveNote Reporter do hereby certify:

That prior to being examined, the witness named in the forgoing deposition, was by me duly sworn to testify the truth, the whole truth, and nothing but the truth.

That said deposition was taken before me at the time and place set forth and was taken down by me in shorthand and thereafter reduced to computerized transcription under my direction and supervision, and I hereby certify the foregoing deposition is a full, true and correct transcript of my shorthand notes so taken.

I further certify that I am neither counsel for nor related to any party to said action nor in anywise interested in the outcome thereof.

S. Arielle Santos, CCR, CLR

Screening Report - MARCO A FERNANDEZ

Serenity at Dorsey Ridge (K7566)

**Property Screening Result**

Application Result: REJECT

**Applicant Information**

NAME: MARCO A FERNANDEZ

SSN: XXX-XX-3199

DOB: [redacted] 1984

CURRENT ADDRESS:1440 Hotel Cir N #334 ST Apt , San Diego , CA 92108

**Additional Applicant Information**

**Residence History**

This applicant has rented or owned

TIME AT CURRENT ADDRESS:3 year 10 month

**Employment/Income**

PRIMARY INCOME:$ 5915 per month

PROPOSED RENT:$1737

RENT/INCOME:29%

TIME AT CURRENT JOB:14 year 2 month

**Individual Result**

REJECT

**Additional Information**

Reasons for Result

- Criminal History Does Not Meet Property Requirements

**Items to review**

- 1 Possible Match in OFAC Name Search
- Rental History Records Found
- Premium National Criminal Records Found

| SERVICE | REQUEST DATE | COMPLETED DATE | STATUS |
|---|---|---|---|
| Credit Report | 11/16/2018 10:56 AM | 11/16/2018 10:56 AM | Complete |
| Criminal Search | 11/16/2018 10:56 AM | 11/16/2018 11:59 AM | Does Not Meet Property Requirements<br>No National Sex Offender Records Found<br>Criminal Records Found |
| Premium National Civil Court Records Search | 11/16/2018 10:56 AM | 11/16/2018 10:56 AM | Meets Property Requirements<br>No Civil Court Records Found |
| Rental History Search | 11/16/2018 10:56 AM | 11/16/2018 10:56 AM | Meets Property Requirements<br>Records Found |
| OFAC Name Search | 11/16/2018 10:56 AM | 11/16/2018 10:56 AM | 1 Possible Match Found |

EXPERIAN CREDIT REPORT

PERSONAL INFORMATION

Name: MARCO A FERNANDEZ

Also Known As: MARCO ANTONIO COLON

Also Known As: COLON MARCO FERNANDEZ

Date of Birth: [redacted] 984

PRIMARY ADDRESS

Address: PSC 303 BOX 97<br>APO AP 96204-3097

Filed: 01/9/2018

OTHER ADDRESSES

Address: 1440 N HOTEL CR APT 334<br>SAN DIEGO CA 92108-2923

Filed: 12/26/2014

Address: 10850 GREEN MOUNTAIN C APT 505<br>COLUMBIA MD 21044-2479

Filed: 02/9/2013

EMPLOYMENT

Company: U.S. NAVY

Title: reported 11-09-2012

Company: NAVY INFORMATION OPERAT

Title: reported 12-19-2014

CHECKPOINT MESSAGES

0084 SSN MATCHES

SSN Issued between 1983 and 1985

| Credit Summary | | | |
|---|---|---|---|
| Total # of Trades | 21 | 30 Days Late | |
| Currently Satisfactory | 21 | 60 Days Late | |

EXHIBIT 008

PLF-000012

| | | | |
|---|---|---|---|
| Previously Delinquent | 1 | 90 Days Late | 0 |
| Currently Delinquent | 0 | 120 Days Late | 0 |
| Collections | 1 | Newest Trade | 01/30/2017 |
| Charge-Offs | 0 | Oldest Trade | 07/18/2005 |
| Legal Items | 0 | Inquires | 0 |

| Open Accounts | Total Numbers | Accounts with a Balance | Balance | Available | Credit Limit | Debt to Credit Ratio | Monthly Payment Amount |
|---|---|---|---|---|---|---|---|
| Revolving | 5 | 3 | $28,799 | $2,426 | $31,225 | 92% | $653 |
| Installment | 1 | 1 | $161,599 | $32,201 | $193,800 | 83% | $1,158 |
| Mortgage | 0 | 0 | $0 | $0 | $0 | 0% | $0 |
| Total | 6 | 4 | $190,398 | $34,627 | $225,025 | 85% | $1,811 |

TRADE REFERENCES

DEPT OF VETERANS AFFAI (Sub# 1994900)

Account type: Govt overpayment

Responsibility: Individual

| | | | | | |
|---|---|---|---|---|---|
| Current Balance: | $0 | Credit Limit: | $125 | Date Opened: | 04/1/2015 |
| Past Due Amount: | n/a | High Balance: | n/a | Last Active On: | 09/13/2015 |
| Monthly Payment: | n/a | Acct. Terms: | REV | Date Updated: | n/a |
| | | | | Balance Date: | 09/29/2015 |

| 2015 | |
|---|---|
| OK | OK |
| SEP | AUG |

Delinquencies: Max: on 08/1/2015
Previous: on 08/1/2015

Remarks: Attorney or outside agency account
Paid account/zero balance

NAVY FEDERAL CR UNION (Sub# 1720115)

Account type: Auto loan

Responsibility: Individual

| | | | | | |
|---|---|---|---|---|---|
| Current Balance: | $0 | Credit Limit: | $35,199 | Date Opened: | 02/24/2014 |
| Past Due Amount: | n/a | High Balance: | n/a | Last Active On: | n/a |
| Monthly Payment: | n/a | Acct. Terms: | 072 | Date Updated: | n/a |
| | | | | Balance Date: | 12/30/2017 |

| 2017 | | | | | | | | | | | | 2016 | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK |
| DEC | NOV | OCT | SEP | AUG | JUL | JUN | MAY | APR | MAR | FEB | JAN | DEC | NOV | OCT | SEP | AUG | JUL | JUN | MAY | APR | MAR | FEB | JAN |

Remarks: Current account
Paid account/zero balance

NAVY FEDERAL CR UNION (Sub# 1720115)

Account type: Unsecured

Responsibility: Individual

| | | | | | |
|---|---|---|---|---|---|
| Current Balance: | $0 | Credit Limit: | $1,500 | Date Opened: | 08/26/2016 |
| Past Due Amount: | n/a | High Balance: | n/a | Last Active On: | n/a |
| Monthly Payment: | n/a | Acct. Terms: | 012 | Date Updated: | n/a |
| | | | | Balance Date: | 03/31/2017 |

| 2017 | | | 2016 | | | | |
|---|---|---|---|---|---|---|---|
| OK | OK | OK | OK | OK | OK | OK | OK |
| MAR | FEB | JAN | DEC | NOV | OCT | SEP | AUG |

Remarks: Current account
Paid account/zero balance

NAVY FEDERAL CR UNION (Sub# 1720115)

Account type: Unsecured

Responsibility: Individual

| | | | | | |
|---|---|---|---|---|---|
| Current Balance: | $0 | Credit Limit: | $500 | Date Opened: | 01/4/2017 |
| Past Due Amount: | n/a | High Balance: | n/a | Last Active On: | n/a |
| Monthly Payment: | n/a | Acct. Terms: | 006 | Date Updated: | n/a |
| | | | | Balance Date: | 03/31/2017 |

| 2017 | | |
|---|---|---|
| OK | OK | OK |
| MAR | FEB | JAN |

Remarks: Current account
Paid account/zero balance

NAVY FEDERAL CR UNION (Sub# 1720115)

Account type: Unsecured — Responsibility: Individual

| | | | | | |
|---|---|---|---|---|---|
| Current Balance: | $0 | Credit Limit: | $1,000 | Date Opened: | 01/30/2017 |
| Past Due Amount: | n/a | High Balance: | n/a | Last Active On: | n/a |
| Monthly Payment: | n/a | Acct. Terms: | 012 | Date Updated: | n/a |
| | | | | Balance Date: | 03/31/2017 |

| 2017 | | |
|---|---|---|
| OK | OK | OK |
| MAR | FEB | JAN |

Remarks: Current account
Paid account/zero balance

SYNCB/AMAZON (Sub# 1004694)

Account type: Charge — Responsibility: Individual

| | | | | | |
|---|---|---|---|---|---|
| Current Balance: | $0 | Credit Limit: | $600 | Date Opened: | 12/25/2014 |
| Past Due Amount: | n/a | High Balance: | $418 | Last Active On: | 02/24/2015 |
| Monthly Payment: | n/a | Acct. Terms: | REV | Date Updated: | n/a |
| | | | | Balance Date: | 03/5/2017 |

| 2017 | | | 2016 | | | | | | | | | | | | 2015 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK |
| MAR | FEB | JAN | DEC | NOV | OCT | SEP | AUG | JUL | JUN | MAY | APR | MAR | FEB | JAN | DEC | NOV | OCT | SEP | AUG | JUL | JUN | MAY | APR |

Remarks: Current account
Paid account/zero balance

NAVY FEDERAL CR UNION (Sub# 1720115)

Account type: Unsecured — Responsibility: Individual

| | | | | | |
|---|---|---|---|---|---|
| Current Balance: | $0 | Credit Limit: | $1,000 | Date Opened: | 06/1/2015 |
| Past Due Amount: | n/a | High Balance: | n/a | Last Active On: | n/a |
| Monthly Payment: | n/a | Acct. Terms: | 012 | Date Updated: | n/a |
| | | | | Balance Date: | 09/30/2015 |

| 2015 | | | |
|---|---|---|---|
| OK | OK | OK | OK |
| SEP | AUG | JUL | JUN |

Remarks: Current account
Paid account/zero balance

NAVY FEDERAL CR UNION (Sub# 1720115)

Account type: Unsecured — Responsibility: Individual

| | | | | | |
|---|---|---|---|---|---|
| Current Balance: | $0 | Credit Limit: | $1,500 | Date Opened: | 12/24/2014 |
| Past Due Amount: | n/a | High Balance: | n/a | Last Active On: | n/a |
| Monthly Payment: | n/a | Acct. Terms: | 006 | Date Updated: | n/a |
| | | | | Balance Date: | 03/31/2015 |

| 2015 | | | 2014 |
|---|---|---|---|
| OK | OK | OK | OK |
| MAR | FEB | JAN | DEC |

Remarks: Current account
Paid account/zero balance

NAVY FEDERAL CR UNION (Sub# 1720115)

| Account type: Auto loan | | | Responsibility: Individual | | |
|---|---|---|---|---|---|
| Current Balance: | $0 | Credit Limit: | $35,182 | Date Opened: | 05/31/2013 |
| Past Due Amount: | n/a | High Balance: | n/a | Last Active On: | n/a |
| Monthly Payment: | n/a | Acct. Terms: | 072 | Date Updated: | n/a |
| | | | | Balance Date: | 03/31/2014 |

| 2014 | | | 2013 | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK |
| MAR | FEB | JAN | DEC | NOV | OCT | SEP | AUG | JUL | JUN | MAY |

Remarks: Current account
Paid account/zero balance

WELLS FARGO BANK AUTO (Sub# 3130059)

| Account type: Auto loan | | | Responsibility: Individual | | |
|---|---|---|---|---|---|
| Current Balance: | $0 | Credit Limit: | $14,099 | Date Opened: | 10/9/2012 |
| Past Due Amount: | n/a | High Balance: | n/a | Last Active On: | 05/14/2013 |
| Monthly Payment: | n/a | Acct. Terms: | 054 | Date Updated: | n/a |
| | | | | Balance Date: | 05/31/2013 |

| 2013 | | | | | 2012 | | |
|---|---|---|---|---|---|---|---|
| OK | OK | OK | OK | OK | OK | OK | OK |
| MAY | APR | MAR | FEB | JAN | DEC | NOV | OCT |

Remarks: Current account
Paid account/zero balance

NAVY FEDERAL CR UNION (Sub# 1720115)

| Account type: Auto loan | | | Responsibility: Individual | | |
|---|---|---|---|---|---|
| Current Balance: | $0 | Credit Limit: | $25,706 | Date Opened: | 05/13/2009 |
| Past Due Amount: | n/a | High Balance: | n/a | Last Active On: | n/a |
| Monthly Payment: | n/a | Acct. Terms: | 072 | Date Updated: | n/a |
| | | | | Balance Date: | 11/1/2012 |

| 2012 | | | | | | | | | | | 2011 | | | | | | | | | | | | 2010 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK |
| NOV | OCT | SEP | AUG | JUL | JUN | MAY | APR | MAR | FEB | JAN | DEC | NOV | OCT | SEP | AUG | JUL | JUN | MAY | APR | MAR | FEB | JAN | DEC |

Remarks: Current account
Paid account/zero balance

THD/CBNA (Sub# 3178962)

| Account type: Charge | | | Responsibility: Individual | | |
|---|---|---|---|---|---|
| Current Balance: | $0 | Credit Limit: | $500 | Date Opened: | 10/29/2008 |
| Past Due Amount: | n/a | High Balance: | n/a | Last Active On: | n/a |
| Monthly Payment: | n/a | Acct. Terms: | REV | Date Updated: | n/a |
| | | | | Balance Date: | 10/6/2011 |

| 2011 | | | | | | | | | | 2010 | | | | | | | | | | | | 2009 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK |
| OCT | SEP | AUG | JUL | JUN | MAY | APR | MAR | FEB | JAN | DEC | NOV | OCT | SEP | AUG | JUL | JUN | MAY | APR | MAR | FEB | JAN | DEC | NOV |

Remarks: Current account
Credit line closed - grantor's request
Paid account/zero balance

WELLS FARGO HM MORTGAG (Sub# 1995515)

| Account type: VA Real Estate Loan | | | Responsibility: Individual | | |
|---|---|---|---|---|---|
| Current Balance: | $0 | Credit Limit: | $191,400 | Date Opened: | 10/24/2008 |
| Past Due Amount: | n/a | High Balance: | n/a | Last Active On: | 04/15/2011 |
| Monthly Payment: | n/a | Acct. Terms: | 360 | Date Updated: | n/a |
| | | | | Balance Date: | 05/1/2011 |

| 2011 | | | | | 2010 | | | | | | | | | | | | 2009 | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK |
| MAY | APR | MAR | FEB | JAN | DEC | NOV | OCT | SEP | AUG | JUL | JUN | MAY | APR | MAR | FEB | JAN | DEC | NOV | OCT | SEP | AUG | JUL | JUN |

Remarks: Current account
Paid account/zero balance

NAVY FEDERAL CR UNION (Sub# 1720115)

Account type: Unsecured | Responsibility: Individual

| | | | | | |
|---|---|---|---|---|---|
| Current Balance: | $0 | Credit Limit: | $3,000 | Date Opened: | 11/9/2009 |
| Past Due Amount: | n/a | High Balance: | n/a | Last Active On: | n/a |
| Monthly Payment: | n/a | Acct. Terms: | 036 | Date Updated: | n/a |
| | | | | Balance Date: | 10/30/2010 |

| 2010 | | | | | | | | | | 2009 | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK |
| OCT | SEP | AUG | JUL | JUN | MAY | APR | MAR | FEB | JAN | DEC | NOV |

Remarks: Current account
Paid account/zero balance

NAVY FEDERAL CR UNION (Sub# 1720115)

Account type: Unsecured | Responsibility: Individual

| | | | | | |
|---|---|---|---|---|---|
| Current Balance: | $0 | Credit Limit: | $1,000 | Date Opened: | 05/22/2009 |
| Past Due Amount: | n/a | High Balance: | n/a | Last Active On: | n/a |
| Monthly Payment: | n/a | Acct. Terms: | 024 | Date Updated: | n/a |
| | | | | Balance Date: | 11/30/2009 |

| 2009 | | | | | | |
|---|---|---|---|---|---|---|
| OK | OK | OK | OK | OK | OK | OK |
| NOV | OCT | SEP | AUG | JUL | JUN | MAY |

Remarks: Current account
Paid account/zero balance

NAVY FEDERAL CR UNION (Sub# 1720115)

Account type: Auto loan | Responsibility: Individual

| | | | | | |
|---|---|---|---|---|---|
| Current Balance: | $0 | Credit Limit: | $16,830 | Date Opened: | 12/1/2008 |
| Past Due Amount: | n/a | High Balance: | n/a | Last Active On: | n/a |
| Monthly Payment: | n/a | Acct. Terms: | 060 | Date Updated: | n/a |
| | | | | Balance Date: | 06/30/2009 |

| 2009 | | | | | | 2008 |
|---|---|---|---|---|---|---|
| OK | OK | OK | OK | OK | OK | OK |
| JUN | MAY | APR | MAR | FEB | JAN | DEC |

Remarks: Current account
Paid account/zero balance

NAVY FEDERAL CR UNION (Sub# 1720115)

Account type: Auto loan | Responsibility: Individual

| | | | | | |
|---|---|---|---|---|---|
| Current Balance: | $0 | Credit Limit: | $17,617 | Date Opened: | 06/24/2008 |
| Past Due Amount: | n/a | High Balance: | n/a | Last Active On: | n/a |
| Monthly Payment: | n/a | Acct. Terms: | 060 | Date Updated: | n/a |
| | | | | Balance Date: | 12/31/2008 |

| 2008 | | | | | | |
|---|---|---|---|---|---|---|
| OK | OK | OK | OK | OK | OK | OK |
| DEC | NOV | OCT | SEP | AUG | JUL | JUN |

Remarks: Current account
Paid account/zero balance

WELLS FARGO HM MORTGAG (Sub# 1995515)

Account type: VA Real Estate Loan — Responsibility: Individual

| | | | | | |
|---|---|---|---|---|---|
| Current Balance: | $161,599 | Credit Limit: | $193,800 | Date Opened: | 05/6/2011 |
| Past Due Amount: | n/a | High Balance: | n/a | Last Active On: | 10/12/2018 |
| Monthly Payment: | $1,158 | Acct. Terms: | 360 | Date Updated: | n/a |
| | | | | Balance Date: | 11/7/2018 |

Late Payments over the last 87 months :
1 payment over 30 days late;

| 2018 | | | | | | | | | | | 2017 | | | | | | | | | | | | 2016 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OK | OK | OK | OK | OK | OK | OK | OK | OK | 30 | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK |
| NOV | OCT | SEP | AUG | JUL | JUN | MAY | APR | MAR | FEB | JAN | DEC | NOV | OCT | SEP | AUG | JUL | JUN | MAY | APR | MAR | FEB | JAN | DEC |

Delinquencies: Max: on 02/1/2018
Previous: on 02/1/2018
Remarks: Acct delinquent 30 days - now current
Open

MILITARY STAR (Sub# 1327980)

Account type: Charge — Responsibility: Individual

| | | | | | |
|---|---|---|---|---|---|
| Current Balance: | $7,800 | Credit Limit: | $8,200 | Date Opened: | 11/25/2005 |
| Past Due Amount: | n/a | High Balance: | $8,352 | Last Active On: | 10/13/2018 |
| Monthly Payment: | $227 | Acct. Terms: | REV | Date Updated: | n/a |
| | | | | Balance Date: | 11/14/2018 |

| 2018 | | | | | | | | | | | 2017 | | | | | | | | | | | | 2016 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK |
| NOV | OCT | SEP | AUG | JUL | JUN | MAY | APR | MAR | FEB | JAN | DEC | NOV | OCT | SEP | AUG | JUL | JUN | MAY | APR | MAR | FEB | JAN | DEC |

Remarks: Current account
Open

NAVY FEDERAL CR UNION (Sub# 1223555)

Account type: Credit card — Responsibility: Individual

| | | | | | |
|---|---|---|---|---|---|
| Current Balance: | $17,211 | Credit Limit: | $17,300 | Date Opened: | 07/18/2005 |
| Past Due Amount: | n/a | High Balance: | $17,969 | Last Active On: | 10/12/2018 |
| Monthly Payment: | $344 | Acct. Terms: | REV | Date Updated: | n/a |
| | | | | Balance Date: | 10/24/2018 |

| 2018 | | | | | | | | | | 2017 | | | | | | | | | | | | 2016 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK |
| OCT | SEP | AUG | JUL | JUN | MAY | APR | MAR | FEB | JAN | DEC | NOV | OCT | SEP | AUG | JUL | JUN | MAY | APR | MAR | FEB | JAN | DEC | NOV |

Remarks: Current account
Open

NAVY FEDERAL CR UNION (Sub# 1720115)

Account type: Line of credit — Responsibility: Individual

| | | | | | |
|---|---|---|---|---|---|
| Current Balance: | $3,788 | Credit Limit: | $5,000 | Date Opened: | 11/6/2009 |
| Past Due Amount: | n/a | High Balance: | $5,000 | Last Active On: | n/a |
| Monthly Payment: | $82 | Acct. Terms: | REV | Date Updated: | n/a |
| | | | | Balance Date: | 09/29/2018 |

| 2018 | | | | | | | | | 2017 | | | | | | | | | | | | 2016 | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK | OK |
| SEP | AUG | JUL | JUN | MAY | APR | MAR | FEB | JAN | DEC | NOV | OCT | SEP | AUG | JUL | JUN | MAY | APR | MAR | FEB | JAN | DEC | NOV | OCT |

Remarks: Current account
Open

COLLECTIONS

MEDICAL PAYMENT DATA (Sub# 1983031 - YC)
Responsibility: Individual

| Current Balance: | $315 | Balance Date: | 10/31/2018 | Date Assigned: | 11/6/2013 |
|---|---|---|---|---|---|
| Original Amount: | $315 | Last Active On: | n/a | Date Updated: | n/a |

Remarks: FCBA - disputed account
Attorney or outside agency account

BUREAU INFORMATION

**experian** *Credit Report*

Experian P.O Box 2104 Allen TX 75013

PREMIUM NATIONAL CRIMINAL RECORDS SEARCH

| REQUEST DATE | COMPLETED | STATUS |
|---|---|---|
| 11/16/2018 10:56 AM | 11/16/2018 11:59 AM | Does Not Meet Property Requirements<br>No National Sex Offender Records Found<br>Criminal Records Found |

FERNANDEZ, MARCO ANTONIO — RECORD 1 OF 2

Last Name: FERNANDEZ
First Name: MARCO
Middle Name: ANTONIO
DOB: 00/00/1984
Record Type: Criminal
State Of Record: CA
Database: Merced County - Superior Court - Historical Data {Inactive: 12/1/2014}

PETTY THEFT UNDER 950.00 — RECORD 1 - CHARGE 1
File Date: 01/11/2012 — Case #: CRL007179
State Of Record: CA
Offense: PETTY THEFT UNDER 950.00
Offense Degree: MISDEMEANOR
Offense Date: 11/16/2011
Disposition: CONVICTION: GUILTY PLEA
Disposition Date: 02/21/2012
Arrest Agency: LOS BANOS POLICE DEPARTMENT
Statute Code: PC484(A)/488
Filing Type: COMPLAINT
Case Disposition: CONVICTION: NOLO PLEA
Case Type: MISDEMEANOR - LOS BANOS
Probation Length Sentenced: 24 MONTHS
Probation Type: PROBATION: COURT
Case Disposition Date: 2012-03-19
Original Degree of Offense: MISDEMEANOR
Count: 1
Year of Birth: 1984
Case Category: MISDEMEANOR: PROPERTY OFFENSE

PETTY THEFT UNDER 950.00 — RECORD 1 - CHARGE 2
File Date: 01/11/2012 — Case #: CRL007179
State Of Record: CA
Offense: PETTY THEFT UNDER 950.00
Offense Degree: MISDEMEANOR
Offense Date: 11/22/2011
Disposition: CONVICTION: GUILTY PLEA
Disposition Date: 02/21/2012
Arrest Agency: LOS BANOS POLICE DEPARTMENT
Statute Code: PC484(A)/488
Filing Type: COMPLAINT
Case Disposition: CONVICTION: NOLO PLEA
Case Type: MISDEMEANOR - LOS BANOS
Probation Length Sentenced: 24 MONTHS

Probation Type: PROBATION: COURT
Case Disposition Date: 2012-03-19
Original Degree of Offense: MISDEMEANOR
Count: 2
Year of Birth: 1984
Case Category: MISDEMEANOR: PROPERTY OFFENSE

PETTY THEFT UNDER 950.00 — RECORD 1 – CHARGE 3

Case #: CRL007179

File Date: 01/11/2012
State Of Record: CA
Offense: PETTY THEFT UNDER 950.00
Offense Degree: MISDEMEANOR
Offense Date: 11/30/2011
Disposition: CONVICTION: GUILTY PLEA
Disposition Date: 02/21/2012
Arrest Agency: LOS BANOS POLICE DEPARTMENT
Statute Code: PC484(A)/488
Filing Type: COMPLAINT
Case Disposition: CONVICTION: NOLO PLEA
Case Type: MISDEMEANOR - LOS BANOS
Probation Length Sentenced: 24 MONTHS
Probation Type: PROBATION: COURT
Case Disposition Date: 2012-03-19
Original Degree of Offense: MISDEMEANOR
Count: 3
Year of Birth: 1984
Case Category: MISDEMEANOR: PROPERTY OFFENSE

FERNANDEZ, MARCO ANTONIO — RECORD 2 OF 2

Last Name: FERNANDEZ
First Name: MARCO
Middle Name: ANTONIO
DOB: 00/00/1984
Record Type: Criminal
State Of Record: CA
Database: Merced County - Superior Court - Historical Data (Inactive: 12/1/2014)

CONTROLLED SUBSTANCE - POSSESSION FOR SA~ — RECORD 2 - CHARGE 1

Case #: CRM020649

File Date: 12/09/2011
State Of Record: CA
Offense: CONTROLLED SUBSTANCE - POSSESSION FOR SALE
Offense Degree: FELONY
Offense Date: 10/15/2011
Disposition: CONVICTION: NOLO PLEA
Disposition Date: 06/06/2012
Arrest Agency: MERCED POLICE DEPARTMENT
Statute Code: HS11378
Filing Type: COMPLAINT
Case Disposition: CONVICTION: NOLO PLEA
Case Type: FELONY - MERCED
Probation Length Sentenced: 36 MONTHS
Probation Type: PROBATION: FORMAL
Case Disposition Date: 2012-06-06
Original Degree of Offense: FELONY
Count: 2
Year of Birth: 1984
Case Category: FELONY: DRUG OFFENSE

PREMIUM NATIONAL CIVIL COURT RECORDS SEARCH

| REQUEST DATE | COMPLETED | STATUS |
|---|---|---|
| 11/16/2018 10:56 AM | 11/16/2018 10:56 AM | Meets Property Requirements<br>No Civil Court Records Found |

RENTAL HISTORY SEARCH

| REQUEST DATE | COMPLETED | STATUS |
|---|---|---|
| 11/16/2018 10:56 AM | 11/16/2018 10:56 AM | Meets Property Requirements<br>Records Found |

Personal Information

Name: Marco Fernandez SSN: XXX-XX-3199

DOB: [redacted]1984 DL: DL State:

Address: 1440 Hotel Circle North APT 334 San Diego, CA 92108

Employment: Navy Information Operations Command – Systems Architect; Annual Income: 6232 Years on Job:

Tenant Information

Lease Address: 1440 Hotel Circle North APT 334 San Diego, CA 92108

Property Information: Alliance Residential Presidio View
Property Address: 1440 Hotel Circle North San Diego, CA 92108

Reasons for Result:

This Payment History meets requirements

The following elements in this Payment History did not contribute to the Rental History Evaluation:

- NSF payments are too old to be considered in the Rental History Evaluation

Lease information:

| | | | |
|---|---|---|---|
| Begin: | Nov 24, 2016 | Move in: | Dec 24, 2014 |
| End: | Nov 23, 2017 | Move out: | Nov 9, 2017 |
| Notice: | | | |

Payment History:

| | Dec | Nov | Oct | Sep | Aug | Jul | Jun | May | Apr | Mar | Feb | Jan |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | . | P | P | P | P | P | P | P | P | P | P | P |
| | Dec | Nov | Oct | Sep | Aug | Jul | Jun | May | Apr | Mar | Feb | Jan |
| | P | P | P | P | P | P | P | P | P | P | P | N |

[illegible]

Rent: $1722.00 Total Rent Paid: $59718.21 Total Write-Offs: $0.00

Powered by Experian RentBureau

OFAC/SDN SEARCH

| REQUEST DATE | COMPLETED | STATUS |
|---|---|---|
| 11/16/2018 10:56 AM | 11/16/2018 10:56 AM | 1 Possible Record Found |

Database(s) Searched: US Treasury Department – OFAC – SDN & Blocked Persons

FERNANDEZ SANTANA, Mario Alberto - *individual*

| ADDRESS | DATABASE |
|---|---|
| Av. Moctezuma 4297, Col. Jardines del Sol<br>Zapopan, Jalisco<br>Mexico | US Treasury Department - OFAC - SDN & Blocked Persons |

| RECORD ID | PROGRAM | REMARKS |
|---|---|---|
| 21070 | SDNTK | DOB 09 May 1977; POB Guadalajara, Jalisco, Mexico; citizen Mexico; Gender Male; R.F.C. FESM770509RQ7 (Mexico); C.U.R.P. FESM770509HJCRNR06 (Mexico); Linked To: FLORES DRUG TRAFFICKING ORGANIZATION; Linked To: EVENTOS LA MORA, S.A. DE C.V.; Linked To: MONTALVA INMOBILIARIA, S.A. DE C.V. |

CUSTOMER ACKNOWLEDGEMENT

Your use of the information in this report is strictly subject to the terms of your screening agreement with RentGrow and all applicable laws and regulations, including the federal Fair Credit Reporting Act, 15 U.S.C. § 1681 et seq. ("FCRA"). Any credit, criminal, civil or rental history information about the individual to

whom this tenant screening report pertains was obtained from public records or third-party consumer reporting agencies. RentGrow, Inc. follows reasonable procedures to assure maximum possible accuracy of the information in this report but cannot guarantee the accuracy or truthfulness of the records. RentGrow will suppress information that the applicant disputes as inaccurate or incomplete, and will notify you of the results of any dispute.

RentGrow does not manage or rent properties, does not set applicant eligibility criteria, and does not make rental decisions. All eligibility criteria are set, and all rental decisions are made, by the responsible property manager or owner.

Processing Information

DATE ENTERED: 11/16/2018 10:56 AM

INPUT BY: swhatley

POLICY: QUE01

MARKET SOURCE: Property Website

Reference: 33926952

**In the Matter Of:**

*FERNANDEZ vs*

*RENTGROW*

---

*PORSCHE KEMP*

*December 10, 2020*

---



IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

MARCO A. FERNANDEZ, )
7501 TRAFALGAR CIR., APT. 31 )
HANOVER, MD 21076-5010 )
(ANNE ARUNDEL COUNTY) )
INDIVIDUALLY AND AS A )
REPRESENTATIVE OF THE CLASS, )
)
Plaintiffs, )
)
vs. ) No.1:19-cv-01190-JKB
)
RENTGROW, INC., )
307 WAVERLY OAKS ROAD, )
SUITE 301 )
WALTHAM, MASSACHUSETTS )
02452-8449, )
)
Defendant. )

The video deposition of PORSCHE KEMP, called by the Defendant for examination, taken pursuant to notice and pursuant to the Federal Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, in Hanover, Maryland, commencing at 10:45 a.m. on the 10th day of December, 2020, taken before Melanie E. Kubiak, Certified Shorthand Reporter, appearing remotely via videoconference.

APPEARANCES:

BERGER MONTAGUE
MR. JOSEPH HASHMALL (via videoconference)
43 SE Main Street
Suite 505
Minneapolis, MN 55414
Phone: (612) 594-5999
E-Mail: jhashmall@bm.net

On behalf of the Plaintiffs;

BAKER & HOSTETLER LLP
MS. BONNIE DELGOBBO (via videoconference)
One North Wacker Drive
Suite 4500
Chicago, Illinois 60606
Phone: (312) 416-6200
E-Mail: bdelgobbo@bakerlaw.com

On behalf of the Defendant.

ALSO PRESENT:

Ms. Brittany De La Cruz (videographer)

* * * * * *

Q. So to start out, can you tell me who your employer is?

**A. Questar Management.**

Q. Okay. And how long have you worked for Questar?

09:51:09

**A. Seven years.**

Q. Okay. What's your current title there?

**A. Senior property manager.**

Q. And how long have you held that role?

09:51:22

**A. I think, like, four years.**

Q. So since about 2016?

**A. Yes.**

Q. Okay. And what was your role before you were senior property manager?

09:51:39

**A. Director of leasing.**

Q. And how long were you in that position?

**A. Three years.**

Q. Okay. And what role did you have before director of leasing with Questar?

09:51:59

**A. I didn't work with Questar prior to that.**

Q. Okay. So it's just the two positions you've had with the company?

**A. Correct.**

Q. And in your -- in your role as senior property

manager for Questar, are you responsible for specific properties?

**A. Yes.**

Q. And what properties are you responsible for?

09:52:24 **A. Serenity Place at Dorsey Ridge and the Villas at Dorsey Ridge.**

Q. Are those properties physically connected to each other?

**A. Not physically connected. They are -- They**

09:52:41 **both sit on about 25 acres, and they're next to each other.**

Q. Okay. And the whole time that you have been senior property manager, have you always been assigned to the two Dorsey Ridge Properties?

09:52:57 **A. Yes.**

Q. What are your main responsibilities as senior property manager?

**A. I just oversee the day-to-day operations of both assets, manage the team, leasing, maintenance,**

09:53:15 **concierge, pretty much anything that comes my way as a property manager.**

Q. Okay. So do you -- Are you responsible for managing or supervising any other Questar employees?

**A. Outside of the two properties? No. But I**

**A. Mm-hmm.**

Q. What -- What responsibilities would she have had as a leasing professional?

**A. Our leasing professionals, their main responsibility is to show prospective residents the property, get them to lease the property, and turn their leases into net move-ins. They do assist with packages from time to time if concierge is busy. Of course, address resident concerns, customer service, but we are a very busy property. We're near the military base, so we have a turnover, we get a lot of orders. So the leasing consultants are typically really busy focusing on leasing. Most of the time, we get a lot of applications that come through the door.**

Q. Are you responsible for training the leasing professionals?

**A. There is a leasing manager that does all the training for the leasing consultants -- leasing professionals. I'm sorry.**

Q. And are you -- Does the leasing manager report to you?

**A. Yes.**

Q. So are you the highest-ranking Questar employee at the two Dorsey Ridge properties?

**A. Yes.**

Q. What are -- What are the different ways that a perspective tenant can submit an application to a Dorsey Ridge property?

09:58:05 **A. In -- I'm trying to think if it was 2017 or 2018, we switched over from RealPage OneSite to Yardi Voyager. And at that point, we started encouraging all applications be submitted online. If someone is not really capable of submitting their application online,**

09:58:30 **they can fill out a printed application in the office and we can process it. But since that point, I would probably say 99 percent of our applications are submitted online.**

Q. Okay. And do you know whether Marco

09:58:45 Fernandez's application was submitted online or in person?

