# In the United States Court of Appeals for the Fourth Circuit

---

MARCO FERNANDEZ,
*Plaintiff-Appellee,*

v.

RENTGROW, INC.,
*Defendant-Appellant.*

---

On Appeal from the United States District Court
for the Eastern District of Maryland at Baltimore
Case No. 1:19-cv-01190-JKB (The Honorable James K. Bredar)

## RESPONSE BRIEF OF PLAINTIFF-APPELLEE

NEIL K. SAWHNEY
GUPTA WESSLER PLLC
100 Pine Street, Suite 1250
San Francisco, CA 94111
(415) 573-0336
neil@guptawessler.com

E. MICHELLE DRAKE
JOHN G. ALBANESE
ARIANA KIENER
BERGER MONTAGUE PC
1229 Tyler Street NE, Suite 205
Minneapolis, MN 55413
(612) 594-5999

MATTHEW W.H. WESSLER
GUPTA WESSLER PLLC
2001 K Street NW, Suite 850 North
Washington, DC 20006
(202) 888-1741
matt@guptawessler.com

MARTIN E. WOLF
GORDON, WOLF & CARNEY, CHTD.
100 W. Pennsylvania Ave., Suite 100
Towson, MD 21204
(410) 825-2300

October 31, 2022

*Counsel for Plaintiff-Appellee*

**CORPORATE DISCLOSURE STATEMENT**

Plaintiff-Appellee is an individual that has no corporate parent and does not issue stock.

# TABLE OF CONTENTS

Table of authorities ................................................................................................ iv

Introduction ........................................................................................................... 1

Statement of the issues .......................................................................................... 2

Statement of the case ............................................................................................ 3

    I.    Statutory background ............................................................................. 3

    II.   Factual and procedural background ...................................................... 6

          A.    RentGrow falsely reports that Mr. Fernandez is a convicted criminal and possible match to a drug trafficker ....................... 6

          B.    RentGrow's standard procedures produce universally inaccurate reports regarding "possible matches" to the OFAC List ............................................................................... 9

          C.    After Mr. Fernandez files this case, the district court denies RentGrow's motion for summary judgment and certifies the class. ...................................................................................... 12

Summary of the argument ..................................................................................... 18

Standard of review ................................................................................................ 20

Argument ............................................................................................................... 20

    I.    Mr. Fernandez and the class members have Article III standing. ........ 20

          A.    *TransUnion v. Ramirez*—which held that "disseminating" inaccurate OFAC List matches to "third parties" causes concrete injury—fully disposes of RentGrow's appeal. .............. 22

          B.    Both historical practice and congressional judgment confirm that a person suffers concrete injury when third parties are falsely told that the person might be a terrorist or serious criminal. ................................................................................... 29

II.   The district court did not abuse its discretion in certifying the class................................................................................................38

Conclusion ......................................................................................................39

# TABLE OF AUTHORITIES

**Cases**

*Amgen Inc. v. Connecticut Retirement Plans & Trust Funds,*
    568 U.S. 455 (2013) ........................................................ 38

*Beck v. McDonald,*
    848 F.3d 262 (4th Cir. 2017) ..................................... 27, 29

*Brian v. Harper,*
    80 So. 885 (La. 1919) .................................................... 33

*Bryant v. TRW, Inc.,*
    689 F.2d 72 (6th Cir. 1982) ........................................ 4, 35

*Cahlin v. General Motors Acceptance Corp.,*
    936 F.2d 1151 (11th Cir. 1991) ........................................ 6

*Casella v. Equifax Credit Information Services,*
    56 F.3d 469 (2d Cir. 1995) .............................................. 5

*Chuluunbat v. Experian Information Solutions, Inc.,*
    4 F.4th 562 (7th Cir. 2021) ............................................ 24

*Cortez v. Trans Union, LLC,*
    617 F.3d 688 (3d Cir. 2010) ............................................ 5

*Dalton v. Capital Associated Industries, Inc.,*
    257 F.3d 409 (4th Cir. 2001) ................................ 3, 4, 5, 6

*Dreher v. Experian Information Solutions, Inc.,*
    856 F.3d 337 (4th Cir. 2017) .......................................... 35

*Ewing v. MED-1 Solutions, LLC,*
    24 F.4th 1146 (7th Cir. 2022) .............................. 24, 26, 27

*Gadelhak v. AT&T Services, Inc.,*
    950 F.3d 458 (7th Cir. 2020) .......................................... 31

*Galper v. JP Morgan Chase Bank, N.A.,*
    802 F.3d 437 (2d Cir. 2015) ............................................ 4

*Garey v. James S. Farrin, P.C.*,
    35 F.4th 917 (4th Cir. 2022)............................................................31

*Gertz v. Robert Welch, Inc.*,
    418 U.S. 323 (1974)......................................................................30

*Gray v. Hearst Communications, Inc.*,
    444 F. App'x 698 (4th Cir. 2011)....................................................38

*Guimond v. Trans Union Credit Information Co.*,
    45 F.3d 1329 (9th Cir. 1995)......................................................4, 35

*Hunstein v. Preferred Collection & Management Services, Inc.*,
    48 F.4th 1236 (11th Cir. 2022)........................................................24

*In re Zetia (Ezetimibe) Antitrust Litigation*,
    7 F.4th 227 (4th Cir. 2021).............................................................20

*Krakauer v. Dish Network, L.L.C.*,
    925 F.3d 643 (4th Cir. 2019)....................................................*passim*

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992).................................................................20, 32

*Maddox v. Bank of New York Mellon Trust Co., N.A.*,
    19 F.4th 58 (2d Cir. 2021)........................................................24, 33

*Madlinger v. Enhanced Recovery Co., LLC*,
    2022 WL 2442430 (D.N.J. July 5, 2022)..........................................26

*Milkovich v. Lorain Journal Co.*,
    497 U.S. 1 (1990)..........................................................................30

*Miranda v. Garland*,
    34 F.4th 338 (4th Cir. 2022)..........................................................39

*Muransky v. Godiva Chocolatier, Inc.*,
    979 F.3d 917 (11th Cir. 2020).........................................................31

*Murray v. GMAC Mortgage Corp.*,
    434 F.3d 948 (7th Cir. 2006).........................................................36

*Paul v. Davis,*
 424 U.S. 693 (1976) ........................................................34

*Piney Run Preservation Association v. County Commissioners of Carroll County,*
 268 F.3d 255 (4th Cir. 2001) ..........................................20

*Pinner v. Schmidt,*
 805 F.2d 1258 (5th Cir. 1986) ........................................4, 5

*Ross v. FDIC,*
 625 F.3d 808 (4th Cir. 2010) ..............................................3

*Safeco Insurance Co. of America v. Burr,*
 551 U.S. 47 (2007) ..............................................................3

*Shimon v. Equifax Information Services LLC,*
 994 F.3d 88 (2d Cir. 2021) ..................................................6

*Spokeo, Inc. v. Robins,*
 578 U.S. 330 (2016) ..................................................*passim*

*Stewart v. Credit Bureau, Inc.,*
 734 F.2d 47 (D.C. Cir. 1984) ..............................................5

*TransUnion v. Ramirez,*
 141 S. Ct. 2190 (2021) ...............................................*passim*

*Walker v. Fred Meyer, Inc.,*
 953 F.3d 1082 (9th Cir. 2020) ............................................5

*Wal-Mart Stores, Inc. v. Dukes,*
 564 U.S. 338 (2011) ..........................................................38

*Warth v. Seldin,*
 422 U.S. 490 (1975) ..........................................................32