**A. Let me see. I'm pretty sure it was online because he applied in 2018, so that would have been online.**

09:59:15 **Is it okay if I pull up my Voyager system? It's easier than me looking in the file.**

Q. Sure.

**A. Okay.**

MR. HASHMALL: Sorry to jump in. Can you just

**A. Jeez. I can't tell you the last time. Most people don't want to apply and move in in the same day. That's kind of rare. I don't -- I think Marco moved in pretty quickly. I don't know if it was the same day he applied but ...**

**I don't -- I can't think of anyone off the top of my head that applied. Sometimes we might not even get screening. Like, we wouldn't even tell anyone that they could apply because we might not get the screening back right then and there. We typically say 72 hours to get the screening back. But, no, I can't think of anyone recently.**

Q. Okay. And can you walk me through -- you mentioned that there are some steps that need to happen between applying and actually moving in. Can you walk me through the process of what needs to be done between application and move in?

**A. Yeah. So at the time, since he did a written application, he would give his application, his supporting income documentation, the proof of income, things of that sort, he would pay his deposit. Since he was military, I believe, his deposit would have been reduced 200 and we would have waived his application fee. So we do ask for the deposit at the time of**

**applying because it actually takes the apartment off the market so no one else can rent the apartment.**

**At that point, once everything is submitted to the leasing professional, she puts everything in the system and submits it for screening.**

10:09:13

Q. And then I think you mentioned that sometimes there are maintenance or other issues that would need to be addressed before move-in. Can you tell me a little bit about that aspect?

10:09:42

**A. Yeah. So we just like to do a final walk-through and make sure everything is pristine before the move in actually occurs. So although an apartment may be ready, sometimes apartments sit for a while and they may get a little dusty. We want to send the cleaners back in, the leasing professional will go through, check the hot water, check the dryer, check all the lights, make sure no light bulbs have burned out. Which if an apartment has been sitting for a while -- you know, we don't replace every light bulb when someone moves out, so it could be an older light bulb. They may burn out. And we just do a fresh wipe-down of the apartment so that it's fresh and clean for the new move-in.**

10:09:58

10:10:12

Q. Okay. And other than the -- you mentioned one

of the steps in the process is that the leasing professional submits the tenant's info for screening?

**A. Mm-hmm.**

Q. Is that screening through RentGrow?

10:10:39 **A. Yes.**

Q. Okay. And are there --

**A. Yeah, I believe it's RentGrow. Yes.**

Q. Okay. And does Questar use any other screening services for tenant applications?

10:10:51 **A. No.**

Q. About how long does it usually take to receive the screening info from RentGrow after it's requested?

**A. It -- I have seen it take up to 72 hours, which typically we -- it's our standard response to our applicants. It's not that common that it takes that** 10:11:19 **long. Usually it's, like, 24 hours. Sometimes the credit will come back quicker than the criminal. But on average, it's 24 -- 24 to 48 hours. Sometimes right then and there, just depends.**

10:11:43 Q. And was I -- was I understanding you correctly, were you saying that you usually tell applicants that it will take up to 72 hours?

**A. Yeah. That's our standard time just to -- so that the prospective resident isn't waiting for us to**

**background. We get their, like, judgment history, like, their -- I believe it's their civil court records. I think it's civil court where it shows -- on that, it's pretty much looking to see if another apartment community has filed for rent possession against them. And then we get their criminal history. And that's it.**

Q. Okay.

**A. We get, like, a recommendation of, like, their credit. We get, like, a recommendation if it's, like, a high-risk or low-risk resident, if, you know, they recommend it. That's what's pulled.**

Q. And the recommendation that you're talking about, is that -- does that appear in the section called Results on the screening report?

**A. Yes.**

Q. And that's based on Questar's -- Questar's criteria for qualities that they want to see in their prospective tenants, right?

**A. Yes.**

Q. So do your -- in -- as a standard business practice, when someone at Questar is reviewing screening info for a prospective tenant at one of the Dorsey Ridge Properties, would it be standard business practice to review the entire screening report or just the screening

result?

**A. The screening result as long as everything comes back fine. The screening report, if something comes back as conditional or denied or criminal or anything of that sort.**

Q. Okay. So if a result shows as accept, then the standard business process is to not review the whole report; is that right?

**A. Yeah. If there's no other concerns with the application, then no.**

Q. So to know if any -- to know if any particular leasing agent had reviewed an entire report for any particular applicant, you'd have to speak to the leasing agent to know whether they reviewed the entire report, right?

**A. Right.**

Q. And do you -- I'm sorry if I asked this earlier, but do you get screening information about every new tenant to the property?

**A. Yes.**

Q. And would you -- Do you ever get screening information about a current tenant at the property or is it more at the initial application stage?

**A. Just at the initial application stage.**

personally review the tenant screening information?

**A. I only review it once the leasing consultant submits it to me that it's ready to review, meaning their welcome letter is uploaded, all of the supporting documentation is attached to it, and I have the file and it's ready for me to review.**

Q. Okay. So after -- the package that the leasing agent submits to you, does that include the tenant screening information from RentGrow or is that other documents that get submitted to you?

**A. It's their complete file, so it will have, like, their screening information, their proof of income, the welcome letter, meaning what the rent is on the apartment they apply for, the incentive that was offered to them, and their scheduled move-in date.**

Q. And do you have to review that information before it's provided to a tenant; or are you seeing it after it's already been given to tenants, the welcome letter?

**A. Do I review the application before the welcome letter is provided to them?**

Q. So, I guess, when you -- when you are telling me that a leasing agent will submit a package to you to review, is that something that you're reviewing in order

to approve the --

**A. Yeah. So it's all submitted to me before the approval, and everything is given to the applicant.**

Q. Okay. Okay. And so as part of your review process, do you typically look at the actual screening report at all or is that something that the leasing agents do?

**A. I will look at the screening.**

Q. Okay. And is it the same process you described to me before, that if the screening shows an accept result, that's the only part of the report that you look at?

**A. Correct.**

Q. So how do the -- so I believe you said that the leasing agents don't get the same alerts that you get that a report is ready to be viewed, right?

**A. Correct.**

Q. Do you -- Do you forward those alerts to the leasing agents, or how would they know that they can review the screening information?

**A. Well, it's -- I don't -- it's a lot, and I don't sometimes know who leased the apartment to who because I just get like, oh, an application was submitted or, oh, screening results came back. So I**

Q. So -- So does that mean anytime that a screening report has either a reject or a conditional, you would be personally reviewing that particular --

**A. Yes. Yes.**

10:30:59 Q. Okay. Have you ever looked at the -- have you ever looked at the section of this screening report that talks about OFAC, O F A C, SDN potential matches?

**A. Where would that be?**

Q. I believe it's included towards the -- kind of

10:31:39 towards the end of a screening report.

**A. I don't know. I know there's, like, a letter and everything and there's -- I don't know off the top of my head.**

Q. Okay. That doesn't -- that's not a section of

10:31:56 the report that is something you review regularly?

MR. HASHMALL: Objection, misstates the testimony.

BY THE WITNESS:

**A. I don't -- I don't know. Because I don't know what it -- it could be something that I review and I**

**10:32:14 might just not know that exact verbiage. But I don't know off the top of my head.**

Q. Okay. Do you know -- Do you know whether Questar has any policies in place about whether apartments can be rented to people who appear on the

OFAC, SDN list?

**A. I'm not sure. I don't -- I'm not aware.**

Q. Okay. So when you were telling me before about -- you were telling me before that you review all application packages to give the final approval or reject decision, right?

**A. (Nodding.)**

Q. Okay. Sorry. Yes?

**A. Yes.**

10:32:58

Q. And is there -- do you have any way of -- Or do you have a standard way of documenting what your decision on the application package is?

10:33:09

**A. So typically, on the paperwork that goes in their file, I will write a handwritten note on there like approved or approved with conditions, an additional deposit, things of that sort. It's just -- and then I initial it.**

10:33:30

Q. And then is there a certain -- a certain place where you keep the paper files?

**A. Yeah, in their -- in their original file.**

10:33:46

Q. And are those all stored at the Dorsey Ridge Property?

**A. Yes.**

Q. Okay. And what about tenant files that result

in rejecting the application? Are those maintained at all or do you --

**A. Yeah. We keep them for a certain amount of time, we keep them in our back storage. And then I think after two years, we move them to an actual storage closet down the hallway.**

Q. Okay. So since you're the highest-ranking employee of the Dorsey Ridge Properties, do you have to -- you don't have to seek any further higher-up approval to decide whether to accept or reject a tenant, right?

**A. No.**

Q. And do you have the -- the leasing agents who work directly with tenants, are they given either a mandatory or a target time frame to complete their application processing?

**A. Within 72 hours of the applicant applying.**

Q. I think you mentioned earlier that the goal is to sign a lease within five days?

**A. Five days, yeah. So we like to give it time. If it takes three days for it to -- everything to come back, get to me to make a decision, then the leasing consultant then prepares the lease. It's a lot quicker now because they can sign the lease online. But at that**

**A. Yes, I believe so.**

Q. Was it Suzanne Whatley who was dealing directly with Mr. Fernandez in connection with his application?

10:42:49 **A. Yes. She leased the apartment to him.**

Q. All right. And do you remember -- Do you remember any conversations that you had with Suzanne Whatley in connection with Mr. Fernandez's application?

**A. I believe -- I don't remember exactly what**

10:43:19 **went on, like what -- but I remember that there was something with his application, and I don't -- I don't know if I called Yardi's Screening or if she called Yardi's Screening to just clarify the information before we -- before we made the decision.**

10:43:42 **I don't -- But I do remember there was something with his application process. And he was a fairly quick move-in, so we wanted to get him taken care of as soon as possible.**

Q. Okay. And do you remember -- do you remember

10:44:00 anything more about what it was that you contacted Yardi or RentGrow about in connection with his application?

MR. HASHMALL: Object to foundation.

BY THE WITNESS:

**A. I don't remember exactly. The only reason why**

**A. Yes.**

Q. And is this application -- Would it be standard process at Questar for this paper application to be filled out before Questar would request a tenant screening from RentGrow?

10:49:39

**A. Yeah, this is completed before we screen them.**

Q. Okay. So the -- it would be standard practice that the line towards the top that says "term of lease," that that would be something filled out before submitting the request for a tenant screening?

10:49:55

**A. Yes.**

Q. And it looks like the beginning date of the lease term on this Exhibit 3 is November 19, 2018, right?

10:50:11

**A. Yes.**

Q. Is it -- Would it be standard practice for the tenant to request the start date of their lease?

**A. Yeah, that's who requests the move-in date. That's who always requests the move-in date.**

10:50:38

Q. Okay. So after receiving this -- so I think you mentioned that in addition to receiving the completed application, there would be some other documents, like proof of income, that Questar would collect before requesting a screening, right?

**A. Yes.**

Q. Was there anything else that we haven't talked about -- other than the application form and the proof of income, are there any other documents that Questar would -- documents or info that Questar would get from an applicant before doing --

**A. We get their -- their ID. It doesn't have to be before the screening. It just has to be before they move in so we have their photo ID on file. And that's it.**

MS. DELGOBBO: And can you show Exhibit 4, please.

**THE WITNESS: Okay. So I should log out of this exhibit, right?**

THE VIDEOGRAPHER: Stand by, please.

MS. DELGOBBO: You can close or minimize the screen.

THE VIDEOGRAPHER: Exhibit 4 is in the chat.

**THE WITNESS: Okay. I will download it.**

**Okay. I have it open.**

BY MS. DELGOBBO:

Q. Do you recognize this document?

**A. Yes.**

Q. So is this the -- is this the type of alert that you would receive when some screening results were

ready?

**A. Yes.**

Q. And this particular one is the alert you received that Mr. Fernandez's results were ready?

10:52:29 **A. Yes.**

Q. I think based on what you said earlier, you would not have -- you would not have reviewed his results immediately after getting this, right? You --

**A. No, not until the leasing professional gives it all to me, that everything is ready to go.**

10:52:51

Q. Okay. So the date on this e-mail, Exhibit 4, saying that the premium national criminal results were available, it looks -- it looks like it was Friday, November 16, 2018, 11:59 a.m., right?

10:53:14 **A. Yes.**

MS. DELGOBBO: And then, can we take a look at Exhibit 2, please.

**THE WITNESS: Sure. Bring the chat back up.**

THE VIDEOGRAPHER: Dropping Exhibit 2 in the chat.

10:53:55 **THE WITNESS: I have it open.**

BY MS. DELGOBBO:

Q. Okay. And do you recognize Exhibit 2?

**A. Yes.**

Q. So this is from suzanne@dorseyridge.com. Is

**applicant.**

Q. Do you remember -- Do you remember anything that you talked about on the call with Resident Screening?

10:55:42 **A. I don't remember.**

Q. And --

**A. I don't even know if -- I can't even remember if I called them back or if Suzanne called them. Because the leasing professional can call them, too. So**

10:56:04 **I don't remember who actually connected -- who connected with them. So I don't know if I don't remember because I didn't actually connect with them. Maybe the leasing manager did. I can't -- I can't remember exactly.**

Q. So as you remember it, was it just the

10:56:35 criminal record information that you had to do a further review of in connection with his application?

**A. Yeah. I do know it was -- his credit was fine, and he was military. It was something on the criminal.**

10:56:50 Q. Okay. So to the best of your memory, the further review of his application didn't have anything to do with OFAC possible match information?

**A. Not to --**

MR. HASHMALL: Objection to the form.

You can answer.

**THE WITNESS: Okay.**

BY THE WITNESS:

**A. Not to my knowledge. I'm not 100 percent sure what OFAC is.**

10:57:19

Q. Okay. And when you get -- when you were mentioning before that the leasing agent will send you the whole application package to review, is that something that's provided to you electronically or in paper?

10:57:50

**A. They bring it into my office usually. It's in their -- in their file, which is in, like, a folder like this.**

Q. So the leasing package is something that they have printed out into paper copy?

10:58:04

**A. Yeah. Well, when we were doing everything written. Now that it's online, no. I log into the computer and everything is attached, and it's much easier. But when we were doing everything printed, yeah, they would bring me the files.**

10:58:16

Q. And do you remember in -- So in November 2018 when Mr. Fernandez applied, would that have been a paper file you were looking at or an electronic one?

**A. It would have been a paper file.**

Q. Okay. And let's see.

Ultimately, you told Suzanne Whatley that she could go ahead and move forward and let Mr. Fernandez move into the complex, right?

10:58:49 **A. Correct.**

Q. Do you -- Do you remember why you made that decision?

**A. I can't -- I can't remember exactly why I made the decision. Probably because however the conversation went with Yardi Screening is what made us change the decision.**

10:59:10

Q. Do you remember -- So in -- Let's see.

So in Exhibit 2, Suzanne Whatley was saying, can you check his application? It came back with a criminal, and he is military.

10:59:39

Do you remember whether knowing that he was in the military helped you determine that any criminal record information must be incorrect on the report?

**A. Well, yeah. Because the issue we -- what I always see come back with people who have, like, speeding tickets in North Carolina, they are usually -- like, I don't know if there's a big military base there or something along those lines; but, yeah, I knew if he's military, he probably doesn't -- you know,**

11:00:00

Q. Did you -- So you wrote that we did not screen him again in December, right?

**A. Yes.**

Q. Do you remember receiving this e-mail about Mr. Fernandez in December 2018?

**A. I don't. We get anywhere from 30 to 50 applications per month. And if there's multiple people applying for the apartment, I get one of these for each applicant. So I typically don't open these. Because I don't review the app until I -- it's submitted to me from the leasing professional. So I don't recall seeing this at that time. I only saw this because I searched for his name when I got the original subpoena. So I was just pulling the documents that came up on my computer. And I just -- I didn't know why it had a December screening date. So ...**

Q. And so as part of -- as part of Questar's standard business processes, would employees ever review screening information that became available after a tenant had already moved in?

**A. No, there would be no reason.**

Q. Okay.

MS. DELGOBBO: Can we take a look at Exhibit 9, please.

THE VIDEOGRAPHER: Pulling it up now.
It's in the chat.
BY THE WITNESS:
**A. Okay. I have it open.**
11:17:13 Q. And do you recognize Exhibit 9?
**A. Yes, it's the lease agreement.**
Q. And is this the lease agreement between Mr. Fernandez and Questar?
**A. Yes. Well, it's Serenity Place Associates, the actual entity name of the property.**
11:17:33
Q. Okay. And at what point in the -- according to Questar's standard business practices, at what point in the application or move-in process would this lease have been completed and signed?
11:17:55 **A. Typically, it's within five days of applying, but I -- his move-in was pretty quick, so he probably signed this on the day that he picked up keys prior to us giving possession to the resident.**
Q. Okay. So the standard business process is that this lease would not be completed and signed until after the tenant was already approved to move in, right?
11:18:15
**A. Oh, yeah, of course.**
Q. Okay. And it looks like the lease began on November 19, the same date requested on the application,

right?

**A. Correct.**

MS. DELGOBBO: Okay. Okay. I think I may be done -- or almost done. If you don't mind, if we could take maybe a ten-minute break for me to look back through my notes --

**THE WITNESS: Sure.**

MS. DELGOBBO: -- and then I think we'll be almost wrapped up.

**THE WITNESS: Okay. So come back at 12:28?**

MS. DELGOBBO: Sure. Sounds good.

**THE WITNESS: Okay. Thank you.**

THE VIDEOGRAPHER: We are going off the record at 12:19 p.m. eastern time.

(A short break was had.)

THE VIDEOGRAPHER: We are now back on the record at 12:32 p.m. eastern time.

MS. DELGOBBO: Thank you.

BY MS. DELGOBBO:

Q. And, Ms. Kemp, I think you may be on mute.

**A. Sorry.**

Q. All right. Thank you.

Okay. I just shared what's marked as Exhibit 12.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

MARCO A. FERNANDEZ, )
7501 TRAFALGAR CIR., APT. 31 )
HANOVER, MD 21076-5010 )
(ANNE ARUNDEL COUNTY) )
INDIVIDUALLY AND AS A )
REPRESENTATIVE OF THE CLASS, )
)
Plaintiffs, )
)
vs. )No.1:19-cv-01190-JKB
)
RENTGROW, INC., )
307 WAVERLY OAKS ROAD, )
SUITE 301 )
WALTHAM, MASSACHUSETTS )
02452-8449, )
)
Defendant. )

I, PORSCHE KEMP, state that I have read the foregoing transcript of the testimony given by me at my deposition on the 10th day of December, 2020, and that said transcript constitutes a true and correct record of the testimony given by me at the said deposition except as I have so indicated on the errata sheets provided herein.

______________________
PORSCHE KEMP

SUBSCRIBED AND SWORN to
before me this ________ day
of __________________, 2020.

________________________
NOTARY PUBLIC

UNITED STATES OF AMERICA )
DISTRICT OF MARYLAND )
STATE OF ILLINOIS )
COUNTY OF COOK )

I, Melanie E. Kubiak, Certified Shorthand Reporter, do hereby certify that PORSCHE KEMP was first duly sworn by me to testify to the whole truth and that the above deposition was reported stenographically by me and reduced to typewriting under my personal direction.

I further certify that the said videoconference deposition was taken at the time and place specified and that the taking of said deposition commenced on the 10th day of December, 2020, at 10:45 a.m.

I further certify that I am not a relative or employee or attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, nor financially interested directly or indirectly in this action.

In witness whereof, I have hereunto set my hand this 20th day of December, 2020.

MELANIE E. KUBIAK, CSR
180 North LaSalle Street
Suite 2800
Chicago, Illinois 60601
Phone: (312) 236-6936

CSR No. 084-004794

**In the Matter Of:**

*Fernandez vs*

*Rentgrow, Inc.*

---

*IRA BLIEDEN*

*December 10, 2020*

---



IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MARYLAND

Case No.: 1:19-cv-01190-JKB

---------------------------------------------------

MARCO A. FERNANDEZ, individually and as a representative of the class,

Plaintiff,

-vs-

RENTGROW, INC.,

Defendant.

---------------------------------------------------

CONFIDENTIAL

REMOTE DEPOSITION OF IRA BLIEDEN

DECEMBER 10, 2020 - 10:00 A.M. EST

JOB NO. 2020-93179

DECEMBER 10, 2020

10:00 A.M. EST

REMOTE DEPOSITION of IRA BLIEDEN, before S. Arielle Santos, Certified Court Reporter, Certified LiveNote Reporter and Notary Public.

IRA BLIEDEN - CONFIDENTIAL

BY MR. GRISWOLD:

Q One is, you testified earlier about what your title was.

Is there anything you want to clarify about your title or correct about your title?

A Yeah. It's -- we'll correctly say it's director of programming for RentGrow.

Q Okay.

A Yep. Thank you.

Q And what does RentGrow do?

A We provide screening systems -- screening services, resident screening services.

Q Okay.

And during the time you've been with RentGrow, has the OFAC reporting or OFAC possible matches ever impacted application results on the resident screening report?

A It does not.

Q Okay.

MR. GRISWOLD: I have no

A C K N O W L E D G E M E N T

STATE OF ____________

COUNTY OF ___________

I, the undersigned, hereby certify that I have read the transcript of my testimony taken under oath in my deposition; that the transcript is a true and complete and correct record of my testimony, and that the answers on the record as given by me are true and correct.

_________________________

IRA BLIEDEN

Signed and subscribed to before me

This _______ day of _______________, 20__.

________________________________

Notary Public

I, S. Arielle Santos, Certified Shorthand Reporter, Certified LiveNote Reporter do hereby certify:

That prior to being examined, the witness named in the forgoing deposition, was by me duly sworn to testify the truth, the whole truth, and nothing but the truth.

That said deposition was taken before me at the time and place set forth and was taken down by me in shorthand and thereafter reduced to computerized transcription under my direction and supervision, and I hereby certify the foregoing deposition is a full, true and correct transcript of my shorthand notes so taken.

I further certify that I am neither counsel for nor related to any party to said action nor in anywise interested in the outcome thereof.

S. Arielle Santos, CCR, CLR

ERRATA SHEET CHANGES IN TESTIMONY
FERNANDEZ v. RENTGROW, INC.
WITNESS: IRA BLIEDEN, DECEMBER 10, 2020

| PAGE | LINE | FROM | TO | REASON FOR CHANGE |
|---|---|---|---|---|
| 9 | 6 | Director of technology | Director of Programming, RentGrow | Misspoke/clarification |
| 10 | 5 | Mr. Blieden stated he does not work on projects that are not related to RentGrow. | Mr. Blieden does work with other teams on integration projects. | Misspoke/clarification |
| 12 | 17 | Not | No | Transcription error |
| 16 | 9 | Resident screening IT | The department is Programming, Resident Screening | Misspoke/clarification |
| 16 | 15 | Yes | Yes, except that the Pune team reports to Siddharth Mehta. | Misspoke/clarification |
| 18 | 12 | issue | case | Misspoke |
| 26 | 9 | -- for managers | -- for managers, directors, and maybe team leads. | Misspoke/clarification |
| 38 | 16 | that team | that case | Misspoke |
| 43 | 3 | transition | transaction | Transcription error |
| 44 | 2 | turn | return | Transcription error |
| 44 | 3 | Okay? | Okay. | Transcription error |
| 44 | 18 | return | retain | Transcription error |
| 47 | 16 | That's correct | That is the date the TR is created | Misspoke/Clarification |

DocuSigned by:
Ira Blieden
6823A78EB6714E5...

SIGNATURE OF WITNESS

1/21/2021 | 12:32 PM PST

DATE

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
**(Northern Division)**

MARCO A. FERNANDEZ, individually and as a Representative of the class,

Plaintiff,

v.

RENTGROW, INC.,

Defendant.

Case No. 1:19-cv-01190-JKB

Chief Judge James K. Bredar

**DEFENDANT'S OBJECTIONS AND RESPONSES TO**
**PLAINTIFF'S FIRST SET OF INTERROGATORIES**

Defendant RentGrow, Inc. ("RentGrow"), pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, hereby states its Objections and Responses to the Interrogatories propounded by Plaintiff Marco A. Fernandez dated August 1, 2019 as follows:

Subject to its objections, RentGrow will respond to the interrogatories to the best of its current knowledge, information, and belief based upon a reasonable and diligent investigation. RentGrow does not concede that any information disclosed in its responses to these interrogatories is relevant to any party's claim or defense or proportional to the needs of this case. RentGrow reserves its right to raise objections regarding the competence, relevance, materiality, discoverability, or admissibility of the information or documents disclosed or identified in its responses in any subsequent proceedings or trial of this or any action in which Plaintiff seeks to use such information. RentGrow reserves the right to amend or supplement its responses, and to make further objections to the requests, should additional discoverable information or bases on which to make objections become known.

**INTERROGATORY NO. 1:**  If you contend that there are meaningful differences among putative class members which relate to the manner in which You presented OFAC/SDN information to landlords, describe those differences and identify the number of class members who may have had their reports presented in each way that You contend is meaningfully different.

**RESPONSE:**  RentGrow objects on the ground that the terms "meaningful differences," "presented OFAC/SDN information to landlords," and "meaningfully different" are vague and ambiguous and do not sufficiently identify the information requested. Subject to and without waiving its objections, RentGrow responds as follows:

Every tenant screening report provided by RentGrow contains a section titled "Additional Information" on the first page of the report. That section includes a sub-section titled "Items to review". At all relevant times, if an applicant had a possible match to a name on the OFAC/SDN list, the "Items to review" section of the report included a bullet point item stating "[X] Possible Match[es] in OFAC Name Search". This item appears on the tenant screening report in the same way for both consumers and RentGrow's clients.

In approximately April 2018, RentGrow began offering an optional feature called "Hold Voyager Move-In," which pauses the tenant move-in process if certain conditions exist, such as a possible social security number mismatch or possible OFAC/SDN match. In the event of a possible OFAC/SDN match, clients who enable this feature are prompted to review the information and then manually resume the tenant move-in process after following their internal procedures for resolving a possible OFAC/SDN match. Documents reflecting the manner in which OFAC/SDN information was reported to clients who enabled this feature are being produced in response to Plaintiff's Document Request No. 4.

RentGrow does not contend that any differences in the manner in which OFAC/SDN information was presented to customers who enabled the "Hold Voyager Move-In" feature are relevant to the claims or defenses in this case. The "Hold Voyager Move-In" feature does not affect the screening "result" that is reported on a tenant screening report—OFAC/SDN information has never been among the criteria that customers may use to generate that "result," as described in Response to Plaintiff's Interrogatory No. 5. Moreover, between April 26, 2018 and May 24, 2019, RentGrow displayed OFAC/SDN information indicating a "possible match" with respect to 356 consumers whose application results were "Accept" or "Accept with Conditions" for whom the

"Hold Voyager Move-In" feature was enabled, and RentGrow has no record that any disputes were submitted by any of those consumers.

**INTERROGATORY NO. 5:** State the criteria available to landlords during the Class Period to be used by You in adjudicating, scoring, grading, rating, or otherwise indicating whether an applicant meets a landlord's chosen criteria and describe the time period in which those criteria have been available.

**RESPONSE:** RentGrow objects on the ground that the phrase "adjudicating, scoring, rating, or otherwise indicating whether an applicant meets a landlord's chosen criteria" is vague and ambiguous and does not sufficiently identify the information requested. RentGrow also objects on the ground that the interrogatory seeks information that is neither relevant to any claim or defense nor proportional to the needs of the case, including because OFAC/SDN information has never been among the criteria that RentGrow clients may select to be factored into the generated "result" that appears on a tenant screening report.

Without waiving any objections, RentGrow responds as follows: RentGrow clients have the ability to obtain tenant screening reports from RentGrow that typically include one of three "results": "Accept," "Reject," or "Accept with Conditions" ("conditions" vary depending on the property, but typically are financial in nature and include such things as requiring a guarantor or an additional security deposit). RentGrow clients have the ability to select specific criteria that generate the "result" that appears on a tenant screening report. Those criteria never have included any OFAC/SDN information. Put differently, the existence of a "possible match" of OFAC/SDN information on a tenant screening report has never affected the "result" that appears on the tenant screening report. In further response to this interrogatory, RentGrow will produce the property screening criteria that was applicable to RentGrow's tenant screening report on Plaintiff, which does not contain any criteria relating to OFAC/SDN information and is illustrative of the nature of the screening criteria that RentGrow's client properties employed during the putative class period.

September 27, 2019

**FOR THE OBJECTIONS TO THE INTERROGATORIES**

*/s/Brian P. Donnelly*

Brian P. Donnelly (Bar No. 19218)
NIXON PEABODY LLP
799 Ninth Street, NW, Suite 500
Washington, D.C. 20001-4501
Telephone: (202) 585-8191
Facsimile: (202) 585-8080
bdonnelly@nixonpeabody.com

*Counsel for Defendant RentGrow, Inc.*

**FOR THE INTERROGATORY ANSWERS**

I certify under penalty of perjury that the foregoing is true and correct to the best of my knowledge and information. Not all matters set forth in the foregoing responses are within my personal knowledge, and I am informed and believe that no single person at RentGrow, Inc. has personal knowledge of all issues relevant to or contained in these responses. I am informed and believe that these responses have been assembled based on information gathered by and from individuals authorized to act on behalf of RentGrow, Inc.

Executed on September 30th, 2019

RENTGROW, INC.

By: ______________________
Patrick Hennessy
Vice President and General Manager of Resident Screening

IN THE UNITED STATES DISTRICT COURT PLEAS
FOR THE DISTRICT OF MARYLAND
(NORTHERN DIVISION)

~~~~~~~~~~~~~~~~~~~~~

FERNANDEZ, et al.,

Plaintiffs,

vs. Case No. 1:19-CV-01190-JKB

RENTGROW, INC.,

Defendant.

~~~~~~~~~~~~~~~~~~~~~

Videotaped ZOOM deposition of
MARCO A. FERNANDEZ

~~~~~~~~~~~~~~~~~~~~~

THIS TRANSCRIPT IS DESIGNATED CONFIDENTIAL

~~~~~~~~~~~~~~~~~~~~~

October 27, 2020
10:16 a.m. EDT
Location of Witness:
7501 Trafalgar Circle, Suite 232
Columbia, Maryland 21044
Wendy L. Klauss, RPR

APPEARANCES:

On behalf of the Plaintiff and the Class:

Berger Montague PC
E. MICHELLE DRAKE, ESQ.
43 S.E. Main Street, Suite 505
Minneapolis, MN 55414
(612) 595-5997
Emdrake@bm.net

On behalf of the Defendant:

Baker & Hostetler LLP
JOEL GRISWOLD, ESQ.
200 South Orange Avenue
Suite 2300
Orlando, FL 32801
(407) 649-4000
Jcgriswold@bakerlaw.com

-AND-

BONNIE KEANE DelGOBBO, ESQ.
1 Wacker Drive, Suite 4500
Chicago, IL 60606
(312) 416-8185

APPEARANCES, Continued:

On behalf of the Defendant:

Yardi

DANIELLE C. PARRINGTON, ESQ.

400 Fifth Avenue, Suite 120

Waltham, MA 02451

(781) 890-5100

Danielle.parrington@yardi.com

-AND-

BRADY M. BUSTANY, ESQ.

430 S. Fairview Avenue

Santa Barbara, CA 93117

(805) 699-2040

Brady.bustany@yardi.com

~ ~ ~ ~ ~

ALSO PRESENT:

Patrick Hennessey, RentGrow, Inc.

Ken Williamson, Videographer

Rodney Myers, Veritext Concierge

Andrew Smith, Veritext Concierge

~ ~ ~ ~ ~

Montague?

A. Yes.

Q. If you turn to your application, which begins at PLF000720 and goes to 000721.

A. Okay.

Q. Is that the application that you completed for purposes of renting an apartment at Dorsey Ridge?

A. Yes.

Q. Did you complete this application in your own handwriting?

A. Yes.

Q. And did you complete this application in person?

A. Yes.

Q. And did you complete at -- well, let me ask you this: Where were you physically when you completed this application?

A. I think I was in the main lobby. I remember filling something out by hand, but I can't remember for sure, but I think there was a component that was also online. I just can't remember what it was.

Q. Is any of the writing on page 720 not your handwriting?

CONFIDENTIAL

the $1,000 signing bonus written at the top, did you write that or did Suzanne?

A. That wasn't me. I don't know who wrote it, but it wasn't me.

Q. Okay. Other than those things, basically everything else on the page from applicant's name down is your handwriting?

A. Yes, sir.

Q. Was Susan Whatley physically present with you when you completed this application?

A. Yes.

Q. She put in the term of the lease as 11-19-2018 to 11-18-2019, in your presence?

A. Yes, I believe so.

Q. And why did she write that down as a term of the lease?

A. Because that's what I was applying for, and the term of lease for the apartment that I wanted, I think that was the minimum.

Q. Okay. But that's when you wanted your lease to start, on November 19 of 2018, right?

A. I think, yeah. I can't remember if this was filled out after the application had

recollection in terms of what date you completed your application for the apartment?

A. No, because it doesn't make sense. I think the 16th would have been a Saturday, which means I wouldn't be in uniform on a Saturday. So when I applied, it had to be a working day.

So either I interpreted this date wrong, it's a typo, or maybe this is the date that the report was issued. I just can't remember what the actual form looked like that required this information from RentGrow.

Q. It looks like this email is dated November -- it says Saturday, November 17, 2018. Do you see that on the date of the email?

A. Yes.

Q. I guess we could go back and look at a calendar to find out if the 17th was a Saturday and the 16th was a Friday, but do you recall whether the -- Friday would have been a workday in your dress clothes, correct?

A. Yes.

Q. So is it possible then that you made your application on Friday, November 16,

2018?

A. Yeah. That's very likely.

Q. Okay. And that you would have sent this email the next day, which would have been Saturday, November 17, 2018?

A. Yeah. That looks like it, yeah.

Q. And why did you put your current mailing address as 7501 Trafalgar Circle?

A. Because that's the apartment that I applied to.

Q. Okay. So you currently weren't able to receive mail at that address though, correct?

A. Correct.

Q. And you hadn't yet lived at that address, correct?

A. Correct.

Q. And did you, as part of this email, also send, as an attachment, the document that -- I guess, the photo of a driver's license appearing on PLF000023?

A. Yes.

Q. It does not appear to be legible, correct?

A. It doesn't look legible, correct.

Q. And the term of this lease was started on November 19 of 2018, right?
A. Yes.
Q. Did you move in that day?
A. I believe so, yes.
Q. Did you have anybody assist you when you moved in?
A. No.
Q. And would you have signed this lease on November 19 of 2018?
A. Yes.
Q. Here comes Exhibit 5, I'm marking. Please let me know when it shows up.

\- - - - -

(Thereupon, Deposition Exhibit 5, November 18 Email, Subject Welcome Letter, Beginning with Bates Label PLF 717, was marked for purposes of identification.)

\- - - - -

Q. We used to be able to just slide these across the table to each other.
A. I know. Times have changed.
Q. Now we would all have to wear gloves if we shared an exhibit with each other.

A. Okay. I see it.

MR. GRISWOLD: Michelle, let me know when it pops up on your screen.

MS. DRAKE: I have it.

Q. All right. Exhibit 5 is a document Bates stamped PLF000717 to 718. What is this document?

A. This looks like a welcome letter from Dorsey Ridge.

Q. And did you receive this letter from Dorsey Ridge?

A. Yes.

Q. And would you have received it on November 18, 2018?

A. Yes.

Q. And it says that, if you go to the second page, that the move-in date was November 19, 2018; is that right?

A. Yes.

Q. So you were approved for purposes of leasing the apartment at least as of November 18, 2018, right?

A. Yes.

Q. You sued RentGrow, correct?

A. Yes.

Q. Why?

A. Several reasons: Number one is when I applied to this apartment, I received a call from Suzanne. From what I recall, she said, I don't think you will be able to move into this apartment, based on the information that we got on your background check.