*Webster v. Fall,*
 266 U.S. 507 (1925) ..........................................................27

**Statutes**

15 U.S.C. § 1681 ................................................................ 3, 35

15 U.S.C. § 1681e. .......................................................... 1, 5, 37

15 U.S.C. § 1681n ................................................................ 5

15 U.S.C. § 1681o ................................................................ 5

**Other Authorities**

115 Cong. Rec. 2411 (1969) .................................................... 3

116 Cong. Rec. 36570 (1970) .................................................. 4

Restatement (Second) of Torts (1977) ................................ 33, 34

S. Rep. No. 517, 91st Cong., 1st Sess. 1 (1969) .................. 4, 35

S. Rep. No. 103–209 (1993) .................................................... 5

S. Rep. No. 108–166 (2003) ............................................... 5, 35

## INTRODUCTION

Just last term, the Supreme Court decided a case that fully resolves this appeal. In *TransUnion v. Ramirez*, 141 S. Ct. 2190 (2021), the Court considered whether class members had Article III standing to pursue their Fair Credit Reporting Act claims based on TransUnion's false reporting that they were potential matches to individuals on the Department of Treasury's OFAC List—a list of terrorists, drug traffickers, and other "specially designated nationals" whom the federal government has determined "threaten America's national security." *Id.* at 2201. In a few short paragraphs of analysis, the Court had "no trouble concluding" that those class members who had inaccurate OFAC match information "disseminated to third parties suffered a concrete injury in fact under Article III." *Id.* at 2209.

As the district court correctly recognized, *Ramirez*'s holding "squarely governs" this case. JA361. Indeed, it is difficult to imagine a case that is more on all fours with *Ramirez* than this one. The key facts are the same: Like TransUnion, RentGrow disseminated reports to third-party businesses falsely stating that more than 70,000 tenants were "possible matches" to terrorists and drug traffickers on the OFAC List. And so are the claims: As in *Ramirez*, the class members here allege that, by reporting such "matches" based on an obviously flawed algorithm, RentGrow failed to adopt "reasonable procedures to assure maximum possible accuracy" of consumer information. 15 U.S.C. § 1681e(b). This Court's holding should be the same too: As

the subjects of consumer reports containing inaccurate information that were disseminated to third-party businesses, the class members have suffered "concrete harm." *Ramirez*, 141 S. Ct. at 2213.

RentGrow resists this conclusion, arguing that FCRA plaintiffs cannot establish concrete Article III injury without an evidentiary showing that the inaccurate information was "actually read" and "understood." But this novel rule—conjured from a few sentences of dicta in an inapplicable footnote in *Ramirez*—cannot override that decision's holding. In fact, TransUnion made the very same argument in *Ramirez*: It contended that the class members lacked Article III standing because they had not shown that they had been injured by the dissemination of the false OFAC "potential match" alert. The Supreme Court correctly rejected that argument. *Dissemination* of false OFAC information to third parties alone, the Court held, was enough to show concrete Article III injury. There is simply no reason for this Court to consider RentGrow's proposal; *Ramirez* already supplies the answer. This Court should therefore affirm the district court's class-certification decision.

## STATEMENT OF THE ISSUES

**1.** Did the district court correctly determine that the named plaintiff Marco Fernandez and the class members suffered concrete Article III injury when RentGrow disseminated to landlords and property managers screening reports inaccurately flagging them as potential terrorists and other national-security threats?

**2.** Did the district court abuse its discretion in certifying the class?

## STATEMENT OF THE CASE

## I.     Statutory background

Congress enacted the Fair Credit Reporting Act in 1970 "to ensure fair and accurate credit reporting, promote efficiency in the banking system, and protect consumer privacy." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 52 (2007).[1] As Congress recognized, "[t]he banking system"—and indeed, much else in our economy—"is dependent upon fair and accurate credit reporting." 15 U.S.C. § 1681(a)(1). Credit reporting agencies "provide a critical economic service by collecting and transmitting consumer credit information." *Ross v. FDIC*, 625 F.3d 808, 812 (4th Cir. 2010); *see* 15 U.S.C. § 1681(a)(3).

But far too often these companies "were reporting inaccurate information that was adversely affecting" consumers. *Dalton v. Cap. Assoc. Indus., Inc.*, 257 F.3d 409, 414 (4th Cir. 2001). As one of the sponsors of the Act observed at the time of its introduction, "[p]erhaps the most serious problem in the credit reporting industry is the problem of inaccurate or misleading information." 115 Cong. Rec. 2411 (1969). Another sponsor cautioned that, with the increasing computerization of personal data, "the individual is in great danger of having his life and character reduced to

---

[1] Unless otherwise indicated, all internal citations, quotation marks, and alterations are omitted.

impersonal 'blips' and key-punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause, and make him unemployable or uninsurable, as well as deny him the opportunity to obtain a mortgage to buy a home." *Bryant v. TRW, Inc.*, 689 F.2d 72, 79 (6th Cir. 1982) (quoting 116 Cong. Rec. 36570 (1970)). What particularly concerned Congress about inaccurate credit reporting, in other words, was "the possible destruction of [a consumer's] good name without his knowledge and without reason." *See id.*

As a result, and motivated by "concerns about the accuracy of information disseminated by credit reporting agencies," *Galper v. JP Morgan Chase Bank, N.A.*, 802 F.3d 437, 444 (2d Cir. 2015), Congress passed the FCRA "to prevent consumers from being unjustly damaged because of inaccurate or arbitrary information in a credit report," S. Rep. No. 517, 91st Cong., 1st Sess. 1 (1969). The law was specifically "crafted to protect consumers from the transmission of inaccurate information about them, and to establish credit reporting practices that utilize accurate, relevant, and current information in a confidential and responsible manner." *Guimond v. Trans Union Credit Info. Co.*, 45 F.3d 1329, 1333 (9th Cir. 1995); *see Pinner v. Schmidt*, 805 F.2d 1258, 1261 (5th Cir. 1986). To that end, the statute provides "a variety of measures designed to insure that agencies report accurate information." *Dalton*, 257 F.3d at 414–15. And it confers on consumers "a private right of action against credit reporting agencies for the

negligent . . . or willful . . . violation of any duty imposed under the statute." *Casella v. Equifax Credit Info. Servs.*, 56 F.3d 469, 473 (2d Cir. 1995); *see* 15 U.S.C. §§ 1681o, 1681n.[2]

The FCRA provision at issue in this appeal is section 1681e(b), which requires credit reporting agencies to "follow reasonable procedures to assure maximum possible accuracy of" consumer reports. 15 U.S.C. § 1681e(b). "This section imposes a duty of reasonable care in the preparation of a consumer report." *Pinner*, 805 F.2d at 1262. "It is important to note that § 1681e(b) erects a standard of '*maximum* possible accuracy,'" which "requires more than merely allowing for the possibility of accuracy." *Cortez v. Trans Union, LLC*, 617 F.3d 688, 709 (3d Cir. 2010) (emphasis added). "Under this standard a plaintiff need not introduce direct evidence of unreasonableness of procedures"—indeed, "inaccurate credit reports by themselves can fairly be read as evidencing unreasonable procedures." *Stewart v. Credit Bureau, Inc.*, 734 F.2d 47, 52 (D.C. Cir. 1984). The question whether a credit reporting agency failed to follow "reasonable procedures" will thus be a "jury question[ ] in the overwhelming majority of cases." *Dalton*, 257 F.3d at 416.