And I remember I was very alarmed, because I knew I've made good decisions, I pay all my bills on time, I've stayed out of trouble, never been convicted of any crime. So I was shocked that she said there was something found in my background.

And I said, There is no way that information could be true, because you saw me in uniform, I couldn't be in the military if that information were true.

So she said, Yeah, that doesn't really make sense, but it's not up to me. I will have to talk to my supervisor to see if she would waive that requirement. And I think the requirement was no convictions, something along those lines.

So she said to me on that phone call, I remember also, she said, If this is not

true, there is a phone number I can give you so you can call. And I Googled the phone number, and that's when -- because I remember calling the number, and I didn't get anywhere, so I Googled the number, and that's where I found out it belonged to RentGrow.

And I started digging, trying to figure out how to get a copy of it. And I think that was it for that day. I can't remember specifically what day she told me, like, You won't be able to move into this community.

But what bothered me the most was, you know, she said to me, you know, We try very hard to keep our community safe, and to me that was a punch in the stomach, honestly, because someone like me, you know, I've served my country for 16 years, make good decisions, pay my bills on time, and I could be denied an apartment or I can be deemed unsafe to a community solely based on my name, that was very upsetting.

So in my professional judgment, I said, there is no way this could be, you know, that this could be okay. But I didn't know

A. Well, I didn't know that right away, because I have a landlord telling me that I have information on my background check that would prevent me from getting into this apartment. So at the time I didn't know specifically anything about OFAC/SDN, I didn't know that that's what it actually was, until I received a copy of the report from RentGrow.

Q. Ms. Whatley never mentioned the OFAC/SDN list to you on the phone, right?

A. I don't remember what specifically she said. She just said that it was based on my background check.

Q. Did she mention to you that there was a positive criminal match on your screening report?

A. I don't remember. I don't remember specifically if she mentioned, like, specifics about the background check. She just told me that, based on my background check, I wouldn't be able to live in the community. And then she gave me the number, and I said all right.

Q. You said she told you to -- that you should try to clear it up; is that right?

A. Yeah, because I was having a

conversation with her, I was, you know -- like as she was telling me that, I was like, you know, There is no way that that could be true, because you saw me in uniform, I'm in the Navy, I couldn't be in the military with, you know, like, a bad record.

But that's when she told me, like, you know, It's not up to me, like, I'll have to talk to my manager to see if she can waive that, but if that's not true, I'm going to give you this number where you can call and find out more about it.

Q. And whatever was on the screening report, that was -- that Ms. Whatley identified as problematic, that was waived, right?

A. From what I understand, yeah, it was ultimately waived by her supervisor, that was.

Q. What day did you receive the call from Ms. Whatley?

A. It was over the weekend. I can't remember what day specifically.

Q. It was either Saturday or Sunday -- it was either Saturday, November 17 or Sunday, November 18?

CONFIDENTIAL

PLF000012 to 21; is that right?

A. Yes.

Q. Have you seen this document before?

A. Yes, I have.

Q. And what is this?

A. This looks like the document I requested from RentGrow when I was seeking to get -- to obtain a copy of the report they issued on my name.

Q. Is this the original screening report provided by RentGrow to Dorsey Ridge?

MS. DRAKE: Objection. Foundation. You can answer if you know.

A. I don't know.

Q. How did you obtain a copy of this report?

MS. DRAKE: Objection. Foundation.

Q. Let me ask you this: Did you receive a copy of this report?

A. I did.

Q. How did you receive it?

A. I believe I requested a copy of it from RentGrow.

Q. And did RentGrow provide you a copy?

A. Yes.

Q. And is this the copy that RentGrow provided to you?

A. Yes.

Q. Now, the application results on the first page says, "Reject"; is that correct?

A. Yes.

Q. And under the Reasons For Result, it says that, quote, Criminal history does not meet property requirements, end quote; is that right?

A. Yes.

Q. So is it your understanding that your application results was a reject because of criminal history not meeting the property requirements?

A. My understanding is based on everything on this report, not just the criminal findings.

Q. And on what do you base that understanding?

A. Because everything in this report is affiliating my name, my Social Security, and my birthday. Like, there is no way it could be someone else. This is all information about

me, supposedly.

Q. Right. Did anybody tell you that anything other than your criminal history matching was the reason for the application being rejected initially?

A. No, I don't think anyone told me why. They just told me based on your background check. It wasn't specific to either criminal or anything else.

Q. Nobody ever told you the specific reason for why?

A. No, and to be honest with you, I wish they did.

Q. Let me back up for a second, just so the record is clean.

Nobody ever told you from Dorsey Ridge what the reason was for the initial application resulting in rejected?

A. No, not specifically.

Q. How about generally?

A. Generally, they told me, based on your background check, you won't be able to move into this property.

Q. Ultimately, your application was not injected, and you were accepted to rent the

CONFIDENTIAL

Q. Are you going to be asking the Court to award you some relief?

MS. DRAKE: Object as to form. You can answer.

A. Yes.

Q. Are you seeking relief because you believe you have been injured?

MS. DRAKE: Object as to form. You can answer.

THE WITNESS: Sorry.

MS. DRAKE: That's okay. I was slow. You can answer the question.

A. Yes, I think my reputation was damaged. I was extremely embarrassed. I felt humiliated at the time. I lost sleep over this, because I couldn't wait for the day to correct it, because I can't -- my livelihood depends on my reputation, my good name. It helps me maintain my clearance, keep my job, and be able to move between apartments.

Q. Okay. You were not physically injured by RentGrow's inclusion of criminal history information on your screening report, right?

MS. DRAKE: Object as to form. You

apartment before or after you inquired about the Dorsey Ridge apartment?

A. It was before.

Q. You have not paid money to anyone as a result of RentGrow's inclusion of criminal history information on your screening report, right?

A. No.

Q. You have not suffered any adverse actions by your employer as a result of RentGrow's inclusion of criminal history information on your screening report, right?

A. So far, no.

Q. And you have told them about it, right?

A. Yes.

Q. You testified that you suffered emotional distress from RentGrow including criminal history information in your screening report; is that right?

A. Yes.

Q. Why did you suffer emotional distress from the inclusion of criminal history information on your screening report?

A. Well, number one, because I was

MS. DRAKE: Object. Asked and answered.

Q. And at the time that you got a call from Suzanne Whatley informing you that there was something on your screening report that prohibited them from renting to you, because you were unsafe, you knew that you had not done anything that would have suggested you were an unsafe person, right?

A. Yes.

Q. You knew there was a mistake on the screening report, right?

A. I didn't know at the time. I didn't know why -- I honestly didn't even know what was going on at the time, until I got a copy of the report.

Q. You said that you were embarrassed that the community thought you were unsafe; is that right?

A. Yes.

Q. What community are you talking about?

A. Dorsey Ridge.

Q. Do you know who at Dorsey Ridge saw your screening report?

A. I don't know.

Q. Do you know whether anyone other than RentGrow and you saw your screening report?

A. I don't know.

Q. If you were concerned that somebody at -- somebody employed by Dorsey Ridge would think that you were unsafe, based on the inclusion of criminal history information in your screening report, then why didn't you make a dispute until almost a month after having received a copy of that report?

MS. DRAKE: I'm going to object. You already asked him this question and he invoked the privilege. I don't think it is proper for you to ask him again in an effort to elicit information he already told you is privileged. Can you explain why you are doing that?

MR. GRISWOLD: I'm sorry. Are you asking a question of the witness?

MS. DRAKE: No. I'm asking a question of you.

MR. GRISWOLD: Oh, no, I'm not under oath right now. So I'm asking the

CONFIDENTIAL

Q. Terrific. You testified that you have experienced stress as a result of RentGrow including criminal history information on a screening report since the time that the screening report was corrected, right?

A. Yes.

Q. Has that stress interfered with your ability to perform your work?

A. No.

Q. Has that stress affected your personal relationships?

A. Not that I'm aware of.

Q. Have you been tested to see whether you are mentally fit for service since RentGrow included criminal record information about you on the November 16, 18 screening report?

A. No.

Q. Why not?

A. There hasn't been a need to, I don't believe.

Q. Do you believe that you are mentally fit to perform the duties of your job?

A. Yes.

Q. Do you believe you are emotionally fit to perform the duties of your job?

CONFIDENTIAL

A. Yes.

Q. Have you sought medical treatment for the stress that you believe RentGrow has caused you as a result of including criminal record information on your November 16, 2018 screening report?

A. No.

Q. You haven't seen a psychologist?

A. No.

Q. You haven't seen a psychiatrist?

A. No.

Q. Why not?

A. Because I feel healthy. I feel physically and mentally fit.

Q. What does OFAC stand for?

A. Office of Foreign Assets Control.

Q. And what does SDN stand for?

A. I can't recall from the top of my head.

Q. Do you know what the OFAC/SDN list is?

A. Yes, I'm aware of it.

Q. What is it?

A. It is a list that the Department of Treasury puts together about criminals and

here.

Does the U.S. Government prohibit U.S. businesses from doing business with those persons and entities that are on the OFAC/SDN list?

A. Yes.

Q. How do you know that?

A. Because that's the reason the Department of Treasury puts it there to begin with, so that definitely U.S. businesses are prohibited from conducting business with those listed there.

Q. Landlords can be U.S. citizens, right?

A. Yes.

Q. Was Serenity at Dorsey Ridge a landlord that was a U.S. business?

A. Yes.

Q. And it was a U.S. business in November of 2018 when it considered your application to rent an apartment?

A. Yes.

Q. Is you were on the OFAC/SDN list in November of 2018, would Dorsey Ridge have been prohibited from renting an apartment to you?

individual would do.

Q. I guess it's possible that somebody who knows that they are on the OFAC list may give an alias, right?

A. I don't know that. I don't know how criminals behave or people that appear on that list behave.

Q. Do you know how people who are national security threats behave, in terms of obscuring their identity?

A. I mean, is it possible? Yes. Can I think of an example right now? No.

Q. Do you claim that RentGrow violated the Fair Credit Reporting Act with regards to including a reference on the screening report that there was one possible match in OFAC name search to your name?

A. Yes.

Q. RentGrow reported that said a possible match, correct?

A. Yes.

Q. They didn't report it as a match, right?

A. I interpreted it as a match, because you are putting it next to my entire

way of knowing that.

Q. If you wanted to learn whether Dorsey Ridge did, in fact, rely upon the one possible match in OFAC name search that appeared on the screening report while deciding whether to rent an apartment to you, would we have to conduct an investigation as to what the people at Dorsey Ridge were relying upon at the time they considered your application?

A. So let me see if I understand the question. You are asking me to make a suggestion on how RentGrow should conduct their investigation; is that right?

Q. No. I'm asking you, if you don't know whether Dorsey Ridge relied upon the one possible match in OFAC name search in deciding whether to rent an apartment to you, then who would know?

A. I know this: What they told me was that based on the information on that report, I wouldn't be able to move in here. So that could have been everything on that report. I have no way of knowing the specifics, or I have no way of knowing who at Dorsey Ridge would know that, because that's beyond me.

Q. We would have to talk to people at Dorsey Ridge to get that answer, right?

A. I would think so.

Q. And for any applicant to any landlord that had a possible OFAC match on their screening report, one would have to talk to that landlord to know whether that possible match factored into a decision regarding that specific applicant, right?

A. No, because, again, I think their decisionmaking is derived on the reporting of RentGrow and the decisions suggested to Dorsey Ridge, which, as you remember in one of the exhibits, the initial report was to reject. Whether it is to reject this tenant or reject this application, that is the source of that information, so that's the only place that it can be addressed.

You can't push the blame on misinformation onto a landlord, because that's why they are paying for your services and products, and it bothers me that I sat here on Friday, and the defendant had a hard time answering whether they thought I was a criminal or not.

the recommendations that RentGrow made.

Q. What would have been a reasonable procedure for RentGrow to follow when running a search to determine whether one is a possible match to a name appearing on the OFAC/SDN list?

A. To look at my name. It's not even at same name.

Q. What do you mean by, to look up your name?

A. I provided my name on the application. I provided a copy of my driver's license, which verifies my name. The OFAC match that you say -- that RentGrow says I am is a completely different name. There is only one name in common, and it's Fernandez, but I believe his name is Mario Alberto Fernandez Santana. Completely different names.

Q. And RentGrow provided the actual information for that individual who was on the OFAC list on the screening report that it provided, correct?

A. Yes, that was included in the report. That's the only way I know it.

Q. And that report was provided to Dorsey Ridge, right?

A. Yes.

Q. And Dorsey Ridge was in contact with you during the application process, right?

A. Yes.

Q. But Dorsey Ridge could conduct a further investigation, request additional information from you, to see whether you, in fact, are the potential or possible name match that was provided on the screening report, right?

A. Could they do that? I'll be speculating on how would they run their business. I have no idea of knowing that. I can only speak from my experience. They didn't go into further investigation.

They just told me flat out that I couldn't move into this community, because they are trying to keep this community safe.

Q. You weren't in contact with anybody from RentGrow at the time that you applied for an apartment from Dorsey Ridge, right?

A. No, I was not.

Q. You were in contact with Suzanne Whatley, right?

A. I was in contact with her.

making money, so you are not going to turn away a tenant, a potential tenant, just because.

So what I was told, as a potential tenant, that the information included in that report was why they wouldn't let me move into this community.

Q. If RentGrow had followed procedures to identify possible matches to a name appearing on the OFAC/SDN list that falls in the range of results reached by the U.S. Department of Treasury's own OFAC search tool, would that be a reasonable procedure?

MS. DRAKE: Object as a form. You may answer.

A. I don't understand the question. Are you asking me if RentGrow going to the Department of Treasury search tool would be sufficient?

Q. Yeah. Here, let's break it down. Department of Treasury has a search tool for OFAC, correct?

A. Yes.

Q. That's publicly available, right?

A. Yes.

Q. And if RentGrow had provided

Q. Why not?

A. Because, number one, you are using the word "possible," and there shouldn't be any possibilities of terrorists or drug traffickers tied to my credit history, my address history, my criminal history. That's not -- that's not a possibility.

So it should require an exact match of name, birthday, and other information. You can't just take information out of the internet and include it just because, Oh, the name sounds the same or has one name matching, because that would be discriminating.

Q. If the Department of Treasury's OFAC search tool uses approximate string matching to identify possible matches between word or character streams as entered into the sanctions list search, would that be an unreasonable process?

A. No, because, again, the responsibility of screening a potential tenant lies with the company that is in the business of that. The Department of Treasury is just providing the information so that you can utilize it, exercising, you know, due care and

due diligence.

I think it is irresponsible to even suggest that the Department of Treasury had some blame for a company matching me to a terrorist or a drug trafficker that doesn't even have my same name.

Q. Do you contend that the U.S. Department of Treasury's own OFAC possible name matching process is unreasonable?

MS. DRAKE: Object as to form. You can answer.

A. No. I'm saying the use of that list by RentGrow is unreasonable.

Q. Why?

MS. DRAKE: Objection. Asked and answered, but you can answer.

A. Because you got the wrong guy. You got the guy that fought those very entities by serving in the military. So it is deeply offensive to even put me in that same category.

Q. Would you be offended if searching your name on the OFAC search tool provided by the Department of Treasury generated possible matches on the OFAC list to your name?

MS. DRAKE: Object as to form. You

Q. Okay. So this is a -- this is a website, that the website address is SanctionsSearch.OFAC.Treasury.gov; do you see that?

A. I do.

Q. Are you familiar with this being the Office of Foreign Assets Control, or OFAC's sanctions list search that's provided by the Department of Treasury?

A. Yes.

MS. DRAKE: Object as to form, but you can answer.

Q. Okay. And as you can see here, what I've done is I've entered your name into the search box, Marco Fernandez --

A. Yes.

Q. -- and I've set the minimum name score to 80, and setting that to 80, the following names are named as possible matches from the OFAC list to your name; do you see those?

A. I see that.

Q. And as you can tell from the first name, that is the only name that was mentioned as a possible OFAC match by RentGrow on the

screening report, correct?

A. Yes.

Q. So the OFAC list search actually identified more people than RentGrow's search algorithm, correct?

A. Yes.

Q. Now, you are saying that to -- let me try -- you can actually adjust the setting, and I'm going to adjust down to 50. That's a possibility under the treasury's OFAC search tool.

I'm going to search it at the 50 level. What I set it for 50 is, it says, "Your search returned too many results. Please narrow your search by adding search criteria"; do you see that?

A. I see that.

Q. I'm actually going to nip this result.

A. Could you, if you don't mind, could you please capture out the disclosure by the Department of Treasury at the top, which kind of tells you how you should use this information or not?

Q. Sure. I can ZOOM in on this, and

A. Yes.

Q. Does that cause you any stress?

A. No, because again, they are telling you up front, right there on the top header of the tool, and I read it again, it says, "Use of Sanctions List Search is not a substitute for undertaking appropriate due diligence."

So, essentially, what they are saying is, Don't blame me for misusing this information, which RentGrow did.

Q. How did RentGrow misuse the information?

A. Because you took a name of a person that is not even the same name, you put it on a report along with my credit report, my criminal history, and you gave it to a landlord and told them to reject my application, because based on the information that you gathered.

That is no different than you just Googling my name, and grabbing any search results, and throwing it in my report as well.

Q. But you are not being identified and you weren't identified in this screening match -- or screening report as a match, you were identified as having a possible match to a

name appearing on the OFAC list, right?

A. Right. And I think that demonstrates the lack of due diligence, because you are putting a possible match on my report. That's a clear demonstration of lack of due diligence, which is what they tell you here not to do.

MS. DRAKE: Joel, if I could just interject. I saw you taking snips. Are we going to come back to those, or how do you want to handle that?

MR. GRISWOLD: Yeah, I'll introduce it. I'm just trying to see here. I got to move it from one folder to another and then introduce it. So maybe I'll do it during a break. I'll try to figure out and put it in the exhibit folder and then we will just mark it.

Q. Has RentGrow's inclusion of a reference that there is one possible match in the OFAC name search to your name on the November 16, 2018 screening report caused you to suffer any injury?

A. Yes. I think I mentioned earlier that all of this situation, you now, I lost my

sleep over it because I wanted to fix it. It became my number one priority.

Q. And you stopped losing sleep in relation to the screening report once it was corrected on December 28, correct?

A. I stopped worrying about it as much, but I was still worried, because I know how much it took for me to fix that. I don't know that everyone affected like me took the same steps.

Q. You received the screening report containing the one possible match in OFAC name search from RentGrow on November 19 of 18, right?

A. I believe so.

Q. And you didn't dispute it until December 17 of 2018, right?

A. Correct.

Q. You were not physically injured by RentGrow's inclusion of one possible match in the OFAC name search in a screening report, right?

A. Right.

Q. You have not lost any money as a result of RentGrow's inclusion of one possible

CONFIDENTIAL

match in the OFAC name search in the screening report, right?

A. No.

Q. You have not paid money to anyone as a result of RentGrow's inclusion of one possible match in the OFAC name search on the screening report, correct?

A. Correct.

Q. You moved into the apartment -- strike that.

You said you suffered stress; is that right?

A. Yes.

Q. Was that stress in relation -- was that stress caused by the inclusion of a reference to one possible match in the OFAC name search on your screening report?

A. Yes. That along with the criminal history. To me, it's all criminal history, because you don't put noncriminals on the OFAC list.

Q. You don't know whether anybody at Serenity or Dorsey Ridge saw the inclusion of one possible name in the OFAC name search, right?

A. I believe Suzanne did, because she told me that, based on the information on that report, I wouldn't be able to live here.

Q. But she didn't mention the possible match in the OFAC name search, right?

A. I don't think she mentioned any specifics, no.

Q. If you are concerned about people knowing that there is a possible match in the OFAC name search between you and someone appearing on the OFAC list, then why did you publicly file a complaint that everyone can view which highlights that possible match?

A. Because, number one, it's the right thing to do. This shouldn't happen to anyone else. If I have to be the guy that champions the fact that companies in the business of tenant screening should get their records straight and accurate, then so be it.

Because I have been blessed that I have a job, I have a career, but I don't know that, as I said before, if this happened to someone, you know, from my family, they wouldn't know -- they wouldn't know what happened, let alone speak English fluently

Q. You don't know whether anyone other than RentGrow saw the inclusion of a possible match in OFAC name search for any putative class member, right?

A. I don't know.

Q. In order to know that, one would have to do a separate investigation and interview as to each landlord who received a screening report for a possible match in OFAC name search, right?

A. No, I don't think -- I think the landlords are outside of the scope of the investigation, because who is producing this product and services is RentGrow.

Q. Not what I'm asking. What I'm asking is, if you want to know one person -- one person wants to know whether a landlord actually saw the inclusion of a possible match in OFAC name search on a screening report from RentGrow, one would have to interview each landlord that received such a report, correct?

A. Yes.

MS. DRAKE: Object to form, but you can answer.

Q. Can you repeat that answer.

A. Yes.

Q. You don't know whether anyone relied on the inclusion of a possible match in OFAC name search in making a rental decision on any putative class member, right?

A. I do. I think RentGrow drew their decision on recommendation, based on the information in my report.

Q. I guess what I'm asking you is: The landlord makes the decision whether to rent, right?

A. The landlord makes the decision on whether to what?

Q. To rent an apartment, right?

A. Yes.

Q. So what I'm asking you is, you don't know whether any landlord relied on the inclusion of a possible match in OFAC name search in making a rental decision with regards to any putative class member, right?

A. Other than myself, no.

Q. And in order to learn whether any landlord relied on the inclusion of a possible match in OFAC name search, one would have to interview each landlord of each putative class

member, right?

A. Yes.

Q. And you don't know whether any putative class member suffered any actual injuries from the inclusion of a possible match in OFAC name search, right?

MS. DRAKE: Object as to form. You can answer.

A. No. I have no way of knowing that.

Q. Or if any class member suffered any damages at all, right?

A. I think if there was inaccurate information on my report, and there was inaccurate information on other screening reports, it's wrong still, under the statute. You know, you are spreading false information.

Q. That's not what I'm asking. I'm asking whether you know whether any class members, other than you, have any damages at all?

A. No, no. I don't know anyone personally.

Q. In order to know whether somebody has any damages, you would have to do a separate investigation as to each putative

CONFIDENTIAL

class member to find out if they were injured and how much in damages they suffered, right?

MS. DRAKE: Object as to form. You can answer.

A. To be honest with you, I don't know what it would take. I don't know what is the right procedure. Like, that's not my line of expertise. I don't know what exactly it would take.

Q. The putative class members that you are seeking to represent could all have different interactions with their landlords in relation to the screening report, right?

A. Yes.

Q. And the screening report could have had different consequences for those putative class members, right?

A. Yes.

Q. Or none at all, right?

A. None at all if RentGrow stops doing it.

Q. Well, the inclusion of the OFAC information could have had no impact at all in certain circumstances, you just don't know, right?

CONFIDENTIAL

A. If it has no impact, then why include it?

Q. You don't know whether it had any impact on any landlord for any putative class member, right? I'm asking you.

A. I'm assuming it does have an impact, and that's why you include it, because what's the alternative, why would you include it otherwise?

Q. But you don't know?

A. I know in my situation, I believe it did, but I can't speak -- I don't know everyone's experience.

Q. You don't know, right?

A. Don't know.

Q. And are you asserting a claim with regards to the information that you received from RentGrow in response to your request for information about the reinvestigation of your dispute, are you seeking to represent anyone other than yourself in relation to that claim?

A. To the criminal mismatches or to the OFAC?

Q. This is a -- I think you have a claim with regards to the information that you

CONFIDENTIAL

A. Yes, sir.

Q. To whom are you engaged?

A. Her name is Jeralys Torres.

Q. And how long have you and Ms. Torres been in a relationship?

A. I want to say around three years.

Q. And how long have you been engaged?

A. Since summer. I want to say it was July, I believe, July or August. I should remember this date. I'm going to get in trouble, but I can find out.

Q. And that's --

A. So what?

Q. That's July of 2020?

A. Yes, sir.

Q. Are you aware that RentGrow has offered to have judgment taken against it and in your favor in the amount of $20,001 plus your reasonable attorneys' fees and costs in this action?

A. Yes, I am.

MS. DRAKE: You can answer that question, Mr. Fernandez. You can answer it yes or no, but you cannot provide details about how you became aware.

A. Yes.

Q. And you rejected that offer; is that correct?

A. Yes.

Q. Do you believe that you can recover more at trial?

MS. DRAKE: I'll let you answer that -- hold on. You can answer that question yes or no.

A. I don't know. Honestly, I don't know.

Q. Are you aware that RentGrow offered to pay you $100,000 plus your reasonable attorneys' fees and costs to solve this action?

A. Yes.

Q. And you rejected that, correct?

A. Yes.

Q. You think you can recover more than $100,000 at trial? Just yes or no.

MS. DRAKE: You can answer that question yes or no.

A. I don't know that. I mean, I'll be speculating on something I don't know.

Q. Are you aware that RentGrow offered to pay $1,000 to each of the 71 persons who

disputed their OFAC results to RentGrow, plus your reasonable attorneys' fees and costs to settle this action?

A. Yes, I'm aware of it.

Q. And did you reject that offer?

A. Yes.

Q. Do you think that that group of people can recover more at trial than the $71,000 plus fees that was offered?

A. I don't know. I wouldn't know.

Q. Are you aware that RentGrow can recover its fees against you if you are proceeding in bad faith or for the purpose of harassment?

A. Yes.

MS. DRAKE: I'm going to object to that question. You can answer.

A. Yes.

Q. Do you think that rejecting an amount of settlement that is more than you could ever recover if you were successful in your claims at trial is good faith?

A. I would just say this: Money is not what drives me. What drives me is fair treatment and doing what's right. I think if

I do further certify that I am not a relative, counsel or attorney for either party, or otherwise interested in the event of this action.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal of office at Cleveland, Ohio, on this 9th day of November, 2020.

Wendy L. Klauss

Wendy L. Klauss, Notary Public
within and for the State of Ohio

My commission expires July 13, 2024.

DEPOSITION REVIEW
CERTIFICATION OF WITNESS

ASSIGNMENT REFERENCE NO: 4301693
CASE NAME: Fernandez, Et Al. v. Rentgrow, Inc.
DATE OF DEPOSITION: 10/27/2020
WITNESS' NAME: Marco A. Fernandez

In accordance with the Rules of Civil Procedure, I have read the entire transcript of my testimony or it has been read to me.

I have made no changes to the testimony as transcribed by the court reporter.

_______________          ________________________
Date                     Marco A. Fernandez

Sworn to and subscribed before me, a Notary Public in and for the State and County, the referenced witness did personally appear and acknowledge that:

They have read the transcript;
They signed the foregoing Sworn Statement; and
Their execution of this Statement is of their free act and deed.

I have affixed my name and official seal

this ______ day of_____________________, 20____.

___________________________________
Notary Public

___________________________________
Commission Expiration Date

DEPOSITION REVIEW
CERTIFICATION OF WITNESS

ASSIGNMENT REFERENCE NO: 4301693
CASE NAME: Fernandez, Et Al. v. Rentgrow, Inc.
DATE OF DEPOSITION: 10/27/2020
WITNESS' NAME: Marco A. Fernandez

In accordance with the Rules of Civil Procedure, I have read the entire transcript of my testimony or it has been read to me.

I have listed my changes on the attached Errata Sheet, listing page and line numbers as well as the reason(s) for the change(s).

I request that these changes be entered as part of the record of my testimony.

I have executed the Errata Sheet, as well as this Certificate, and request and authorize that both be appended to the transcript of my testimony and be incorporated therein.

_______________ ________________________
Date Marco A. Fernandez

Sworn to and subscribed before me, a Notary Public in and for the State and County, the referenced witness did personally appear and acknowledge that:

They have read the transcript;
They have listed all of their corrections in the appended Errata Sheet;
They signed the foregoing Sworn Statement; and
Their execution of this Statement is of their free act and deed.

I have affixed my name and official seal this ______ day of_____________________, 20____.

___________________________________
Notary Public

___________________________________
Commission Expiration Date

ERRATA SHEET

VERITEXT LEGAL SOLUTIONS MIDWEST

ASSIGNMENT NO: 10/27/2020

PAGE/LINE(S) / CHANGE /REASON

____________________________________________________

____________________________________________________

____________________________________________________

____________________________________________________

____________________________________________________

____________________________________________________

____________________________________________________

____________________________________________________

____________________________________________________

____________________________________________________

____________________________________________________

____________________________________________________

____________________________________________________

____________________________________________________

____________________________________________________

_______________ _________________________

Date Marco A. Fernandez

SUBSCRIBED AND SWORN TO BEFORE ME THIS ________

DAY OF ________________________, 20______ .

___________________________________

Notary Public

___________________________________

Commission Expiration Date

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

MARCO A. FERNANDEZ, individually and as a representative of the class,

Plaintiff,

v.

RENTGROW, INC.,

Defendant.

Case No.: 1:19-cv-01190-JKB

**DECLARATION OF JOHN G. ALBANESE IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

I, John G. Albanese, hereby declare as follows:

1. I am one of Plaintiff's Counsel in the above-captioned matter.

2. I submit this Declaration in support of Plaintiff's Opposition to Defendant's Motion for Summary Judgment.

3. Attached as Exhibits are true and correct copies of the following:

**Exhibit 1:** Excerpts from the Transcript of the October 27, 2020 Deposition of Marco Fernandez (unredacted version filed under seal);

**Exhibit 2:** Excerpts from Plaintiff's 3d Objections & Supplemental Answers to Defendant's Interrogatories, Set I;

**Exhibit 3:** Document Bates-labeled RG003584-93 (filed under seal);

**Exhibit 4:** Excerpts and select Exhibit from the Transcript of the October 23, 2020 Deposition of Patrick Hennessey (filed under seal);

**Exhibit 5:** Documents Bates-labeled PLF-000419-421;

**Exhibit 6:** Excerpts from the Transcript of the December 9, 2020 Deposition of Staci Lamoureux (filed under seal);

**Exhibit 7:** Declaration of Erich C. Ferrari (filed under seal);

**Exhibit 8:**    Defendant's Supplemental Objections & Responses to Plaintiff's Interrogatory No. 4;

**Exhibit 9:**    Defendant's Supplemental Answer to Plaintiff's Interrogatory No. 3;

**Exhibit 10:**    Defendant's Supplemental Objections & Responses to Plaintiff's Interrogatories, Set IV;

**Exhibit 11:**    Spreadsheet labeled RFP 19_500 Sample (3), modified to remove Applicant ID, Property Name, Address, Application Result and Applicant Result columns (filed under seal);

**Exhibit 12:**    Document Bates-labeled PLF-000753-780;

**Exhibit 13:**    Sazma Report & Exhibits, Bates-labeled PLF-001346-49, 51-54. There is no Exhibit 1 to the Sazma Report and the exhibits referenced therein (other than the video exhibit) are single-page excerpts from Plaintiff's RentGrow screening report. For instance, Exhibits 4 and 5 referenced in paragraph 25 of the Sazma report refer to the documents Bates-labeled at PLF-001351 and PLF-001352 respectively that are appended to the end of the Sazma report;

**Exhibit 14:**    Document Bates-labeled RG2000089-92 (filed under seal);

**Exhibit 15:**    Dispute Exemplars produced by Defendant (filed under seal);

**Exhibit 16:**    Excerpts from the Transcript of the October 29, 2020 Deposition of Geralys Torres James (unredacted version filed under seal);

**Exhibit 17:**    Excerpts from the Transcript of the December 10, 2020 Deposition of Porsche Kemp; and

**Exhibit 18**:    Excerpt from the Supplemental Excerpts of Record, Volume IV, filed at ECF No. 27-4 in *Ramirez v. Trans Union, LLC*, No. 17-17244 (9th Cir. May 25, 2018).

The foregoing statement is made under penalty of perjury and is true and correct to the best of my knowledge and belief.

Date: September 8, 2021                    /s/John G. Albanese
                                          John G. Albanese

IN THE UNITED STATES DISTRICT COURT PLEAS
FOR THE DISTRICT OF MARYLAND
(NORTHERN DIVISION)

~~~~~~~~~~~~~~~~~~~~~

FERNANDEZ, et al.,

Plaintiffs,

vs. Case No. 1:19-CV-01190-JKB

RENTGROW, INC.,

Defendant.

~~~~~~~~~~~~~~~~~~~~~

Videotaped ZOOM deposition of
MARCO A. FERNANDEZ

~~~~~~~~~~~~~~~~~~~~~

THIS TRANSCRIPT IS DESIGNATED CONFIDENTIAL

~~~~~~~~~~~~~~~~~~~~~

October 27, 2020
10:16 a.m. EDT
Location of Witness:
7501 Trafalgar Circle, Suite 232
Columbia, Maryland 21044
Wendy L. Klauss, RPR

APPEARANCES:

On behalf of the Plaintiff and the Class:

Berger Montague PC

E. MICHELLE DRAKE, ESQ.

43 S.E. Main Street, Suite 505

Minneapolis, MN 55414

(612) 595-5997

Emdrake@bm.net

On behalf of the Defendant:

Baker & Hostetler LLP

JOEL GRISWOLD, ESQ.

200 South Orange Avenue

Suite 2300

Orlando, FL 32801

(407) 649-4000

Jcgriswold@bakerlaw.com

-AND-

BONNIE KEANE DelGOBBO, ESQ.

1 Wacker Drive, Suite 4500

Chicago, IL 60606

(312) 416-8185

APPEARANCES, Continued:

On behalf of the Defendant:

Yardi
DANIELLE C. PARRINGTON, ESQ.
400 Fifth Avenue, Suite 120
Waltham, MA 02451
(781) 890-5100
Danielle.parrington@yardi.com

-AND-

BRADY M. BUSTANY, ESQ.
430 S. Fairview Avenue
Santa Barbara, CA 93117
(805) 699-2040
Brady.bustany@yardi.com

~ ~ ~ ~ ~

ALSO PRESENT:

Patrick Hennessey, RentGrow, Inc.
Ken Williamson, Videographer
Rodney Myers, Veritext Concierge
Andrew Smith, Veritext Concierge

~ ~ ~ ~ ~

was challenging.

Q. How long were you employed with the Navy?

A. I'm currently still employed with the Navy. It's been 16 years.

Q. When you first began your employment with the Navy, what was your first position?

[redacted]

Q. And was a security clearance required to work in that position?

A. Yes.

Q. Are there different levels of security clearance?

A. Yes, sir.

[redacted]

[redacted]

Q. Did the Navy perform a background check on you to determine whether you met that security clearance?

A. Okay. I see it.

MR. GRISWOLD: Michelle, let me know when it pops up on your screen.

MS. DRAKE: I have it.

Q. All right. Exhibit 5 is a document Bates stamped PLF000717 to 718. What is this document?

A. This looks like a welcome letter from Dorsey Ridge.

Q. And did you receive this letter from Dorsey Ridge?

A. Yes.

Q. And would you have received it on November 18, 2018?

A. Yes.

Q. And it says that, if you go to the second page, that the move-in date was November 19, 2018; is that right?

A. Yes.

Q. So you were approved for purposes of leasing the apartment at least as of November 18, 2018, right?

A. Yes.

Q. You sued RentGrow, correct?

A. Yes.

Q. Why?

A. Several reasons: Number one is when I applied to this apartment, I received a call from Suzanne. From what I recall, she said, I don't think you will be able to move into this apartment, based on the information that we got on your background check.

And I remember I was very alarmed, because I knew I've made good decisions, I pay all my bills on time, I've stayed out of trouble, never been convicted of any crime. So I was shocked that she said there was something found in my background.