---

[2] In 1996, Congress amended the FCRA to expand its protections for consumers. "The driving force behind the [amendments] was the significant amount of inaccurate information that was being reported by consumer reporting agencies and the difficulties that consumers faced getting such errors corrected." S. Rep. No. 108-166, at 5–6 (2003); *see Walker v. Fred Meyer, Inc.*, 953 F.3d 1082, 1094 (9th Cir. 2020). The FCRA's requirements, Congress reiterated, were necessary for "consumers . . . to protect their privacy and ensure the accuracy of information in their files." S. Rep. No. 103-209, at 6 (1993).

Courts have held that, to make out a section 1681e(b) violation, a consumer must also present "evidence tending to show that a credit reporting agency prepared a report containing inaccurate information." *Id.* at 415. "A report is inaccurate when it is patently incorrect or when it is misleading in such a way and to such an extent that it can be expected to have an adverse effect." *Id.*; *see Shimon v. Equifax Info. Servs. LLC*, 994 F.3d 88, 91 (2d Cir. 2021). "[T]he standard of accuracy embodied in [section 1681e(b)] is an objective measure that should be interpreted in an evenhanded manner toward the interests of both consumers and potential creditors in fair and accurate credit reporting." *Cahlin v. Gen. Motors Acceptance Corp.*, 936 F.2d 1151, 1158 (11th Cir. 1991).

## II. Factual and procedural background

### A. RentGrow falsely reports that Mr. Fernandez is a convicted criminal and possible match to a drug trafficker.

Plaintiff Marco Fernandez is a sixteen-year Navy veteran with Top Secret security clearance who works at Fort Meade in the Cyber Strike Activity 63 Command. JA23. In November 2018, Mr. Fernandez returned stateside from a one-year deployment in South Korea and applied to rent an apartment located a few miles from Fort Meade in a community called Serenity Place in Hanover, Maryland. JA24.

As part of this process, the company that owned Serenity Place, Dorsey Ridge, purchased a consumer report on Mr. Fernandez from RentGrow. RentGrow is a consumer reporting agency that offers to "assist[]" property owners "in making

informed decision about tenants for their properties" by selling them a "resident screening report about applicants." RentGrow, *Learn: Frequently Asked Questions* https://perma.cc/3ZVS-ZY2R (last visited October 31, 2022). These reports can include an applicant's "credit history, rental history, and other publicly reported civil or criminal records." *Id.*

The first page of the report RentGrow sold to Dorsey Ridge flagged, as an "Item to Review," that Mr. Fernandez was a "possible match" to a known drug trafficker on the Department of Treasury's Office of Foreign Assets Control (OFAC) List. JA413, 421. This information was incorrect in every respect. Mr. Fernandez's full name is Marco Antonio Fernandez; the name of the "possible match" was Mario Alberto Fernandez Santana. JA352; *see* JA421. Mr. Fernandez is an American citizen who has never lived in Mexico; the "possible match" was a Mexican national ███ ████████████████████████████████████████████ ████████████████ with an entirely different birthday. *Id.* Additionally, RentGrow's report falsely stated that Mr. Fernandez was convicted of petty theft and possession of a controlled substance in California—even though, here too, the date of birth listed on the records was not the same as Mr. Fernandez's. JA352; *see* JA419–21.

After receiving RentGrow's report, Dorsey Ridge denied Mr. Fernandez's application. JA58. The leasing agent who handled his application, Suzanne Whatley, told Mr. Fernandez that he wasn't going to be allowed to move into the apartment

"based on information" Dorsey Ridge received from Mr. Fernandez's "background check." JA58. Ms. Whatley told Mr. Fernandez that Dorsey Ridge had a "no convictions" policy and tries "very hard to keep [the] community safe." JA58–59.

The rejection felt to Mr. Fernandez like a "punch in the stomach": He had "served [his] country for 16 years, ma[d]e good decisions, pa[id] his bills on time" and had "never committed [] crime." JA59, 64. It also made him worry that something in the report would "affect[] [his] clearance" because he would "have to report [it] to the Navy." JA60. He began to lose sleep because his "livelihood depends on [his] reputation" and "good name." JA62. At the time, he was also "living in a hotel" and having to "eat outside every day," which was "not an enjoyable experience." JA60. He "couldn't wait to move in" and now faced "this roadblock." JA60.

Eventually, Mr. Fernandez was able to convince Dorsey Ridge that the report about him contained inaccurate information and to rent him the apartment. JA57. Mr. Fernandez also demanded that RentGrow remove the inaccurate information from its report. JA352–53, 434. RentGrow eventually did so. JA352–53, 433–44. █

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

[REDACTED]

[REDACTED]

[REDACTED]

**B.** **RentGrow's standard procedures produce universally inaccurate reports regarding "possible matches" to the OFAC List.**

Mr. Fernandez's experience was not unique. In a roughly two-year period, between April 23, 2017, and May 24, 2019, RentGrow reported that 71,036 people who had applied for rental housing were possible matches to the OFAC List. JA106. So, under RentGrow's procedures, one out of every hundred applicants would have been on the list. *See* JA106 (noting that RentGrow generated reports on a total of 6,344,346 consumers during the class period). But, as of August 4, 2021, the OFAC List—which is publicly available, downloadable, and searchable—had only 5,082 individuals listed on it. JA470. [REDACTED]

[REDACTED]

RentGrow offered no evidence that even a single one out of the thousands of matches it reported was accurate. JA398–99. Yet it nevertheless generated reports for all of the consumers—including the OFAC List match information—and sent all of those reports to third parties.

RentGrow's standard procedures laid the foundation for these errors. Before RentGrow generates a report, it requires a client to provide the housing applicant's

personally identifying information, ███████████████████████████████████████████████████████
███████████████████████████████████████████████████. RentGrow then employs an algorithm that simply matches a consumer to its downloaded copy of the OFAC List based only on whether the consumer's first and last name resembles (within a couple characters) the names on the list. JA111–12, JA424. RentGrow's algorithm never compared any other information on the list with the consumer's information to evaluate whether the consumer is a possible match—██████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
██████████████████████████████████
█████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
█████████████████████████████████████████████

RentGrow's "name-only" matching algorithm led the company to produce thousands of reports with uniformly inaccurate matches to the OFAC List. Its own internal data illustrate the uniform way in which its approach produced inaccurate reports. During discovery, the company produced a sample of 500 potential OFAC List matches that it had reported during the class period. *See* JA485–535. The reports all show the same type of matching error: Consumers who had applied for rental housing were identified as a "possible match" to names on the list because of a single shared first or last name, even when other identifying information was facially different. Here is an example from the sample:



ECF 168 at 9 (Sealed Class Cert. Mem.) (summarizing JA485–535).

RentGrow's procedures also led the company to link individuals on the OFAC List with multiple different consumers. ████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████. None of the consumers with "possible matches" had a date of birth or address that matched the date of birth or address associated with the matched name on the OFAC List. JA398–99 & n.28.

The company had good reason to know that the so-called "possible matches" were inaccurate. Its CEO had long acknowledged that "valid, positive hits [on the OFAC List] are extremely rare" and that RentGrow itself had "yet to come across one." JA143. ████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████

**C.    After Mr. Fernandez files this case, the district court denies RentGrow's motion for summary judgment and certifies the class.**

**1.** To remedy the harms caused by RentGrow's inaccurate reporting, Mr. Fernandez filed this putative class action against RentGrow, alleging, on behalf of

himself and the class, that RentGrow violated section 1681e(b) of the FCRA. JA33.[3]

After the parties conducted appropriate discovery, RentGrow filed a motion for summary judgment, and Mr. Fernandez filed a motion to certify the following class:

> All individuals who were the subject of a consumer report (1) furnished by Defendant between April 23, 2017 and May 24, 2019 at 7:28 a.m. and (2) which reported OFAC/SDN information indicating a possible match, and (3) where there is not also a match between the (a) date of birth, (b) address, or (c) social security number associated with the subject of the report and the corresponding information regarding the person on the OFAC/SDN List.