And I said, There is no way that information could be true, because you saw me in uniform, I couldn't be in the military if that information were true.

So she said, Yeah, that doesn't really make sense, but it's not up to me. I will have to talk to my supervisor to see if she would waive that requirement. And I think the requirement was no convictions, something along those lines.

So she said to me on that phone call, I remember also, she said, If this is not

true, there is a phone number I can give you so you can call. And I Googled the phone number, and that's when -- because I remember calling the number, and I didn't get anywhere, so I Googled the number, and that's where I found out it belonged to RentGrow.

And I started digging, trying to figure out how to get a copy of it. And I think that was it for that day. I can't remember specifically what day she told me, like, You won't be able to move into this community.

But what bothered me the most was, you know, she said to me, you know, We try very hard to keep our community safe, and to me that was a punch in the stomach, honestly, because someone like me, you know, I've served my country for 16 years, make good decisions, pay my bills on time, and I could be denied an apartment or I can be deemed unsafe to a community solely based on my name, that was very upsetting.

So in my professional judgment, I said, there is no way this could be, you know, that this could be okay. But I didn't know

CONFIDENTIAL

about tenant screening services, I didn't know any of that. I had to educate myself, because I really thought this was on my credit report.

At the time, I really thought that my credit was messed up, this affects my clearance, I have to report to the Navy that there is an error. So I was under a lot of stress, because I have never had anything like this in my record, let alone be denied an apartment.

And when you are living in a hotel and you are, like, having to eat outside every day, it's just not an enjoyable experience. So I couldn't wait to move in, and then had this roadblock.

So as I found out how to obtain a copy of the report, and I received -- I think, that was the email that you showed in one of the exhibits, it was me requesting the information that was issued about me.

And I received a copy of the report, and when I looked at it, it was worse than I actually thought. It was worse than what was described to me over the phone, because that's when I saw all the convictions

in the State of California for petty theft, for -- I think there was something about drug substances with the intention to sell, and also that my name appears to match on the OFAC/SDM list, that very same list that I serve my country to fight against, and I was placed in the same category.

So I found everything on the report very offensive, humiliating, and I started reaching out to people that would know more than me about whether there was any way to, number one, fix this, and learn how to fix it in the future for me and others.

Q. Thank you. So is your claim that RentGrow -- let me strike that.

What do you claim that RentGrow did that violated the law, as to you?

A. They accused me of being a criminal and being a felon, they accused me of being a terrorist or a drug trafficker, and none of that information is true.

So it not only damages my reputation and prevents me from obtaining an apartment right away, but it also deters me from seeking other apartments because, at the

CONFIDENTIAL

Q. Are you going to be asking the Court to award you some relief?

MS. DRAKE: Object as to form. You can answer.

A. Yes.

Q. Are you seeking relief because you believe you have been injured?

MS. DRAKE: Object as to form. You can answer.

THE WITNESS: Sorry.

MS. DRAKE: That's okay. I was slow. You can answer the question.

A. Yes, I think my reputation was damaged. I was extremely embarrassed. I felt humiliated at the time. I lost sleep over this, because I couldn't wait for the day to correct it, because I can't -- my livelihood depends on my reputation, my good name. It helps me maintain my clearance, keep my job, and be able to move between apartments.

Q. Okay. You were not physically injured by RentGrow's inclusion of criminal history information on your screening report, right?

MS. DRAKE: Object as to form. You

apartment before or after you inquired about the Dorsey Ridge apartment?

A. It was before.

Q. You have not paid money to anyone as a result of RentGrow's inclusion of criminal history information on your screening report, right?

A. No.

Q. You have not suffered any adverse actions by your employer as a result of RentGrow's inclusion of criminal history information on your screening report, right?

A. So far, no.

Q. And you have told them about it, right?

A. Yes.

Q. You testified that you suffered emotional distress from RentGrow including criminal history information in your screening report; is that right?

A. Yes.

Q. Why did you suffer emotional distress from the inclusion of criminal history information on your screening report?

A. Well, number one, because I was

CONFIDENTIAL

deemed unsafe to this community. That's something that no one ever wants to go through, to show up at a place, know that you lived a great life, paid your bills on time, never committed any crime, and have a landlord tell you that you are unsafe to the community. That's very humiliating.

I mean, that's cruel, because everything I just described to you are choices that I made. I chose to pay my bills on time, I chose my career, I chose to follow the law.

I can't choose my name, unfortunately. It was chosen for me. So to find myself in a position that I never thought I would, that solely based on my name I would be discriminated against, yeah, I was shocked, I was devastated, and like I said earlier, I lost sleep over it, because I just couldn't believe that a serious organization would do this, like, so recklessly.

Q. At the time that you received the screening report that included criminal history information, you knew that information did not pertain to you, correct?

A. Correct.

others that may have been affected this way, and I, as you asked me at the beginning of our questioning, I grew up in Puerto Rico. English is my second language.

I can tell you, if this happened to a member of my family, not only they wouldn't understand why they got denied, they wouldn't even know how to fix it, and, unfortunately, some of the information on this report, often times, as much as I don't want to, but sometimes I think to myself, What if my name wasn't Hispanic? Like it makes me feel like if my name wasn't Hispanic, I wouldn't be here today, like none of this would have happened to me. It is solely based on a common name.

Q. Does the publication of your -- strike that.

Does including the criminal history information on your screening report cause you embarrassment if others learn of such inclusion?

A. If they didn't know that that information was false, yes, it would cause me embarrassment. That's part of why I'm doing this, because you can't assure me that this

Q. Would you mind reading that back.

THE NOTARY: Question: "What symptoms of emotional distress have you been experiencing as a result of RentGrow's inclusion of criminal record information about you on a screening report?"

A. As I mentioned earlier, I was very stressed out, I felt humiliated, and I couldn't sleep at night, because I couldn't wait to fix this.

At the time I -- and this is something that wasn't brought up before, but I just mention it now, just the timing of this, when this happened, I was up for my reinvestigation on my clearance, so I was scheduled to speak to an investigator in person, and I was concerned that this would put in jeopardy my okay to work, why I came here.

So it was an extraordinary amount of pressure on me, because it wasn't only about me being able to live in this community, but I was concerned that there was misinformation out there that would prevent me from renewing my clearance and being able to do the job that I do here.

Q. Do you continue to lose sleep as a result of RentGrow's inclusion of criminal record information about you on the November 16, 2018 screening report?

A. Do I continue to lose sleep? No, not that much anymore, but during the time, yes.

Q. How long after receiving the screening report with the criminal record information being reported did you lose sleep?

A. I would say that I couldn't stop thinking about this until shortly after it was fixed, shortly after I got a new report from RentGrow, saying, like, Yeah, this is not you, we removed the records.

Q. You felt better after that?

A. Yes.

Q. And the same thing with the stress, did you stop feeling stressed after you received the corrected report from RentGrow?

A. No. I still feel stressed to this date, and it's not because of me. It's because I care for other people that may not be in the position that I'm in to be able to communicate, "Hey, this is wrong."

A. I wouldn't lose my sleep over something for work, from work. I do my job, and when I leave the office, I don't bring work-related stress home.

Q. Would you say that the stress that you are experiencing from RentGrow's temporary inclusion of criminal history information on a screening report is severe?

A. Yes.

Q. What are some of the symptoms of stress that you are experiencing from this severe emotional distress?

MS. DRAKE: Objection. Asked and answered. You can answer it again.

A. As I said before, I felt humiliated, I felt discriminated against, felt embarrassed, I lost my sleep over it because I was counting the days until I could fix this.

Q. And I'm actually asking after it was fixed, what stress you have experienced?

A. After what again?

Q. After the screening report was fixed by RentGrow, how the stress has manifested itself in your life?

A. I'll be honest with you, I don't

name appearing on the OFAC list, right?

A. Right. And I think that demonstrates the lack of due diligence, because you are putting a possible match on my report. That's a clear demonstration of lack of due diligence, which is what they tell you here not to do.

MS. DRAKE: Joel, if I could just interject. I saw you taking snips. Are we going to come back to those, or how do you want to handle that?

MR. GRISWOLD: Yeah, I'll introduce it. I'm just trying to see here. I got to move it from one folder to another and then introduce it. So maybe I'll do it during a break. I'll try to figure out and put it in the exhibit folder and then we will just mark it.

Q. Has RentGrow's inclusion of a reference that there is one possible match in the OFAC name search to your name on the November 16, 2018 screening report caused you to suffer any injury?

A. Yes. I think I mentioned earlier that all of this situation, you now, I lost my

sleep over it because I wanted to fix it. It became my number one priority.

Q. And you stopped losing sleep in relation to the screening report once it was corrected on December 28, correct?

A. I stopped worrying about it as much, but I was still worried, because I know how much it took for me to fix that. I don't know that everyone affected like me took the same steps.

Q. You received the screening report containing the one possible match in OFAC name search from RentGrow on November 19 of 18, right?

A. I believe so.

Q. And you didn't dispute it until December 17 of 2018, right?

A. Correct.

Q. You were not physically injured by RentGrow's inclusion of one possible match in the OFAC name search in a screening report, right?

A. Right.

Q. You have not lost any money as a result of RentGrow's inclusion of one possible

REPORTER'S CERTIFICATE

The State of Ohio, )
SS:
County of Cuyahoga. )

I, Wendy L. Klauss, a Notary Public within and for the State of Ohio, duly commissioned and qualified, do hereby certify that the within named witness, MARCO A. FERNANDEZ, was by me first duly sworn to testify the truth, the whole truth and nothing but the truth in the cause aforesaid; that the testimony then given by the above-referenced witness was by me reduced to stenotypy in the presence of said witness; afterwards transcribed, and that the foregoing is a true and correct transcription of the testimony so given by the above-referenced witness.

I do further certify that this deposition was taken at the time and place in the foregoing caption specified and was completed without adjournment.

I do further certify that I am not a relative, counsel or attorney for either party, or otherwise interested in the event of this action.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal of office at Cleveland, Ohio, on this 9th day of November, 2020.

Wendy L. Klauss

Wendy L. Klauss, Notary Public
within and for the State of Ohio

My commission expires July 13, 2024.

ERRATA SHEET

VERITEXT LEGAL SOLUTIONS MIDWEST

ASSIGNMENT NO: 10/27/2020

| PAGE/LINE(S) / | CHANGE | /REASON |
|---|---|---|
| 16:4, 7 | "ID" to "IG" | transcription error - refers to inspector general |
| 22:24 | "travel" to "family" | misstates testimony |
| 40:24 | "trait" to "trade" | transcription error |
| 42:23 | "TTB" to "TTP" | transcription error |
| 62:24 | "sailer" to "sailor" | transcription error |
| 63:5 | Q. should read "Did you stay in touch with each other" | misstates question as witness remembers it |
| 67:2 | "some" to "something" | transcription error |

12/3/2020
Date

DocuSigned by:
Marco Fernandez
7E04D088C92744D...
Marco A. Fernandez

This e-copy is the official court record (GC68150).

LARRY D. MORSE II SBN 139485
DISTRICT ATTORNEY
County of Merced
550 W. Main Street
Merced, CA 95340
(209) 385-7381

Attorneys for Plaintiff

FILED
JAN 11 2012

MERCED SUPERIOR COURT
LOS BANOS
By
deputy

IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA
IN AND FOR THE COUNTY OF MERCED

The People of the State of California
Plaintiff,
vs.
MARCO ANTONIO FERNANDEZ 05/19/1984
Defendant(s).

CRL 007179

**CRIMINAL COMPLAINT**

The District Attorney of Merced County, California hereby accuses the above named defendant(s) of the following criminal offenses occurring in the County of Merced, State of California.

**Count 1**

**PC484(A)/488: Petty Theft Under $950 - Misdemeanor**

On or about November 16, 2011 Marco A Fernandez did unlawfully take, steal, misappropriate and/or fraudulently take the property and/or labor of another which had a value of less than nine hundred fifty dollars ($950.00), thereby committing the crime of petty theft, in violation of PENAL CODE §§ 484(a) & 488.

**Count 2**

**PC484(A)/488: Petty Theft Under $950 - Misdemeanor**

This e-copy is the official court record (GC68150).

is returned by the Post Office, it is requested that a warrant of arrest be issued pursuant to Penal Code Section 813 or 1427.

Pursuant to Penal Code Section 1054.5(b), the People are hereby informally requesting that defendant(s) and his or her attorney provide to the People the discovery required by Penal Code Section 1054.3. This is a continuing request pursuant to the provisions of Penal Code Section 1054.7.

NOTICE TO ATTORNEY

The materials accompanying this notice may include information about witnesses which is disclosed to you pursuant to Penal Code Section 1054.2, which reads as follows:

> "No attorney may disclose or permit to be disclosed to a defendant, members of the defendant's family or anyone else, the address or telephone number of a victim or witness whose name is disclosed to the attorney pursuant to subdivision (a) Section 1054.1 unless specifically permitted to do so by the Court after a hearing and showing of good cause."

Willful violation of this subdivision by an attorney is a misdemeanor. For purposes of this section, all names included in the attached reports are deemed to be witnesses pursuant to subdivision (a) of Section 1054.1.

This e-copy is the official court record (GC68150).

SUPERIOR COURT OF CALIFORNIA
COUNTY OF MERCED

The People of the State of California,
Plaintiff
vs.
Marco Antonio Fernandez
Defendant
DOB: 05-19-84 Defendant is ☐ Present ☒ Not Present
Minutes: HEARING: OTHER MODIFY/MODIFICATION

☐ AMENDED MINUTE ORDER TO CORRECT:
Date: August 21, 2013 Time: 8:30 am
Judge/Comm: ☐Kirihara ☐Hansen ☐Flanagan ☐McCabe ☐Ash ☒Garcia ☐ Proietti ☐ Moranda ☐ Bacciarini ☐ Jacobs ☐ Schechter ☐ Dougherty, Assigned Judge
Clerk: K. Heredia Assigned Judge:
Court Reporter: D. Balloli Probation Officer: McCoy
Interpreter: Language: ☐Certified ☐ Non-Cert
Agency: Merced Police Department DA Case/Citation No.: 1153315
Cite Date: 10-15-11
Case No. CRM020649
Location: Courtroom 3

Charges: Ct 2: HS11378-FEL- Conviction: Nolo Plea

**APPEARANCES**
☐ Stipulated to ☐ Commissioner ☐ Temporary Judge
☐ PD ☐ CPD ☒ Retained ☐ 977 Waiver/App entered
☒ District Attorney: M. McKinney
☒ Defense Attorney: J. Garcia
☐ Spec. appearance for:
☐ Bail Review: OR ☐ Granted ☐ Denied ☐ Bail Review OR on Electronic Monitor ☐ Granted ☐ Denied
☐ Interpreter needed (language) ☐ Court Reporter needed
☐ Defendant stipulates to non-certified interpreter. A certified interpreter is not available, Court finds good cause to appoint a non-certified interpreter, finds interpreter qualified

**DEFENDANT STATUS**
☐ O.R. ☐ In-Custody Bail $
☐ Bail as set is Reasonable
☐ Released on Bail Bond/Cash $
☐ Electronic Monitoring ☒ Sentenced Federal
☐ No bail – do not release ☐ Other: Custody

**WARRANT/BOND INFORMATION**
☐ F.T.A. ☐ Issue Warrant $ ☐ Stayed
☐ Revoke ☐ O.R. ☐ Probation
☐ Bail Forfeited In Open Court ☐ on the Record
☐ Reassumption Letter Accepted, Bail Reinstated
☐ Bond Exonerated ☐ Probable cause finding made
☐ Bail Reduced to $

**COUNSEL/TRIAL STATUS/MOTIONS/ARRAIGNMENT**
☐ App't ☐Reappt'd ☐ PD ☐ Next ☐ CPD ☐ Def. waives counsel's presence ☐ Cont/Def to obtain atty
☐ Defendant's counsel declares conflict, relieved ☐ substitutes in as defendant's counsel ☐ Time Waived for Arraignment
☐ Defendant advised purs. PC987.8(f) and ordered to complete the Financial Declaration Form / report to the Revenue and Reimbursement Officer forthwith
☐ No disposition Matter ☐ Confirmed ☐ Set for ☐ Pre-Prelim ☐ Prelim ☐ Cont'd Prelim ☐ Settlement Conf ☐ Jury Trial, time estimate day(s)
☐ Petition/Motion of ☐ Court ☐ DA ☐ Defense ☐ Probation ☐ Continued ☐ People ☐ Defense ☐ Object ☐ No opposition
☐ Petition/Motion is ☐ Granted ☐ Denied ☐ Continued ☐ Dropped ☐ PC1203.4 Petition is ☐ Granted ☐ Denied ☐Cont'd ☐ Dropped
☐ Matter is taken under submission ☐ Motion is dismissed ☐ Good Cause Continuance Stated Reason:

☐ Amended ☐ Complaint ☐ Information filed ☐ Defendant arraigned ☐Arraignment/Advisement of rights waived ☐ True name as charged
☐ Not Guilty Plea entered ☐ Complaint ☐ Information amended on face to reflect:

**PLEA/ADMISSION**
☐ Guilty ☐ No Contest ☐ Plea entered, not accepted ☐ Admission of ☐ Enhancement(s) ☐ Prior(s)
Count: ☐ Felony ☐ Misdemeanor ☐ Amended Motion to modify sentencing –
Count: ☐ Felony ☐ Misdemeanor ☐ Amended
Count: ☐ Felony ☐ Misdemeanor ☐ Amended from 365 days to 364 days County Jail.
Dismissed Count(s): ☐ Time waived for sentencing ☐ See attached for additional counts
☐ Harvey Waiver ☐ Cruz Waiver ☐ Arbuckle Waiver entered ☐ Prop 36 waived ☐ Intentional Program Violation ☐ Food Stamps ☐ Cash Aid
☐ Referred to Probation for ☐ full Probation Report ☐Credits & Fine Report ☐ full Pre-plea Report ☐ Pre-plea Restitution Report only Denied
☐ Conditional Sentence & Revocable Release months ☐ Misdemeanor ☐ Felony (see conditions below)

**CONDITIONS OF RELEASE ON BAIL/O.R./ELECTRONIC MONITORING/PROBATION/CONDITIONAL SENTENCE & REVOCABLE RELEASE**
☒ Obey all laws ☒ Report change of address to the court immediately ☐ Enroll/complete ☐ DUI Program ☐ Cert Batterers Treatment Program
☐ Do not annoy, ☐ harass, ☐ threaten, ☐ strike ☐ Stay away from at least ____ yards ☐ Have no contact with
☐ Submit person, vehicle, place of residence or area over which he has control to search for and seizure of narcotics, drugs or other contraband at any time day or night, with or without search warrant, with or without probable cause, as directed by any peace officer
☐ Do not possess, consume or be under the influence of illegal drugs or paraphernalia
☐ Submit to chemical testing at the request of any peace officer for being under the influence of drugs and/or intoxicating beverages
☐ Other:

**JAIL**
☐ Serve ☐ days ☐ months in jail with credit for: Actual Conduct Total days served. ☐ Forthwith
☐ Report to ☐ Court ☐ Jail Starting at ☐AM ☐PM ☐ Jail to determine credits ☐ Time Served
☐ Serve ☐ concurrent with ☐consecutive to any time being served ☐ Other

**PRISON/CRC/PC1170(h) SENTENCING:** ☐ Defendant waives presence for receipt of report and requests immediate sentencing
☐ Probation ☐ denied ☐ terminated ☐ Defendant is sentenced to ☐ CRC ☐ CDC ☐ PC1170(h) Community Supervision ☐ See attached for additional counts
Count: ☐ low-term ☐ 1/3 mid-term, cons ☐ mid-term ☐ upper-term years Months ☐ cons ☐ conc
Enh: years mos ☐ cons ☐ conc Enh: years mos ☐ cons ☐ conc
Count: ☐ low-term ☐ 1/3 mid-term, cons ☐ mid-term ☐ upper-term years Months ☐ cons ☐ conc
Enh: years mos ☐ cons ☐ conc Enh: years mos ☐ cons ☐ conc
☐ Sentence doubled per Enhancement 1170.12 ☐ Credits: Actual days Local conduct = Total Credits
☐ Financial Obligations ☐ Restitution fine of $ each per PC1202.4(b) and PC1202.45/1202.44 ☐ Restitution of $ ☐ Amount to be determined per PC1202.4(f) to ☐ victim ☐ Restitution Fund ☐ Court reserves jurisdiction as to Restitution ☐ Prison priors admitted
☐ Restitution of $ plus admin fee (if applicable) to victim(s)
☐ PC296/DNA ☐ PC1202.1/AIDS ☐ other Register pursuant to section ☐ PC290 ☐ HS11590 ☐ PC186.30 ☐ other
☐ Full sentence to be served straight time in Merced County Jail pursuant to PC1170(h) ☐ PC1170(a)(3) Pre-confinement credits equal/exceed time imposed (Paper Comm.)

**PRISON SUSPENDED/PROBATION or PC1170(h) SUSPENDED/MANDATORY COMMUNITY SUPERVISION**
☐ CDC Sentence Suspended
☐ ☐ Years ☐ Months ☐ Days county jail to be served straight time and additional ☐ Years ☐ Months ☐ Days suspended to be served under the mandatory community supervision of the probation officer pursuant to PC1170(h)(5) with the terms & conditions attached and incorporated herein.
☐ Execution of PC1170(h) sentence suspended with full term to be served under the mandatory supervision of the probation officer with the terms & conditions attached and incorporated herein ☐ Report to the Probation Officer ☐ Immediately ☐within 1 business day upon release from custody & thereafter as directed.

**FEES/FINES – INSTALLMENT FEE OF $35.00; $45.00 Effective 09/01/12 OR ACCOUNTS RECEIVABLE FEE OF $30.00 WILL BE IMPOSED PC1205(d)**
☐ Pay fines/fees as follows: Ct. $ Ct. $ Ct. $
Amounts include any: Penalty Assessment, $140.00 State Restitution Fund (misd.), $40.00* (*eff 10/25/10) Court Security fee per conviction pursuant to PC1465.8, and $30.00 fee imposed per Misdemeanor/Felony conviction and/or $35.00 fee imposed on Infractions pursuant to GC70373, $4.00 EMS fee imposed per VC conviction purs. GC76000.10.
☐ Pay $ To R&R for Domestic Violence fee pursuant to 1203.097 ☐ Pay $25.00 plus administration fee to a battered woman's shelter.
☐ Pay Today -Pay to ☐ Court ☐ R&R ☐ Pay restitution in the amount of $ plus admin. fee to R&R by
☐ Pay $1,000 ☐ $500 (if reduced to misd) ☐ Other Attorney fees to R&R ☐ Report to Revenue & Reimbursement within 1 business day to set up a payment plan.

**PRELIMINARY EXAMINATION**
☐ Preliminary Examination Held and it appearing to the above named Judge that a felony violation has been committed and that there is sufficient cause to believe the above named defendant GUILTY thereof, it is ordered that he/she be held to answer the same on Ct(s)
Dismissed Count(s):
☐ Preliminary Examination Waived; the above named defendant, being charged in a complaint on file in this Court under the above case number, and having waived preliminary examination on the charges, the Court and the District Attorney consenting thereto, it is ordered that he/she be held to answer the same
☐ PC1203.03; PC1203.067; PC1368; WI3051 PROCEEDINGS DUI TERMS (see attached) ☐ PASS ☐ RELEASE ORDER ☐ ORDER SIGNED/FILED
☐ DEFERRED JUDGMENT/DRUG COURT/PROP 36 (see attached) ☐ CLETS PROTECTIVE ORDER ☐ ISSUED ☐MODIFIED ☐TERMINATED
☐ PC1203.9 TRANSFER OUT TO IS ☐ GRANTED ☐ DENIED/REASON

NEXT COURT DATE: TIME: COURTROOM: FOR:

USCA4 Appeal: 22-1619 Doc: 19 Filed: 08/01/2022 Pg: 318 of 416

# Metro SIU

2392 72nd Ct E
Inver Grove Heights, MN 55076

Telephone: (651) 675-8511

Email: admin@metrosiu.com

**CASE TYPE**
**Civil**

**Prepared for**
**John Albanese**

CONFIDENTIAL

**"PRIVILEGED COMMUNICATION"**
This report is confidential and is intended solely for the use and information of the client to whom it is addressed.

**Monday, December 07, 2020**

Serving Minneapolis | St. Paul | Greater Minnesota
Providing Investigative Services For
Attorneys | Employers | Insurance Companies | General Public
Email: admin@metrosiu.com | Website: www.metrosiu.com

PLF-001346

JA314

# Investigative Report

Date: December 7, 2020

Investigator: Donald A. Sazma – Minnesota Private Detective License #1058

1. From 1981 through about 2007, I was a reserve police officer for the City of Roseville, Minnesota.
2. From about 1987 through July 1995, I was a reserve Deputy Sheriff and then eventually became a licensed part time Deputy Sheriff for the Ramsey County Sheriff's Office, Minnesota.
3. From July 1995 through October 2016, I was employed by the Ramsey County Sheriff's Office as a full-time licensed peace officer.
4. During my career with the Ramsey County Sheriff's Office, my career included working and conducting criminal investigations.
5. In addition, I also conducted background investigations related to the potential hiring of new employees.
6. I have been trained in conducting background investigations related to the private sector.
7. I have been trained in conducting thorough background investigations related to background investigations of Peace Officers.
8. From 2012 through the current date, I am a Licensed Private Investigator.
9. During my career as a licensed peace officer and a licensed private investigator, I regularly utilized online data bases to conduct searches on individuals.
10. Based on my experience, online data base searches can contain inaccurate information related to the actual person that the search is being conducted on.
11. At times, information related to a completely different individual will appear in the search results of the actual individual the investigation is being conducted on.

12. Online data bases are utilized as an investigative tool only to assist an investigator with locating possible records that maybe associated with an individual.

13. With information obtained from online data base searches, additional steps and investigative work must be conducted to make certain that the information does belong to the individual whom is being investigated.

14. If a data base indicates that an individual has a possible criminal record, then this would require to do an additional search of the actual court records to determine if the record does belong to the individual in which the investigation is being conducted or if the record belongs to someone else.

15. Based on my experience, multiple individuals have the same name and year of birth. However, the actual date of birth is different.

16. On or about December 3, 2020, I was contacted by the legal counsel for Marco A. Fernandez.

17. I was informed that Mr. Fernandez did not have any criminal records, however, based on a screening report, the screening report stated he had been convicted of crimes in the past.

18. I was provided a copy of the screening report used for determining if Mr. Fernandez did have a criminal record.

19. I printed a copy of the screening report.

20. I reviewed the screening report and noticed that two separate court cases out of Merced County California showed that criminal records related to Mr. Fernandez might exist.

21. Using a computer at my residence, I recorded the computer screen related to the actions took conducting the searches related to Mr. Marco Fernandez. **(Exhibit 2. Screen Recording of Search Conducted.)**

22. Using the information contained in the Screening Report I was provided; it clearly states the name of Marco A. Fernandez. DOB: August 8, 1984. **(Exhibit 3)**

23. Using the Google search engine, I queried Merced County Superior Court.

24. Upon finding the Merced County Superior Court website, I entered the name of Marco Fernandez to search for court records.

25. In the results, I observed a Court File record that was part of the Screening Report. This Court file number was CRL00719. **(Exhibit 4 and Exhibit 5)** Upon clicking on this record, I viewed the criminal complaint. The name was the same, however the date of birth of this individual was May 19, 1984. This record obviously was not the record of Mr. Marco Fernandez DOB August 8, 1984.

26. Also, in the results, I observed another Court File record that was part of the Screening Report. This Court file number was CRM020649. **(Exhibit 6)** Upon clicking on this record, I viewed the Historical Data. The name was the same, however the date of birth of this individual was May 19, 1984. This record obviously was not the record of Mr. Marco Fernandez DOB August 8, 1984.

27. Upon completely the search of the Merced County Superior Court, I stopped the screen recording I was doing. **(Exhibit 2)**

28. With the information that was provided in the screening report, it took me less than 5 minutes using a computer to search court records and easily determine that Mr. Marco Fernandez DOB August 8, 1984, did not have any criminal records in Merced County, California.

Respectfully submitted;

Don Sazma
MN License #1058

# Screening Report - MARCO A FERNANDEZ

Serenity at Dorsey Ridge

**Property Screening Result**
Application Result: REJECT

**Applicant Information**
NAME: MARCO A FERNANDEZ
SSN: xxx-xx-3199
DOB: 08/08/1984
CURRENT ADDRESS: 1440 Hotel Cir N #334 ST, San Diego, CA 92108

**Individual Result**
REJECT

**Additional Information**

**Reasons for Result**
- Criminal History Does Not Meet Property Requirements

**Items to Review**
- 1 Possible Match in OFAC Name Search
- Rental History Records Found
- Premium National Criminal Records Found

**Additional Applicant Information**

**Residence History**
This applicant has rented or owned.
TIME AT CURRENT ADDRESS: 3 years 10 months

**Employment/Income**
PRIMARY INCOME: $5915 per month
PROPOSED RENT: $1737
RENT/INCOME: 29%
TIME AT CURRENT JOB: 14 years 2 months

| SERVICE | REQUEST DATE | COMPLETED DATE | STATUS |
|---|---|---|---|
| Credit Report | 11/16/2018 10:56 AM | 11/16/2018 10:56 AM | Complete |
| Criminal Search | 11/16/2018 10:56 AM | 11/16/2018 11:59 AM | Does Not Meet Property Requirements<br>No National Sex Offender Records Found<br>Criminal Records Found |
| Premium National Civil Court Records Search | 11/16/2018 10:56 AM | 11/16/2018 10:56 AM | Meets Property Requirements<br>No Civil Court Records Found |
| Rental History Search | 11/16/2018 10:56 AM | 11/16/2018 10:56 AM | Meets Property Requirements<br>Records Found |
| OFAC Name Search | 11/16/2018 10:56 AM | 11/16/2018 10:56 AM | 1 Possible Match Found |

PLF-001351

DOB: 00/00/1984
Record Type: Criminal
State Of Record: CA
Database: Merced County - Superior Court - Historical Data {Inactive: 12/1/2014}

---

PETTY THEFT UNDER 950.00 RECORD 1 - CHARGE 1

File Date: 01/11/2012 Case #: CRL007179
State Of Record: CA
Offense: PETTY THEFT UNDER 950.00
Offense Degree: MISDEMEANOR
Offense Date: 11/16/2011
Disposition: CONVICTION: GUILTY PLEA
Disposition Date: 02/21/2012
Arrest Agency: LOS BANOS POLICE DEPARTMENT
Statute Code: PC484(A)/488
Filing Type: COMPLAINT
Case Disposition: CONVICTION: NOLO PLEA
Case Type: MISDEMEANOR - LOS BANOS
Probation Length Sentenced: 24 MONTHS
Probation Type: PROBATION: COURT
Case Disposition Date: 2012-03-19
Original Degree of Offense: MISDEMEANOR
Count: 1
Year of Birth: 1984
Case Category: MISDEMEANOR: PROPERTY OFFENSE

---

PETTY THEFT UNDER 950.00 RECORD 1 - CHARGE 2

File Date: 01/11/2012 Case #: CRL007179
State Of Record: CA
Offense: PETTY THEFT UNDER 950.00
Offense Degree: MISDEMEANOR
Offense Date: 11/22/2011
Disposition: CONVICTION: GUILTY PLEA
Disposition Date: 02/21/2012
Arrest Agency: LOS BANOS POLICE DEPARTMENT
Statute Code: PC484(A)/488
Filing Type: COMPLAINT
Case Disposition: CONVICTION: NOLO PLEA
Case Type: MISDEMEANOR - LOS BANOS
Probation Length Sentenced: 24 MONTHS
Probation Type: PROBATION: COURT
Case Disposition Date: 2012-03-19
Original Degree of Offense: MISDEMEANOR
Count: 2
Year of Birth: 1984
Case Category: MISDEMEANOR: PROPERTY OFFENSE

PLF-001352

Original Degree of Offense: MISDEMEANOR
Count: 2
Year of Birth: 1984
Case Category: MISDEMEANOR: PROPERTY OFFENSE

PETTY THEFT UNDER 950.00

RECORD 1 - CHARGE 3
Case #: CRL007179

File Date: 01/11/2012
State Of Record: CA
Offense: PETTY THEFT UNDER 950.00
Offense Degree: MISDEMEANOR
Offense Date: 11/30/2011
Disposition: CONVICTION: GUILTY PLEA
Disposition Date: 02/21/2012
Arrest Agency: LOS BANOS POLICE DEPARTMENT
Statute Code: PC484(A)/488
Filing Type: COMPLAINT
Case Disposition: CONVICTION: NOLO PLEA
Case Type: MISDEMEANOR - LOS BANOS
Probation Length Sentenced: 24 MONTHS
Probation Type: PROBATION: COURT
Case Disposition Date: 2012-03-19
Original Degree of Offense: MISDEMEANOR
Count: 3
Year of Birth: 1984
Case Category: MISDEMEANOR: PROPERTY OFFENSE

Last Name: FERNANDEZ
First Name: MARCO
Middle Name: ANTONIO
DOB: 00/00/1984
Record Type: Criminal
State Of Record: CA
Database: Merced County - Superior Court - Historical Data {Inactive: 12/1/2014}

CONTROLLED SUBSTANCE - POSSESSION FOR SA- RECORD 2 - CHARGE 1

File Date: 12/09/2011
Case #: CRM020649
State Of Record: CA
Offense: CONTROLLED SUBSTANCE - POSSESSION FOR SALE
Offense Degree: FELONY
Offense Date: 10/15/2011
Disposition: CONVICTION: NOLO PLEA
Disposition Date: 06/06/2012
Arrest Agency: MERCED POLICE DEPARTMENT
Statute Code: HS11378
Filing Type: COMPLAINT
Case Disposition: CONVICTION: NOLO PLEA
Case Type: FELONY - MERCED
Probation Length Sentenced: 36 MONTHS
Probation Type: PROBATION: FORMAL
Case Disposition Date: 2012-06-06
Original Degree of Offense: FELONY
Count: 2
Year of Birth: 1984
Case Category: FELONY: DRUG OFFENSE

PREMIUM NATIONAL CIVIL COURT RECORDS SEARCH

| REQUEST DATE | COMPLETED | STATUS |
|---|---|---|
| 11/16/2018 10:56 AM | 11/16/2018 10:56 AM | Meets Property Requirements<br>No Civil Court Records Found |

RENTAL HISTORY SEARCH

| REQUEST DATE | COMPLETED | STATUS |
|---|---|---|
| 11/16/2018 10:56 AM | 11/16/2018 10:56 AM | Meets Property Requirements<br>Records Found |

PLF-001354

**In the Matter Of:**

*FERNANDEZ vs*

*RENTGROW*

---

*PORSCHE KEMP*

*December 10, 2020*

---



IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

MARCO A. FERNANDEZ, )
7501 TRAFALGAR CIR., APT. 31 )
HANOVER, MD 21076-5010 )
(ANNE ARUNDEL COUNTY) )
INDIVIDUALLY AND AS A )
REPRESENTATIVE OF THE CLASS, )
)
Plaintiffs, )
)
vs. )No.1:19-cv-01190-JKB
)
RENTGROW, INC., )
307 WAVERLY OAKS ROAD, )
SUITE 301 )
WALTHAM, MASSACHUSETTS )
02452-8449, )
)
Defendant. )

The video deposition of PORSCHE KEMP, called by the Defendant for examination, taken pursuant to notice and pursuant to the Federal Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, in Hanover, Maryland, commencing at 10:45 a.m. on the 10th day of December, 2020, taken before Melanie E. Kubiak, Certified Shorthand Reporter, appearing remotely via videoconference.