JA362.[4] Following a stay pending the Supreme Court's decision in *Ramirez*, the district court issued a thorough 62-page opinion denying RentGrow's motion for summary judgment and granting the motion to certify the class.[5]

**2.** The court began by analyzing standing. RentGrow challenged only Article III injury in fact, arguing that both Mr. Fernandez and the class lacked standing because their alleged injuries were insufficiently concrete. JA357–58. RentGrow based this argument entirely on testimony from Porsche Kemp—a Dorsey Ridge property manager who did not "deal[] directly with Mr. Fernandez in connection

---

[3] Mr. Fernandez also alleged, only on behalf of himself, that RentGrow violated section 1681i. That individual claim has been dismissed and is not at issue in this appeal.

[4] The class definition ends on May 24, 2019 because that is when RentGrow changed its OFAC List matching procedures. JA352.

[5] Apart from the Article III standing question, the district court's summary-judgment decision is not at issue in this Rule 23(f) appeal.

with his application," JA210—that she did not recall reading the OFAC List "possible match" alert when she reviewed Mr. Fernandez's report. *See* JA207–08, 214–15. But given that the "possible match" was flagged as an "item to review" on the first page of Mr. Fernandez's report, the district court found in denying RentGrow's motion for summary judgment that it was reasonable to infer that Dorsey Ridge's employees "did in fact read the alert and simply forgot." JA360–61 n.11.

In addition to rejecting RentGrow's conclusions drawn from the factual record, the district court rejected RentGrow's theory of standing. The court recognized that RentGrow had "base[d] much of this argument" on a single footnote in *Ramirez*. JA359. But that footnote, the court explained, addressed a different question—whether consumers "whose reports were not disseminated to a third party nonetheless suffered concrete injury." JA359. The plaintiffs in *Ramirez* had argued that "TransUnion 'published' the class members information *internally*—for example, to employees within TransUnion and to the vendors that printed and sent the mailings that the class members received." JA359. The Supreme Court "found this argument 'unavailing'" because "intra-company disclosures" were traditionally not recognized as "actionable publications" capable of supporting a defamation claim. JA359. So, in the absence of evidence that the "document was actually read [by someone internally at Trans Union] and not merely processed," this "internal publication theory" could not prevail. JA359.

That discussion, the district court held, was "inapplicable" to this case. The "key difference here is that Mr. Fernandez's report *was disseminated* to his future landlords, rather than maintained by RentGrow internally." JA359 (emphasis added). Thus, "[j]ust as with the 1,853 *TransUnion* class members who suffered an injury recognized by Article III, 'the risk of future harm materialized' for Mr. Fernandez" because RentGrow provided an inaccurate OFAC alert to a third party. JA360. The same was true for the putative class members as well. *See* JA362 (recognizing that, under *TransUnion*, "the putative class members—who by definition has had allegedly inaccurate information 'furnished' to a third party—have standing"). In short, the district court concluded, "*TransUnion* squarely governs." JA361. For purposes of Article III injury, in other words, the district court was required to "draw[] the line where the Supreme Court did: dissemination to a third party." JA359.

**3.** The district court also granted class certification under Rule 23. Over the course of more than 30 pages, the district court thoroughly evaluated both Rule 23(a)'s threshold numerosity, commonality, typicality, and adequacy requirements, (including an implied ascertainability requirement), and Rule 23(b)(3)'s predominance and superiority requirements. *See* JA379–409.

The court noted that many of RentGrow's objections to class certification were premised on the same mistaken Article III standing theory the court had

rejected under *Ramirez*. *See* JA381 n.20, 384 n.21, 388–89, 406 n.30. RentGrow separately argued that three issues—accuracy, the reasonableness of its procedures, and damages—created enough individualized inquiries to defeat predominance. JA394. As to the first, it claimed that proving accuracy on a classwide basis was impossible because, "[t]o do so, an individualized inquiry into every putative class member's report would be necessary." JA394–95. But, the court explained, RentGrow had failed throughout discovery to identify *any* "individual who [was] a match to the OFAC list." JA398. In addition, Mr. Fernandez had produced a reliable, class-wide method of determining accuracy by "comparing the personal identifying information of each consumer to the OFAC/SDN information included on each report" and had demonstrated the viability and manageability of this method using a 500-person sample. JA387, 398–400.[6]

RentGrow's second purported individualized issue—the reasonableness of its procedures—fared no better. "[E]valuating the reasonableness of RentGrow's procedures requires an evaluation of *RentGrow's* conduct, not its effects on each putative class member." JA400. So doing that would "not require individualized

---

[6] Far from shifting the burden of proving inaccuracy to RentGrow, *see* Opening Br. 10 n.4, the district court made a finding of fact, namely that none of RentGrow's reports were accurate because they all matched a consumer to someone on the OFAC List who was not a match on date of birth. JA398–99 & n.28. In the absence of any evidence to believe RentGrow has *ever* issued an accurate report, the district court's conclusion was reasonable.

analysis." JA400. Nor did it matter, as RentGrow argued, that the company allegedly "modified its procedures during the putative class period." JA400. Both of RentGrow's procedures used the same allegedly unreasonable procedure—"name-only matching"—and so the "minor change in RentGrow's OFAC matching procedure" was "immaterial to this case." JA401.

The court also rejected RentGrow's argument that individualized damages issue could defeat predominance. In RentGrow's view, a class member's actual damages would be relevant for determining damages in this case. But, as the court explained, the class claim here was "expressly limited" to statutory damages. JA404. And because the FCRA explicitly "exclude[s]" actual damages from the calculation of statutory damages, calculating damages here would not require an "inquiry into the harm suffered by each individual putative class member." JA403, JA404.

Finally, the court concluded that pursuing this case as a class action was superior to other methods of adjudication. "Claims brought under the FCRA are well suited for class resolution," the court observed, because they "tend to involve a large number of harmed individuals with small claims, often dispersed throughout the country." JA407, JA409. Taken together with the existence of several "predominating common questions," the court recognized that evaluating the common issues and proof "in the same action will further judicial economy." JA407–408

On June 7, 2022, this Court granted RentGrow's petition for permission to appeal from the district court's certification decision under Rule 23(f).

## SUMMARY OF THE ARGUMENT

**I.** The Supreme Court's holding in *Ramirez* controls this appeal. There, the Court held that class members whose inaccurate "credit reports were disseminated to third-party businesses during the class period suffered a concrete harm" for purposes of Article III. 141 S. Ct. at 2212–13. All circuit courts that have considered *Ramirez*, including those cited by RentGrow, have understood the decision's holding to turn on dissemination to third parties. Here, every class member definitionally had an inaccurate "possible match" to the OFAC List "disseminated" to landlords and property managers. They, along with Mr. Fernandez, therefore suffered concrete Article III injury.

RentGrow urges a novel rule under which dissemination is not enough; instead, a consumer must show that the third party "actually read" and "understood" the inaccurate information. But this conflicts with *Ramirez*'s holding. Indeed, there was no evidence in *Ramirez* that *any* of the absent class members' inaccurate information had been read. This Court should reject RentGrow's proposal, which mirrors the strained arguments that TransUnion made against the class members' Article III standing in *Ramirez*—and which the Supreme Court rejected. Because RentGrow derives its rule from a footnote of dicta in *Ramirez* that concerned class

members who *did not* have information disseminated to third parties, the district court properly held this footnote to be "inapplicable" here. JA359.