APPEARANCES:

BERGER MONTAGUE
MR. JOSEPH HASHMALL (via videoconference)
43 SE Main Street
Suite 505
Minneapolis, MN 55414
Phone: (612) 594-5999
E-Mail: jhashmall@bm.net

On behalf of the Plaintiffs;

BAKER & HOSTETLER LLP
MS. BONNIE DELGOBBO (via videoconference)
One North Wacker Drive
Suite 4500
Chicago, Illinois 60606
Phone: (312) 416-6200
E-Mail: bdelgobbo@bakerlaw.com

On behalf of the Defendant.

ALSO PRESENT:
Ms. Brittany De La Cruz (videographer)

* * * * * *

**applicant.**

Q. Do you remember -- Do you remember anything that you talked about on the call with Resident Screening?

10:55:42 **A. I don't remember.**

Q. And --

**A. I don't even know if -- I can't even remember if I called them back or if Suzanne called them. Because the leasing professional can call them, too. So**

10:56:04 **I don't remember who actually connected -- who connected with them. So I don't know if I don't remember because I didn't actually connect with them. Maybe the leasing manager did. I can't -- I can't remember exactly.**

Q. So as you remember it, was it just the

10:56:35 criminal record information that you had to do a further review of in connection with his application?

**A. Yeah. I do know it was -- his credit was fine, and he was military. It was something on the criminal.**

10:56:50 Q. Okay. So to the best of your memory, the further review of his application didn't have anything to do with OFAC possible match information?

**A. Not to --**

MR. HASHMALL: Objection to the form.

You can answer.

**THE WITNESS: Okay.**

BY THE WITNESS:

**A. Not to my knowledge. I'm not 100 percent sure what OFAC is.**

10:57:19

Q. Okay. And when you get -- when you were mentioning before that the leasing agent will send you the whole application package to review, is that something that's provided to you electronically or in paper?

10:57:50

**A. They bring it into my office usually. It's in their -- in their file, which is in, like, a folder like this.**

Q. So the leasing package is something that they have printed out into paper copy?

10:58:04

**A. Yeah. Well, when we were doing everything written. Now that it's online, no. I log into the computer and everything is attached, and it's much easier. But when we were doing everything printed, yeah, they would bring me the files.**

10:58:16

Q. And do you remember in -- So in November 2018 when Mr. Fernandez applied, would that have been a paper file you were looking at or an electronic one?

**A. It would have been a paper file.**

**they've been found guilty and convicted of the crime?**

Q. No. So, I mean, that's a good question. So the -- you may remember that Counsel from the previous investigation asked you about this thing called the OFAC list. And you indicated you didn't know what OFAC was.

11:42:12

**A. Mm-hmm.**

Q. I'm going to tell you for the purposes of this question that the OFAC list is a list of people that's been compiled by the federal government who have been -- the federal government has determined are associated with things like terrorism and narcotics trafficking.

11:42:26

**A. Oh.**

Q. And it's not necessarily criminal conviction, but it's a list of people that the government has determined are associated with those activities.

11:42:38

So if you knew that someone -- the federal government put someone on a list as associated with narcotics trafficking, is that something you would consider? Is that something that would weigh in your decision whether or not to rent them an apartment?

11:42:52

MS. DELGOBBO: Object to form and foundation.

BY THE WITNESS:

**A. That would all be based upon the screen criteria that Questar has set up that I'm not really**

**privy to because it's a recommendation that comes back to us.**

Q. I see.

**A. So I kind of don't know how to answer that question. I'm sorry.**

11:43:12

Q. No, that's a great answer. Thank you.

So you -- the screening criteria, do you know -- so your testimony is you don't have access to Questar's specific screening criteria; is that correct?

11:43:30

**A. Like, the parameters that they set up with Yardi Screening, I don't have access to that. That would have all been set up, like, on the executive level.**

Q. Got it.

11:43:45

And do you know if, for example, you wanted to see if you know who in your company would you ask to see it?

**A. If I would ask to see, like, the criteria that they have set up? I have never asked to see it. The person that set everything up, he's no longer with the company.**

11:44:04

Q. Okay.

**A. He sets everything up with Yardi Voyager.**

Q. Okay.

UNITED STATES OF AMERICA )
DISTRICT OF MARYLAND )
STATE OF ILLINOIS )
COUNTY OF COOK )

I, Melanie E. Kubiak, Certified Shorthand Reporter, do hereby certify that PORSCHE KEMP was first duly sworn by me to testify to the whole truth and that the above deposition was reported stenographically by me and reduced to typewriting under my personal direction.

I further certify that the said videoconference deposition was taken at the time and place specified and that the taking of said deposition commenced on the 10th day of December, 2020, at 10:45 a.m.

I further certify that I am not a relative or employee or attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, nor financially interested directly or indirectly in this action.

In witness whereof, I have hereunto set my hand this 20th day of December, 2020.

MELANIE E. KUBIAK, CSR
180 North LaSalle Street
Suite 2800
Chicago, Illinois 60601
Phone: (312) 236-6936

CSR No. 084-004794

DEPARTMENT OF THE TREASURY
WASHINGTON, D.C. 20220

OCT 2 7 2010

**FAC No. GN-492817**

Denise A. Norgle
Vice President
TransUnion LLC
555 W. Adams Street
Chicago, IL 60661

Dear Ms. Norgle:

Since our meeting with you in July 2007 and subsequent correspondence of May 27, 2008, the Office of Foreign Assets Control ("OFAC") continues to hear from credit bureau clients and individual consumers who have been adversely impacted by screening products related to OFAC targets that are associated with consumer credit reports. While OFAC appreciates your firm's attempts to provide tools to help ensure that persons on OFAC's Specially Designated Nationals and Blocked Persons List ("SDN List") do not access the U.S. financial system, it is obviously important that such tools provide accurate information in an understandable manner. We remain concerned that name-matching services ("Interdiction Products") used by credit bureaus to inform clients about potential dealings with persons on the SDN List may be creating unnecessary confusion. An Interdiction Product that does not include rudimentary checks to avoid false positive reporting can create more confusion than clarity and cause harm to innocent consumers. This is particularly worrisome when Interdiction Products are disseminated broadly in conjunction with credit reports.

In light of the recent appellate court decision regarding credit bureaus' obligations under the Fair Credit Reporting Act, 15 U.S.C. §§ 1681-1681x, to ensure the accuracy of the information they provide as part of a consumer credit report,[1] including information generated by Interdiction Products, we would appreciate the opportunity to review the steps you have taken – or plan to take – with regard to Interdiction Product information that you disseminate to clients. We are particularly interested in procedures or policies you have established to mitigate the impact of false positives on credit applicants.

We look forward to working with you to advance those goals and to your timely response. If you have any questions, please do not hesitate to contact Dennis P. Wood, Assistant Director, Sanctions Compliance & Evaluation, at dennis.wood@do.treas.gov or (202) 622-1646.

Sincerely,

Adam J. Szubin
Director
Office of Foreign Assets Control

cc: Stuart K. Pratt, Consumer Data Industry Association
Rebecca Kuehn, Federal Trade Commission

[1] *Cortez v. Trans Union, LLC*, 617 F.3d 688 (3d Cir. 2010).

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

MARCO A. FERNANDEZ, individually and as a representative of the class,

Plaintiff,

v.

RENTGROW, INC.,

Defendant.

Case No.: 1:19-cv-01190-JKB

**DECLARATION OF JOHN G. ALBANESE IN SUPPORT OF PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR CLASS CERTIFICATION**

I, John G. Albanese, hereby declare as follows:

1. I am one of Plaintiff's Counsel in the above-captioned matter.

2. I submit this Declaration in support of Plaintiff's Reply in support of Motion for Class Certification.

3. Attached as Exhibits are true and correct copies of the following:

**Exhibit 15:** Excerpts from the December 10, 2020 Deposition of Porsche Kemp; and

**Exhibit 16:** Excerpt from ECF No. 168-5, highlighted for emphasis (filed under seal).

The foregoing statement is made under penalty of perjury and is true and correct to the best of my knowledge and belief.

Date: October 6, 2021

/s/John G. Albanese
John G. Albanese

**In the Matter Of:**

*FERNANDEZ vs*

*RENTGROW*

---

*PORSCHE KEMP*

*December 10, 2020*

---



IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

MARCO A. FERNANDEZ, )
7501 TRAFALGAR CIR., APT. 31 )
HANOVER, MD 21076-5010 )
(ANNE ARUNDEL COUNTY) )
INDIVIDUALLY AND AS A )
REPRESENTATIVE OF THE CLASS, )
)
Plaintiffs, )
)
vs. )No.1:19-cv-01190-JKB
)
RENTGROW, INC., )
307 WAVERLY OAKS ROAD, )
SUITE 301 )
WALTHAM, MASSACHUSETTS )
02452-8449, )
)
Defendant. )

The video deposition of PORSCHE KEMP, called by the Defendant for examination, taken pursuant to notice and pursuant to the Federal Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, in Hanover, Maryland, commencing at 10:45 a.m. on the 10th day of December, 2020, taken before Melanie E. Kubiak, Certified Shorthand Reporter, appearing remotely via videoconference.

APPEARANCES:

BERGER MONTAGUE
MR. JOSEPH HASHMALL (via videoconference)
43 SE Main Street
Suite 505
Minneapolis, MN 55414
Phone: (612) 594-5999
E-Mail: jhashmall@bm.net

On behalf of the Plaintiffs;

BAKER & HOSTETLER LLP
MS. BONNIE DELGOBBO (via videoconference)
One North Wacker Drive
Suite 4500
Chicago, Illinois 60606
Phone: (312) 416-6200
E-Mail: bdelgobbo@bakerlaw.com

On behalf of the Defendant.

ALSO PRESENT:
Ms. Brittany De La Cruz (videographer)

* * * * * *

**A. Yes, I believe so.**

Q. Was it Suzanne Whatley who was dealing directly with Mr. Fernandez in connection with his application?

10:42:49 **A. Yes. She leased the apartment to him.**

Q. All right. And do you remember -- Do you remember any conversations that you had with Suzanne Whatley in connection with Mr. Fernandez's application?

**A. I believe -- I don't remember exactly what went on, like what -- but I remember that there was something with his application, and I don't -- I don't know if I called Yardi's Screening or if she called Yardi's Screening to just clarify the information before we -- before we made the decision.**

10:43:19 10:43:42 **I don't -- But I do remember there was something with his application process. And he was a fairly quick move-in, so we wanted to get him taken care of as soon as possible.**

Q. Okay. And do you remember -- do you remember anything more about what it was that you contacted Yardi or RentGrow about in connection with his application?

10:44:00 MR. HASHMALL: Object to foundation.

BY THE WITNESS:

**A. I don't remember exactly. The only reason why**

10:44:30 10:44:51 **I know this is when all this came up, I searched, like, my e-mail with his name, and I saw that Yardi's Screening had called me -- like, called me concerning his application. I had, like, an e-mail, I think, from Suzanne or something like that. I don't -- I don't remember exactly what went on at that time, unfortunately. But I do remember something went on with his application, and Suzanne had told me about it, and she was working on it before submitting the application to me.**

Q. Okay. Do you -- Do you remember whether Suzanne told you anything else about Mr. Fernandez during the application process?

**A. No.**

10:45:06 MR. HASHMALL: Objection, asked and answered.

BY MS. DELGOBBO:

Q. Okay. Do you remember -- Do you remember if she mentioned to you that he was in the military?

10:45:22 MR. HASHMALL: Objection, leading, asked and answered.

BY THE WITNESS:

**A. I --**

MR. HASHMALL: Go ahead.

BY THE WITNESS:

**A. I don't remember exactly. But I did know he was in the military. I don't know if I knew that before or after. I mean, I knew because his proof of income, but I don't know at what point I knew. She may have -- she may have said it to me -- because I believe she said something to me along the lines that something came back on his application but he's military, which is, I think, what kind of got me involved with it early on.**

Q. Okay. At what point -- At what point in the process would an applicant submit proof of income? Would that be before or after Questar receives the tenant screening report?

**A. No. They submit it when they submit their application. We won't screen them without their proof of income.**

MS. DELGOBBO: Okay. Okay. If we could -- if the document tech, if you could drop into the chat function what we have marked as Exhibit 3.

THE VIDEOGRAPHER: Okay. Stand by, please.

**THE WITNESS: Will I see that on the screen or ...**

MS. DELGOBBO: Yeah, there should be -- along the bottom of your Zoom window, there should be a little bubble that says "chat."

**THE WITNESS: Oh, a blue box?**

MS. DELGOBBO: Yeah, I think so. If you click on the chat button at the bottom, then you should have --

**THE WITNESS: Oh, okay.**

THE VIDEOGRAPHER: Do you want me to share my screen?

10:47:17 MS. DELGOBBO: You know what? I think it may actually -- let's just -- are you able to click on download and get Exhibit 3 on your computer? Sometimes I think it's actually easier to actually just look at it that way.

10:47:30 THE VIDEOGRAPHER: Okay. No problem.

**THE WITNESS: Sure.**

MR. HASHMALL: For what it's worth, I'm not seeing the chat. It would be helpful if we could see it on the screen, too.

10:47:38 THE VIDEOGRAPHER: Stand by, please.

MS. DELGOBBO: And, Joe, I think if you click -- if you kind of hover towards the bottom of your Zoom screen, if the chat isn't showing right now, there should be kind of a button that says chat at the bottom that if you click on it, it will --

10:47:54 MR. HASHMALL: You're right. Now I see it. Okay. Cool. Yeah, I can download the exhibits, too. That's fine.

MS. DELGOBBO: Okay.
BY MS. DELGOBBO:
Q. So, Ms. Kemp, did you -- do you have the document called Exhibit 3 in front of you now?
10:48:11 **A. Yes.**
Q. Okay. Is this -- is this a copy -- or do you recognize this document?
**A. Yes, it's the application.**
Q. Okay. For -- For Marco Fernandez?
10:48:27 **A. Yes.**
Q. And is this form that it's on, is that -- in November 2018, was that the standard form that Questar used to accept paper applications?
**A. Yes.**
10:48:41 Q. Okay. So would this -- is any of that -- does any of the handwriting on this belong to you or ...
**A. No.**
Q. Do you -- Do you recognize any of the handwriting at the very top?
10:49:02 **A. Yeah. It's Suzanne Whatley.**
Q. Okay. And which -- so is it correct to say that everything above the line that starts with applicant's name, everything above that is Suzanne Whatley's handwriting?

**A. Yes.**

Q. And is this application -- Would it be standard process at Questar for this paper application to be filled out before Questar would request a tenant screening from RentGrow?

**A. Yeah, this is completed before we screen them.**

Q. Okay. So the -- it would be standard practice that the line towards the top that says "term of lease," that that would be something filled out before submitting the request for a tenant screening?

**A. Yes.**

Q. And it looks like the beginning date of the lease term on this Exhibit 3 is November 19, 2018, right?

**A. Yes.**

Q. Is it -- Would it be standard practice for the tenant to request the start date of their lease?

**A. Yeah, that's who requests the move-in date. That's who always requests the move-in date.**

Q. Okay. So after receiving this -- so I think you mentioned that in addition to receiving the completed application, there would be some other documents, like proof of income, that Questar would collect before requesting a screening, right?

**A. Yes.**

Q. Was there anything else that we haven't talked about -- other than the application form and the proof of income, are there any other documents that Questar would -- documents or info that Questar would get from an applicant before doing --

**A. We get their -- their ID. It doesn't have to be before the screening. It just has to be before they move in so we have their photo ID on file. And that's it.**

MS. DELGOBBO: And can you show Exhibit 4, please.

**THE WITNESS: Okay. So I should log out of this exhibit, right?**

THE VIDEOGRAPHER: Stand by, please.

MS. DELGOBBO: You can close or minimize the screen.

THE VIDEOGRAPHER: Exhibit 4 is in the chat.

**THE WITNESS: Okay. I will download it.**

**Okay. I have it open.**

BY MS. DELGOBBO:

Q. Do you recognize this document?

**A. Yes.**

Q. So is this the -- is this the type of alert that you would receive when some screening results were

ready?

**A. Yes.**

Q. And this particular one is the alert you received that Mr. Fernandez's results were ready?

10:52:29 **A. Yes.**

Q. I think based on what you said earlier, you would not have -- you would not have reviewed his results immediately after getting this, right? You --

**A. No, not until the leasing professional gives it all to me, that everything is ready to go.** 10:52:51

Q. Okay. So the date on this e-mail, Exhibit 4, saying that the premium national criminal results were available, it looks -- it looks like it was Friday, November 16, 2018, 11:59 a.m., right?

10:53:14 **A. Yes.**

MS. DELGOBBO: And then, can we take a look at Exhibit 2, please.

**THE WITNESS: Sure. Bring the chat back up.**

THE VIDEOGRAPHER: Dropping Exhibit 2 in the chat.

10:53:55 **THE WITNESS: I have it open.**

BY MS. DELGOBBO:

Q. Okay. And do you recognize Exhibit 2?

**A. Yes.**

Q. So this is from suzanne@dorseyridge.com. Is

that Suzanne Whatley?

**A. Yes.**

Q. This looks like you received this e-mail the same day as Exhibit 4, Friday, November 16th, 2018, right?

10:54:22

**A. Correct.**

Q. 4:16 p.m., so just later in -- later in the day after the results had become available but still the same day?

**10:54:33**

**A. Correct.**

Q. And do you -- I guess do you remember what you did after receiving this e-mail from Ms. Whatley asking -- she says, Can you check his application? It came back with a criminal, and he's military.

**10:54:53**

**A. Yeah. So I would have went and reviewed the screening to see what came back on the criminal. And if I, you know, questioned it, I would have then called Yardi's Screening.**

Q. And do you remember whether -- do you remember for sure whether you called Resident Screening about this application?

10:55:17

**A. I'm pretty sure I did because I saw an e-mail that they -- that the lease consultant told me that they called me -- they called me back concerning that**

**applicant.**

Q. Do you remember -- Do you remember anything that you talked about on the call with Resident Screening?

10:55:42 **A. I don't remember.**

Q. And --

**A. I don't even know if -- I can't even remember if I called them back or if Suzanne called them. Because the leasing professional can call them, too. So**

10:56:04 **I don't remember who actually connected -- who connected with them. So I don't know if I don't remember because I didn't actually connect with them. Maybe the leasing manager did. I can't -- I can't remember exactly.**

Q. So as you remember it, was it just the

10:56:35 criminal record information that you had to do a further review of in connection with his application?

**A. Yeah. I do know it was -- his credit was fine, and he was military. It was something on the criminal.**

10:56:50 Q. Okay. So to the best of your memory, the further review of his application didn't have anything to do with OFAC possible match information?

**A. Not to --**

MR. HASHMALL: Objection to the form.

UNITED STATES OF AMERICA )
DISTRICT OF MARYLAND )
STATE OF ILLINOIS )
COUNTY OF COOK )

I, Melanie E. Kubiak, Certified Shorthand Reporter, do hereby certify that PORSCHE KEMP was first duly sworn by me to testify to the whole truth and that the above deposition was reported stenographically by me and reduced to typewriting under my personal direction.

I further certify that the said videoconference deposition was taken at the time and place specified and that the taking of said deposition commenced on the 10th day of December, 2020, at 10:45 a.m.

I further certify that I am not a relative or employee or attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, nor financially interested directly or indirectly in this action.

In witness whereof, I have hereunto set my hand this 20th day of December, 2020.

MELANIE E. KUBIAK, CSR
180 North LaSalle Street
Suite 2800
Chicago, Illinois 60601
Phone: (312) 236-6936

CSR No. 084-004794

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **MARCO A. FERNANDEZ,** | * | |
| **Plaintiff** | * | |
| **v.** | * | **CIVIL NO. JKB-19-1190**<br>**UNDER SEAL** |
| **RENTGROW, INC.,** | * | |
| **Defendant.** | * | |

* * * * * * * * * * * *

# Table of Contents

I. Background....3
II. Discussion....6
A. Summary Judgment....7
1. Standing....7
a. TransUnion....9
b. Standing of Named Plaintiff....10
c. Standing of Putative Class Members....15
2. FCRA Violation....16
a. Accuracy....16
b. Reasonable Procedures....20
i. OFAC Matching Protocol....21
ii. Criminal Records....22
c. Willful Noncompliance....24
i. OFAC Alert....25
ii. Criminal Records....27
d. Negligent Noncompliance....28
3. Conclusion....31
B. Class Certification....32
1. Legal Standard....32
2. Rule 23(a)....33
a. Ascertainability....33
b. Numerosity....36
c. Commonality....36
d. Typicality....38
e. Adequacy....44
3. Rule 23(b)(3)....46
a. Predominance....46
i. Accuracy....47
ii. Reasonableness....53
iii. Damages....54
b. Superiority....59
4. Conclusion....62
III. Conclusion....62

**SEALED MEMORANDUM**

Plaintiff Marco A. Fernandez filed suit in his individual capacity and as the named representative of a putative class against Defendant RentGrow, Inc. ("RentGrow") for violations of the Fair Credit Reporting Act (the "FCRA"), 15 U.S.C. § 1681, *et seq.* (Compl., ECF No. 1.) Pending before the Court are RentGrow's Motion for Summary Judgment (ECF No. 163) and Mr. Fernandez's Motion to Certify Class (ECF No. 167).[1] These Motions are now ripe for review and no hearing is required. *See* Local Rule 105.6 (D. Md. 2021). For the reasons that follow, RentGrow's Motion for Summary Judgment will be DENIED and Mr. Fernandez's Motion for Class Certification will be GRANTED.

## *I. Background*[2]

The Court begins by reiterating the facts of this case, most recently discussed in the Court's May 6, 2021 Memorandum Opinion. (ECF No. 155.) In November of 2018, Plaintiff Marco A. Fernandez applied to rent an apartment at Serenity Place at Dorsey Ridge ("Dorsey Ridge") in Hanover, Maryland. (Compl. ¶ 3.) Dorsey Ridge requested a tenant report about Mr. Fernandez from Defendant RentGrow—which is a consumer reporting agency that sells consumer reports about prospective tenants to landlords and management companies.[3] (*Id.* ¶¶ 2, 3.) These tenant screening reports contain information that landlords request and RentGrow collects from various

[1] RentGrow's Motions in Limine (ECF Nos. 182, 193) will be analyzed in a separate Memorandum and Order. Additionally, as specified in the Order accompanying this Memorandum, the Court clarifies that Mr. Fernandez's Motion to Seal ECF No. 196 (ECF No. 197) is GRANTED.

[2] At the summary judgment stage, the Court is "required to view the facts and draw reasonable inferences in the light most favorable to the [non-moving] party." *Scott v. Harris*, 550 U.S. 372, 378, 127 S. Ct. 1769 (2007) (internal citations and quotations omitted); *see also Harris v. Pittman*, 927 F.3d 266, 272 (4th Cir. 2019) ("It is axiomatic that in deciding a motion for summary judgment, a district court is required to view the evidence in the light most favorable to the nonmovant . . . and to draw all reasonable inferences in his favor.").

[3] RentGrow concedes that it is a reseller consumer reporting agency within the meaning of the FCRA. *See* 15 U.S.C. § 1681a(u); (Def.'s Mot. Summ. J. Mem. Supp. at 4.)

consumer reporting agencies and public records. (Def.'s Mot. Summ. J. Mem. Supp., ECF No. 165 at 4.) If a landlord requests information about a prospective tenant's criminal record, RentGrow purchases data from backgroundchecks.com—a criminal records vendor—and "matches those records to consumers, taking into account name, date of birth, jurisdiction of record, and any address associated with the criminal record." (Pl.'s Opp'n Summ. J., ECF No. 185 at 9.) RentGrow also compares prospective tenants against persons on the United States Department of Treasury's Office of Foreign Assets Control's Specially Designated List (the "OFAC list") and notifies landlords when it identifies "possible matches." (Pl.'s Mot. Class Certification Mem. Supp., ECF No. 168 at 8.) During the time period relevant to this lawsuit, RentGrow used the following procedures to find possible matches to the OFAC list:

1. From April 23, 2017 and continuing until July 27, 2017,[4] RentGrow compared a consumer's name to those appearing on the most recent OFAC list—which RentGrow downloaded daily—and listed a "possible match" alert if the consumer's first and last name was within two or fewer characters of a name appearing on the OFAC list, or if the consumer's first and last names matched based on software designed to capture phonetic similarities in order to match similar names in spite of small spelling disparities, (*see* Def.'s Opp'n Class Certification, ECF No. 181 at 6, 37 n.16; ECF No. 181-15 at 2–5);

2. From July 27, 2017 to May 24, 2019 at 7:28 a.m.,[5] RentGrow only reported a "possible match" if the consumer's first and last names were within one character of a name on the OFAC list, (*see id.*); and

[4] This is the beginning of the proposed class period. (Pl.'s Mot. Class Certification Mem. Supp., ECF No. 168 at 12.)

[5] This is the end of the proposed class period. (Pl.'s Mot. Class Certification Mem. Supp. at 12.)

3. As of May 24, 2019 at 7:28 a.m., RentGrow requires that the consumer's first name, last name, and full date of birth *exactly match* the name of an individual on the OFAC list before it will report a consumer as a "possible match." (*See id.*)

The report that RentGrow provided to Dorsey Ridge contained two alleged inaccuracies. First, the report indicated that in 2012, Mr. Fernandez had been convicted of one felony and three misdemeanor offenses in California, even though Mr. Fernandez has no criminal record. (*Id.* ¶¶ 4, 5.) The individual for whom he was mistaken has the same first, middle, and last name, birth year, and state of residence as Mr. Fernandez—although the birth date on the criminal record was incomplete (it was listed as 00/00/1984). (Def.'s Mot. Summ. J. Mem. Supp. at 30; Pl.'s Opp'n Summ. J. at 5.) Second, the first page of the report contained an alert indicating that Mr. Fernandez was a "possible match" to an individual on the OFAC List, in spite of the fact that Mr. Fernandez is not this individual.[6] (*Id.* ¶¶ 7, 8; *see also* ECF No. 168-1.) In fact, the individual whom RentGrow identified as a possible match on the OFAC list—"Mario Alberto Fernandez Santana"—has a different name, date of birth, and address than Mr. Fernandez. (*Id.* ¶ 8.) The tenant screening report also included the complete OFAC list record in its final pages. (*See* ECF No. 168-1.) Mr. Fernandez was initially denied the opportunity to rent an apartment at Dorsey Ridge, but once Mr. Fernandez explained to his prospective landlord that the criminal records reported on his tenant screening report did not belong to him, he was approved to rent the apartment and moved in on the date specified in his lease application. (*See id.* ¶¶ 12, 38–39; *see also* Def.'s Mot. Summ. J. Mem. Supp. at 1.) In a letter dated December 3, 2018, Mr. Fernandez disputed the accuracy of his tenant screening report with RentGrow, and RentGrow corrected the report after an investigation to confirm that neither the criminal records nor the OFAC alert were accurate.

[6] Federal regulations generally prohibit individuals and businesses in the United States from transacting business with individuals on the OFAC list. *See, e.g.*, 31 C.F.R. § 536.201.

(Compl. ¶ 41; *see also* ECF No. 167-6.) Between the discovery of the alleged inaccuracy in November 2018 and RentGrow's correction in December 2018, Mr. Fernandez alleges that he suffered actual damages in the form of mental and emotional distress resulting, in part, from the "sensitive nature of his employment in cybersecurity" with the U.S. Navy and concomitant duty to maintain a Top Secret security clearance. (*Id.* ¶ 43.) In January of 2019, Mr. Fernandez asked RentGrow to describe "the procedures used to investigate his dispute" pursuant to its obligations under 15 U.S.C. § 1681i, but RentGrow never responded. (*Id.* ¶ 42.)

Mr. Fernandez filed suit in this Court on April 23, 2019, bringing two counts against RentGrow under the FCRA. (*See generally id.*) Count 1 is an individual and class claim brought under 15 U.S.C. § 1681e(b). It argues that RentGrow failed "to establish or to follow reasonable procedures to assure maximum possible accuracy in the preparation of the consumer reports it furnished regarding" Mr. Fernandez and the putative class members. (*Id.* ¶ 68.) Count 2 is an individual claim brought under § 1681i challenging RentGrow's alleged failure to provide a description of the procedures used to investigate his December 2018 dispute, (*see id.* ¶ 73), but this Count was dismissed by stipulation in August of 2021. (*See* ECF No. 162; *see also* ECF No. 172, *as corrected by* ECF No. 174.)

## *II. Discussion*

When presented with both a motion for summary judgment and a motion for class certification, the Court has discretion to consider the summary judgment motion first. *See Ginwright v. Exeter Fin. Corp.*, 280 F. Supp. 3d 674, 679–80 (D. Md. 2017). The Court therefore looks first to RentGrow's Motion for Summary Judgment (ECF No. 163) before turning to Mr. Fernandez's Motion for Class Certification (ECF No. 167).

***A. Summary Judgment***

Federal Rule of Civil Procedure 56 provides that a party can move for summary judgment on a "claim or defense—or the part of [any] claim or defense," provided it shows "that there is no genuine dispute as to any material fact" and that it is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The burden is on the moving party to demonstrate the absence of any genuine dispute of material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). If a party carries this burden, then the Court will award summary judgment, unless the opposing party can identify specific facts, beyond the allegations or denials in the pleadings, that show a genuine issue for trial. Fed. R. Civ. P. 56(e). If sufficient evidence exists for a reasonable factfinder to render a verdict in favor of the party opposing the motion, then a genuine dispute of material fact is presented, and summary judgment will be denied. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). However, the "mere existence of a scintilla of evidence in support of the [opposing party's] position" is insufficient to defeat a motion for summary judgment. *Id.* at 252.

***1. Standing***

To sue in federal court, a plaintiff must demonstrate "the irreducible constitutional minimum of standing." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S. Ct. 2130 (1992). This requirement arises from Article III of the Constitution, which "confines the federal judicial power to the resolution of 'Cases' and 'Controversies.'" *TransUnion, LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021) (citing *Raines v. Byrd*, 521 U.S. 811, 819 (1997)). For judicial resolution to be proper, a plaintiff must have a "personal stake" in the action. *Raines*, 521 U.S. at 819.

To establish standing, it is the plaintiff's burden to show that he or she has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338,

136 S. Ct. 1540 (2016) (citing *Lujan*, 504 U.S. at 560–61; *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180–81, 120 S. Ct. 693 (2000)). "[T]he injury-in-fact requirement requires a plaintiff to allege an injury that is both 'concrete *and* particularized.'" *Id.* at 335 (citing *Laidlaw*, 528 U.S. at 180–81) (emphasis in original). A concrete injury can be intangible. *See id.* at 340 (citing *Pleasant Grove City v. Summum*, 555 U.S. 460 (2009) (free speech); *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520 (1993) (free exercise)).

There are two considerations that are of particular importance in determining whether an injury is concrete: "historic practice and the judgment of Congress." *Krakauer v. Dish Network, LLC*, 925 F.3d 643, 653 (4th Cir. 2019). Thus, courts "should assess whether the alleged injury to the plaintiff has a 'close relationship' to a harm 'traditionally' recognized as providing a basis for a lawsuit in American courts." *TransUnion*, 141 S. Ct. at 2204. They must also heed the decisions of Congress, who "may 'elevate to the status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate in law.'" *Id.* at 2204–05 (citing *Spokeo*, 578 U.S. at 341); *see also Baehr v. Creig Northrop Team, P.C.*, 953 F.3d 244, 253 (4th Cir. 2020) ("Cognizant that a statutory cause of action is not a replacement for concrete injury, we recognize that a plaintiff suffers a concrete injury if she shows the harm stemming from the defendant's statutory violation is the type of harm Congress sought to prevent when it enacted the statute.") (internal quotations and citations omitted).

This case was stayed pending resolution of the Supreme Court's decision in *TransUnion v. Ramirez* due to the analogous standing issues presented in both matters. (*See* ECF No. 156.) Given its acknowledged relevance, the Court will briefly discuss *TransUnion* before analyzing the standing of Mr. Fernandez and of putative class members.

***a. TransUnion***

In *TransUnion v. Ramirez*, 141 S. Ct. 2190 (2021), plaintiff Sergio Ramirez brought a class action against credit reporting agency TransUnion for violating several provisions of the FCRA, including § 1681e(b). As with RentGrow's procedures in this case, TransUnion engaged in name-only matching against the OFAC list and placed an alert on the credit reports of matched consumers flagging them as a "potential match." *TransUnion*, 141 S. Ct. at 2202. Mr. Ramirez argued that by using this procedure, TransUnion "failed to follow reasonable procedures to ensure the accuracy of information in his credit file." *Id.* However, of the 8,185 putative members of the *TransUnion* class, only 1,853 individuals had their reports actually disseminated to third parties. *Id.* Despite this, the District Court certified a class consisting of all 8,185 persons. *See generally Ramirez v. TransUnion, LLC*, 301 F.R.D. 408 (N.D. Cal. 2014).

After the District Court certified the class, a jury returned a verdict for Mr. Ramirez and the class he represented. *Id.* The Ninth Circuit affirmed in relevant part, holding that "all members of the class had Article III standing." *Id.* Judge McKeown dissented, arguing that the 6,332 class members whose reports had not been provided to a third party did not suffer a concrete injury. *Id.*

The Supreme Court agreed with Judge McKeown, holding that the 1,853 class members "whose credit reports were disseminated to third-party businesses during the class period suffered a concrete harm," while the 6,332 class members whose reports were not provided to third-party businesses did not. *Id.* at 2212–13. Central to the Court's analysis was the "'close relationship'" that the injury suffered by the 1,853 class members bore "to . . . the reputational harm associated with the tort of defamation." *Id.* at 2208 (citing *Spokeo*, 578 U.S. at 341). The Court rejected TransUnion's contention that those 1,853 class members' individual harms did not bear a close relationship to defamation because the OFAC alerts were not technically false, explaining that

courts should not require an "exact duplicate" of an injury recognized at common law and finding that "the harm from being labeled a 'potential terrorist' bears a close relationship to the harm from being labeled a 'terrorist.'" *Id.* at 2209. The "standing inquiry" thus distinguished "between (i) credit files that consumer reporting agencies maintain[ed] internally and (ii) the consumer credit reports that consumer reporting agencies disseminate[d] to third-party creditors." *Id.* at 2210. The remaining 6,332 class members who fell into the latter category did not suffer a concrete injury, because "[a] letter that is not sent does not harm anyone, no matter how insulting the letter is." *Id.*

### *b. Standing of Named Plaintiff*[7]

The parties do not dispute that Mr. Fernandez's alleged injury is particularized, as opposed to a diffuse injury suffered by many. *See Spokeo*, 578 U.S. at 339. Indeed, the tenant screening report containing inaccurate information was prepared about Mr. Fernandez himself and was given to his prospective landlords to aid their decision to accept or reject his rental application. Nor do the parties dispute that Mr. Fernandez's alleged injury was caused by RentGrow, or that money damages awarded under either of FCRA's damages provisions, §§ 1681n, 1681o, would redress his injury.[8] *See generally City of Los Angeles v. Lyons*, 461 U.S. 95 (1983) (finding that sought

---

[7] The Court finds that Mr. Fernandez has standing to challenge RentGrow's criminal records reporting procedures even under RentGrow's more rigorous reading of *TransUnion*. In addition to RentGrow's dissemination of the criminal records to Mr. Fernandez's prospective landlords, there is evidence in the record supporting the conclusion that his prospective landlords read and understood the report. (*See* Def.'s Mot. Summ. J. Mem. Supp. at 7.) They even initially denied him the opportunity to rent an apartment at Dorsey Ridge based on the records. *Id.* Mr. Fernandez has therefore satisfied his burden to show that he has standing to challenge RentGrow's criminal records reporting procedures.