RentGrow's rule also runs afoul of the two-prong inquiry that the Supreme Court uses to determine whether a harm qualifies as concrete Article III injury: historical practice and congressional judgment. *First*, the harms suffered by the class here are analogous to the harms that the common law of defamation recognized as actionable. RentGrow's attempt to graft on an "actually read" requirement—which itself conflicts with substantive defamation law—cannot be squared with the Supreme Court's command that courts should "not require an exact duplicate" of the common-law analogue, just "a close relationship." *Ramirez*, 141 S. Ct. at 2209. *Second*, the class members' harms—the dissemination of derogatory, inaccurate information—are precisely the harms that Congress sought to prevent when it enacted the FCRA. RentGrow's proposed rule is therefore "nothing more than an attempt to dismember the" FCRA and frustrate Congress's purposes. *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 654 (4th Cir. 2019).

**II.** The district court did not abuse its discretion in certifying the class. RentGrow's primary objection to certification is just its mistaken Article III standing theory dressed up as a predominance argument. Because establishing concrete injury does not require determining whether any particular landlord or property manager actually read a class member's inaccurate information, the district court correctly

found that no individualized inquiries are required. RentGrow barely addresses any other aspects of the district court's thorough 30-page certification decision, let alone demonstrates that the court abused its discretion.

## STANDARD OF REVIEW

This Court "review[s] a district court's decision to certify a class for abuse of discretion." *In re Zetia (Ezetimibe) Antitrust Litig.*, 7 F.4th 227, 233 (4th Cir. 2021). Its "review of class certification issues is deferential, cognizant of both the considerable advantages that our district court colleagues possess in managing complex litigation and the need to afford them some latitude in bringing that expertise to bear." *Krakauer*, 925 F.3d at 654. "In analyzing a decision on Article III standing," this Court reviews "the district court's factual findings for clear error" and its legal determination that the plaintiff "possesses standing to sue as a de novo matter." *Piney Run Pres. Ass'n v. Cnty. Comm'rs of Carroll Cnty.*, 268 F.3d 255, 262 (4th Cir. 2001).

## ARGUMENT

## I. Mr. Fernandez and the class members have Article III standing.

To establish standing, "a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021); *see Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). This appeal concerns only the first Article III requirement: whether Mr. Fernandez's and the class members' injury in fact is

"concrete"—or, in other words, "'real,' and not 'abstract.'" *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016).

Although determining whether an injury is concrete can sometimes be difficult, it is not here. That is because, in *Ramirez*, when faced with the exact same fact pattern as this case, the Supreme Court squarely held that individuals "suffered a concrete injury in fact under Article III" when reports falsely suggesting they were "potential matches" to people on the OFAC List "were disseminated to third parties." 141 S. Ct. at 2209. As the district court correctly recognized, that holding controls this case: Because RentGrow disseminated reports inaccurately informing landlords and property managers that Mr. Fernandez (and *every* class member) were potential matches to the OFAC List, all class members suffered a concrete injury in fact sufficient for Article III standing. Yet, ignoring *Ramirez*'s holding, RentGrow instead urges this Court to conjure a novel standing rule based on a footnote of dicta in the decision. The Court should decline to do so: *Ramirez*'s plain holding is enough to decide this appeal.

RentGrow's proposed rule simply has no grounding in any of the Supreme Court's standing jurisprudence. The Court has repeatedly identified two criteria for determining whether an intangible harm is sufficiently concrete for purposes of Article III: analogous historical practice and Congress's judgment. Here, both support finding standing. By contrast, RentGrow's unworkable and impractical

standing rule is not only in direct conflict with *Ramirez*'s core holding, but also would subvert Congress's very purpose in enacting the FCRA—to protect individuals against the dissemination of inaccurate information. This Court should affirm.

**A.** ***TransUnion v. Ramirez*—which held that "disseminating" inaccurate OFAC List matches to "third parties" causes concrete injury—fully disposes of RentGrow's appeal.**

**1.** This appeal starts and ends with *Ramirez*. In that case, as here, the defendant disseminated to third-parties credit reports that stated, inaccurately, that both the named plaintiff and class members were potential matches with people on the OFAC List. And there, as here, the class brought section 1681e(b) claims based on the defendant's failure to adopt reasonable procedures to assure the accuracy of information contained in its consumer reports. The harms in *Ramirez* and the harms here, in other words, are exactly same. The only difference between the two cases is that, in *Ramirez*, there were two groups of class members. It was undisputed that, for approximately 6,000 class members, TransUnion had *not* disseminated inaccurate credit reports to any third parties. *See* 141 S. Ct. at 2209. The Supreme Court held that these class members did not have Article III standing because "[t]he mere presence of an inaccuracy in an internal credit file, if it is not disclosed to a third party, causes no concrete harm." *Id.* at 2210.

But the Court had "no trouble concluding" that the other "1,853 class members whose reports were disseminated to third parties"—and thus identical to all the class

members here—"suffered a concrete injury in fact under Article III." *Id.* at 2209. The Court "agree[d] with the plaintiffs" that "the publication to a third party of a credit report bearing a misleading OFAC alert injures the subject of the report." *Id.* at 2208–09. This was so because such an injury—"label[ing] the class members as potential terrorists, drug traffickers, or serious criminals"—had "a 'close relationship' to the harm associated with the tort of defamation." *Id.* at 2209. In so holding, the Court rejected TransUnion's argument that the class members needed to show *additional* injury after "a credit report containing a 'potential match' alert [was] disseminated to a third party." Br. for Petr. TransUnion LLC, No. 20-297 (Feb. 1, 2021), 2021 WL 409753, *42.

Following its analysis of the two groups, the Court helpfully confirmed its holding—twice. "The standing inquiry in this case," the Court explained, "distinguishes between (i) credit files that consumer reporting agencies maintain internally and (ii) the consumer credit reports that consumer reporting agencies *disseminate* to third-party creditors." *Id.* at 2210 (emphasis added). Several pages later, the Court reiterated the point: "In sum, the 6,332 class members whose internal TransUnion credit files were *not disseminated* to third-party businesses did not suffer a concrete harm. By contrast, the 1,853 class members (including Ramirez) whose credit reports *were disseminated* to third-party businesses during the class period suffered a concrete harm." *Id.* at 2212–13 (emphasis added).

Given the clarity with which the Court spoke, post-*Ramirez* decisions—including those cited favorably by RentGrow—have readily acknowledged that *Ramirez*'s holding turned on the defendant's act of disseminating false or inaccurate information to third parties. In *Ewing v. MED-1 Solutions, LLC*, for example, the Seventh Circuit observed that *Ramirez* "held that the plaintiffs whose credit reports had been disseminated had standing because the harm *caused by the dissemination of a credit report with misleading information* related closely to the reputational harm associated with defamation." 24 F.4th 1146, 1151–52 (7th Cir. 2022) (emphasis added). The Eleventh Circuit, too, has recognized that the *Ramirez* "plaintiffs whose credit reports *were released* to a third party" suffered concrete injury. *Hunstein v. Preferred Collection & Mgmt. Servs., Inc.*, 48 F.4th 1236, 1244 (11th Cir. 2022) (en banc) (emphasis added); *see also, e.g.*, *Maddox v. Bank of New York Mellon Tr. Co., N.A.*, 19 F.4th 58, 63 (2d Cir. 2021); *Chuluunbat v. Experian Info. Sols., Inc.*, 4 F.4th 562, 566 n.3 (7th Cir. 2021).