[8] In his Motion for Class Certification, Mr. Fernandez explained that he "does not seek individualized damage awards on behalf of the [putative class] but instead seeks statutory damages . . . plus punitive damages for [RentGrow's] willful violations of the FCRA." (Pl.'s Mot. Class Certification Mem. Supp. at 3.) Mr. Fernandez has further clarified that he does not seek actual damages with respect to his OFAC alert claim. (Fernandez Dep. 37:2–25, ECF No. 181-12 at 7.) The Court will therefore proceed on the understanding that Mr. Fernandez seeks only willful damages under § 1681n with respect to his class claim challenging RentGrow's OFAC alert reporting procedures, while he seeks both negligent and willful damages under §§ 1681n and 1681o with respect to his individual claim challenging RentGrow's criminal records reporting procedures. (*See* Pl.'s Mot. Class Certification Mem. Supp. at 3.)

damages, and not injunctive relief, would properly redress past harm). The Court finds that Mr. Fernandez has carried his burden to establish these elements of standing. Accordingly, the standing inquiry in this case centers around whether Mr. Fernandez's alleged injury is sufficiently concrete to establish Article III standing.

RentGrow argues that dissemination of inaccurate information to another individual or entity is not enough to create a concrete injury. Instead, RentGrow would have the Court require some showing that a third party actually read and relied on the OFAC information.[9] RentGrow focuses on *TransUnion*'s comparison of the common law tort of defamation to the injury suffered by the class members whose inaccurate report was distributed to a third party. Because defamation's publication element required "evidence that the defendant actually 'brought an idea to the perception of another,'" generally requiring "evidence that the [defamatory] document was actually read and not merely processed," RentGrow argues that a plaintiff alleging a violation of § 1681e(b) must show that a third party actually read the document. *TransUnion*, 141 S. Ct. at 2210 n.6. Applying this reading of *TransUnion*, RentGrow points to testimony from two depositions which it argues demonstrates that Mr. Fernandez did not suffer a concrete injury: (1) Mr. Fernandez's testimony that he "does not know whether anyone other than himself and [RentGrow] even *saw* his tenant screening report" and his admission that the leasing agent he worked with "never mentioned anything about OFAC information on [his] screening report before

[9] RentGrow filed a Notice of Supplemental Authority on November 23, 2021, alerting the Court to the Second Circuit's decision in *Maddox v. Bank of New York Mellon Tr. Co., N.A.*, 19 F.4th 58 (2d Cir. 2021), and arguing that it held that an injury is not concrete where a plaintiff presents no evidence that anyone read the challenged record. (*See* ECF No. 207.) As Mr. Fernandez points out in his response, that case involved a mortgage record that was publicly available but was not disseminated to anyone directly. *See Maddox*, 19 F.4th at 65; (ECF No. 208.) The *Maddox* Court expressly distinguished *TransUnion*, where—as here—class members had their credit reports disseminated to third parties. This was so because "[t]here could be no doubt that the third-party businesses viewed those credit reports, which they had specifically requested and paid for." *Id.* Thus, the Court finds RentGrow's argument under *Maddox* unavailing. As discussed later, *see infra* at 13–14 n.11, RentGrow's business model—in which it sells reports on potential tenants to landlords—renders a similar assumption reasonable at this stage of the litigation in spite of some evidence RentGrow brings forth to challenge such an assumption.

or after he rented the apartment"; and (2) the testimony of Porsche Kemp—the individual who "reviewed and approved" Mr. Fernandez's lease application—in which she states that she "does not recall reviewing any OFAC information" on Mr. Fernandez's tenant screening report. (Def.'s Mot. Summ. J. Mem. Supp. at 7.)

RentGrow bases much of this argument on a footnote from *TransUnion*. *See TransUnion*, 141 S. Ct. at 2210 n.6. In this footnote, the Supreme Court addressed an argument brought by the plaintiffs in that case in support of finding that the 6,332 individuals whose reports were not disseminated to a third party nonetheless suffered a concrete injury. The *TransUnion* plaintiffs argued that "TransUnion 'published' the class members' information *internally*—for example, to employees within TransUnion and to the vendors that printed and sent the mailings that the class members received." *Id.* (emphasis added). The Court found this argument "unavailing," in part because "intra-company disclosures" have traditionally not been recognized as "actionable publications" to maintain a defamation claim. *Id.* The Supreme Court found lacking evidence "that the defendant actually 'brought an idea to the perception of another'" or that the "document was actually read and not merely processed." *Id.* (citing Restatement of Torts § 559, Comment *a*, p. 140 (1938)). The 6,332 plaintiffs' injuries therefore did "not bear a sufficiently 'close relationship' to the traditional defamation tort to qualify for Article III standing." *Id.*

The Court finds this discussion inapplicable to the case before it and draws the line where the Supreme Court did: dissemination to a third party. The analysis on which RentGrow relies was made in reference to the *TransUnion* plaintiffs' "internal publication" theory. Again, the key difference here is that Mr. Fernandez's report was disseminated to his future landlords, rather than simply maintained by RentGrow internally—where the risk of publication would have been "too

speculative."[10] *TransUnion*, 141 S. Ct. at 2212. Just as with the 1,853 *TransUnion* class members who suffered an injury recognized by Article III, "the risk of future harm materialized" for Mr. Fernandez—"that is, . . . [an] inaccurate OFAC alert" was "provided to [a] third part[y.]" *Id.* at 2211. Further, *TransUnion* emphasized that although courts are to evaluate "whether a plaintiff's asserted harm has a 'close relationship' to a harm traditionally recognized as providing a basis for a lawsuit in American courts, . . . an exact duplicate" is not required. *Id.* at 2209; *see also id.* at 2204. That Mr. Fernandez's injury may not precisely map onto all of the elements of common law defamation does not preclude the Court from finding that he has Article III standing. Finally, RentGrow's proposed rule would render it functionally impossible to sustain a class action under § 1681e(b)—a provision under which class actions are frequently litigated.[11] *See* 7 Newberg on

---

[10] Of course, the injury that any plaintiff suffers must fit the relief he or see seeks. *Compare TransUnion*, 141 S. Ct. at 2209 (holding that the "1,853 class members whose reports were disseminated to third parties suffered a concrete injury in fact under Article III" and could seek damages), *with Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 153–56 (2010) (holding that conventional alfalfa farmers had Article III standing to seek injunctive relief where deregulation of genetically-modified alfalfa would cause the farmers to take reasonable precautionary measures to prevent future harm). In *TransUnion*, yet another reason why the 6,332 plaintiffs' claims failed was because the "mere risk of future harm, without more,"—such as evidence of an independent emotional injury that occurred as a result of "exposure to the risk itself"—was insufficient "to demonstrate Article III standing in a suit for *damages*." *TransUnion*, 141 S. Ct. at 2211 (emphasis added). *TransUnion* specifically distinguished those 1,853 class members for whom "the risk of future harm materialized—that is, . . . the inaccurate OFAC alerts in their internal TransUnion credit filed were . . . provided to third parties." *Id.* So too here, where "the risk of future harm materialized" for all putative class members, who by definition had a report provided to a third party. *Id.* Dissemination of the OFAC alert to a third party constitutes a concrete, past injury that supports standing on a claim for damages like that of Mr. Fernandez. *See id.* at 2209, 2212.

[11] Even if the Court were to adopt RentGrow's proposed rule and require Mr. Fernandez to show that his prospective landlords read the OFAC alert, he still would have carried his burden to demonstrate standing at this stage of the litigation. A plaintiff's burden of proof to establish each element of Article III standing changes "with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. 555, 561. Thus, at the summary judgment stage, a plaintiff must "set forth by affidavit or other evidence specific facts" that support standing and that will be assumed to be true. *Id.*

Under its proposed rule, RentGrow argues that Mr. Fernandez was required to present some evidence supporting the conclusion that those who evaluated his lease application did, in fact, read the OFAC alert on his report. (*See* Def.'s Mot. Summ. J. Mem. Supp. at 7.) RentGrow identifies two depositions that raise doubt as to whether a third party read the OFAC alert in support of its contention that Mr. Fernandez failed to carry his burden to demonstrate standing. *Id.* However, RentGrow also concedes that its business model is based on "provid[ing] tenant screening reports on applicants to its customers" "*[o]n request*." *Id.* at 4 (emphasis added). As the Second Circuit recently said of the 1,853 class members in *TransUnion* who suffered a concrete injury because their inaccurate credit reports were given to a third party, "[t]here could be no doubt that the third-party businesses viewed those credit reports, which they had specifically requested and paid for." *Maddox v. Bank of N.Y. Mellon Trust Co., N.A.*, 19 F.4th 58, 65 (2d Cir. 2021). Because Mr. Fernandez's landlord paid RentGrow for the report, it would be reasonable for a jury to

Class Actions ("Newberg") § 21:4 (5th ed. 2021) ("FCRA matters remain good candidates for class actions—they tend to involve a large number of harmed individuals with small claims, often disbursed throughout the country. Absent a class suit, many FCRA violations would remain unremedied."). If courts required each putative class member to show not only that inaccurate information was disseminated to a third party, but that the third party actually read and understood that information, the individualized inquiry that such a standard would require would undoubtedly predominate over other issues common to putative class members. This would render class certification in a § 1681e(b) lawsuit functionally impossible. The Court declines to adopt RentGrow's proposed reading of *TransUnion* and effectively foreclose an entire category of routinely pursued lawsuits.

Mr. Fernandez argues that to establish standing to pursue a § 1681e(b) violation under *TransUnion*, it is enough for a plaintiff to show that their information was disseminated to a third party. (Pl.'s Opp'n Summ. J. at.14–18); *see also Chuluunbat v. Experian Info. Sols., Inc*, 4 F.4th 562, 566 n.3 (7th Cir. 2021) ("[T]he plaintiffs in these cases have all alleged that their credit reports were accessed by third parties. . . . We conclude that the plaintiffs here have similarly [to the 1,853 class members in *TransUnion*] alleged a concrete injury."). The Court agrees that *TransUnion* squarely governs and compels the Court to find that Mr. Fernandez has standing. Like the 1,853 class members whose inaccurate reports were disseminated to a third party in *TransUnion*, the report that RentGrow prepared about Mr. Fernandez—which included the false OFAC alert and criminal history report—was given to his potential landlords. Even absent evidence that the false information was relied upon—as is the case with the OFAC alert—Mr. Fernandez suffered an

conclude that the individual(s) who reviewed Mr. Fernandez's rental application did in fact see the alert and simply forgot. At the summary judgment stage, when the Court views the facts in the light most favorable to the non-moving party, Mr. Fernandez would have carried his burden to demonstrate standing even under RentGrow's reading of *TransUnion*.

injury far more significant than he would have suffered as the result of a defamatory letter sitting in a drawer. *Cf. TransUnion*, 141 S. Ct. at 2210 (2021) ("A letter that is not sent does not harm anyone, no matter how insulting the letter is.").

Because Mr. Fernandez suffered a concrete and particularized injury that RentGrow caused when it provided a tenant screening report to Serenity Place at Dorsey Ridge, and because that injury would be redressed by the damages afforded by the FCRA, *see* 15 U.S.C. §§ 1681n, 1681o, Mr. Fernandez has carried his burden to demonstrate standing at this stage.

***c. Standing of Putative Class Members***[12]

In class actions, the Court analyzes "'standing based on the allegations of personal injury by the named plaintiffs.'" *Baehr v. Creig Northrop Team, P.C.*, 953 F.3d 244, 252 (4th Cir. 2020) (citing *Hutton v. Nat'l Bd. Of Exam'rs in Optometry, Inc.*, 892 F.3d 613, 620 (4th Cir. 2018)); *see also Dreher v. Experian Info. Sols., Inc.*, 856 F.3d 337, 343 (4th Cir. 2017). As already discussed, Mr. Fernandez has demonstrated that he has standing to challenge RentGrow's reporting procedures under § 1681e(b). For the same reasons, the Court further finds that the putative class members also have standing. Mr. Fernandez seeks to certify the following class:

> All individuals who were the subject of a consumer report (1) *furnished* by Defendant between April 23, 2017 and May 24, 2019 at 7:28 a.m. and (2) which reported OFAC/SDN information indicating a possible match, and (3) where there is not also a match between the (a) date of birth, (b) address, or (c) social security number associated with the subject of the report and the corresponding information regarding the person on the OFAC/SDN List.

(*See* Pl.'s Mot. Class Certification Mem. Supp. at 12 (emphasis added).) Under *TransUnion*, the putative class members—who by definition have had allegedly inaccurate information "furnished" to a third party—have standing. (*See id.* at 18 ("Plaintiff, like all putative class members, had an

---

[12] Though not challenged in RentGrow's Motion for Summary Judgment, for clarity, the Court briefly addresses the standing of the putative class members in this section.

inaccurate report disseminated to a third party . . . .").) Both Mr. Fernandez and the putative class members have therefore established that they have standing to challenge RentGrow's procedures.

### 2. *FCRA Violation*

Mr. Fernandez brings this action under the FCRA. Enacted in 1970, the FCRA's purpose is to "require that consumer reporting agencies adopt reasonable procedures" in, *inter alia*, reporting consumer information "in a manner which is fair and equitable to the consumer, with regard to the confidentiality, accuracy, relevancy, and proper utilization of such information[.]" 15 U.S.C. § 1681(b). To do so, the FCRA "'imposes a host of requirements concerning the creation and use of consumer reports.'" *TransUnion*, 141 S. Ct. at 2200 (quoting *Spokeo*, 578 U.S. at 335).

In relevant part, the statute commands that "[w]henever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." 15 U.S.C. § 1681e(b). Thus, to avoid summary judgment, Mr. Fernandez must produce sufficient evidence for a reasonable factfinder to conclude that (1) the tenant screening report RentGrow prepared about him was inaccurate and that (2) RentGrow "did not follow reasonable procedures." *Soutter v. Equifax Info. Servs., LLC*, 498 F. App'x 260, 264 (4th Cir. 2012) ("*Soutter II*") (citing *Dalton v. Cap. Associated Indus.*, 257 F.3d 409, 415 (4th Cir. 2001)). The FCRA provides civil liability for both willful and negligent noncompliance. *See* 15 U.S.C. §§ 1681n, 1681o.

#### a. *Accuracy*[13]

To succeed on a FCRA claim, a plaintiff must show that the information contained in the challenged report was inaccurate. *See Brown v. Experian Credit Reporting*, Civ. No. JKB-12-2048, 2012 WL 6615005, at *3 (D. Md. Dec. 17, 2012). "A report is inaccurate [under the FCRA]

---

[13] RentGrow does not argue that the criminal records accompanying Mr. Fernandez's report were accurate. (*See* Def.'s Mot. Summ. J. Mem. Supp. at 28–31.) The Court therefore considers this point conceded.

when it is 'patently incorrect' or when it is 'misleading in such a way and to such an extent that it can be expected to [have an] adverse [ ]' effect." *Dalton*, 257 F.3d at 415; *see also Letren v. Trans Union, LLC*, Civ. No. PX-15-3361, 2017 WL 445237, at *7 (D. Md. Feb. 2, 2017) ("Accuracy is a complete defense to a claim brought under § 1681e(b)."). The plain text of § 1681e(b) requires credit reporting agencies to assure "*maximum possible* accuracy." *See Cortez v. Trans Union, LLC*, 617 F.3d 688, 710 (3d Cir. 2010) ("Congress clearly intended to ensure that credit reporting agencies exercise care when deciding to associate information with a given consumer[.]"); *see also Twumasi-Ankrah v. Checkr, Inc.*, 954 F.3d 938, 942 (6th Cir. 2020) ("What's more, a brief tour of § 1681e(b)'s surrounding provisions shows that Congress was concerned with 'incomplete' credit reporting as much as it was with 'inaccurate' credit reporting.").

RentGrow argues that its inclusion of an OFAC alert on Mr. Fernandez's tenant screening report was not technically inaccurate because it merely listed Mr. Fernandez as a "possible match" to an individual on the OFAC list, rather than a match. (*See* Def.'s Mot. Summ. J. Mem. Supp. at 14–15.) In support of this contention, RentGrow cites two cases—neither of which are from this Circuit—that awarded summary judgment to the defendant credit reporting agency where the defendant did not "wrongfully attribute" inaccurate criminal information to the subject of the report and instead either warned the report requester that the criminal record may not belong to the subject, or included additional information about the criminal record itself that the report requester could use to verify whether the record belonged to the subject. *Erickson v. First Advantage Background Servs. Corp.*, 981 F.3d 1246, 1252 (11th Cir. 2020); *see also Taylor v. Tenant Tracker, Inc.*, Civ. No. BSM-10-0282, 2011 WL 5402388 (E.D. Ark. Nov. 4, 2011). Accepting this argument would cause the Court to interpret the FCRA in a way that is simply unsupported by the text of § 1681e(b), which requires "maximum possible accuracy" rather than mere technical

accuracy. *See Twumasi-Ankrah*, 954 F.3d at 942. It would also require the Court to disregard binding caselaw, which, of course, it may not do. *See Dalton*, 257 F.3d at 415 (holding that a report that is "misleading in such a way and to such an extent that it can be expected to have an adverse effect" is inaccurate) (cleaned up).

Moreover, that RentGrow included a copy of the full text from the OFAC list in the tenant screening report does not entitle RentGrow to summary judgment because it would not preclude a reasonable jury from finding that the tenant screening report was nonetheless misleading. (*See* Def.'s Reply Supp. Summ. J., ECF No. 194 at 6.) "The harm from being labeled a 'potential terrorist' bears a close relationship to the harm from being labeled a 'terrorist,'" *TransUnion*, 141 S. Ct. at 2209, and it would be reasonable for a jury to find that a report that indicates the subject is a "possible match" to someone on the OFAC list on the first page and only includes the matched OFAC record in the report's final pages might mislead the requester of the report in such a way and to such an extent as to disadvantage the report's subject. (*See* ECF No. 164-11 at 2, 10–11); *see also Dalton*, 257 F.3d at 415.

RentGrow also argues that federal guidance supports the accuracy of Mr. Fernandez's report. It cites guidance from the Treasury Department describing procedures credit reporting agencies should follow when listing a consumer as a "possible match" to an individual on the OFAC list. (Def.'s Mot. Summ. J. Mem. Supp. at 16–17; *see* ECF No. 165-16; *see also* ECF Nos. 165-17, 165-18.) RentGrow appears to argue that because its practices were consistent with this guidance, they are accurate as a matter of law. (*See* Def.'s Mot. Summ. J. Mem. Supp. at 19.) This argument fails for three reasons. First, the Treasury Department guidance does not suggest that complying with its guidelines results in maximum possible accuracy. Rather, it merely states that credit bureaus "should consider the following guidelines" if they "choose to place OFAC

information" on their reports. (*Id.* at 16; *see also* ECF No. 165-16 at 3.) In other words, that the Treasury Department prescribed methods by which credit reporting agencies could make "possible match" reporting less misleading does not make "possible match" reporting that complies with those guidelines accurate under the FCRA.

Second, it is dubious that the Treasury Department brochure—the only Treasury Department resource RentGrow cites that provides guidance to consumer reporting agencies rather than consumers—even interprets the FCRA. (*See* ECF No. 165-16 at 2 (listing nine statutes—none of which is the FCRA—on which OFAC exercises its authority).) This further confirms that compliance with the Treasury Department guidance alone would not satisfy the requirements of the FCRA.

Finally, to the extent RentGrow argues that the Treasury Department's guidance interprets the FCRA, the Court declines to defer to that interpretation. Following the passage of the Consumer Protection Act of 2010, the Consumer Financial Protection Bureau ("CFPB")—not the Treasury Department—is charged with the duty to "prescribe rules" or "issue guidelines" about and interpreting the FCRA, while the Federal Trade Commission ("FTC") retains authority to enforce its provisions.[14] *See* 15 U.S.C. §§ 1681s(a)(1), 1681s(e)(1); *Kidd v. Thomson Reuters Corp.*, 925 F.3d 99, 106 n.8 (2d Cir. 2019). Further, the Treasury Department's message about the desirability of "possible match" reporting is, at best, inconclusive. (*See* Pl.'s Opp'n Summ. J. at 24.) The very brochure RentGrow cites states that "all organizations involved in the credit reporting process . . . should strive to protect consumers from erroneous or *misleading* information

[14] The FCRA is mentioned only once in the Treasury Department materials that RentGrow cites: in a "Frequently Asked Questions" resource that instructs consumers about their statutory right to dispute an inaccurate OFAC alert on a credit report. (*See* ECF No. 165-17.) Even this instruction, though, directs consumers to either "visit the Federal Trade Commission's website or the Consumer Financial Protection Bureau at 855-411-2372," further underscoring the fact that these agencies, rather than the Treasury Department, are charged with administering the FCRA. (*Id.*)

appearing on credit reports." (*See* ECF No. 165-16 at 2–3 (emphasis added).) For these reasons, the Treasury Department's argued condonement of RentGrow's "possible match" practice is entitled to very little weight. *See Henderson v. Trans Union, LLC*, Civ. No. JAG-14-0679, 2017 WL 1734036, at *2 (E.D. Va. May 2, 2017) (explaining that guidance from the FTC and the CFPB are "authoritative sources" in interpreting the FCRA); *see generally United States v. Mead Corp.*, 533 U.S. 218 (2001); *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944).

The parties agree that Mr. Fernandez is not on the OFAC list. At bottom, the Court holds that a reasonable jury could find the inclusion of an alert describing Mr. Fernandez as a "possible match" to an individual on the OFAC list to be "misleading in such a way and to such an extent that it can be expected to have an adverse effect." *Dalton*, 257 F.3d at 415 (cleaned up). Indeed, one jury has already found that this "possible match" procedure produces inaccurate results. *See Ramirez v. TransUnion, LLC*, Civ. No. JSC-12-0632, 2017 WL 5153280, at *1 (N.D. Cal. Nov. 7, 2017), *rev'd on other grounds by TransUnion v. Ramirez*, 141 S. Ct. 2190 (2021). RentGrow is therefore not entitled to summary judgment on the issue of accuracy.

***b. Reasonable Procedures***

Under § 1681e(b), "the plaintiff bears the burden . . . to show that the consumer reporting agency did not follow reasonable procedures." *Dalton*, 257 F.3d at 416. Whether a credit reporting agency followed "reasonable procedures" within the meaning of the FCRA "will be a 'jury question[] in the overwhelming majority of cases." *Id.* (citing *Guimond v. Trans Union Credit Info. Co.*, 45 F.3d 1329, 1333 (9th Cir. 1995)). However, error-free consumer reports are not required; a credit reporting agency may rely on sources it reasonably believes to be reputable so long as it has no notice of systemic problems. *Smith v. Auto Mashers, Inc.*, 85 F. Supp. 2d 638, 640–41 (W.D. Va. 2000); *see also Letren v. TransUnion, LLC*, Civ. No. 15-3361, 2017 WL

445237, at *8 (D. Md. Feb. 2, 2017) ("The implementing regulations for the FCRA clarify that a CRA follows reasonable procedures if it relies on information from a reputable source unless it has some notice of systemic problems with the accuracy of its reports.").

### *i. OFAC Matching Protocol*

In support of its argument that the Court should grant summary judgment in its favor, RentGrow reiterates that it followed Treasury Department guidance. (*See* Def.'s Mot. Summ. J. Mem. Supp. at 19.) Assuming *arguendo* that the Treasury Department guidance is persuasive, that RentGrow may have followed Treasury Department guidance about "how much [OFAC] information should be reported," (Def.'s Reply Supp. Summ. J. at 10)—i.e., the "possible match" practice—tells the Court nothing about whether RentGrow was following Treasury Department guidance when it used only a consumer's name to search the OFAC list for potential matches. This is because the cited Treasury guidance only provides guidelines for *reporting* OFAC matches, not guidelines for determining whether an OFAC match *may exist* in the first place.

In an attempt to argue that its procedures with respect to the latter process were reasonable, RentGrow cites the OFAC list search function maintained on the Treasury Department's website. This tool allows users to conduct searches using name alone and produces a greater range of possible matches. RentGrow takes this as evidence that its own procedures for matching and reporting matches to the OFAC list were reasonable.[15] (*See* Def.'s Mot. Summ. J. Mem. Supp. at 19.) Although RentGrow makes much of the fact that Mr. Fernandez admitted that the Treasury Department's search function is not unreasonable, (*see id.*; Def.'s Reply Supp. Summ J. at 11), this argument is similarly unavailing. That the Treasury Department search tool "can be

[15] RentGrow also discusses two cases that are pertinent to the Court's analysis of RentGrow's alleged willful noncompliance, rather than the reasonableness of its procedures. The Court will consider these arguments in Subsection (c), *infra*.

configured" to conduct a name-only search does not bear on the reasonableness of the decision of a consumer reporting agency to *exclusively use* name-only searching. (Pl.'s Opp'n Summ. J. at 4.)

The Court finds that the question of reasonableness of RentGrow's "name-only" matching procedure when reporting a "possible match" to the OFAC list is one for the jury, not for the Court. *Dalton*, 257 F.3d at 416; *see also Cortez v. TransUnion, LLC*, 617 F.3d 688, 704, 710 (3d Cir. 2010). While the OFAC list is undoubtedly a source that RentGrow could reasonably rely on, *see Letren*, 2017 WL 445237, at *8, the Court cannot say as a matter of law that *how* RentGrow went about collecting data from the otherwise-reliable OFAC list was reasonable. The undisputed evidence in this case shows that when RentGrow produced Mr. Fernandez's November 2018 report, and, indeed, during the entire putative class period, RentGrow only used a consumer's name when conducting searches against the OFAC list. (*See* Def.'s Opp'n Class Certification at 6, 37 n.16; ECF No. 181-15 at 2–5.) It also shows that RentGrow has not identified any individual who was the subject of a tenant screening report who was accurately matched to the OFAC list. (*See* ECF No. 184-7 at 3 (failing, in RentGrow's response to Interrogatory No. 10 of Mr. Fernandez, to identify a tenant screening report it believed accurately identified a match to the OFAC list).) This evidence is more than sufficient to create a dispute of material fact about the reasonableness of RentGrow's OFAC reporting procedures.

***ii. Criminal Records***

To obtain criminal records for a tenant screening report, RentGrow purchases data from backgroundchecks.com and "matches those records to consumers, taking into account name, date of birth, jurisdiction of record, and any address associated with the criminal record." (Pl.'s Opp'n Summ. J. at 9.) RentGrow cites its 0.19% dispute rate of the criminal records it includes in its tenant screening reports and the Sixth Circuit's opinion in *Smith v. LexisNexis Sols.*, 837 F.3d 604

(6th Cir. 2016), in support of its argument that its criminal records reporting procedures were reasonable as a matter of law. (Def.'s Mot. Summ. J. Mem. Supp. at 30–31.)  In *Smith*, the credit reporting agency used the same first name, last name, and exact date of birth to match the plaintiff to a criminal record that was not his. *Smith*, 837 F.3d at 606–07.  However, *Smith* relied in part on a comparably low dispute rate in finding that the plaintiff failed to create a dispute of material fact with respect to *willfulness*, leaving intact the jury's finding that the credit reporting agency's procedures were unreasonable.  *See Smith*, 837 F.3d at 610, 612 (finding that the text of the FCRA—compelling credit reporting agencies to "follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates"—would support a jury's conclusion "that a reasonably prudent [credit reporting agency] . . . would have required additional identifying information—like a middle name—to heighten the accuracy of its reports").

Just as it would be reasonable for a jury to conclude that the agency in *Smith* should have used a screening subject's middle name to ensure the accuracy of the criminal records that were reported, a jury could reasonably conclude that RentGrow should have required an exact match to Mr. Fernandez's date of birth.  Moreover, a reasonable jury could find that a FCRA-compliant credit reporting agency would have acquired the criminal records directly from the court in order to verify the offender's date of birth—a data point that Mr. Fernandez's investigator was able to obtain "in less than five minutes using the Merced County website." (Pl.'s Opp'n Summ. J. at 10.) Mr. Fernandez has therefore created a dispute of material fact regarding the reasonableness of RentGrow's criminal history reporting procedures sufficient to survive summary judgment on this issue.

### c. *Willful Noncompliance*

The FCRA allows plaintiffs to recover the following damages resulting from willful noncompliance:

> (a) In general. Any person who willfully fails to comply with any requirement imposed under this subchapter with respect to any consumer is liable to that consumer in an amount equal to the sum of—
> (1) (A) any actual damages sustained by the customer as a result of the failure or damages of not less than $100 and not more than $1,000; or
> (B) in the case of liability of a natural person for obtaining a consumer report under false pretenses or knowingly without a permissible purpose, actual damages sustained by the consumer as a result of the failure or $1,000, whichever is greater;
> (2) such amount of punitive damages as the court may allow; and
> (3) in the case of any successful action to enforce any liability under this section, the costs of the action together with reasonable attorney's fees as determined by the court.

15 U.S.C. § 1681n(a). Thus, a plaintiff will be entitled to punitive damages, attorney's fees, and either actual or statutory damages if it can be shown that the defendant violated the FCRA willfully.

To show that a credit reporting agency was willful in its disregard of the FCRA's requirements, a plaintiff may "'show that the defendant knowingly and intentionally committed an act in conscious disregard for the rights of the consumer.'" *Ausherman v. Bank of Am. Corp.*, 352 F.3d 896, 900 (4th Cir. 2003) (citing *Dalton*, 257 F.3d at 418 (4th Cir. 2001)); *see also Thomas v. Mercedes Benz Credit Corp.*, Civ. No. 04-0976, 2006 WL 8457059, at *6 (D. Md. June 27, 2006) ("To the contrary, when asked by Trans Union's [sic] counsel whether she had any reason to believe that someone at Trans Union was 'purposely trying to harm' her, she responded, 'No.'"). Since *Ausherman* and *Dalton*, the Supreme Court has also confirmed that willful violations of the FCRA are "not only knowing violations . . . , but reckless ones as well." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 57 (2007). A reckless violation of the FCRA "entail[s] an unjustifiably high risk of harm that is either known or so

obvious that it should be known." *Id.* at 68. Although "[a] showing of malice or evil motive is not required to prove willfulness under [the FCRA]," summary judgment is warranted if a plaintiff provides no evidence of willfulness. *Dalton*, 257 F.3d at 417–18; *see generally Smith v. LexisNexis Screening Sols., Inc.*, 837 F.3d 604 (6th Cir. 2016). However, "[s]ummary judgment is seldom appropriate in cases in which particular states of mind are decisive elements of claim or defense, because state of mind is so often proved by inferences from circumstantial evidence and by self-serving direct evidence." *Magill v. Guld & W. Indus., Inc.*, 736 F.2d 976, 979 (4th Cir. 1984).

*i. OFAC Alert*

RentGrow argues that Mr. Fernandez has failed to create a dispute of material fact about whether its alleged FCRA violation was willful.[16] First, RentGrow notes that before this lawsuit, RentGrow's OFAC reporting procedures had never been challenged in any civil litigation or regulatory enforcement action. (Def.'s Mot. Summ. J. Mem. Supp. at 21.) RentGrow cites an email it sent notifying Dorsey Ridge that the OFAC alert on Mr. Fernandez's report was incorrect, (ECF No. 164-4), and further argues that the fact that it has since modified its reporting procedures to require an exact match to the first name, last name, and full date of birth of someone on the OFAC list before reporting a consumer as a possible match on a tenant screening report "negates any inference" that RentGrow willfully violated § 1681e(b). (*Id.* (citing *Dalton*, 257 F.3d at 418).)

[16] RentGrow also relies on *Smith v. Auto Mashers, Inc.*, 85 F. Supp. 2d 638 (W.D. Va. 2000), which itself relied on FTC guidance interpreting § 1681e(b) to conclude that the FCRA "'does not require error-free reports,'" and that a credit reporting agency is not "'on the hook' until it 'learns or should reasonably be aware of errors in its reports that may indicate systematic problems.'" *Smith*, 85 F. Supp. 2d at 641 (citing FTC Commentary on the Fair Credit Reporting Act). However, this Commentary was rescinded in 2011 after the FTC found its guidance to be "stale[]" following the passage of several amendments to the FCRA "expand[ing] the duties of consumer reporting agencies" and "increase[ing] the obligations of users of consumer reports, particularly employers." Statement of General Policy or Interpretation; Commentary on the Fair Credit Reporting Act, 76 Fed. Reg. 44,462 (July 26, 2011). Neither *Smith* nor the administrative guidance it cites instructs the Court on how to interpret the FCRA during the time period relevant to this case.

Although *Dalton* found insufficient evidence to support a reasonable jury's finding of willfulness, it is distinguishable from this case. There, the challenged procedure involved a subvendor's reliance on the legal opinion of a court clerk—which resulted in the inaccurate listing of a prior conviction as a felony, rather than a misdemeanor. *Dalton*, 257 F.3d at 413. The *Dalton* court concluded that a plaintiff failed to show this inaccuracy was willful because the plaintiff did not show that the credit reporting agency "was aware that its subvendors relied upon informal legal opinions from court clerks" and failed to present evidence that other consumers lodged similar complaints. *Id.* at 418. In addition, the agency had generally found the subvendor to be "reliable," and corrected its error one day after the plaintiff challenged the accuracy of the report. *Id.* Here, in contrast, it is clear that RentGrow was aware of its own procedures for finding and reporting OFAC information. (*See* Def.'s Opp'n Class Certification at 6, 37 n.16; ECF No. 181-15 at 2–5). Further, although the dispute rate is of RentGrow's OFAC reporting practice is low, Mr. Fernandez has successfully shown that at least 71 individuals filed complaints similar to his own. Far from finding its process to be "reliable," RentGrow has not identified any individual who was accurately matched to the OFAC list through its name-only search procedure. (*See* ECF No. 184-7 at 3.) *Dalton* therefore does not compel the Court to grant summary judgment.

RentGrow also points to the 0.1% dispute rate it received during the putative class period, explaining that the Sixth Circuit reversed a jury verdict due to insufficient evidence of willfulness where the procedure in question had a 0.2% dispute rate. (*Id.* at 22); *Smith*, 837 F.3d at 607, 612. Even in light of Mr. Fernandez's emphasis that "many consumers simply are not in a position to dispute [their tenant report], especially here, where English may be a second language to many of the affected customers," (Pl.'s Opp'n Summ. J. at 28), the OFAC reporting procedure's 0.1% dispute rate nonetheless weakens Mr. Fernandez's arguments that the 71 disputes RentGrow

received over the course of the putative class period demonstrates that it knew its procedures violated the FCRA.