Here, the district court properly applied *Ramirez*'s holding to hold that Mr. Fernandez and the class members—who, again, suffered the *exact same* harm as Ramirez and the smaller class of 1,853 consumers—have standing. JA360–62. *Every* class member (including Mr. Fernandez) definitionally had a credit report "furnished" to third-party landlords and property managers that falsely stated that the class member was a "possible match"—based solely on loose name-only matching criteria—to a terrorist, drug trafficker, or other specially designated

national on the OFAC List. JA362. In other words, in this case, by definition, *all* class members' inaccurate credit reports "were disseminated to third-party businesses." *Ramirez*, 141 S. Ct. at 2212–13. So this Court, like the Supreme Court, should have "no trouble" concluding that Mr. Fernandez and every class member "suffered a concrete injury in fact under Article III." *Id.* at 2209.

**2.** RentGrow barely grapples with *Ramirez*'s actual holding. Indeed, even though the Supreme Court heavily emphasized the importance of "dissemination" to its holding—mentioning it more than a dozen times in the opinion—RentGrow's brief never quotes, let alone acknowledges, this key concept.

Instead, RentGrow invents a new holding. In its view, the Supreme Court did not hold in *Ramirez* that "transmission of OFAC/SDN possible match information in a report to a third party" qualifies as concrete Article III injury, Opening Br. 13— even though the Court expressly stated that the "class members whose reports were disseminated to third parties suffered a concrete injury in fact under Article III." 141 S. Ct. at 2209. Rather, according to RentGrow, *Ramirez* imposed an "actually read" standing requirement for section 1681e(b) claims, which asks whether the "third party actually read and underst[oo]d the [inaccurate] information." Opening Br. 14, 18. If not, RentGrow contends, there is no concrete injury.

RentGrow's novel standing theory—which is premised entirely on a footnote in *Ramirez*—cannot withstand scrutiny. To start, RentGrow's understanding of this

footnote conflicts with *Ramirez's* actual *holding*. *See Ewing*, 24 F.4th at 1154. As detailed above, *Ramirez*'s standing analysis turned on whether the inaccurate credit information had been "disseminated" to third parties: Those whose information had been disseminated suffered concrete injury; those whose hadn't, didn't. *Ramirez*, 141 S. Ct. at 2212–13. So RentGrow is just wrong when it claims (at 18) that the Court's "analysis focused on whether the injurious information was read or perceived by another person." Indeed, the Court did not mention "reading" or "perception" at all in the section of its opinion discussing those class members whose credit reports had been disseminated to third-party businesses. Its only mention of that concept (in footnote six) was in reference to those class members who had *not* had inaccurate credit reports disseminated, and who argued that they nonetheless suffered concrete injury from TransUnion's "internal" publication to TransUnion's employees and mail vendors. *See* 141 S. Ct. at 2210 n.6.

Moreover, as RentGrow's own cited cases recognize, the *Ramirez* footnote is "dicta." *Ewing*, 24 F.4th at 1153; *see also, e.g.*, *Madlinger v. Enhanced Recovery Co., LLC*, 2022 WL 2442430, at *8 & n.4 (D.N.J. July 5, 2022) (describing this "footnote" as "dicta"). In footnote six, the Court first held that the plaintiffs had "forfeited" the "internal publication" argument. *Ramirez*, 141 S. Ct. at 2210 n.6. So everything that followed, including the Court's observation that publication may under certain circumstances require "evidence that the document was actually read and not merely processed,"

played no part in the Court's holding. *See id.* As the district court recognized, then, the footnote is simply "inapplicable." JA359. Accepting RentGrow's argument, as the Seventh Circuit explained, "would permit the dicta in footnote six to erode TransUnion's holding that evidence of dissemination to a third party is sufficient to show publication." *Ewing*, 24 F.4th at 1154.

Unable to explain away this problem, RentGrow resorts to blatantly attempting to rewrite *Ramirez*. It contends that there "the Court was satisfied that the OFAC Name Screen Alerts disseminated to third-party businesses were actually read." Opening Br. 19. This supposed fact, RentGrow (erroneously) asserts, "was not a contested point before the Court, but was a reasonable conclusion supported by the record evidence." *Id.*

Of course, "[t]his court is bound by holdings of the Supreme Court, not its unwritten assumptions." *Beck v. McDonald*, 848 F.3d 262, 273 (4th Cir. 2017); *see Webster v. Fall*, 266 U.S. 507, 511 (1925) ("Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents."). And, as explained, the holding of *Ramirez* is on all fours with the facts of this case: Individuals who have consumer reports inaccurately identifying them as matches to the OFAC List "disseminated to third parties suffer[] a concrete injury in fact under Article III." 141 S. Ct. at 2209.

Moreover, RentGrow misstates the record in *Ramirez*. There was no evidence in that case showing that any third-party business read or understood any class members' false OFAC List "potential match" alerts aside from the Nissan dealer who read Mr. Ramirez's credit report. To the contrary, TransUnion explicitly argued in its Supreme Court brief that "Ramirez never presented a single piece of evidence showing that any absent class member suffered any injury on account of having a credit report containing a 'potential match' alert disseminated to a third party." Br. for Petr. TransUnion LLC, No. 20-297 (Feb. 1, 2021), 2021 WL 409753, *42. That the Supreme Court nonetheless rejected TransUnion's arguments for the class members who had inaccurate information disseminated to third parties—and had "no trouble" concluding that they suffered concrete Article III injury—confirms that the Court did not apply an "actually read" or "understood" requirement.

All that RentGrow has left is an irrelevant factual distinction between *Ramirez* and this case. The company repeatedly emphasizes (at 14, 19, 22) that, in *Ramirez*, the third-party creditors "had specifically opted into the purchase of an OFAC/SDN search product sold by TransUnion," whereas here it was included as part of the overall RentGrow screening service. But the Supreme Court never mentioned this fact once in its standing analysis. Whether a report is sold as a stand-alone product

or part of a bundle simply cannot bear the *constitutional* weight that RentGrow places on it. *See Beck*, 848 F.3d at 273.[7]

In short, the Supreme Court meant what it held in *Ramirez*. Individuals who have information "disseminated to third parties" that falsely suggests they are matches to the OFAC List "suffer[] a concrete injury in fact under Article III." 141 S. Ct. at 2209. That describes Mr. Fernandez and all of the class members here. This Court should reject RentGrow's attempt to manufacture a novel and convoluted rule from an inapplicable footnote of dicta. Instead, it should faithfully apply *Ramirez*'s holding and affirm.

### B. Both historical practice and congressional judgment confirm that a person suffers concrete injury when third parties are falsely told that the person might be a terrorist or serious criminal.

RentGrow's proposed rule is not only contrary to *Ramirez*'s holding, but it runs up against this Court's pronouncements about Article III standing since *Spokeo*. To explain, the Supreme Court has instructed that, "[i]n determining whether an intangible harm constitutes injury in fact, both history and the judgment of Congress play important roles." *Spokeo*, 578 U.S. at 340; *see Ramirez*, 141 S. Ct. at 2204–05. Here,

_____

[7] RentGrow's argument also does not make sense on its own terms. Why would it be reasonable to infer that the creditors read the OFAC List information in *Ramirez*, but not reasonable to infer that landlords and property managers read the same information contained in reports that they also paid for, but just not as a separate service? After all, the *first page* of RentGrow's report flags the class member as a "possible match" to the OFAC List. *See* JA360–61 n.11.

both criteria support the district court's finding that Mr. Fernandez and the class suffered concrete injury.