However, two other factors lead the Court to conclude that the question of RentGrow's willful noncompliance with respect to its OFAC reporting procedures is nonetheless a question for the jury to resolve. First, eight years before RentGrow issued the disputed tenant screening report about Mr. Fernandez, the Third Circuit upheld a jury verdict finding that a substantially similar policy—in which the credit reporting agency only used a subject's name "when retrieving OFAC information" and reported potential matches as an "OFAC ADVISOR ALERT"—violated the FCRA. *See Cortez v. Trans Union, LLC*, 617 F.3d 688, 699, 704, 709–10 (3d Cir. 2010).[17] Second, the fact that RentGrow has not identified any individual who was the subject of a tenant screening report that accurately matched him or her to the OFAC list also bears on the willfulness inquiry. (*See* ECF No. 184-7 at 3.) These points create a dispute of material fact because it would be reasonable for a jury to conclude that RentGrow proceeded with its name-only matching policy in reckless disregard of the fact that it had yet to produce a valid match and in defiance of a federal Court of Appeals decision upholding a jury verdict finding that the very procedure it used to report possible matches to the OFAC list violated § 1681e(b).

***ii. Criminal Records***

RentGrow argues that it is entitled to summary judgment on this issue because it removed the criminal records from Mr. Fernandez's report "promptly" after he disputed them, and again cites its relatively low dispute rate of 0.19% as evidence that precludes Mr. Fernandez from

[17] RentGrow appears to argue that because the challenged procedure in *Cortez* reported "matches"—rather than "possible matches"—to the OFAC list, its OFAC reporting procedures are distinguishable. (Def.'s Reply Supp. Summ J. at 8–9.) However, both RentGrow and the *Cortez* defendant used name-only matching to the OFAC list to identify either matches or potential matches in the first place. *Cortez*, 617 F.3d at 704. This is the significant similarity that could bear on a reasonable jury's finding of willfulness.

demonstrating that it acted willfully. (Def.'s Mot. Summ. J. Mem. Supp. at 31.) Although this evidence may prove determinative to a jury, it is again insufficient for the Court to find that RentGrow was not willful as a matter of law. Mr. Fernandez creates a dispute of material fact by identifying meaningful inconsistencies between the criminal records it found and the tenant screening report it created, and by showing that it received "disputes involving California records matched based on year of birth"—suggesting that RentGrow may have had knowledge of other false matches to California court records based on incomplete dates of birth. (*See* Pl.'s Opp'n Summ. J. at 29–30, ECF No. 185-8.) The Court therefore does not grant summary judgment with respect to this issue.

***d. Negligent Noncompliance***[18]

The FCRA allows plaintiffs to recover the following damages resulting from negligent noncompliance:

> (a) In general. Any person who is negligent in failing to comply with any requirement imposed under this subchapter with respect to any consumer is liable to that consumer in an amount equal to the sum of—
> (1) any actual damages sustained by the consumer as a result of the failure; and
> (2) in the case of any successful action to enforce any liability under this section, the costs of the action together with reasonable attorney's fees as determined by the court.

15 U.S.C. § 1681o(a). Thus, a plaintiff may still seek relief under the FCRA for a negligent violation even if he or she cannot clear the higher bar necessary to show a willful violation. *See Dalton*, 257 F.3d at 418; *Smith*, 837 F.3d at 610. However, his or her recovery for a negligent violation will be limited to actual damages caused by the FCRA violation. "Actual damages may include not only economic damages, but also damages for humiliation and

[18] The Court proceeds on the understanding that the only claim for which Mr. Fernandez seeks negligent damages under § 1681o is his individual claim challenging RentGrow's criminal records reporting procedures. (*See* Pl.'s Mot. Class Certification Mem. Supp. at 3; Fernandez Dep. 37:2–25, ECF No. 181-12 at 7.)

mental distress." *Sloane v. Equifax Info. Servs., LLC*, 510 F.3d 495, 500 (4th Cir. 2007); *Dalton*, 257 F.3d at 419 ("[Plaintiff] alleges that he suffered emotional distress and loss of reputation as a result of the false report. Damages for such injuries are recoverable under FCRA."); *see also Cortez*, 617 F.3d at 719 ("[T]he FCRA allow[s] recovery for humiliation and embarrassment or mental distress even if the plaintiff has suffered no out-of-pocket losses."); *Losch v. Nationstar Mortg. LLC*, 995 F.3d 937, 944 (11th Cir. 2021).

Because Mr. Fernandez has already carried his burden to create a dispute of material fact about the willfulness of RentGrow's criminal records reporting procedures, he has satisfied the less rigorous negligence standard. The only remaining issue for the Court to decide is whether RentGrow's criminal records reporting procedures did not, as a matter of law, cause Mr. Fernandez actual damages. RentGrow argues that the evidence Mr. Fernandez has brought forward to support his emotional damages claim is conclusory, and therefore fails to show that he suffered any actual damages. (Def.'s Mot. Summ. J. Mem. Supp. at 25–28, 31.) Mr. Fernandez responds that under the Fourth Circuit's decision in *Sloane v. Equifax Info. Servs.*, 510 F.3d 495 (4th Cir. 2007), it has produced enough evidence of Mr. Fernandez's emotional damages to survive a motion for summary judgment. The Court agrees that *Sloane* is instructive here. There, the Fourth Circuit upheld at jury verdict[19] based on a plaintiff's testimony explaining "objective verification of her emotional distress," specific descriptions of the events that caused her distress, and the physical manifestations of that stress (including sleeplessness), as well as her spouse's testimony corroborating "the emotional toll" she endured. *Sloane*, 510 F.3d at 503–04. The *Sloane* court concluded that this evidence was

[19] Although the *Sloane* court upheld the jury's finding of sufficient emotional damages to support a § 1681o claim, it did reduce the damages awarded to the plaintiff from $245,000 to $150,000. *Sloane*, 510 F.3d at 507. This is immaterial to the inquiry presently before the Court because *Sloane* upheld the underlying finding of actual damages.

"substantial, if not overwhelming," and sufficiently supported the jury's emotional distress award. *Id.* at 504.

The cases RentGrow cites do not aid its argument because they are either non-binding or distinguishable from the instant case. In *Peckey v. Bank of Am.*, Civ. No. RDB-14-0433, 2016 WL 6951940 (D. Md. Nov. 28, 2016), the court granted summary judgment because the plaintiff produced *no evidence* of his emotional damages—relying instead on a single sentence in his briefing. *Peckey*, 2016 WL 6951940, at *2. In contrast, Mr. Fernandez has provided evidence in the form of his deposition and of Ms. Torres's deposition. In *Dorris v. Accounts Receivable Management, Inc.*, Civ No. GLR-11-3453, 2013 WL 1209629 (D. Md. Mar. 22, 2013), the court rejected a plaintiff's claim of actual damages under the Fair Debt Collection Practices Act because his testimony did not establish "an impact on his behavior, physical condition, or any other indicator or emotional distress." *Dorris*, 2013 WL 1209629, at *8. Mr. Fernandez has testified that he "lost sleep," was "extremely embarrassed" and concerned about his reputation (on which his livelihood depends), and that he was "under a lot of stress." (Fernandez Dep. 101:4–102:9, 148:13–148:20, ECF No. 185-1, at 9–11.) This testimony also distinguishes cases like *Taylor v. Tenant Tracker, Inc.*, 710 F.3d 824 (8th Cir. 2013), which dealt with a "matter that was resolved within five to ten minutes," while Mr. Fernandez's alleged ordeal lasted several weeks. *Taylor*, 710 F.3d at 829. Finally, the plaintiff's claim in *Johnson v. Equifax, Inc.*, 510 F. Supp. 2d 638 (S.D. Al. May 31, 2007), failed because of a causation issue, while Mr. Fernandez's own testimony directly links his alleged emotional distress to RentGrow's actions. *See Johnson*, 510 F. Supp. 2d at 648 ("In contrast, Johnson's stress, by her own admission, was caused by the fact that she did not have a job which paid a lot of money and she, therefore, qualified and received food stamps.").

In sum, the cases cited by RentGrow do not persuade the Court that it is entitled to summary judgment on this issue.

Mr. Fernandez has produced sufficient evidence to create a dispute of material fact about the actual damages he allegedly suffered as a result of RentGrow's policies. Like the plaintiff in *Sloane*, Mr. Fernandez testified in detail about the distress he suffered as a result of the information reported on his tenant screening report. Mr. Fernandez explained that he felt that his "reputation was damaged," that he was "extremely embarrassed," and that he was "humiliated." (Fernandez Dep. 148:13–15.) The stress was so severe that he allegedly "lost sleep." (*Id.* at 148:15, 156:18, 162:9, 163:7–8, 170:17.) Mr. Fernandez further testified that he worried about the effect that his tenant screening report would have on his security clearance, for which he was "up for . . . reinvestigation" at the time. (*Id.* at 162:15–18.) Just as the plaintiff's spouse in *Sloane* corroborated some of the plaintiff's emotional harm, Ms. Torres—Mr. Fernandez's then-fiancée, who was not living with Mr. Fernandez at the time and could not witness his loss of sleep firsthand—testified that she "noticed" physical symptoms of sleep deprivation on FaceTime calls with Mr. Fernandez. (Torres Dep. 48:25–49:5, ECF No. 185-9 at 16–17 ("[B]ecause when a person hasn't slept, they have circles under their eyes, they're tired.").) Based on this evidence, a reasonable jury could find that RentGrow's policies—which produced an inaccurate tenant screening report—caused Mr. Fernandez emotional harm sufficient to entitle him to actual damages under the FCRA.

***3. Conclusion***

RentGrow has not carried its burden to show that no reasonable jury could find that it failed to "follow reasonable procedures to assure maximum possible accuracy of the information" it reported on Mr. Fernandez's tenant screening report. 15 U.S.C. § 1681e(b); *see also* §§ 1681n,

1681o. Mr. Fernandez has also successfully shown that he has standing to challenge those procedures. *See generally TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021). Accordingly, RentGrow's Motion for Summary Judgment (ECF No. 163) is DENIED.

***B. Class Certification***

The Court turns next to Mr. Fernandez's Motion for Class Certification (ECF No. 167). Mr. Fernandez seeks, pursuant to Federal Rule of Civil Procedure 23(b)(3), to certify a class consisting of:

> All individuals who were the subject of a consumer report (1) furnished by Defendant between April 23, 2017 and May 24, 2019 at 7:28 a.m. and (2) which reported OFAC/SDN information indicating a possible match, and (3) where there is not also a match between the (a) date of birth, (b) address, or (c) social security number associated with the subject of the report and the corresponding information regarding the person on the OFAC/SDN List.

(Pl.'s Mot. Class Certification Mem. Supp. at 12.) Thus, the class Mr. Fernandez seeks to certify challenges only RentGrow's OFAC reporting procedures, and not its procedures for reporting criminal records. Mr. Fernandez has also limited the scope of his class claim to include only a claim of a willful violation under § 1681n, and he does not seek actual damages. (*See* Pl.'s Mot. Class Certification Mem. Supp. at 3.) In its opposition, RentGrow asks the court to deny class certification and strike with prejudice the class allegations and prayer for class-wide relief. (Def.'s Opp'n Class Certification at 40.) For the reasons set forth below, the Court will grant Mr. Fernandez's Motion for Class Certification.

***1. Legal Standard***

To warrant certification under Rule 23(b)(3), a putative class must also satisfy Rule 23(a). Rule 23(a) identifies four threshold preconditions for class certification: numerosity, commonality, typicality, and adequacy of representation. *See* Fed. R. Civ. P. 23(a). Rule 23(a) also implicitly requires that the members of the putative class be ascertainable. *Peters v. Aetna*, 2 F.4th 199, 241–

42 (4th Cir. 2021). Rule 23(b)(3) further mandates that the Court find both "that the questions of law or fact common to class members predominate over any questions affecting only individual members" (the "predominance" requirement), and that "a class action is superior" to other methods of fair and efficient adjudication (the "superiority" requirement). Fed. R. Civ. P. 23(b)(3). "It is the plaintiff's burden to demonstrate compliance with Rule 23, but the district court has an independent obligation to perform a 'rigorous analysis' to ensure that all of the prerequisites have been satisfied." *EQT Prod., Co. v. Adair*, 764 F.3d 347, 358 (4th Cir. 2014) (citing *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011)); *see also Soutter II*, 498 F. App'x at 264.

***2. Rule 23(a)***

As noted above, Rule 23(a) implicitly requires that a class must be (a) ascertainable and explicitly requires the Court to conclude that: (b) "the class is so numerous that joinder of all members is impracticable"; (c) "there are questions of law or fact common to the class"; (d) "the claims or defenses of the representative parties are typical of the claims or defenses of the class"; and (e) "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a).

***a. Ascertainability***

"'Rule 23 contains an implicit threshold requirement that the members of a proposed class be readily identifiable.'" *Peters*, 2 F.4th at 241–42 (citing *Adair*, 764 F.3d at 358). For certification to be proper, a court must be able to "readily identify the class members in reference to objective criteria"—although a plaintiff "need not be able to identify every class member at the time of certification." *Id.* at 242; (internal citations and quotations omitted); *see also Adair*, 764 F.3d at 358. However, certification is inappropriate where "class members are impossible to identify without extensive and individualized fact-finding or mini-trials." *Id.* (internal citations

and quotations omitted). "The relevant inquiry is whether 'the administrative burden of identifying class members in the instant case would render class proceedings too onerous.'" *J.O.P. v. U.S. Dep't Homeland Sec.*, 338 F.R.D. 33, 52 (D. Md. 2020) (citing *Adair*, 764 F.3d at 358).

Mr. Fernandez argues that the class he seeks to certify is ascertainable because the class definition uses "objective criteria"—that is, criteria that enable membership in the class to be demonstrated beyond reasonable dispute. *Peters*, 2 F.4th at 242. Because RentGrow knows the number of consumers about whom it reported an OFAC alert, and because RentGrow has other identifying information about those consumers that could be used to evaluate whether they fall within the class definition and to "provide written notice" of the class, Mr. Fernandez concludes that the class "is readily ascertainable with reference to [RentGrow's] own records." (Pl.'s Mot. Class Certification Mem. Supp. at 29–30.) RentGrow responds that the OFAC list itself does not, in fact, list a date of birth for each individual identified therein, and that RentGrow does not have the social security number of every consumer about whom it prepared a tenant screening report.[20] (Def.'s Opp'n Class Certification at 21–22.) According to RentGrow, determining whether a given individual is a class member would therefore be impossible where this data is lacking. (*Id.* at 22.)

Despite these objections, Mr. Fernandez has successfully persuaded the Court that such determinations would be administratively feasible because "class membership can be determined by a simple comparison of the class members' personally identifying information to the information on the OFAC/SDN List that was included on their report"—a procedure RentGrow already employs when resolving a disputed OFAC alert. (Pl.'s Reply Supp. Class Certification at

---

[20] RentGrow also raises an argument based on its flawed reading of *TransUnion*: because the standing inquiry will require proof that each putative class member's report was read and understood by a third party, "there is no objective measure by which to readily identify the class members who have Article III standing." (Def.'s Opp'n Class Certification at 21.) The Court has rejected this reading of *TransUnion*, requiring instead that putative class members have had their reports "disseminated" to a third party. As already explained, the Court is satisfied that putative class members would have standing because their tenant screening reports have been "furnished" to another.

10–11.) This comparison is both feasible and administrable because the three criteria the proposed class definition uses to define a class member are objective. First, it requires that a class member must have had their tenant screening report "furnished" to a RentGrow customer within a clearly-defined range of time. (Pl.'s Mot. Class Certification Mem. Supp. at 12.) Second, the report must contain an OFAC alert. (*Id.*) Finally, there cannot be "a match between the (a) date of birth, (b) address, or (c) social security number associated with the subject of the report and the corresponding information regarding the person" on the OFAC list. (*Id.*) Whether each of these criteria is satisfied can be objectively determined—i.e., without debate or requiring additional adjudication.

Finally, that the OFAC list and RentGrow may each have some incomplete data has no bearing on the ascertainability of the putative class. As Mr. Fernandez explains, if a social security number match fails because the OFAC list did not have it, the match fails just as it would if the OFAC list contained a different social security number. In other words, Mr. Fernandez's class claim challenges RentGrow's policy of using name-only matching when reporting OFAC alerts. He argues that it was unreasonable for RentGrow not to require some other identifier (i.e., date of birth, address, or social security number) beyond an individual's name before putting an OFAC alert on that individual's tenant screening report. Thus, for purposes of determining class membership, the reason why a date of birth, address, or social security number match fails does not matter. Whether RentGrow's name-only matching process was unreasonable or yielded inaccurate results has yet to be determined, for these are merits inquiries in which the Court does not have "free-ranging" "license to engage" at the class certification stage. *Adair*, 764 F.3d at 358; (*see* Def.'s Opp'n Class Certification at 22–23.) But whether RentGrow used only an individual's

name when determining whether to report an OFAC alert can be simply and objectively determined. Ascertainability is therefore satisfied.

***b. Numerosity***

Evaluating whether a "class is so numerous that joinder is impracticable" is a fact-specific inquiry. Fed. R. Civ. P. 23(a); *see Kelley v. Norfolk & W. Ry. Co.*, 584 F.2d 34, 35 (4th Cir. 1978). "There is no mechanical test for determining whether in a particular case the requirement of numerosity has been satisfied." *Kelley*, 584 F.2d at 35; *see also Cypress v. Newport News Gen. & Nonsectarian Hosp. Ass'n*, 375 F.2d 648, 653 (4th Cir. 1967). During the putative class period, RentGrow "reported OFAC/SDN information indicating a 'possible match' with respect to 71,036 unique consumers." (ECF No. 167-7 at 3.) Mr. Fernandez further explains that the 500-person sample of reports that RentGrow issued during the relevant time period did not contain a "date of birth, address, or social security number match," and each of those individuals is therefore a putative class member. (ECF No. 196 at 11; *see also* ECF No. 168-5.) Based on the 500-person sample, the Court agrees with Mr. Fernandez and concludes that a significant number of the 71,036 customers about whom RentGrow reported OFAC information are likely to fit within the class definition. The Court has no difficulty reaching the conclusion that numerosity is satisfied in this case. *See Soutter v. Equifax Inf. Servs., LLC*, 307 F.R.D. 183, 199 (E.D. Va. 2015) ("*Soutter IV*") (finding a revised class of "roughly 1,000 persons" to be numerous); 1 Newberg § 3:12 (5th ed. 2021) ("As a general guideline . . . a class of 40 or more members raises a presumption of impracticability of joinder based on numbers alone.").

***c. Commonality***

To demonstrate commonality, a plaintiff must show that the class members "'have suffered the same injury.'" *Wal-Mart*, 564 U.S. at 350 (citing *General Telephone Co. of Southwest v.*

*Falcon*, 457 U.S. 147, 157 (1982)). It is not enough to "'merely . . . alleg[e] a violation of the same legal provision by the same defendant.'" *Soutter II*, 498 F. App'x at 265–66 (citing *M.D. ex rel. Stukenberg v. Perry*, 675 F.3d 832, 840 (5th Cir. 2012)). In addition to suffering "a violation of the same provision of law," the putative class members' "claims must depend on a common contention" such that "determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart*, 564 U.S. at 350; *see also Brown v. Nucor Corp.*, 785 F.3d 895, 909 (4th Cir. 2015). Commonality "is generally satisfied by the existence of a single issue of law or fact that is common across all class members and is thus easily met in most cases." 1 Newberg § 3:18 (5th ed. 2021). In a certification motion brought under Rule 23(b)(3), however, the commonality requirement is "subsumed under, or superseded by, the more stringent" predominance inquiry. *Gray v. Hearst Commc'ns, Inc.*, 444 F. App'x 698, 700 (4th Cir. 2011) (citing *Lienhart v. Dryvit Sys., Inc.*, 255 F.3d 138, 146 n.4 (4th Cir. 2001)).

That commonality is met in this case can be shown by comparing its facts to those of the landmark commonality case *Wal-Mart v. Dukes*, 564 U.S. 338 (2011).[21] In *Wal-Mart*, because plaintiffs failed to establish that the discrimination claims of the putative class were driven by a nationwide pattern or practice, they also failed to establish commonality. *Id.* at 352. Here, in contrast, the "glue holding" together the claims of the putative class members are RentGrow's OFAC reporting policies. *Wal-Mart*, 564 U.S. at 352 ("Here respondents wish to sue about literally millions of employment decisions at once. Without some glue holding the alleged *reasons* for all those decisions together, it will be impossible to say that examination of all the class

[21] RentGrow's sole challenge to commonality is the now-familiar argument that the "threshold question of whether anyone 'actually read' or understood the OFAC possible match information is one to which there is no common answer." (Def.'s Opp'n Class Certification at 24.) The Court has rejected the notion that such a showing is required to establish Article III standing in this case and therefore finds this argument with respect to commonality unavailing.

members' claims for relief will produce a common answer to the crucial question *why I was disfavored*."). The answer to the question of whether RentGrow followed "reasonable procedures to assure maximum possible accuracy" of its OFAC alert reporting will help decide the merits of each putative class member's claim. Equally class wide will be the questions of RentGrow's willfulness and the proper measure of statutory and punitive damages, if applicable. 15 U.S.C. §§ 1681e, 1681n; (*see also* Pl.'s Mot. Class Certification Mem. Supp. at 19–20.) During the entire class period, RentGrow used only the names of the putative class members to search for possible matches on the OFAC list. (*See* Def.'s Opp'n Class Certification, ECF No. 181 at 6, 37 n.16; ECF No. 181-15 at 2–5.) Because there is a "common contention" across putative class members, that is, that RentGrow used name-only matching to report them as "possible" matches to individuals to the OFAC list, the commonality requirement is fulfilled.

***d. Typicality***

"Typicality 'goes to the heart of a representative['s] ability to represent a class.'" *Soutter II*, 498 F. App'x at 264 (citing *Deiter v. Microsoft Corp.*, 436 F.3d 461, 466 (4th Cir. 2006)). The typicality requirement functions to ensure "that 'as goes the claim of the named plaintiff, so go the claims of the class.'" *Deiter*, 436 F.3d at 466 (quoting *Broussard v. Meineke Discount Muffler Shops, Inc.*, 155 F.3d 331, 340 (4th Cir.1998)). To determine whether a movant for class certification has satisfied typicality, the Court compares the movant's claims and the nonmovant's defenses to those claims with those of the putative class by reviewing the elements of a prima facie case and the facts supporting those elements to determine the extent to which those facts would also prove the claims of absent class members. *Soutter II*, 498 F. App'x at 265; *see also Deiter*, 436 F.3d at 467. In other words, "'a class representative must be part of the class and possess the same interest and suffer the same injury as the class members.'" *Deiter v. Microsoft Corp.*, 436

F.3d 461, 466 (4th Cir. 2006) (citing *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 156 (1982)). "[F]actual differences will not render a claim atypical if the claim both arises from the same event or practice or course of conduct that gives rise to the claims of the class members and is based on the same legal theory." Newberg § 3:34.

In *Soutter II*, the Fourth Circuit decertified a § 1681e(b) class for lack of typicality because the facts supporting the prima facie case of the named plaintiff did not also support the claims of absent class members. *See Soutter II*, 498 F. App'x at 264–66. Two aspects of the named plaintiff's claim in particular defeated typicality. First, proof of the "reasonableness" element varied because the defendant used at least three different means of collecting the challenged records during the class period. *Id.* at 265. Second, plaintiff's proof offered in support of her allegation that the defendant acted "willfully"—letters she sent to defendant notifying it of the status of a court disposition before defendant issued a consumer report containing inaccurate information about the very same court disposition—did not advance the claims of absent class members.[22] On remand and in response to a renewed request for class certification, the district court ultimately granted certification—an order that the Fourth Circuit denied the defendant permission to appeal. *See generally Soutter IV*, 307 F.R.D. 183 (E.D. Va. 2015); *Equifax Inf. Servs., LLC v. Soutter*, No. 15-172 (4th Cir. June 15, 2015) (order denying petition to appeal class certification order).

Unlike the typicality-defeating individual proof identified in *Soutter II*, the proof Mr. Fernandez offers in support of his class claim tends to advance the claims of absent putative class members. As with the plaintiff in *Soutter II*, to succeed on his class claim, Mr. Fernandez must

[22] The Fourth Circuit in *Soutter II* also found that calculating statutory damages would necessarily entail a problematically individualized inquiry. The Court addresses this issue in its discussion of Rule 23(b)(3) predominance.

show that "the credit report contains inaccurate information[,] . . . [that RentGrow] did not follow reasonable procedures to assure maximum possible accuracy," and that RentGrow acted willfully. *Soutter II*, 498 F. App'x at 265 (citing *Dalton*, 257 F.3d at 415). First, Mr. Fernandez has shown—with the 500-person sample produced during discovery, (*see* ECF No. 168-5)—that inaccuracy can be demonstrated by "comparing the personal identifying information of [each] consumer to [the] OFAC/SDN information included on [each] report."[23] (Pl.'s Reply Supp. Class Certification at 20.)

Further, Mr. Fernandez's proof with respect to reasonableness advances all putative class members' claims. Unlike in *Soutter II*, the single change RentGrow made to its OFAC reporting procedures during the putative class period would not materially change a factfinder's reasonableness inquiry because Mr. Fernandez seeks to challenge reasonableness of the name-only matching process—a shared quality of the two procedures RentGrow used during the putative class period. (*See* Def.'s Opp'n Class Certification at 6, 37 n.16; ECF No. 181-15 at 2–5; Pl.'s Reply Supp. Class Certification at 23.) Finally, the proof offered in support of Mr. Fernandez's willfulness theory—including the existence of a Third Circuit ruling condemning the name-only procedure RentGrow used to report OFAC information that predated the putative class injuries by several years—will tend to advance the claims of the entire putative class. *See generally Cortez v. Trans Union, LLC*, 617 F.3d 688 (3d Cir. 2010).

RentGrow's arguments that Mr. Fernandez's claim is atypical of the class he seeks to certify are unavailing. First, RentGrow argues that the emotional harm Mr. Fernandez suffered as a result of the OFAC alert on his tenant screening report is atypical of any emotional or monetary harm suffered by the putative class members. However, with his class claim, Mr. Fernandez seeks

[23] The reliability of this method of demonstrating inaccuracy is discussed at length in the Court's analysis of Rule 23(b)(3) predominance.

statutory damages, not actual damages, under § 1681n. As discussed at greater length in the Court's analysis of predominance, the degree of harm suffered as a result of an underlying FCRA violation is not relevant to awarding statutory damages under § 1681n. The harm Mr. Fernandez may have suffered as a result of the OFAC alert is therefore not relevant to the allocation of damages for his class claim. Mr. Fernandez has suggested that bifurcating his individual claim (related to the inaccurate criminal history report) from his class claim and holding different trials with respect to each would address RentGrow's concern that it "would be extremely unfair and prejudicial" for a jury to consider Mr. Fernandez's testimony about the harm he suffered.[24] (Def.'s Opp'n Class Certification at 27; *see* Pl.'s Reply Supp. Class Certification at 14.) RentGrow has not yet been afforded an opportunity to address the issue. Accordingly, should either party seek bifurcation as a result of this Memorandum and Order, they should file a motion that includes a detailed proposal of the claims and issues that will be covered at each stage of the trial. *See, e.g.*, *Buchanan v. Consol. Stores Corp.*, 217 F.R.D. 178, 188–89 (D. Md. 2003); Newberg § 11:3 ("[B]ecause the defendant's liability is an issue that likely applies to all class members' claims, while damages may be individualized, bifurcation often enables a case to proceed as a class action by ensuring that the common liability issues predominate while the individualized damages issues are addressed in some other manageable fashion.").

Next, RentGrow argues that Mr. Fernandez is subject to several unique defenses which should prevent the Court from finding his claims to be typical of the putative class. Specifically, it asserts that Mr. Fernandez cannot establish standing and it is unclear whether other putative class

---

[24] The Court proceeds on the understanding that the division of Mr. Fernandez's individual and class claims are as follows: Mr. Fernandez seeks only statutory damages for a willful violation of the FCRA under § 1681n with respect to his class claim challenging RentGrow's OFAC alert reporting procedures, while he seeks actual damages for both a negligent and a willful violation of the FCRA under §§ 1681n and 1681o with respect to his individual claim challenging RentGrow's criminal records reporting procedures. *See supra* note 8; (Pl.'s Mot. Class Certification Mem. Supp. at 3; Fernandez Dep. 37:2–25, ECF No. 181-12 at 7.)

members will be subject to the same defense; the Treasury Department allows its users to conduct name-only searching, suggesting that RentGrow's procedure was reasonable; and estoppel and waiver. First, the argued significance of RentGrow's standing defense fails because neither Mr. Fernandez nor the putative class members are subject to it. Although typicality can be defeated by the existence of a unique defense that is not ultimately successful, *see Shiring v. Tier Technologies, Inc.*, 244 F.D.R. 307, 313 (E.D. Va. 2007), "[a] unique defense will render the proposed class representative's claims atypical only if it is likely to be a 'major focus' of the litigation." Newberg § 3:45. The typicality inquiry seeks to prevent class actions in which the named plaintiff is subject to a unique defense because "the fear is that the named plaintiff will become distracted by the presence of a possible defense applicable only to him so that the representation of the rest of the class will suffer." *J.H. Cohn & Co. v. American Appraisal Assocs., Inc.*, 628 F.2d 994, 999 (7th Cir. 1980). "'To defeat class certification, a defendant must show some degree of likelihood that a unique defense will play a significant role at trial.'" *In re Zetia (Ezetimibe) Antitrust Litigation*, 7 F.4th 227, 237 (4th Cir. 2021) (citing *Beck v. Maximus, Inc.*, 457 F.3d 291, 300 (3rd Cir. 2006)). These considerations are simply not at play when it comes to deciding whether a plaintiff has standing, which is a jurisdictional issue that *the Court* must decide before anyone—named plaintiff and class member alike—can recover damages. *TransUnion*, 141 S. Ct. at 2208. The Court has rejected RentGrow's reading of *TransUnion*, and has already found that Mr. Fernandez and putative class members—who by definition had their tenant screening reports disseminated to a third party—have established Article III standing at this stage. RentGrow has thus failed to show that standing "will play a significant role at trial." *In re Zetia*, 7 F.4th at 237.

Further, and setting aside the Court's determination that the existence of the Treasury Department search tool does not entitle RentGrow to summary judgment, it is unclear how this defense would be "unique." Any evidence supporting RentGrow's argument that its procedures were reasonable—even evidence only produced in reference to Mr. Fernandez, like RentGrow's comparatively more narrow name-only search results relative to the Treasury Department website—would apply to all putative class members, who were all the subject of tenant screening reports with OFAC alerts issued as a result of RentGrow's name-only search function, because such evidence goes to the overall reasonableness of the procedure. *Cf. Soutter IV*, 307 F.R.D. at 209 ("Soutter's evidence about Equifax's treatment of her own notice will focus on the reasonableness of Equifax's policies and procedures for handling notices of inaccuracy in general.").

Finally, RentGrow argues that Mr. Fernandez is subject to an estoppel and waiver defense because he rejected settlement offers on behalf of himself and on behalf of the 71 individuals who disputed the OFAC alerts on their tenant screening reports—each in an amount that, RentGrow contends, "equaled more than [Mr. Fernandez] could have hoped to recover on his own." (Def.'s Opp'n Class Certification at 29–30.) As Mr. Fernandez observes, it is inappropriate for the Court to say whether a settlement offer is complete when a plaintiff's recovery might include punitive damages. *See Milbourne v. JRK Residential Am., LLC*, Civ. No. 12-0861, 2014 WL 1369378, at *4 (E.D. Va. Apr. 7, 2014) ("There is no cap on punitive damages in an FCRA case[.]"); (Pl.'s Reply Supp. Class Certification at 17.) Moreover, it is unclear whether this defense survives the Supreme Court's decision in *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153 (2016). *See Gomez*, 577 U.S. at 165 ("[A]n unaccepted settlement offer or offer of judgment does not moot a plaintiff's case."); *see also Bennett v. Office of Federal Employee's Group Life Insurance*, 683 F. App'x 186,

188 (4th Cir. 2017). Although "it is not necessary that the [unique] defense asserted against the putative class representative ultimately succeed," these defenses are speculative at best. *Shirling*, 244 F.R.D. at 313. The Court finds that they are insufficient to defeat typicality.

Because the proof Mr. Fernandez offers in support of his class claim also tends to advance the claims of absent putative class members, typicality under Rule 23(a) is satisfied.

***e. Adequacy***

"The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997). The presence of a conflict does not defeat adequacy unless the conflict is "fundamental," and a conflict is not fundamental when it does not undermine the fact that "all class members 'share common objectives and the same factual and legal positions [and] have the same interest in establishing the liability of [defendants].'" *Sharp Farms v. Speaks*, 917 F.3d 276, 295 (4th Cir. 2019) (citing *Ward v. Dixie Nat'l Life Ins. Co.*, 595 F.3d 164, 179 (4th Cir. 2010)).

The Court finds that Mr. Fernandez and class counsel both adequately represent the putative class.[25] There is no fundamental conflict of interest between Mr. Fernandez and; in fact, Mr. Fernandez has shown that he is committed to the vigorous prosecution of this case. *See Benway v. Res. Real Estate Servs., LLC*, 239 F.R.D. 419, 425 (D. Md. 2006). For instance, he has

[25] Both the named plaintiff and plaintiff's counsel must serve as adequate class representatives. *See Oxendine v. Williams*, 509 F.2d 1405, 1407 (4th Cir. 1975). RentGrow does not challenge the adequacy of counsel for Mr. Fernandez to represent the putative class, who "has been appointed as lead counsel in dozens of FCRA class actions." (Pl.'s Mot. Class Certification Mem. Supp. at 25; *see also* ECF No. 167-2.) The Court must conduct its own inquiry pursuant to Federal Rule of Civil Procedure 23(g)(1)(A). Ms. E. Michelle Drake "has served as lead class counsel in over fifty class and collective actions alleging violations of" several federal and state consumer protection statutes, including the FCRA. (ECF No. 167-2 ¶ 5.) Mr. John G. Albanese has "been actively involved in litigating Fair Credit Reporting Act claims for over seven years." (*Id.* ¶ 6.) Ms. Drake and Mr. Albanese are from Berger Montague, a law firm that "specializes in class action litigation and is one of the preeminent class action law firms in the United States." (*Id.* ¶ 3.) Mr. Martin E. Wolf "is a principal in Gordon, Wolf & Carney, Chtd." and has served as counsel in at least thirteen class actions in federal and state courts in Maryland. (*Id.* ¶¶ 7, 9.) The Court finds that to this point in the litigation, counsel has expended a significant amount of time zealously investigating potential claims in this action. *See* Fed. R. Civ. P. 23(g)(1)(A). It further finds that counsel's experience and knowledge of the applicable law have been demonstrated. *Id.* Accordingly, the Court concludes that counsel is adequate.

rejected more than one settlement offer that would have served his interests but would not have achieved relief for many potential absent class members. (*Compare* Def.'s Opp'n Class Certification at 30,) *with Amchem*, 521 U.S. at 626 (holding that named parties were inadequate to represent absent class members because the class contained both those currently suffering from injuries and those facing the possibility of future injury, and thus a settlement negotiated by the named parties would undercut the interests of absent class members); *see also* Newberg § 3:58.