**1.** There is no doubt that "intangible harms," such as "reputational harms," can "be concrete." *Ramirez*, 141 S. Ct. at 2204. The relevant historical inquiry, the Supreme Court has explained, "asks whether plaintiffs have identified a close historical or common-law analogue for their asserted injury." *Id.* In other words, what matters is whether the "alleged intangible harm has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts." *Spokeo*, 578 U.S. at 341.

The harm suffered by Mr. Fernandez and the class has a clear "common-law analogue"—defamation. Again, *Ramirez* squarely controls this question. "Under longstanding American law, a person is injured when a defamatory statement 'that would subject him to hatred, contempt, or ridicule' is published to a third party." 141 S. Ct. at 2208–09 (quoting *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 13 (1990); *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 349 (1974)). Here, "[RentGrow] provided third parties with [tenant] reports containing OFAC alerts that labeled the class members as potential terrorists, drug traffickers, or serious criminals." *See id.* at 2209. They "therefore suffered a harm with a 'close relationship' to the harm associated with the tort of defamation." *See id.*

RentGrow does not meaningfully contest that the injuries caused by its section 1681e(b) violation are analogous to the injuries caused by defamation. Instead, it just contends that they are not analogous *enough*. But this contention is meritless, both as a matter of Article III standing law and defamation law.

First, the Supreme Court has been clear that, to find concrete Article III injury in the context of a statutorily defined harm, courts should "not require an exact duplicate" of the common-law analogue—just "a close relationship." *Id.* at 2209; *see Spokeo*, 578 U.S. at 340–41. Or, as this Court has put it, the "inquiry is focused on *types of harms* protected at common law, not the precise point at which those harms become actionable." *Krakauer v. Dish Network, L.L.C.*, 925 F.3d 643, 653–54 (4th Cir. 2019) (emphasis added). Nothing about the Supreme Court's Article III jurisprudence requires courts to "import the elements of common law torts, piece by piece, into any scheme Congress may devise." *Id.*; *see also Garey v. James S. Farrin, P.C.*, 35 F.4th 917, 922 (4th Cir. 2022) (reaffirming *Krakauer* after *Ramirez*).[8] Indeed, to hold otherwise would subvert the Supreme Court's repeated affirmation that "Congress may elevate to the status of legally cognizable injuries concrete, de facto injuries that were previously inadequate in law." *Ramirez*, 141 S. Ct. at 2204–05; *see Spokeo*, 578 U.S at

---

[8] *See also, e.g.*, *Gadelhak v. AT&T Servs., Inc.*, 950 F.3d 458, 462 (7th Cir. 2020) (Barrett, J.) (when asked "to analogize to harms recognized by the common law, [courts are] are meant to look for a 'close relationship' in kind, not degree"); *Muransky v. Godiva Chocolatier, Inc.*, 979 F.3d 917, 926 (11th Cir. 2020) (en banc) ("The fit between a new statute and a pedigreed common-law cause of action need not be perfect.").

341; *Lujan*, 504 U.S. at 578. Requiring an "exact duplicate" would effectively result in the common law forever paralyzing Congress: All that the Constitution would permit Congress to do is replicate and codify existing common-law causes of action.

Yet this is exactly what RentGrow calls for here. It cannot contest that Mr. Fernandez has demonstrated a harm analogous to the harm caused by defamation: RentGrow disseminated thousands of inaccurate reports to third-party businesses, falsely labeling Mr. Fernandez and tens of thousands of others as potential terrorists, national security threats, and serious criminals. The company merely argues (at 19) that Mr. Fernandez would not be able to succeed on the *merits* of a defamation claim because substantive defamation law requires that he show someone "actually read" the report. But this Court—and the Supreme Court—have repeatedly rejected the idea that this "sort of judicial grafting" is necessary to establish Article III injury in fact. *Krakauer*, 925 F.3d at 654; *see, e.g.*, *Warth v. Seldin*, 422 U.S. 490, 500 (1975) (standing "often turns on the nature and source of the claim asserted," but it "in no way depends on the merits" of the claim).

In any event, RentGrow is also wrong about the law of defamation itself. The only element of defamation that the company contends is not satisfied here is "publication," which it contends includes an "actual reading" requirement. But traditionally "publication of defamatory material" was understood as the "communication intentionally or by a negligent act to one other than the person

32

defamed." Restatement (Second) of Torts § 577 (1977). Here, there is no dispute that the defamatory statements about Mr. Fernandez and the class members were "communicated" to a vast network of landlords and property managers. And RentGrow expected these communications to be reviewed: The company ignores the undisputed facts that landlords and property managers specifically order, pay for, and actually use RentGrow's reports to evaluate potential tenants for housing.[9]

Indeed, the facts here would have been sufficient for a claim even under the common law, which did not require *proof* in these circumstances that the defamatory statements were "actually read." As one court put it more than a century ago:

> The plaintiff was not required, in stating his cause of action, to allege that the publication complained of was actually read by any one. It is alleged that the defendant wrote the defamatory article and caused it to be published, over his signature, in a weekly newspaper, the Winnfield Sentinel, . . . and that defendant gave large circulation to the issue of the newspaper containing the publication, in the parish of Winn and in Grant and Caldwell. It is too well settled to require citation of authority that a libel committed by publication in a newspaper is accomplished when the publication goes into circulation. When the libeler thus has sent his missiles broadcast, the presumption is that some of them have hit the mark.

*Brian v. Harper*, 80 So. 885, 886 (La. 1919). Nor, under the common law, would Mr. Fernandez have to show that a third party "understood" the "defamatory

---

[9] This is why RentGrow's reliance on the Second Circuit's decision in *Maddox* is misplaced. There, the inaccurate mortgage record was not "disseminated" or "communicated" to anyone—it simply remained available at the county clerk's office. *See* 19 F.4th at 65.

significance" of RentGrow's inaccurate statements about him. *See* Opening Br. 18, 22–23. That's because the statements here—that Mr. Fernandez might be a terrorist or other serious criminal—would plainly be defamatory per se. *See* Restatement (Second) of Torts § 571(a) (1977) (words imputing "a criminal offense" that, "if committed in the place of publication, would be . . . punishable by imprisonment in a state or federal institution" are defamatory per se ); *Paul v. Davis*, 424 U.S. 693, 697 (1976) ("Imputing criminal behavior to an individual is generally considered defamatory Per se.").

Put differently, RentGrow is not just asking this Court to require Mr. Fernandez (and consumers like him) to show that their harm is an "exact duplicate" of the harm caused by defamation, in violation of the Supreme Court's commands. The company is actually asking the Court to hold consumers to a *higher* standard than defamation law itself—requiring them to prove that the defamatory material was "actually read" when courts considering common-law defamation claims did not. That is as absurd as it sounds. Nothing commends RentGrow's approach, which runs counter to the Supreme Court's established Article III jurisprudence. Because Mr. Fernandez has shown that his and the class members' injuries have a "close relationship" to historically cognizable harms, he has demonstrated concrete injury.

**2.** RentGrow's proposed rule is also contrary to the judgment of Congress. Although "Congress's creation of a statutory prohibition or obligation and a cause

of action does not relieve courts of their responsibility to independently decide whether a plaintiff has suffered a concrete harm under Article III," its views remain "instructive." *Ramirez*, 141 S. Ct. at 2204–05. That is because "Congress is well positioned to identify intangible harms that meet minimum Article III requirements." *Spokeo*, 578 U.S. at 341. Courts should accordingly "pay[] heed to Congress's judgment of what sort of particular and concrete harms ought to count." *Krakauer*, 925 F.3d at 653–54.