RentGrow argues that because Mr. Fernandez is pursuing an individual claim on a negligence theory of liability in addition to his class claim, and because he "testified he cannot attribute any portion of his alleged emotional distress to his individual claim as opposed to his class claim," Mr. Fernandez "is pursuing different claims and relief than the class." (Def.'s Opp'n Class Certification at 31.) Although the inextricability of the two causes of Mr. Fernandez's harm may possibly have some bearing on the ultimate success of his individual claim for actual damages under § 1681o, it has no bearing on the adequacy inquiry because he has limited recovery on his class claim to statutory damages under § 1681n. As explained at greater length in the Court's predominance analysis, the calculation of statutory damages under § 1861n does not rely on the harm to the plaintiff. *See infra* Part II.B.3.a. Thus, while a named plaintiff's failure to provide a legitimate model with which to calculate compensatory damages might be fatal to class certification, statutory damages awarded under § 1681n simply do not serve such a function. *See Franklin v. Midwest Recovery Sys., LLC*, Civ. No. 18-2085, 2021 WL 1035121, at *7 (C.D. Cal. Feb. 5, 2021) (denying class certification where no "common methodology" was shown for calculating *actual damages* under a California state statute, rather than statutory damages under the FCRA). Should either party wish to bifurcate the individual issues presented by Mr.

Fernandez's negligence claim, they should file a motion that includes a detailed proposal of the claims and issues that will be covered at each stage of the trial.

Mr. Fernandez has persuaded the Court that the class he seeks to certify is readily ascertainable, is sufficiently numerous, that there exist common questions of law and fact among the putative class members, that his claim is typical of the putative class members, and that he and his counsel will adequately represent absent class members. The Court thus turns to the requirements enumerated under Rule 23(b)(3).

### 3. *Rule 23(b)(3)*

A movant to certify class under Rule 23(b)(3) must show that common questions of law or fact predominate over any individualized questions, and that a class action is superior to other methods of deciding the dispute. Pertinent to determining whether a putative class complies with the requirements of Rule 23(b)(3) are the following factors:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
> (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3)(A)–(D).

#### a. *Predominance*

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623. "Critically, Rule 23(b)'s commonality-predominance test is qualitative rather than quantitative." *Stillmock v. Weis Markets, Inc.*, 385 F. App'x. 267, 273 (4th Cir. 2010) (citing *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 424 (4th Cir. 2003)). To satisfy this requirement, "'[c]ommon questions must

predominate over any questions affecting only individual members such that a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated." *Gray*, 444 F. App'x at 701 (citing *Amchem*, 521 U.S. at 615) (cleaned up). "'Common issues will predominate if individual factual determinations can be accomplished using computer records, clerical assistance, and objective criteria—thus rendering unnecessary an evidentiary hearing on each claim.'" *Soutter IV*, 307 F.R.D. at 214 (citing 2 Newberg § 4:50).

Mr. Fernandez argues that three common questions predominate over the individual questions at issue in this case: (1) whether RentGrow's name-only matching process was a reasonable procedure that assured the maximum possible accuracy of its OFAC alert results; (2) whether RentGrow's argued FCRA violation was willful; and (3) the proper measure of statutory and punitive damages. (Pl.'s Mot. Class Certification Mem. Supp. at 26.) RentGrow responds that three issues raise significant individualized inquiries that defeat predominance: (1) accuracy; (2) reasonableness of RentGrow's procedures; and (3) damages.[26] (Def.'s Opp'n Class Certification at 32–38.)

*i. Accuracy*

Among other elements necessary to establish to succeed on a § 1681e(b) claim, a plaintiff must show that the challenged record is inaccurate. *Soutter II*, 498 F. App'x at 265. RentGrow argues that Mr. Fernandez "cannot prove inaccuracy"—an issue about which Mr. Fernandez bears the burden of proof at trial—"on a classwide basis" because "[t]o do so, an individualized inquiry

[26] RentGrow does not argue that the Court's willfulness inquiry will be an individual issue, but the Court must address its significance as a part of its "rigorous" predominance analysis. *Adair*, 764 F.3d at 358 (citing *Wal-Mart*, 564 U.S. at 351). "Where the challenged behavior takes the form of a policy, practice, or procedure with generally applicable impact, willfulness is likely to be a common issue." *Soutter IV*, 307 F.R.D. at 206. Whether RentGrow willfully violated § 1681e(b) necessarily involves an inquiry into *RentGrow's* decisions, motives, and practices—not those of the putative class members. In other words, the question of whether RentGrow acted willfully can be answered on a class-wide basis. *Id.* at 207; *see also Rivera v. Equifax Inf. Servs.*, Civ. No. 18-4639, 2021 WL 5027797 (N.D. Ga. July 16, 2021). Thus, willfulness is a common, predominating issue in this case.

into every putative class member's report would be necessary." (Def.'s Opp'n Class Certification at 32–34.) Mr. Fernandez responds that "determining the accuracy of the report[s]" of each putative class member "is a simple process of comparing the personal identifying information of the consumer to [the] OFAC/SDN information included on [each] report." (Pl.'s Reply Supp. Class Certification at 20.)

Courts have reached differing conclusions about whether the issue of accuracy in § 1681e(b) cases will be so individualized that it will predominate over common questions of law or fact. *Compare Patel v. TransUnion, LLC*, 308 F.R.D. 292 (N.D. Cal. 2015) (granting certification and predominance found where accuracy of OFAC list matching was at issue), *Ramirez v. TransUnion, LLC*, 301 F.R.D. 408, 422–23 (N.D. Cal. 2014) (same), *and Soutter IV*, 307 F.R.D. at 214–15 (holding that predominance requirement was satisfied where accuracy of class members' records could be verified via a "simple, straightforward, and objective" comparison to centralized court records "managed by the Office of Executive Secretary ("OES") of the Supreme Court of Virginia), *with Gomez v. Kroll Factual Data, Inc.*, Civ. No. 13-0445, 2014 WL 1456530, at *3 (D. Colo. Apr. 14, 2014) (denying class certification where accuracy of OFAC list matching was at issue), *Henderson v. Corelogic Nat'l Bkgd. Data, LLC*, Civ. No. 12-0097, 2016 WL 4611570, at *11–*12 (E.D. Va. Sept. 2, 2016) (finding that the individual issue of completeness under 15 U.S.C. § 1681k predominated where plaintiffs challenged reporting of criminal background data, which would require an individualized review of each record to determine whether and how it was incomplete), *Jones v. Realpage, Inc.*, Civ. No. 19-2087, 2021 WL 852218, at *7 (N.D. Tex. Jan. 27, 2021) (finding that individual issues predominated where evaluating accuracy of criminal records would require case-by-case analysis), *Farmer v. Phillips Agency, Inc.*, 285 F.R.D. 688, 703 (N.D. Ga. 2012), *Owner-Operator Indep. Drivers Ass'n, Inc v. USIS*

*Com. Servs., Inc.*, 537 F.3d 1184, 1194 (10th Cir. 2008) (affirming district court denial of class certification where determining the accuracy of class members' employment history records required a predominating individualized inquiry), *and Harper v. TransUnion*, Civ. No. 04-3510, 2006 WL 3762035, at *8–*9 (E.D. Pa. Dec. 20, 2006) (finding that accuracy, among other issues, was individualized and defeated class certification where the credit reports of putative class members "incorrectly noted that" they "had filed for bankruptcy protection"). Those that have found accuracy to require individual inquiries into each putative class member have largely done so because the disputed records varied meaningfully across the putative class.

Two cases from the Northern District of California have faced class certification motions in actions challenging the precise practice at issue here—reporting individuals as possible matches to persons on the OFAC list—and have granted certification. *See Patel*, 308 F.R.D. at 308–10; *TransUnion*, 301 F.R.D. at 422–23. *But see Gomez*, 2014 WL 1456530, at *3.[27] Before the Supreme Court reversed and remanded on the separate issue of class standing, the district court in *TransUnion* certified a class that challenged a strikingly similar set of procedures to those presently before the Court. There, TransUnion used only a consumer's first and last name to search for matches to the OFAC list. *TransUnion*, 301 F.R.D. at 414. If this process yielded a hit, TransUnion would "automatically place[] an OFAC Alert" on a consumer report in addition to a disclaimer that the "'match' may or may not apply to the consumer whose eligibility is being considered" by TransUnion's client. *Id.* When TransUnion argued that determining the accuracy of each record was "an individual question that render[ed] certification inappropriate," the district

[27] RentGrow has identified one case involving name-only matching to the OFAC list where the district court found the issue of accuracy to involve an individualized inquiry that precluded class certification: *Gomez v. Kroll Factual Data, Inc.*, Civ. No. 13-0445, 2014 WL 1456530 (D. Colo. Apr. 14, 2014). This case engaged in three sentences of analysis on this issue, citing to some of the cases that the Court now distinguishes from the instant matter. Because of the conclusory nature of the analysis relative to the rigorous inquiry conducted by *TransUnion* and *Patel*, and because there is no indication in *Gomez* of whether the plaintiff presented evidence that no putative class member was an accurate match to an individual on the OFAC list, the Court does not find *Gomez* persuasive.

court found that the record before it did not support TransUnion's argument because TransUnion could not "identify any instance in which a person it identified as a 'potential match' was in fact a match." *Id.* at 422. Because TransUnion failed to identify an example "in which there [was] something other than the person's name to suggest the person [was] on the OFAC List," the record supported "a finding that not one of the members of the class [was] in fact on the OFAC List." *Id.* (citing *Meyer v. Portfolio Recovery Assocs., LLC*, 707 F.3d 1036 (9th Cir. 2012)). *Patel*, which involved a materially identical procedure, came to the same conclusion on this issue. *Patel*, 308 F.R.D. at 308–10.

RentGrow is correct to point out that in many instances, perhaps even most instances, a case requiring a file-by-file evaluation of the accuracy of the challenged records is not suitable for class resolution. *See, e.g.*, *Owner-Operator*, 537 F.3d at 1194; *Jones*, 2021 WL 853318, at *6–*9. For example, in *Owner-Operator*, plaintiff truck drivers sought to certify a class challenging, *inter alia*, the procedures used by defendant USIS Commercial Services to produce and distribute employment history reports. *Owner-Operator*, 537 F.3d at 1186–87. The district court found, and the Tenth Circuit affirmed, that determining the accuracy of the employee history reports—which contained a unique composition of records from varying employers depending on the individual in question—"required a particularized inquiry." *Id.* at 1194. Similarly, in *Jones*, the plaintiff's proposed class "include[d] individuals about whom [the defendant] sold a consumer report that included criminal-record information where the offender's name and the consumer's name did not exactly match." *Jones*, 2021 WL 852218, at *6. The court concluded that "a consumer applicant could provide a name to a leasing agency different than the name reflected on the consumer-applicant's generated criminal record," and that therefore simply showing the district court that the consumer's name did not exactly match a name on a criminal record could not prove that the

criminal record did not belong to the consumer. *Id.* at *7. The individualized issue of accuracy therefore predominated over the common issues in that case and class certification was denied. *Id.* at *9.

However, as with *TransUnion* and *Patel*, "this case presents a peculiar situation." *Patel*, 308 F.R.D. at 302; *cf. Jones*, 2021 WL 852218, at *9 (distinguishing *TransUnion* because the record before the court in *Jones* did not support a finding that none of the putative class members' records were inaccurate). As Mr. Fernandez has repeatedly emphasized, RentGrow has not identified an individual who it believes is a match to the OFAC list. (*See* ECF No. 184-7 at 3.) It is possible that, as both parties have suggested, a putative class member might have lied about his or her date of birth, address, and/or social security number such that a name match (or a lack thereof) does not tell the Court anything about whether that class member is in fact a match to the OFAC list. This would mean that there could be any number of accurate matches based on name alone. However, entertaining the possibility that there is a certification-defeating critical mass of accurately matched individuals based on name alone and without any other matching data would require the Court to assume that an individual on the OFAC list, seeking to evade detection, would lie about his or her date of birth, social security number, and/or address—but not about his or her name. *See Patel*, 308 F.R.D. at 302. The Court finds this practice implausible, at least at such a scale that class certification would be defeated. As with *Patel* and with *TransUnion*, the Court is willing to assume that "a predominant number of the proposed class [are] *not* terrorists" based on the record before it. *Id.* at 303.

The Court emphasizes that this does not shift Mr. Fernandez's ultimate burden to prove inaccuracy. *Cf. Patel*, 308 F.R.D. at 302. To be sure, if this case proceeds to trial, Mr. Fernandez will need to persuade a jury that the reports were inaccurate across the class and that no class

member is in fact a terrorist whose identity was actually uncovered by RentGrow's OFAC reporting procedures. However, the Court finds that the proof Mr. Fernandez has already brought forth—including the mismatch of data contained in the 500-person sample;[28] RentGrow's failure to identify a single accurate match; and the sheer number of possible matches that were reported during the putative class period—shows the likely class-wide reliability of Mr. Fernandez's proposed method of determining inaccuracy: looking to whether there is any information beyond an individual's name that ties him or her to an individual on the OFAC list.[29] *See Patel*, 308 F.R.D. at 303 ("[T]he court thinks that class members can accurately self-identify as to whether or not they are terrorists," and "there are methods (such as applying criteria beyond the name-only matching logic) to winnow out less obviously false positives from the data set."). This kind of evidence was simply not available in the cases that found that issues of accuracy defeated predominance. *See, e.g.*, *Jones*, 2021 WL 853318, at *9 ("The *Ramirez* court found that the record before it supported a finding that not one of the members of the class was in fact on the OFAC list. That is not the nature of the record before the Court today.") (cleaned up). "[A]bsent some pretty significant proof to the contrary," the Court is willing to assume for the purposes of class certification that this method of identification is reliable enough such that any confirmed matches to the OFAC list—if found—will be few and far between. *Patel*, 308 F.R.D. at 302 ("Absent some pretty significant proof to the contrary, the court is willing to assume that no significant (read: certification-breaking) fraction of the tagged proposed class was in fact accurately tagged as

[28] In its own review of this sample, the Court was unable to identify a single match based on date of birth (day, month and year) or address. (*See generally* ECF No. 168-5.) The Court observes, however, that the social security numbers of the 500 consumers were not included in this sample. Mr. Fernandez warrants that RentGrow has this information in its possession. (Pl.'s Mot. Class Certification Mem. Supp. at 7.) This data point will be required in order to determine class membership.

[29] RentGrow uses a similar procedure when investigating OFAC alert disputes: in the event of a dispute, an employee looks at the screening report to "compare the identifiers on the possible match to the personal information of the consumer," and nothing more. (*See* Lamoureux Dep. 26:15–21; ECF No. 168-6 at 3.)

potential terrorists.") The Court therefore finds that any individual issues that may arise from Mr. Fernandez's ultimate burden to show that the OFAC alerts were inaccurate do not predominate over the significant common issues in this case.

### *ii. Reasonableness*

Whether RentGrow's OFAC reporting procedures were reasonable is "the most qualitatively significant question" of Mr. Fernandez's class claim. *Soutter IV*, 307 F.R.D. at 215. As already discussed with respect to commonality, evaluating the reasonableness of RentGrow's procedures requires an evaluation of *RentGrow's* conduct, not its effects on each putative class member. Because determining whether RentGrow's OFAC reporting procedures were reasonable will not require individualized analysis for each putative class member, the Court concludes that this is a significant common issue that, among other common issues, "predominate[s] over any questions affecting only individual members." Fed. R. Civ. P. 23(b)(3).

RentGrow contends that Mr. Fernandez cannot prove the unreasonableness of its procedures on a class-wide basis because it modified its procedures during the putative class period. (Def.'s Opp'n Class Certification at 36–38.) The Court finds this argument unavailing. The class period embraces reports that RentGrow furnished "between April 23, 2017 and May 24, 2019 at 7:28 a.m." (Pl.'s Mot. Class Certification Mem. Supp. at 12.) Thus, during the class period, RentGrow used two policies to match consumers to the OFAC list: (1) from April 23, 2017 and continuing until July 27, 2017, RentGrow compared a consumer's name to those appearing on the most recent OFAC list—which RentGrow downloaded daily—and only listed a "possible match" alert if the consumer's first and last name was within two or fewer characters of a name appearing on the OFAC list, or if the consumer's first and last names matches based on software designed to capture phonetic similarities in order to match similar names in spite of small spelling

disparities; and (2) from July 27, 2017 to May 24, 2019 at 7:28 a.m., RentGrow only reported a "possible match" if the consumer's first and last names were within one character of a name on the OFAC list. (*See* Def.'s Opp'n Class Certification at 6, 37 n.16; ECF No. 181-15 at 2–5.) Both of these procedures use only the name of the consumer to match individuals to the OFAC list. Because Mr. Fernandez seeks to challenge reasonableness of the name-only matching process—a shared quality of the two procedures RentGrow used during the class period—the minor change in RentGrow's OFAC matching procedure during the class period is immaterial to this case. (Pl.'s Reply Supp. Class Certification at 23.) Whether RentGrow's OFAC matching procedures were reasonable is therefore a common, predominating inquiry.

***iii. Damages***

Any individualized inquiries that may be involved in calculating damages do not predominate over other common issues in this case. Where there is another "qualitatively overarching issue," and "the purported class members were exposed to the same risk of harm every time the defendant violated the statute in the identical manner, the individual statutory damages issues are insufficient to defeat class certification under Rule 23(b)(3)." *Stillmock*, 385 F. App'x at 273 (citing *Murray v. GMAC Mortg. Corp.*, 434 F.3d 948, 953 (7th Cir. 2006)). This is not a case "where individual damages issues are especially complex or burdensome," because calculating statutory damages will involve only a straightforward tallying of each proven FCRA violation. *Id.*; *see also* Newberg § 21:4 ("FCRA class actions seeking statutory damages are more easily certified than those seeking actual damages, as individual issues are more likely to predominate over common issues in actual damages cases, though individualized damages are not necessarily fatal at the class certification stage.").

RentGrow argues that class certification is improper because determining statutory damages requires the court to conduct an "individualized assessment." (Def.'s Opp'n Class Certification at 35.) Underlying RentGrow's argument is an assumption that the harm suffered by each putative class member would be relevant to determining the proper measure of statutory damages under § 1681n. (*See, e.g.*, *id.* at 35 ("Indeed, Plaintiff did not know why it would be appropriate to award him the same amount of damages as someone who was denied an apartment or suffered worse emotional distress as a result of any OFAC possible match information on their tenant screening report."); *id.* at 36 ("Where, as here, Plaintiff has provided no evidence of any injury to putative class members, let alone a method for calculating statutory damages on their behalf, individualized inquiries into each putative class member's damages will predominate.").)

In addition to punitive damages and attorney's fees, the FCRA expressly allows plaintiffs to pursue either "actual damages sustained by the consumer as a result of . . . failure" to comply with its terms or "damages of not less than $100 and not more than $1000." 15 U.S.C. § 1681n(a)(1)(A). With his class claim, Mr. Fernandez seeks statutory damages—that is, damages within the statutorily-defined range of $100 to $1,000—and punitive damages, not actual damages. *See* § 1681n; (Pl.'s Mot. Class Certification Mem. Supp. at 3.) The FCRA does not provide guidance about the appropriate allocation of statutory damages. There has, accordingly, been a good deal of confusion about whether quantifying statutory damages requires consideration of evidence about the individual injury suffered by each putative class member to such an extent that it that would prevent class certification. *Compare Stillmock*, 385 F. App'x at 273 (finding that the only individualized inquiry required to award § 1681n statutory damages involved simply tallying each violation, rather than an extensive inquiry into the injury each violation caused), *Soutter IV*, 307 F.R.D. at 217 (same), *and Dreher v. Experian Inf. Sols.*, Civ. No. 11-0624, 2014 WL 2800766,

at *3–*5 (E.D. Va. June 19, 2014) (same) (vacated and remanded by *Dreher II*, 856 F.3d 337, 346 (4th Cir. 2017), with instructions to dismiss for lack of standing), *with Soutter II*, 498 F. App'x at 265 (4th Cir. 2012) (finding that statutory damages typically require an "individualized inquiry") (citing *Stillmock*, 385 F. App'x at 277 (Wilkinson, J., concurring)).

As an initial matter, the Court finds that statutory damages do not serve the same purpose as "actual damages" in § 1681n. "Actual damages—the result of the alleged injury—typically consist of monetary losses, physical injuries, or mental suffering." *Dreher*, 2014 WL 2800766, at *4. It follows from the use of the conjunction "or" that damages awarded pursuant to the statutory range contained in the second clause of § 1681n(a)(1)(A) would exclude "actual damages." *See* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 170–74 (2012) (explaining that a material variation in terms suggests a variation in meaning). Observing this distinction, at least one court has "reject[ed] the proposition that actual harm is a relevant factor when determining statutory damages under FCRA because FCRA expressly imposes a heavier burden on class members seeking statutory damages (*i.e.*, proof of the defendant's willfulness) than it does on those seeking only actual damages." *Ashby v. Farmers Ins. Co. of Or.*, 592 F. Supp. 2d 1307, 1318 (D. Or. 2008). *Ashby* concluded that "the factor most germane to the amount of statutory-damages award to class members is the jury's perception of the importance, and hence the value, of the rights and protections conferred on the consuming public by FCRA's . . . requirements." *Id.*

One other case from this circuit adopted the approach outlined *Ashby*. *See Dreher*, 2014 WL 2800766, at *3–*5. Two more concluded that statutory damages issues did not predominate over other common questions. *See Stillmock*, 385 F. App'x at 273; *Soutter IV*, 307 F.R.D. at 217. *Soutter II* also did not find that statutory damages did not cause individual issues to predominate

over class issues, but rather determined that the individualized inquiry involved in calculating statutory damages contributed to a finding of atypicality between the named plaintiff and the class. *Soutter II*, 498 F. App'x at 265. However, it did so in reliance on a concurring opinion from *Stillmock*—a case in which the Fourth Circuit found that the district court abused its discretion in *declining to certify* a class, in part because any individual issues that accompanied calculating § 1681n statutory damages should not have prevented the district court from certifying the class. *See Stillmock*, 385 F. App'x at 272–73 ("While we agree with the district court's implicit holding that statutory damages under § 1681n(a)(1)(A) are to be awarded on a per consumer basis, we also agree with Plaintiffs that the district court erred in concluding that individual issues of damages would predominate over issues common to the class.").

Accordingly, the Court follows *Stillmock* to conclude that any individual issues involved in determining the question of damages do not predominate over the common issues raised by Mr. Fernandez's class claim. Importantly, Mr. Fernandez has expressly limited his class claim to statutory damages. Had he instead sought actual damages, the necessary inquiry into the harm suffered by each individual putative class member would undoubtedly eclipse the other common issues in this case and class certification would be inappropriate. *See Harper v. TransUnion, LLC*, Civ. No. 04-3510, 2006 WL 3762035, at *8 (E.D. Pa. Dec. 20, 2006); Newberg § 21:4. Unless the Court "finds that personal injuries are large in relation to statutory damages, a representative plaintiff must be allowed to forego claims for compensatory damages in order to achieve class certification. When a few class members' injuries prove to be substantial, they may opt out and litigate independently." *Murray*, 434 F.3d at 953. FCRA matters "tend to involve a large number of harmed individuals with small claims," and the Court has seen no evidence that a certification-defeating number of putative class members have suffered actual harm to such an extent that a

statutory damages award would not be an adequate remedy. Newberg § 21:4. Thus, the damages issue does not prevent the Court from granting class certification.

Finally, RentGrow argues that the Supreme Court's decision in *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013), prevents the Court from certifying the class. Specifically, RentGrow contends that *Comcast* rejected a plaintiff's ability to "argue that the same amount of statutory damages can simply be assessed across the class, without proof as to how the damages are calculated." (Def.'s Opp'n Class Certification at 36.) In *Comcast*, the Supreme Court rejected a model that an expert witness produced to calculate damages designed to account for the "overbuilder-deterrence impact" resulting from Comcast's anticompetitive behavior. *Comcast*, 569 U.S. at 31–32. The expert witness designed a model that compared "a figure that would show what the competitive prices would have been if there had been no antitrust violations" to "the actual prices during the charged period." *Id.* at 36. The Supreme Court found that the model's failure to attribute its underlying calculus to any one legal theory prevented its application to the entire class in a way that would satisfy Rule 23(b)(3). *Id.* at 38. *Comcast* is inapposite here because of the nature of the damages at issue: there, the damages model sought to compensate the aggrieved parties for expected losses as a result of Comcast's anticompetitive behavior. As already discussed, the statutory damages provided for by § 1681n do not serve such a function. *Comcast* therefore does not preclude class certification in this case.

For the foregoing reasons, the common issues of whether RentGrow's procedures were reasonable, whether it acted willfully, and the appropriate award of statutory and punitive damages predominate over any individual issues. Rule 23(b)(3)'s predominance requirement is satisfied.

***b. Superiority***

The superiority requirement requires the Court to "find that the class action instrument would be better than, not just equal to, other methods of adjudication" before certifying a class under Rule 23(b)(3). *Hewlett v. Premier Salons Intern., Inc.*, 185 F.R.D. 211, 220 (D. Md. 1997). To evaluate the utility of a class action in a given case, the Court should consider "1) the interest [of absent class members] in controlling individual prosecutions; 2) the existence of other related litigation; 3) the desirability of concentrating the litigation in the forum; and 4) manageability." *Newsome v. Up-To-Date Laundry, Inc.*, 219 F.R.D. 356, 365 (D. Md. 2004) (citing *Hewlett*, 185 F.R.D. at 220). Additional factors that may bear on the superiority determination include judicial economy; the barriers that may face individual claimants in obtaining relief; whether the "dominance of state law issues may affect the suitability" of litigating the case in federal court; and whether the defendant has acted in good faith. *Adair*, 764 F.3d at 370–71. "[T]here is a strong presumption in favor of a finding of superiority where . . . the alternative to a class action is likely to be no action at all for the majority of class members." *Soutter IV*, 307 F.R.D. at 218; *see also Gibbs v. Stinson*, Civ. No. 18-0676, 2021 WL 4812451, at *20 (E.D. Va. Oct. 14, 2021); *Milbourne v. JRK Residential Am., LLC*, Civ. No. 12-0861, 2014 WL 5529731, at *13–*14 (E.D. Va. Oct. 31, 2014).

These factors weigh in favor of class certification.[30] There seems to be little to be gained from the pursuit of individual lawsuits for these claims. RentGrow's lamentation that it is unclear "whether putative class members suffered any harm at all from the OFAC reporting," which it

[30] RentGrow reiterates its argument that "individualized proof is necessary to prove whether each putative class member's report was actually inaccurate and the amount of statutory damages to award each member," and a class action is therefore not a superior method of resolving this dispute. (Def.'s Opp'n Class Certification at 38–39.) Because the Court has already addressed these arguments, it does not further engage with them here.

argues would render class certification "unfair,"[31] in fact supports the conclusion that class resolution would be more efficient. (Def.'s Opp'n Class Certification at 39.) With no indication that a critical mass of putative class members suffered harm that would support a substantial amount of actual damages, collective pursuit of statutory damages would appear to be preferable. *See Murray*, 434 F.3d at 953. If any such class members are found, "they may opt out and litigate independently." *Id.* As previously explained, FRCA actions "tend to involve a large number of harmed individuals with small claims, often dispersed throughout the country." Newberg § 21:4 ("Absent a class suit, many FCRA violations would remain un-remedied."). Such is the instant case. Here, some putative class members will face insurmountable barriers to obtaining counsel and pursuing a FCRA claim, others may be time-barred absent class resolution,[32] and still others may not even know that their statutorily protected consumer rights may have been violated. (*See* Pl.'s Opp'n Summ. J. at 28 ("[M]any consumers simply are not in a position to dispute, especially here, where English may be a second language to many of the affected consumers.").) In such cases, a class action is a suitable, and indeed preferable, mechanism to litigate the dispute. *See Soutter IV*, 307 F.R.D. at 218. Additionally, the presence of predominating common questions—including, but not limited to, the reasonableness of RentGrow's procedures and its willfulness—

[31] In support of this assertion, RentGrow cites two cases—both from outside this Circuit—finding that principles of fairness prevented the pursuit of class-wide relief because the possible damages awards that could result from class litigation were simply too exorbitant. *See Anderson v. Cap. One Bank*, 224 F.R.D. 444, 453 (W.D. Wis. 2004); *In re Trans Union Corp. Priv. Litig.*, 211 F.R.D. 328, 351 (N.D. Ill. 2002). Mr. Fernandez correctly observes that these decisions predated the Seventh Circuit's decision in *Murray*, which found it improper for a district court to "curtail aggregate damages for violations [that were] deemed trivial." *Murray*, 434 F.3d at 953–54. Moreover, "FCRA statutory damages are not capped," and the question of whether such a limiting principle should exist "is for Congress and not for this Court." *Ramirez v. TransUnion, LLC*, Civ. No. 12-0632, 2017 WL 5153280, at *6 (N.D. Ca. Nov. 7, 2017); *see also Saunders v. Branch Banking and Trust Co.*, 526 F.3d 142, 152 (4th Cir. 2008).

[32] The FCRA's statute of limitations provides that an action must be commenced "not later than the earlier of (1) 2 years after the date of discovery by the plaintiff of the violation that is the basis for such liability; or (2) 5 years after the date on which the violation that is the basis for such liability occurs." 15 U.S.C. § 1681p.

indicates that there will likely be common proof among the putative class members. Evaluating this proof in the same action will further judicial economy.

Moreover, that the FCRA contains an attorney's fees provision does not—standing alone—support a finding that individual adjudication is preferable. RentGrow correctly points out that the Fourth Circuit in *Yohay v. City of Alexandria Emps. Credit Union*, 827 F.2d 967 (1987), declined to restrict an attorney's fee award in an individual FCRA action in an effort to avoid "discourage[ing] vigorous enforcement of the Act." *Yohay*, 827 F.2d at 974. That this Circuit has not imposed atextual restrictions on the attorney's fees that may be awarded in an individual FCRA action perhaps shows that it is not impossible for an individual to bring a lawsuit under FCRA, but it does not show that such a resolution is *preferable*. Indeed, the Fourth Circuit has already found that "there is no reasoned basis to conclude that the fact that an individual plaintiff can recover attorney's fees in addition to statutory damages up to $1,000 will result in enforcement of FCRA by individual actions of a scale comparable to the potential enforcement by way of class action."[33] *Stillmock*, 385 F. App'x at 274 (citing *Bertulli v. Indep. Ass'n of Cont'l Pilots*, 242 F.3d 290, 299 (5th Cir. 2001), and *Tchoboian v. Parking Concepts, Inc.*, Civ. No. 09-0422, 2009 WL 2169883, at *9 (C.D. Cal. July 16, 2009)). The Court agrees.[34]

---

[33] Judge Wilkinson wrote separately in *Stillmock* to explain his skepticism that denial of class certification in FCRA cases "will allow proven violators of a statute to escape largely untouched." *Stillmock*, 385 F. App'x at 272–82 (Wilkinson, J., concurring). In so doing, he deftly identified mechanisms that individual FCRA litigants could use to effectuate the FCRA's purpose and deter unreasonable consumer reporting practices. *See id.* at 282 (citing, in addition to the presence of an attorney's fees provision, the possibility of punitive damages and offensive collateral estoppel). The Court finds that these mechanisms may mitigate, but do not entirely address, the problems that face individual FCRA litigants. There is a real possibility that any number of putative class members may not know that an OFAC alert was included in their tenant screening report. Worse still, it is possible that some were denied a lease and did not know or understand why. Given the barriers facing individual litigants in this case, the Court questions whether attorney's fees, punitive damages, and offensive collateral estoppel are enough to incentivize individual lawsuits on a scale that would deter unreasonable consumer reporting practices in the absence of class litigation.

[34] The Court does not believe that there is other pending litigation or any dominant state law issue that would bear on the superiority analysis. *See Adair*, 764 F.3d at 370–71; *Hewlett*, 185 F.R.D. at 220. Those factors therefore do not counsel against class certification.

Claims brought under the FCRA are well-suited for class resolution, and this case is no exception. The Court finds that a class action is a superior method of resolving this dispute.

#### *4. Conclusion*

For the foregoing reasons, Mr. Fernandez's Motion for Class Certification (ECF No. 167) is GRANTED. The Court certifies the following class:

> All individuals who were the subject of a consumer report (1) furnished by Defendant ***to a third party*** between April 23, 2017 and May 24, 2019 at 7:28 a.m. and (2) which reported OFAC/SDN information indicating a possible match, and (3) where there is not also a match between the (a) date of birth, (b) address, or (c) social security number associated with the subject of the report and the corresponding information regarding the person on the OFAC/SDN List.

The Court adds the inserted language to ensure that all class members will have Article III standing under *TransUnion*. A separate order will issue consistent with the terms of Federal Rule of Civil Procedure 23(c).

### *III. Conclusion*

For the foregoing reasons, RentGrow's Motion for Summary Judgment (ECF No. 163) will be DENIED, and Mr. Fernandez's Motion for Class Certification (ECF No. 167) will be GRANTED.

DATED this 9 day of March, 2022.

BY THE COURT:

James K. Bredar
Chief Judge

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

**MARCO A. FERNANDEZ,** *

**Plaintiff** *

**v.** * **CIVIL NO. JKB-19-1190**

**RENTGROW, INC.,** *

**Defendant.** *

* * * * * * * * * * * *

**ORDER**

For the reasons set forth in the foregoing Memorandum, it is hereby ORDERED that:

1. Defendant RentGrow's Motion for Summary Judgment (ECF No. 163) is DENIED, meaning Mr. Fernandez will be permitted to continue pursuing the following claims and no others:
    a. His individual claim that RentGrow willfully and negligently violated 15 U.S.C. § 1681e(b) when it reported criminal records on his November 2018 tenant screening report, *see* 15 U.S.C. §§ 1681n, 1681o; and
    b. His representative claim that RentGrow willfully violated 15 U.S.C. § 1681e(b) when it reported an OFAC alert on his November 2018 tenant screening report, *see* 15 U.S.C. § 1681n;
2. Plaintiff Marco A. Fernandez's Motion for Class Certification (ECF No. 167) is GRANTED;
    a. The Court certifies the following Class pursuant to Fed. R. Civ. P. 23(b)(3):

All individuals who were the subject of a consumer report (1) furnished by Defendant to a third party between April 23, 2017 and May 24, 2019 at 7:28 a.m.

and (2) which reported OFAC/SDN information indicating a possible match, and (3) where there is not also a match between the (a) date of birth, (b) address, or (c) social security number associated with the subject of the report and the corresponding information regarding the person on the OFAC/SDN List.

    b.  Named Plaintiff Marco A. Fernandez is appointed as Class Representative;

    c.  E. Michelle Drake and John G. Albanese of Berger Montague and Martin E. Wolf of Gordon, Wolf & Carney are appointed Class Counsel (*see* ECF No. 167-2);

    d.  The claim that RentGrow's OFAC alert reporting procedures constituted a willful violation of 15 U.S.C. § 1681e(b) is certified on behalf of the Class;

    e.  Pursuant to Federal Rule of Civil Procedure 23(c)(2), it is hereby ORDERED that notice shall be prepared and distributed to the Class. The parties are to meet and confer within fourteen (14) days of this Order for purposes of discussing the preparation of a list of all class members and their last known contact information, and to prepare a proposed notice that meets the requirements of Rule 23(c)(2)(B). The parties are to submit a proposed Notice to the Court within twenty-one (21) days of this Order for the Court's approval, which submission shall also include a proposed timeline for the distribution of Notice;

3.  The Memorandum accompanying this Order is SEALED. It shall be UNSEALED ten (10) days after its entry on the docket. Should either party identify any information in the accompanying Memorandum that it believes should be sealed indefinitely, the party shall notify the Court and identify with specificity the information they believe should remain under seal, all before the expiration of ten (10) days following the docketing of the Memorandum; and

4.  Plaintiff Marco A. Fernandez's Motion to Seal (ECF No. 197) is GRANTED.

DATED this 9 day of March, 2022.

BY THE COURT:

James K. Bredar
Chief Judge