Here, Congress's judgment is clear: Congress specifically enacted the FCRA because of concerns that credit reporting agencies were disseminating "[i]naccurate credit reports." 15 U.S.C. § 1681(a)(1); *see* S. Rep. No. 517, 91st Cong., 1st Sess. 1 (1969). The point of the FCRA, in other words, is "to protect consumers from the transmission of inaccurate information about them," thereby protecting their "reputation" and "good name." *Guimond*, 45 F.3d at 1333; *Bryant*, 689 F.2d at 79. And the harm at issue here—the dissemination of inaccurate (and damaging) information—is precisely "the type of harm Congress sought to prevent when it enacted the FCRA." *Dreher v. Experian Info. Sols., Inc.*, 856 F.3d 337, 346 (4th Cir. 2017); *see* S. Rep. No. 108-166, at 5–6 (2003) (describing "the significant amount of inaccurate information that was being reported" as the "driving force" behind amendments to the FCRA expanding its protections for consumers). Indeed, the harm to Mr. Fernandez in particular perfectly illustrates the reputational concerns that motivated

Congress to enact the FCRA. RentGrow stained a 16-year Navy veteran's reputation by falsely suggesting he was a drug-trafficker and national security threat—which not only made him feel "shocked" and "humiliated," JA62, 64, but also caused him to worry that his Top Secret clearance would be revoked and that there would be damage to his job security and career prospects, JA60–62.

In short, Congress's views reinforce what *Ramirez*'s holding and historical practice have already established: Mr. Fernandez and the class members have suffered concrete Article III injury.

**3.** This Court need not consider the practical consequences of RentGrow's novel rule to reject it under *Ramirez*. Still, it is worth noting that RentGrow's rule would be difficult, if not impossible, to administer in practice. RentGrow does not explain how one goes about proving its "actually read" requirement. What if, as here, one of the third party's employees (Porsche Kemp) doesn't recall if they read the inaccurate information—but another employee (Suzanne Whatley) did? JA214–15. Or what if the third-party did read the information, but then forgot? *See* JA360–61 n.11. RentGrow provides no answers to these questions.[10]

---

[10] RentGrow's rule, as the district court recognized, would also make it "functionally impossible to sustain a class action" in the FCRA context. JA360; *see Murray v. GMAC Mortg. Corp.*, 434 F.3d 948, 953 (7th Cir. 2006) (Easterbrook, J.) (observing that "Rule 23(b)(3) was designed for situations such as [FCRA actions], in which the potential recovery is too slight to support individual suits, but injury is substantial in the aggregate").

More importantly, RentGrow's proposal, if accepted, would effectively neuter the FCRA's requirement that credit reporting agencies adopt "reasonable procedures to assure maximum possible accuracy" of consumer information. 15 U.S.C. § 1681e(b). Its novel rule, in other words, "is nothing more than an attempt to dismember the" FCRA, "converting a simple remedial scheme into a fact-intensive quarrel over" whether a creditor or other third-party business actually read and understood inaccurate consumer information. *See Krakauer*, 925 F.3d at 654. Of course, as this Court has observed, "Congress could have created such a cumbersome scheme if it wanted to." *Id.* But it "instead opted for a more straightforward and manageable way of protecting personal privacy, and the Constitution in no way bars it from doing so." *Id.*

Given the problems posed by RentGrow's proposed rule, it is little surprise that the Supreme Court in *Ramirez* adopted a different rule—one that accords with historical practice and Congress's judgment. Individuals who have inaccurate consumer reports "disseminated to third parties [have] suffered a concrete injury in fact under Article III." *Ramirez*, 141 S. Ct. at 2209. That is all that is needed to decide this appeal. RentGrow's contrary position—which would effectively delete *Ramirez*'s holding from the U.S. Reporter less than two years after the Supreme Court decided it—should be rejected.

## II. The district court did not abuse its discretion in certifying the class.

RentGrow's objection to the district court's certification decision is premised entirely on its mistaken Article III standing argument. *See* Opening Br. 24–30. Determining whether a landlord or property manager actually read each class member's inaccurate terrorist-match alert, RentGrow argues, requires individualized inquiries and thus defeats Rule 23(b)(3)'s predominance requirement.

But, as we have explained, there is no basis for RentGrow's "actually read" theory of Article III standing. To establish concrete injury, the class members must merely show that RentGrow "disseminated" their inaccurate reports "to third parties." *Ramirez*, 141 S. Ct. at 2209. Here, that is true for *every* class member, because, by definition, the class contains only those individuals who had inaccurate reports "*furnished*" to others. JA362 (emphasis added). The class definition, therefore, ensures that the Article III injury question will be answered—in the affirmative—in "one stroke." *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). So "there is no risk whatever" that "individual questions [will] predominat[e]." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 467–68 (2013); *see Gray v. Hearst Commc'ns, Inc.*, 444 F. App'x 698, 702 (4th Cir. 2011) (holding that predominance satisfied because "the putative class members all assert injury from the same action").

Aside from its erroneous predominance argument, RentGrow offers no reason to reverse the class-certification decision. Its halfhearted bullet list of single-sentence

arguments (at 30–31) pales against the district court's 30 pages of careful analysis of Rule 23's requirements. JA379–409; *see Krakauer*, 925 F.3d at 654 (emphasizing that this Court's review of a certification decision is "deferential"); *see also Miranda v. Garland*, 34 F.4th 338, 350 (4th Cir. 2022) (noting that "such scant treatment of an issue" may "constitute waiver"). Put simply, RentGrow has not even come close to showing, as it must, that the district court abused its discretion in certifying this class. The district court's thorough certification decision should therefore be affirmed.

## CONCLUSION

This Court should affirm the district court's order certifying the class.

Respectfully submitted,

*/s/Neil K. Sawhney*
NEIL K. SAWHNEY
GUPTA WESSLER PLLC
100 Pine Street, Suite 1250
San Francisco, CA 94111
(415) 573-0336
*neil@guptawessler.com*

MATTHEW W.H. WESSLER
GUPTA WESSLER PLLC
2001 K St. NW, Suite 850 North
Washington, DC 20006
(202) 888-1741
*matt@guptawessler.com*

E. MICHELLE DRAKE
JOHN G. ALBANESE
ARIANA KIENER
BERGER MONTAGUE PC

1229 Tyler Street NE, Suite 205
Minneapolis, MN 55413
(612) 594-5999

MARTIN E. WOLF
GORDON, WOLF & CARNEY, CHTD.
100 W. Pennsylvania Ave., Suite 100
Towson, MD 21204
(410) 825-2300

October 31, 2022                    *Counsel for Plaintiff-Appellee*

**CERTIFICATE OF COMPLIANCE**

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 27(d)(2)(A) because it contains 9,417 words, excluding the parts exempted by Rule 32(f). This brief complies with the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Baskerville font.

October 31, 2022                                  _/s/ Neil K. Sawhney_
                                                   Neil K. Sawhney

**CERTIFICATE OF SERVICE**

I hereby certify that on October 31, 2022, I electronically filed the foregoing brief with the Clerk of the Court for the U.S. Court of Appeals for the Fourth Circuit by using the CM/ECF system.

October 31, 2022

*/s/ Neil K. Sawhney*
Neil K. Sawhney